IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case # 05-6002-01-CR-SJ-GAF |
| | ) | |
| | ) | |
| LISA M. MONTGOMERY | ) | |
| Defendant | ) | |

### *LISA M. MONTGOMERY'S REPLY TO GOVERNMENT RESPONSE REGARDING  MOTION FOR JUDGMENT OF ACQUITTAL OR FOR NEW TRIAL, WITH SUGGESTIONS*

Comes now Lisa M. Montgomery, by attorney, Frederick A. Duchardt, Jr., and does hereby make reply to the government's response (Doc. 368) regarding Mrs. Montgomery's motion for judgment of acquittal or for new trial (Doc. 360).

### *I. Failure of Proof regarding kidnapping resulting in death*

1. Summary of Mrs. Montgomery's point

For the Judgment of Acquittal portion of her request for relief, Mrs. Montgomery renewed her challenge, made pretrial and during trial, that the government's evidence failed upon the essential element of proving that the act of kidnapping resulted in the death of Bobbie Jo Stinnett (Doc. 360, p. 2-4, Doc. 188, Doc. 217, Doc. 274, Doc. 335).  Mrs. Montgomery noted four undeniable truths:

- that the government's burden was to show that the act of kidnapping of a

1

"person" was the proximate cause of the death of Bobbie Jo Stinnett (Doc.

360, p. 2); *United States v. Mayhew*, 360 F.Supp.2d 936, 958-

960 (S.D.Ohio 2005); *United States v. Foghorn*, 2006 WL 4017477, *25-27

 (D.N.M. 2006); 18 U.S.C. 1201;

- that the charging document against Mrs. Montgomery, and the instructions
  to the jury, specifically alleged that Montgomery "kidnapped, abducted,
  carried away and held Victoria Jo Stinnett" and that these actions were
  "resulting in the death of Bobbie Jo Stinnett" (Doc. 360, p. 3; Doc. 154, p. 1;
  Doc. 339, Instruction 17, p. 25);

- that, under the Federal law applicable at time of trial, Victoria Jo Stinnett
  could not be considered a person until after she was delivered, alive, from
  her mother's body; *Roe v. Wade*, 410 U.S. 113, 156-157 (1973);

- that the evidence in the case unequivocally showed that the acts of killing
  Bobbie Jo Stinnett necessarily occurred before the birth of Victoria Jo
  Stinnett, and in point of fact those acts of killing Bobbie Jo Stinnett were
  actually the means for causing that birth.

From those premises, Mrs. Montgomery argued the inescapable conclusion that the

kidnapping of the person of Victoria Jo Stinnett could not have proximately caused

the death of Bobbie Jo Stinnett because the acts of kidnapping could not have

2

begun until the child was born alive, those acts of kidnapping occurring only after the acts which proximately caused the death of Bobbie Jo Stinnett (Doc. 360, p. 3-4).

2. Standard of Review

As the government suggests, and as Mrs. Montgomery has conceded in her previous pleadings, in considering a request for judgment of acquittal, the Court must view the evidence in the case in a light most favorable to the government (Doc. 360, p. 4; Doc. 368, p. 1). *United States v. Pinckney*, 85 F.3d 4, 7 (2nd Cir. 1996); *United States v. Gaydos*, 108 F.3d 505, 509 (3rd Cir. 1997). That having been said, if despite being given this advantage, the government still failed in its evidence presentation on a key element, allowing such a case to go to a jury amounts to a fundamental error, seriously impugning the integrity of the judicial system, requiring dismissal by the Court even after a jury verdict. *United States v. Pinckney*, supra; *United States v. Gaydos*, supra.

3. The government concedes, as it must, that the injuries causing the death of Bobbie Jo Stinnett were inflicted prior to the birth of Victoria Jo Stinnett

In its pleading, the government admits what the evidence unequivocally shows, that the taking away of Victoria Jo Stinnett did not, and could not, occur until after Bobbie Jo Stinnett was mortally wounded in the process of cutting out the child (Doc. 368, p. 6). The government clarifies that its expert could not say

3

for sure whether the death of Bobbie Jo Stinnett occurred shortly before or shortly after the birth of the child (Doc. 368, p. 6, fn. 1).  However, as the government itself notes, the government's expert testified that the acts of the killing, the strangulation and the cutting, necessarily preceded the birth of the child (Doc. 368, p. 6).  Thus the proximate cause of the death necessarily occurred prior to the birth of the child.  The question then is whether the timing of the kidnapping could be made to coincide with the time when the proximate cause of the death, the strangulation and cutting, occurred.  The answer to this question is plainly no, because the kidnapping could not have begun until the child was born alive, an event which did not occur until after the proximate causes of death, the strangulation and cutting, could have occurred.

## 4. The government still fails in distinguishing the ***Roe v. Wade*** holding that the term "person" does not include the unborn

In its most recent pleading, the government reprises its argument that the holding in ***Roe v. Wade*** is inapplicable here because that holding has somehow been limited to the abortion context, and therefore is not applicable to this criminal law context (Doc. 368, p. 3).  As before, the government ventures this statement in its most recent pleading without being able to cite to even one case from any Court which speaks of a limitation of ***Roe v. Wade*** to only the abortion context (Doc. 368, p. 3).  The government cannot and does not cite to even one case in which the

4

Federal law definition of "person" was held to include the unborn. That failure

owes to the fact that all of the law is to the contrary of its position.

One can start with the very language of the ***Roe v. Wade*** opinion. Though it

is certainly true that ***Roe v. Wade*** decided the lawfulness of abortion, as based

upon the privacy rights of the mother, that ultimate decision was made by the

Court via consideration of other legal arguments of the parties, including the much

broader legal argument, made by the State of Texas, "that the fetus is a person

within the language and meaning of the Fourteenth Amendment", and thereby

entitled to life, liberty and property as guaranteed under the Constitution. ***Roe v.***

***Wade***, 156-157. The Supreme Court considered this much broader legal argument,

and after examining the history of the common law, rejected the argument,

determining that the term "person", as that term is used in the Fourteenth

Amendment to the Constitution, "does not include the unborn". ***Roe v. Wade***, 158.

In fact, though the Court was very divided upon the narrower question of abortion,

upon this broader question, about exclusion of the unborn from the definition of

person, there was unanimity. ***Planned Parenthood of Southeastern Pennsylvania***

***v. Casey***, 505 U.S. 833, 912-914, *Justice Stevens concurring* (1992).

Moreover, the lower Federal Courts have persistently held, in a variety of

contexts, that the term "person", as used in the Federal law, does not include the

5

unborn, period. ***Lewis v. Thompson***, 252 F.3d 567, 585-587 (2nd Cir. 2001) (the term "person", as used in the Fifth Amendment to the Constitution of the United States, does not include the unborn); ***Alexander v. Whitman***, 114 F.3d 1392, 1401-1402 (3rd Cir. 1997) (same); ***Reed v. Gardner***, 986 F.2d 1122, 1127-1128 (7th Cir. 1993) (the term "person, as used in 42 U.S.C. 1983, does not include the unborn); ***Guyton v. Phillips***, 606 F.2d 248, 250 (9th Cir. 1979) (same); ***Roe v. Casey***, 464 F.Supp. 483, 486-487 (D.C.Pa. 1978) (the term "person", as used in F.R.Civ.P. 17 and 24, does not include the unborn).

Put simply, the Federal law term "person" has never been held to include the unborn.

### 5. The government's point, that it would be constitutionally permissible to legislate inclusion of the unborn in a statutory definition of person, is beside the point, since such Federal legislation has never been passed

The government also repeats another of its previous arguments, that the Supreme Court has consistently held that the Constitution permits a legislature, if it so chooses, to extend the protections of its laws to the unborn (Doc. 368, p. 4, 6-7). However, this point actually militates against the government's position.

As Mrs. Montgomery has persistently noted, the method by which a legislature can extend the protections of its criminal laws to the unborn is to do what States like Missouri have done, that is to rewrite its criminal and civil laws to

specifically include the unborn.  *Webster v. Reproductive Health Services*, 492

U.S. 490, 504 (1989).  However, while the government consistently refers to cases

in which States have taken this Constitutionally proper, dramatic step, it utterly

fails to note where and when the Congress of the United States has itself

supposedly taken such a dramatic step.  Of course, that is because Congress,

though the road map to this end has clearly been drawn for it for nearly two

decades, has never chosen to follow that road.  Thus the government's point, that

*Roe v. Wade* does not invalidate a legislative decision to treat a child as a person

(Doc. 368, p. 8), is beside the point.  The point is that, though Congress could have

properly changed the Federal law, had it chosen to do so, Congress has never made

such changes in the Federal law, and thus the Federal law definition of person

remains that as interpreted by *Roe v. Wade* and the other Federal cases cited above.

    The government also makes the argument that there is nothing in *Roe v.*

*Wade* which sets a timetable as to when life begins (Doc. 368, p. 4).  What the

government does not explain is what difference that makes, since the statutory term

at issue is not "life", but "person".

## 6. The Unborn Victims of Violence Act aids the government's position not one wit

    The Unborn Victims of Violence Act is the only Federal legislation to which

the government can point to supposedly support its argument that the Federal law

7

definition of "person" has been somehow changed to include the unborn (Doc. 368, p. 5). The trouble is that the government's wishes and hopes in this regard are dashed by the clear language and legislative history of the act.

The government contends that the statute creates a new category of victim, the fetus *in utero* (Doc. 368, p. 5). This is absolutely correct. A single category, assaults on the mother while an unborn child is *in utero* resulting in death or physical injury to the unborn child, was clearly addressed. The government also contends that the statute, by word or implication, broadened the definition of person to include the unborn child (Doc. 368, p. 5-6). Certainly, there is nothing in the language of the statute to support such an argument. Resort to the language of the statute itself proves this point.

> **(a)(1)** Whoever engages in conduct that violates any of the provisions of law listed in subsection (b) and thereby causes the death of, or bodily injury (as defined in section 1365) to, a child, who is in utero at the time the conduct takes place, is guilty of a separate offense under this section.
>
> **(2)(A)** Except as otherwise provided in this paragraph, the punishment for that separate offense is the same as the punishment provided under Federal law for that conduct had that injury or death occurred to the unborn child's mother.
>
> **(B)** An offense under this section does not require proof that--
>
> **(i)** the person engaging in the conduct had knowledge or should have had knowledge that the victim of the underlying offense was pregnant; or
> **(ii)** the defendant intended to cause the death of, or bodily injury to, the unborn child.

8

**(C)** If the person engaging in the conduct thereby intentionally kills or attempts to kill the unborn child, that person shall instead of being punished under subparagraph (A), be punished as provided under sections 1111, 1112, and 1113 of this title for intentionally killing or attempting to kill a human being.

**(D)** Notwithstanding any other provision of law, the death penalty shall not be imposed for an offense under this section.

**(b)** The provisions referred to in subsection (a) are the following:

**(1)** Sections 36, 37, 43, 111, 112, 113, 114, 115, 229, 242, 245, 247, 248, 351, 831, 844(d), (f), (h)(1), and (i), 924(j), 930, 1111, 1112, 1113, 1114, 1116, 1118, 1119, 1120, 1121, 1153(a), 1201(a), 1203, 1365(a), 1501, 1503, 1505, 1512, 1513, 1751, 1864, 1951, 1952 (a)(1)(B), (a) (2)(B), and (a)(3)(B), 1958, 1959, 1992, 2113, 2114, 2116, 2118, 2119, 2191, 2231, 2241(a), 2245, 2261, 2261A, 2280, 2281, 2332, 2332a, 2332b, 2340A, and 2441 of this title.
**(2)** Section 408(e) of the Controlled Substances Act of 1970 (21 U.S.C. 848(e)).
**(3)** Section 202 of the Atomic Energy Act of 1954 (42 U.S.C. 2283).

**(c)** Nothing in this section shall be construed to permit the prosecution--

**(1)** of any person for conduct relating to an abortion for which the consent of the pregnant woman, or a person authorized by law to act on her behalf, has been obtained or for which such consent is implied by law;
**(2)** of any person for any medical treatment of the pregnant woman or her unborn child; or
**(3)** of any woman with respect to her unborn child.

**(d)** As used in this section, the term "unborn child" means a child in utero, and the term "child in utero" or "child, who is in utero" means a member of the species homo sapiens, at any stage of development, who is carried in the womb.

18 U.S.C.A. § 1841

Nowhere in this statute did Congress endeavor to redefine the term "person", as used elsewhere in the Federal law, to include unborn children, the government's statements to the contrary notwithstanding.

To the extent that the government's pleading could be interpreted as a request to broadly interpret the otherwise narrow language of this statute as somehow evincing an unsaid Congressional intent to redefine the term "person", the government cites no authority to support such an approach by the Court. Of course, the general rule of statutory interpretation is just the opposite, that criminal statutes are to be strictly and narrowly construed. *United States v. Chandler*, 66 F.3d 1460, 1466 (8th Cir. 1995). What is more, the legislative history of the Act clearly demonstrates that a reading of the statute, beyond its narrow terms, would be wholly inconsistent with legislative intent.

Review of the record of the debate on the floor of the House and the Senate provides ample evidence that the Unborn Victims of Violence Act faced strong opposition, including an alternative bill, which instead of offering protections for the unborn child would have called for enhanced penalties for assaults committed upon pregnant women. 150 Cong. Rec. S3124-2 (March 25, 2004); 150 Cong. Rec. H587-03 (February 25, 2004). In their debate in favor of their bill, Sponsors of the Unborn Victims of Violence Act made clear that, in order to garner the

necessary support for passage, they had strictly limited the bill, making it abortion neutral, eliminating application of the death penalty, and addressing the single purpose of providing a mechanism for making criminal the causing of death or physical injury to an unborn child due to acts committed while *in utero*. 150 Cong. Rec S3124-2, S3134-S3135. This legislative history makes plain that the government's broad claims about a broader ambit of this legislation are simply not true

Therefore, in light of the general rules about narrow statutory construction, in light of the plain, limited language of the statute itself, and in light of the clear legislative history about the limited ambit of this statute, 18 U.S.C. 1841, the Unborn Victims of Violence Act, cannot be interpreted as anything more than what it is, a law making it a crime to cause injury or death to a fetus, or unborn child, while *in utero*. Because of its limited ambit, the Act cannot be seen to redefine the term "person", as used in 18 U.S.C. 1201, to include the unborn.[1]

7. Conclusion

---

[1] In fact, a prosecution under 18 U.S.C. 1841 could not have been brought in this case because the unborn child involved, Victoria Jo Stinnett, suffered no injury or death as a result of the assault on her mother.

11

For the aforementioned reasons, Mrs. Montgomery persists in her request that this Court order her acquitted on the charge brought due to the failure of the evidence under the applicable law.

## II. Refusal to Permit, in either phase of trial, Evidence of Abnormal Brain Function by Dr. Ruben Gur

### 1. Summary of Mrs. Montgomery's points

For her second point, Mrs. Montgomery challenged this Court's refusal to permit the testimony of Dr. Ruben Gur during the first phase of trial, arguing that she made sufficient showings regarding the scientific validity of the evidence and the importance of the evidence to support the findings by defense experts Dr. William Logan, M.D. and Dr. V.S. Ramachandran, M.D. (Doc. 360, p. 5-6). Mrs. Montgomery's point fifteen challenged the Court's failure to permit this presentation during the penalty phase of trial (Doc. 360, p. 15-16).

### 2. Summary of government retorts

In response to point two, the government endeavors to defend the Court's exclusion of Dr. Gur's evidence in three ways. First, the government claims that the Court's exclusion of Dr. Gur's testimony was proper because Dr. Gur purportedly never established the scientific validity of his methods and conclusions as required under F.R.E. 702 (Doc. 368, p. 9). Second, in a related claim, the government asserts that Dr. Gur's evidence was somehow confusing and

12

misleading, and therefore inadmissible under F.R.E. 403 (Doc. 368, p. 11-12). Third, the government posits that exclusion of this evidence was an appropriate sanction for Dr. Gur's purported failure to provide his raw data for analysis by prosecution experts (Doc. 368, p. 10-11).

As to point fifteen, regarding the exclusion of this presentation at penalty phase, the government claims that its arguments with relation to point two address all of the pertinent issues (Doc. 368, p. 34-35).

<u>3. Listing of supporting documents</u>

In light of the claims made by the government, it is essential that the Court have readily available for its review correspondence and reports made by the experts before and during trial. Mrs. Montgomery is providing those items as appendices to this pleading. Those items are as follows:

Appendix AA     8/1/07 government request for Dr. Gur data

Appendix BB     8/14/07 Dr. Gur e-mail response

Appendix CC     8/14/07 Dr. Gur detailed response

Appendix DD     8/17/07 government followup questions for Dr. Gur

Appendix EE     8/23/07 Dr. Gur responses to followup questions

Appendix FF     8/29-9/3/07 e-mail thread re further questions and answers

Appendix GG     9/7/07 government request for normals from new scanner

| | |
|---|---|
| Appendix HH | 9/14/07 response re raw data from new scanner |
| Appendix II | 9/15/07 response re raw data from old scanner |
| Appendix JJ | 9/17/07 further response re raw data from new scanner |
| Appendix KK | 9/19/07 government expert Dr. Evans raw data receipt |
| Appendix LL | 9/19/07 government expert Dr. Mayberg raw data receipt |
| Appendix MM | 9/20/07 Evans/Mayberg report re raw data findings |
| Appendix NN | 9/28/07 responsive report by Dr. Gur |
| Appendix OO | 10/1/07 reply report by Dr. Evans |
| Appendix PP | 10/2/07 surreply report by Dr. Gur |
| Appendix QQ | 10/3/07 surreply report by Dr. Evans |
| Appendix RR | 10/3/07 surreply report by Dr. Mayberg |
| Appendix SS | 10/3/07 second surreply report by Dr. Gur |
| Appendix TT | 10/9/07 Dr. Gur further disclosure regarding new scanner data |
| Appendix UU | 10/9/07 Dr. Evans response to disclosure |
| Appendix VV | 10/9/07 Matt Whitworth response to disclosure |
| Appendix WW | 10/10/07 Dr. Mayberg response to disclosure |
| Appendix XX | 10/10/07 Matt Whitworth response to disclosure |
| Appendix YY | 10/14/07 Dr. Gur further disclosure re new scanner data |
| Appendix ZZ | 10/17/07 Dr. Gur further disclosure re old scanner data |

Appendix AAA       10/22/07 Dr. Gur supplemental report

Appendix BBB       1/8/08 Dr. Gur supplemental report

Appendix CCC       Report by Dr. William Logan, M.D.

Appendix DDD       Report by Dr. V.S. Ramachandran, M.D.

      Making reference to these various items, undersigned counsel will address

the government's claims.

## 4. Dr. Gur is well-qualified as an expert in the field, easily satisfying the requirements of F.R.E. 702 in that respect

      In his testimony before the Court, Dr. Gur detailed his impeccable

credentials to offer expert testimony on the subjects of neuropsychological,

positron emission tomography (PET) and magnetic resonance imaging (MRI)

testing  (Gur testimony, p. 103-104).  Dr. Gur further explained that he has been

involved in brain imaging research since its inception, publishing some 180 peer

reviewed articles directly related to the matter (Gur testimony, p. 104-105).  Dr.

Gur also described his clinical experience in treatment of patients, his duties in

teaching of neurology and psychology to medical students, and his position as an

editor of peer reviewed journals (Gur testimony, p. 105-106, 178-179).  Both of the

government's experts conceded Dr. Gur's qualifications and preeminent position in

the field (Evans testimony, p. 21; Mayberg testimony, p. 33). Dr. Gur has also been

consistently recognized by the Courts as one of the world's foremost experts

15

regarding the conduct and interpretation of PET and MRI testing, and his conclusions in these regards have been regularly received by the Courts. ***United States v. Hammer***, 404 F.Supp.2d 676, 722, 725 (M.D.Pa.,2005); ***State v. Jones***, 2005 WL 950122, *1 (Del.Super. 2005); ***State v. Jones***, 2004 WL 2190097, *2 (Del.Super. 2004); ***Black v. State***, 2005 WL 2662577, *4 (Tenn.App. 2005). Consequently, Dr. Gur was clearly shown to meet and exceed the minimal requirements for an expert set forth under F.R.E. 702. ***Harris v. Smith***, 372 F.2d 806, 813-814 (8th Cir. 1967); ***Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion***, 345 F.3d 15, 24-25 (1st Cir. 2003).

### 5. Dr. Gur's findings and conclusions were relevant, straightforward, and not confusing in the least, easily meeting the requirements of F.R.E. 403 and 702

While the government claims that Dr. Gur's findings and conclusions were somehow confusing (Doc. 368, p. 11-12), a review of those findings and conclusions demonstrates they were easily understandable.

In his pretrial testimony before this Court, Dr. Gur detailed the medical testing conducted on Mrs. Montgomery, the results generated by that testing, and the conclusions which could be drawn from those results (Gur testimony, p. 121-127). Dr. Gur testified that, in light of Mrs. Montgomery's medical history, particularly a series of head injuries suffered by Mrs. Montgomery, he deemed it appropriate that neuropsychological testing of Mrs. Montgomery be conducted

16

(Gur testimony. 119-121). Dr. Gur explained that neuropsychological testing has been a part of standard medical practice for detection of brain injuries for more than a century (Gur testimony, p. 118, 124-125). Dr. Gur indicated, when the neuropsychological data was fully analyzed and graphed, those results raised questions regarding Mrs. Montgomery's brain functioning, and led to the conclusion that further medical testing needed to be conducted, particularly structural brain imaging made possible through MRI testing, and functional brain imaging made possible through PET testing (Gur testimony, p. 121-127). Dr. Gur explained that each of these tests generated a series of numerical results for individual areas of Mrs. Montgomery's brain, and further explained that abnormalities in structure or function of a particular area of Mrs. Montgomery's brain could be identified by comparing the numerical results from that area of Mrs. Montgomery's brain against the average of the numerical results for the corresponding area of the brain from a control group of normal subjects (Gur testimony, p. 110-111, 139-149). Dr. Gur indicated that, when the results from Mrs. Montgomery's tests were so compared against normal controls, structural and functional abnormalities were found in Mrs. Montgomery's midbrain, and that those results were significant in light of the known functions of those areas of the brain and in light of the diagnoses reached by defense psychiatrists (Gur testimony,

17

p. 139-149, 170-175).  Dr. Gur noted that the MRI results demonstrated loss of brain matter volume in the limbic system and the somatomotor area (Gur testimony, p. 143-146).  Dr. Gur further noted that the PET results demonstrated hyperactivity in these same portions of the brain (Gur testimony, p. 171-173, 179-180).  Dr. Gur explained that, while these results were not, in and of themselves, diagnostic (Gur testimony, p. 164), the results strongly corroborated the diagnoses made by defense psychiatrists (Gur testimony, p. 164-165, 173-174).  Dr. Gur noted that generally, the abnormalities in these areas of the brain are related to vulnerability to abnormality in thinking and thought processing, and that particularly, these abnormalities are in areas of the brain significant to the psychiatrically-diagnosed condition, pseudocyesis (Gur testimony, p. 164-165, 173-174).

Not only has Dr. Gur testified in these regards, in order to assist with this explanatory process at this stage of the proceedings, Dr. Gur has generated a new report, and has reiterated his conclusions in that report (Appendix BBB, p. 3-5, 11-12).

In light of the fact that Mrs. Montgomery was advancing issues pertaining to her mental illness in both phases of trial, this evidence was clearly relevant.  *Hose v. Chicago Northwestern Transp. Co*., 70 F.3d 968, 973 (8th Cir. 1995)；  *United*

18

*States v. Alexander*, 805 F.2d 1458, 1464 (11th Cir. 1986); *United States v. Ives*, 609 F.2d 930, 932 (9th Cir. 1979); *United States v. Smith*, 507 F.2d 710, 711 (4th Cir. 1974); *United States v. McRary*, 616 F.2d 181, 184-185 (5th Cir. 1980); *United States v. Brawner*, 471 F.2d 969, 995 (D.C.Cir. 1974).    Moreover, Dr. Gur's explanation of the matter was easily understandable, leaving no room for an accusation, as made by the government, that the jury would be somehow confused by the presentation.  Therefore, the presentation plainly meets the requirements of F.R.E. 403 and 702 in these regards.

6. Dr. Gur's approach was based upon scientific fundamentals which the Courts have accepted and which government experts conceded were reliable

While the government seems to generally challenge the science underpinning Dr. Gur's conclusions, such a general challenge is roundly debunked, even by the government's own experts.

All of the medical procedures utilized by Dr. Gur, neuropsychological, PET and MRI testing, have all been deemed by the Courts to be reliable and admissible. *Cruzan by Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 310 (1990); *Hose v. Chicago Northwestern Transp. Co*., 70 F.3d 968, 973 (8th Cir. 1995); *People v. Weinstein*, 591 N.Y.S.2d 715, 722-723 (N.Y.Sup. 1992); *In re Stanford*, 123 S.Ct. 472, 474 (2002); *Rustenhaven v. American Airlines, Inc.*, 320 F.3d 802, 808 (8th Cir. 2003).

19

Moreover, government's Counsel conceded the efficaciousness of the neuropsychological testing and results (Gur testimony, p. 126).

And, both of the government's experts testified that PET and MRI are scientifically reliable techniques for functional and structural imaging of the brain (Evans' testimony, p. 22-23; Mayberg testimony, p. 34-35). Those experts also agreed that statistical analysis of a subject's results against normal groups is the proper manner in which to detect abnormalities (Evans testimony, p. 23; Mayberg testimony, p. 38).

Thus, this evidence meets the applicable F.R.E. 702 requirements in this regard as well.

7. Dr. Mayberg's claim, that PET results have only limited utility, was controverted by Dr. Gur, by otherdefense experts, and by admissions by Dr. Mayberg herself, and was an issue easily understood and properly resolved by a jury

Dr. Mayberg testified that PET results, by themselves, were diagnostic of only three conditions: brain tumor, Alzheimer's dementia and epilepsy (Mayberg testimony, p. 8-11). Dr. Mayberg took the further position that PET results could not properly be used for any diagnostic purpose outside of those three conditions (Mayberg testimony, p. 12-13). However, in taking this latter position, Dr. Mayberg had to admit that she is familiar with other, qualified experts, in addition to Dr. Gur, who disagree with this position (Mayberg testimony, p. 47-51, 83).

Dr. Gur, for his part, agreed with Dr. Mayberg that the PET can be used, BY ITSELF, to diagnose the three conditions mentioned by Dr. Mayberg, plus one more, schizophrenia (Gur testimony, p. 113-114). However, Dr. Gur further explained that it was general practice, so standard that it is taught in textbooks to medical students, to use neuropsychological, PET and MRI testing results like these to corroborate independently-reached medical and psychiatric diagnoses (Gur testimony, p. 114, 179, 196-197).

In keeping with Dr. Gur's explanation of standard practice, Dr. William Logan, M.D. and Dr. V.S. Ramachandran, M.D. both relied upon Dr. Gur's neuropsychological, PET and MRI testing results to support their independently-reached diagnoses (Appendix CCC, p. 27; Appendix DDD, p. 2, 3, 9, 12, 18, 19, 20, 23).

In light of these facts, it appears that Montgomery, and not the government, has the better of this argument about the utility of this testing. Regardless, this is the sort of controversy which can be understood by a jury, and should be addressed, not by exclusion of the evidence, but rather through affording an opportunity for presentation of the evidence, and for confrontation with cross-examination contrary evidence, before the jury. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-1044 (2nd Cir. 1995). Thus, Dr. Mayberg's position did not

21

constitute grounds for exclusion of this evidence.

## 8. The difference between the parties over statistical significance in clinical versus experimental settings should not have been a basis for exclusion of any of the evidence

The question of statistical significance was also a bone of contention between the experts. Dr. Evans posited that, even though there were differences for particular areas of the brain between the results for Mrs. Montgomery's scans as compared to the results generated for the normal subjects, those differences should be disregarded unless the differences reached the threshold of two standard deviations (Evans testimony, p. 11-12, 32, 41). On the other hand, Dr. Gur testified that, while the two standard deviations level is appropriate in an experimental context, in a clinical setting, differences at the level of one standard deviation are appropriate for diagnosis and treatment so long as other factors, such as history and the results of other tests, provide confirmatory support (Gur testimony, p. 129-139). In his testimony, and even more so in his supplemental report, Dr. Gur has provided scholarly references in support of his position (Gur testimony, p. 130-137; Appendix BBB, p. 1-3).

This Court seemed to side with Dr. Evans in its September 5, 2007 ruling upon this matter, ordering that Dr. Gur be limited from testifying about results for Mrs. Montgomery which involved variations of less than two standard deviations

Case 5:05-cr-06002-GAF   Document 396   Filed 03/06/08   Page 22 of 77

from the normal (9/5/07 Tr. 4-6). With all due respect to the Court, this was not the proper approach.

Here again, Dr. Gur should not have been prohibited, on the basis of objections lodged by Dr. Evans, from advancing his PET and MRI results which reached the level of clinical significance at one standard deviation; rather, he should have been permitted to present this work, subject to cross-examination and rebuttal evidence regarding the positions advanced by Dr. Evans. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-1044 (2nd Cir. 1995).

9. Whatever confusion was raised by government experts, through a series of objections over Dr. Gur's calculation methods, was fully and understandably addressed by Dr. Gur in a series of responses

The government claims that Dr. Gur never provided his underlying raw data for analysis by government experts (Doc. 368, p. 8, 9, 12). That is simply not true. The untruth of that contention is borne out by the series of communications and reports by the experts and the parties.

On August 1, 2007, the government made its request for information from Dr. Gur (Appendix AA). On August 14, Dr. Gur responded (Appendix BB and CC). On August 17, the government posed follow up questions (Appendix DD), to which Dr. Gur responded on August 23 (Appendix EE). Then, in a series of e-mails beginning on August 29, Dr. Evans, the government's expert, requested from

Dr. Gur certain of Dr. Gur's underlying data in order to double-check Dr. Gur's calculations (Appendix FF). Dr. Gur responded to Dr. Evans that complying with the request was difficult from a practical standpoint, because certain of the requested data was maintained, not by him, but by the University PET Center (Appendix FF). Dr. Gur further questioned the reasoning behind the request, explaining what Dr. Gur believed was a misapprehension on Dr. Evans' part regarding Dr. Gur's methodology (Appendix FF).

On September 4, in testimony before this Court, Dr. Mayberg conceded that the request for the particular underlying data made by Dr. Evans on August 29 was not included in the original, August 1 request for information advanced by her and Dr. Evans (Mayberg testimony, p. 35). Dr. Mayberg even went so far as to say that production of the underlying data sought by Dr. Evans was not necessary as far as she was concerned, since that data involved normals tested on a different scanner from the one on which Mrs. Montgomery was tested (Mayberg testimony, p. 36-37). Dr. Mayberg instead, consistent with a criticism of Dr. Gur's method voiced by her, believed that, since the normals used by Dr. Gur had been tested on a different PET scanner, that group of normals should be thrown out, and a new group of comparison normals should be generated for the same scanner on which Mrs. Montgomery was tested (Mayberg testimony, p. 99-101). In keeping with

24

this position taken by Dr. Mayberg, on September 7, the government followed up with a request for underlying data for normals from the same scanner on which Mrs. Montgomery was tested (Appendix GG).

Dr. Gur, for his part, testified that he had available, and had offered to Dr. Evans, certain data which he received from the PET center, which consisted of the data generated by the PET machine, subjected to an initial group of mathematical calculations (hereinafter referred to as the "raw data") (Gur Testimony, p. 184). Dr. Gur explained that the data directly from the PET machine, without the initial calculations (hereinafter referred to as the raw raw data), was maintained by the PET center, and would be much more difficult to obtain (Gur testimony, p. 185-186). Dr. Gur also testified that Dr. Mayberg's criticism over his use of normals tested on a different PET machine was insignificant because the resolution quality of both machines was so high, well-capable of accurately imaging the involved structures of the brain, and thus any differences would be negligible from a calculations standpoint (Gur testimony, p. 155-159).

After the hearing, Dr. Gur provided the raw data for the normals which he used for comparison, in response to the request by Dr. Evans, as well as a batch of raw raw data for normals for the scanner on which Mrs. Montgomery was tested, in response to the request by Dr. Mayberg (Appendix HH, II, JJ). On September 19,

25

Dr. Evans and Dr. Mayberg both acknowledged receipt and usability of the raw data provided by Dr. Gur (Appendix KK, LL) and on September 20 these two generated a joint report using that raw data (Appendix MM). In that new report, Dr. Evans and Dr. Mayberg postulated, and set out to prove, that Dr. Gur erred in his mathematical calculations by using a different method to make calculations for the data for his normals from that used to make calculations for the data for Mrs. Montgomery; Dr. Evans and Dr. Mayberg also made calculations which they contended demonstrated that Mrs. Montgomery's results did not vary more than two standard deviations from the normals in the raw data (Appendix MM). Interestingly, though Dr. Mayberg had emphasized the need for, and had requested the raw raw data for the normals for the machine on which Mrs. Montgomery was tested, Dr. Mayberg made no use of that data (Appendix MM).

On September 28, Dr. Gur responded to the Evans/Mayberg September 20 report, explaining that he had never used the incorrect calculation scheme as alleged by Dr. Evans and Dr. Mayberg (Appendix NN). Dr. Gur also noted that, after properly recalculating all results using the raw data which he had provided, he still found that the results for the critical areas of Mrs. Montgomery's brain varied from the normal group by two standard deviations (Appendix NN).

On October 1, Dr. Evans submitted a one-page reply to Dr. Gur's response,

essentially reiterating the positions taken by him in his September 20 report (Appendix OO).

On October 2, Dr. Gur made surreply to Dr. Evans' reply, explaining that the calculations made by Dr. Evans were not only not made in the same way that Dr. Gur had made them, they were done in a scientifically invalid way in light of the nature of the raw data; Dr. Gur specifically explained that the calculation method used by Dr. Evans improperly lumped together large and small areas of the brain with varying amounts of white and grey matter, all of which was contrary to standard scientific procedure (Appendix PP). Dr. Gur also explained that progress on obtaining the raw raw data for the original group of normals had been slowed because the computer which stored that data had been mothballed by the University PET Center, and had to be resurrected (Appendix PP).

On October 3, Dr. Evans issued a third report, reiterating what was set forth in his previous two reports about his calculations using the raw data (Appendix QQ). In that report, despite having made the calculations which he did using the raw data supplied by Dr. Gur, Dr. Evans registered the complaint that the raw raw data from the original normal group had not yet been supplied (Appendix QQ).

Dr. Mayberg also submitted a report on October 3 (Appendix RR). In that report, Dr. Mayberg conceded that the calculations made, graphed and reported in

27

the September 20 and October 1 reports from Dr. Evans were not done with standard scientific methods, and in fact were done with a method which she could not and would not endorse (Appendix RR, p. 2). Rather, Dr. Mayberg explained, this method of calculation was done guessing that that must have been the method used by Dr. Gur, since that method seemed to produce a graph similar to that produced by Dr. Gur (Appendix RR, p. 1-2). Dr. Mayberg also complained that what Dr. Gur had supplied, the raw data for the normals from the old scanner, and the raw raw data for the normals from the scanner on which Mrs. Montgomery was tested, was somehow not the required data, leaving her and Dr. Evans, despite their use of some of that data in their September 20 report, unable to test Dr. Gur's methods (Appendix RR, p. 1-2). It should be noted again that, though Dr. Mayberg had testified that raw raw data from the new scanner was critical to evaluation of Dr. Gur's work (Mayberg testimony, p. 17-19, 23, 25, 39, 40-41, 99), and though she had caused a request to be made for that data (Appendix GG), Dr. Mayberg never reported on making use of that data which was provided to her by Dr. Gur (Appendix RR).

Dr. Gur made an October 3 response to the Evans/Mayberg reports, indicating that he had sent precisely what was requested in terms of the raw data from the older machine, and the raw raw data from the newer machine, and had

28

even reformatted it and re-sent it in keeping with requests made by Dr. Evans and Dr. Mayberg (Appendix SS, p. 1). It should be noted that Dr. Gur's positions in these regards are borne out by the communications between the scientists (Appendix HH, II, JJ, KK, LL). Dr. Gur also explained, in more detail, why the incorrect method used by Dr. Evans produced a graph for the normals similar to that produced by Dr. Gur in his original report; in essence, the reason for the similarities is that the results for the normal group will come out similarly even though white and grey matter and large and small portions of the brain are lumped in this fashion, because the subjects are normal (Appendix SS, p. 2). Dr. Gur explained that the problem with this invalid approach shows up, not with the results of the normals, but with the abnormal results of the subject, artificially suppressing the appearance of the abnormality (Appendix SS, p. 2). Dr. Gur ended by noting that it was likely that, once calculations were redone using the raw raw data from the old and new scanners, those numbers would undoubtedly generate results very similar to the original results which he had reported, and about which he had testified, pertaining to significant abnormalities in critical structures of Mrs. Montgomery's brain (Appendix SS, p. 2).

While all of this was going on, jury selection in the trial began on October 1 (Doc. 313). Once jury selection was completed, the Court held a status conference

regarding the Gur evidence (10/3/07 Tr. 1). At that point, undersigned counsel reiterated the positions advanced by Dr. Gur regarding the misuse of his data by Dr. Evans and Dr. Mayberg (10/3/07 Tr. 3-5). After hearing argument, the Court ruled that it would prohibit use of Dr. Gur's testimony in light of what the Court believed was minimal probative value of the evidence, in the restricted form as ordered by the Court on September 5, versus the potential for the jury to become sidetracked over the calculations disagreements between the experts (10/3/07 Tr. 5-6).

On October 9, Dr. Gur provided more raw raw data for the new scanner, and gave an update on unearthing the raw raw data from the older scanner (Appendix TT). Though this data was provided to prosecution experts, as per their request (Appendix GG) and though Dr. Mayberg had insisted on the importance of this data (Mayberg testimony, p. 99-101), the choice was made by the prosecution team to not have the experts make use of this data (Appendix UU, VV, WW, XX).

On October 14, Dr. Gur reported his findings that, using the raw raw data from the new scanner normals as comparisons, as insisted upon by Dr. Mayberg, Mrs. Montgomery's abnormalities, in the same critical places in the brain as showed up in Dr. Gur's previous reporting, to the same two standard deviations level, still appeared, thereby confirming the previous results using the old scanner

30

raw data (Appendix YY). Because defense psychiatric evidence had not yet been presented, and because undersigned counsel knew from the aforementioned communications that the prosecution experts had chosen not to do this work themselves in the interim, undersigned counsel requested a brief postponement in the trial to permit the prosecution to now do the work it had previously eschewed, and submit a report responsive to Dr. Gur's most recent report. This Court denied that request, and persisted with its previous order that the defense proceed without the Gur testimony. Per this Court's direction, the testimony of Dr. Ramachandran and Dr. Logan was presented on October 16 and 17 respectively, stripped of any reference to Dr. Gur's supportive findings (Doc. 331, 332).

On October 17, Dr. Gur provided the old scanner raw raw data (Appendix ZZ). Then, on October 22, Dr. Gur reported his global findings, comparing Mrs. Montgomery's data against the raw raw data from the old scanner, against the raw raw data from the new scanner, and the raw data initially used; the results were all the same, with Mrs. Montgomery showing greater than two standard deviations difference in those critical midbrain areas which had previously been reported when compared against each of the three normal databases (Appendix AAA). Undersigned counsel made a supplemental offer of proof to the Court concerning Dr. Gur's comprehensive findings (Doc. 344). In a separate request, undersigned

31

counsel requested that the Court permit use of Dr. Gur's findings during penalty phase, but that request was denied.

As noted earlier, undersigned counsel has requested that Dr. Gur reiterate all of his findings and conclusions in a supplemental report; Dr. Gur has done that, specifically chronicling the history of the controversy over calculations and explaining, in detail, the errors made by Dr. Evans and Dr. Mayberg, as well as the support for Dr. Gur's own conclusions afforded by the raw raw normal data from both scanners (Appendix BBB, p. 5-10). Dr. Gur also explained that, once the raw raw data was provided by him to Dr. Evans and Dr. Mayberg, it would have taken those experts only a matter of a couple hours to generate their own calculations using that data, and thus those experts could have speedily responded to Dr. Gur's reports, at time of trial, had they chosen to do so (Appendix BBB, p. 8).

In light of the foregoing, it is plain that, contrary to the government's claims (Doc. 368, p. 8, 9, 12), Dr. Gur provided all of his raw data prior to the time of trial, and all of his raw raw data as soon as possible and during trial.

Though this Court has never found that there was an actionable discovery failure here, the government persists in making that claim, advancing in supposed support of its claim the Supreme Court holding in *Taylor v. Illinois*, 484 U.S. 400 (1988) (Doc. 368, p. 9-10). There is nothing in *Taylor v. Illinois* which supports

32

the government's position under the facts in this case.

In ***Taylor v. Illinois***, the defense had failed to identify a critical witness until they were ready to put the witness on the stand, on the second day of trial.  ***Taylor v. Illinois***, 403.  Though defense counsel initially represented to the Illinois trial court that the delay owed to the witness just being located, the witness later debunked that claim by testifying in a proffer that defense counsel had found and interviewed him a week prior to trial.  ***Taylor v. Illinois***, 405.  The Illinois trial court, finding that defense counsel had willfully withheld discovery, and that the willful discovery violation was part of a pattern of knowing deception by this defense attorney in this case as well as multiple previous cases, excluded the testimony of the witness as a sanction for the willful discovery violation.  ***Taylor v. Illinois***, 405.

On appeal to the Supreme Court, the State had urged that the sanction of exclusion of evidence does not implicate Sixth Amendment concerns, but the Supreme Court rejected that argument out of hand based upon its holding in ***Pennsylvania v. Ritchie***, 480 U.S. 39, 56 (1987).  ***Taylor v. Illinois***, 408-409.  The Court likewise rejected Taylor's argument that the Sixth Amendment would never allow exclusion as a sanction.  ***Taylor v. Illinois***, 414-415.  However, the Court was clear that such a harsh sanction as exclusion of evidence would be deemed

appropriate in the *Taylor* case only because of the clear evidence that this discovery violation involved the defense willfully and blatantly hiding the identity of the witness until after trial had begun, for the purpose of gaining tactical advantage. *Taylor v. Illinois*, 416-417.

The *Taylor v. Illinois* exclusion sanction would not attend in this Montgomery case for a couple of critical reasons. First, there was no hiding of the identity of a witness. Dr. Gur's identity and conclusions were well known for seven months prior to trial. Second, there was nothing willful or blatant in the delay by Dr. Gur in trying to comply with what the government's own expert, Dr. Evans, has admitted in e-mail communications amounts to an unusual scientific request (Appendix FF). The government does not provide case law applicable to the benign facts here. In fact, in light of the Sixth Amendment concerns arising therefrom, the drastic sanction of exclusion of evidence is to be confined to the sort of situation confronted in *Taylor v. Illinois* wherein there is a willful violation of a discovery rule motivated by a desire to gain tactical advantage. *Taylor v. Illinois*, 416-417; *United States v. Finley*, 301 F.3d 1000, 1018-1019 (9th Cir. 2004). In this Montgomery case, it would be an incredible stretch to say that a discovery violation has occurred. But even if that could be said, there is no indication whatsoever that what occurred was in any way willful or motivated by a desire to

34

obtain advantage.

That this is not the appropriate place for an exclusion sanction is fully illustrated by the Ninth Circuit holding upon the facts in *United States v. Finley*, supra.  In *United States v. Finley*, the District Court had excluded testimony from a defense mental health expert because of the government's complaint that it had not received sufficiently detailed discovery concerning the expert's conclusions and the reasons therefor.  *United States v. Finley*, 1016-1017.   The Ninth Circuit found that, since there had been discovery provided, and since no willful misleading had been shown, the exclusion remedy could not be employed since other, less onerous remedies, such as a postponement, could be employed instead. *United States v. Finley*, 1017-1018.

What also needs be realized is that, when these same sanction rules are applied to the government, a party without the protection of the Sixth Amendment, exclusion of evidence is normally deemed too harsh unless bad faith in the discovery failure and prejudice to the opposing party can be shown.  *United States v. DeCoteau*, 186 F.3d 1008, 1010 (8th Cir. 1999); *United States v. Gonzales*, 164 F.3d 1285, 1292 (10th Cir. 1999); *United States v. W.R. Grace*, 493 F.3d 1119, 1130-1131 (9th Cir. 2007).  In determining the appropriate sanction, the Court normally employs the least onerous sanction available, considering whether there

35

has been a showing of bad faith committed in connection with the discovery failure, whether there has been a showing of prejudice to the opposing party as a result of the discovery failure, and whether there is a less onerous solution to the discovery failure. *United States v. DeCoteau*, 1010; *United States v. Gonzales*, 1292; *United States v. W.R. Grace*, 1030. Even if there has been a showing of bad faith, if there is lack of true prejudice, even if avoidance of prejudice needs to be accomplished through use of an alternative remedy such as a continuance, that all militates against use of the exclusion sanction. *United States v. DeCoteau*, 1010-1011; *United States v. Gonzales*, 1292-1293; *United States v. W.R. Grace*, 1031.

Here, the delay in providing Dr. Gur's raw raw data would have required a small postponement during trial, but clearly only a very brief one, especially when one considers the ready ability of the government experts to put that raw raw data to effect within hours of its receipt. Consequently, and contrary to the government's position, the case law counsels against the use of exclusion as a discovery sanction under facts like those presented here. *United States v. Finley*, supra; *United States v. DeCoteau*, supra; *United States v. Gonzales*, supra; *United States v. W.R. Grace*, supra.

As noted already, this Court never indicated its ruling was as a sanction for a discovery failure (10/3/07 Tr. 1-6). Thus, the government's discovery-based

Case 5:05-cr-06002-GAF   Document 396   Filed 03/06/08   Page 36 of 77

argument is not well taken for that reason as well .

Rather, the Court's stated reasons for the exclusion at the first phase of trial were the perceived limited probative value of the evidence being outweighed by the danger of sidetracking the jury (10/3/07 Tr. 5-6). However, in light of the facts and the applicable law, that determination by this Court was incorrect for three main reasons.

First, the Court's conclusion about the limited probative value of the evidence owed to the impact of the Court's own incorrect ruling, prohibiting Dr. Gur from presenting the full body of his work, neuropsychological, MRI and PET results, and limiting the evidence being presented to only certain of Mrs. Montgomery's PET results which achieved the two standard deviations from normal level (9/5/07 Tr. 4-6). As already noted above, and again with all due respect to the Court, this was not the proper approach.

As Dr. Gur explained in his testimony, and supported with authority, and as he reiterates and supports in his supplemental report, while the two standard deviations level is appropriate in an experimental context, in a clinical setting, differences at the level of one standard deviation are appropriate for diagnosis and treatment so long as other factors, such as history and the results of other tests, provide confirmatory support (Gur testimony, p. 129-139; Appendix BBB, p. 1-3).

37

For these reasons, Dr. Gur should not have been prohibited, on the basis of objections lodged by government experts, from advancing all of his results, neuropsychological, PET and MRI, even those which reached the level of clinical significance at one standard deviation; rather, he should have been permitted to present the entire body of his work, subject to cross-examination and rebuttal evidence regarding the positions advanced by the government experts. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-1044 (2nd Cir. 1995).

When one marshals the full body of Dr. Gur's work, neuropsychological findings, buttressed by PET and MRI findings, the Court's contention about marginal probative value is simply overwhelmed by the sheer volume of the scientific results.

Second, the Court's perception about the marginal probative value of this evidence does not correspond with the context in which this evidence was offered at the first phase of trial. It was Mrs. Montgomery burden to prove, via clear and convincing evidence, that she suffered from a combination of mental illnesses, including pseudocyesis, and as a consequence could not appreciate the nature and quality or wrongfulness of her conduct. Both of the medical doctors who concluded that Mrs. Montgomery's mental illness robbed her of the ability to appreciate nature and quality or wrongfulness found critical support for their

38

findings in the results which Dr. Gur reported (Appendix CCC, p. 27; Appendix DDD, p. 2, 3, 9, 12, 18, 19, 20, 23).  In his testimony before this Court, and again in his most recent report, Dr. Gur fully explained why the reliance upon his results by the medical doctors was appropriate: because the areas of the brain detected as abnormal in the testing are those critically related to the very mental dysfunctions found by the medical doctors (Gur testimony, p. 164-165, 173-174; Appendix BBB, p. 3-5, 11-12), and because medical practice permits reliance upon such results to support independently-made diagnoses (Gur testimony, p. 114, 179, 196-197).   By prohibiting the defense medical doctors from expressing their reliance upon this critical support for their findings, that left them without the full retinue of scientific evidence to buttress their findings and to rebut the contrary findings made by government experts.  In this case, that left these doctors essentially fighting prosecution experts with one arm tied behind their backs.  Contrary to this position taken by this Court, Courts in the past have always found it necessary to be liberal in permitting testimony and evidence upon the defense of insanity. *United States v. Alexander*, 1464; *United States v. Ives*, 932; *United States v. Smith*, 711; *United States v. McRary*, 184-185; *United States v. Brawner*, 995. This Court's ruling violated Mrs. Montgomery's Sixth Amendment right to present critical evidence in support of the defense of mental illness for which she had the

burden of proof.

Third, as for the Court's position that a debate between the experts over calculation methods would somehow distract the jury from its duties, to the contrary, resolution of such a debate was at the heart of the controversy over Mrs. Montgomery's mental condition, and was therefore was a duty which was clearly in the bailiwick of the jury, precisely the work the jury was there to do; put another way, it was not something which would distract the jury, but rather, it was the essence of what the jury was to determine. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-1044 (2nd Cir. 1995). Mrs. Montgomery was entitled to have her side of the matter presented to the jury, the government was entitled to present its side, and it was up to the jury to settle the matter. *McCullock v. H.B. Fuller Co.*, supra.

<u>10. There was even less justification for prohibiting presentation of this evidence at the penalty phase of trial considering the relaxed evidentiary standards and broader issues in play at that phase of trial</u>

The government contends that its arguments with relation to prohibiting this evidence at the first phase of trial attend with equal force in rebutting Mrs. Montgomery's arguments with relation to second phase use of the evidence (Doc. 368, p. 35-36).

The government obviously chooses to forget that there are Constitutional and statutory imperatives, that a defendant must enjoy relaxed evidentiary

Case 5:05-cr-06002-GAF   Document 396   Filed 03/06/08   Page 40 of 77

standards and be permitted to present all relevant information in mitigation of punishment, and that prohibiting presentation of relevant mitigation information violates the due process and cruel and unusual punishment clauses of the Constitution, as well as applicable Federal statutes. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Atkins v. Virginia*, 536 U.S. 304, 318-319 (2002); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982); *Skipper v. South Carolina*, 476 U.S. 1, 5-6 (1986); *Wiggins v. Smith*, 123 S.Ct. 2527, 2542 (2003); 18 U.S.C. 3592 and 3593. The government also obviously chooses to forget that, unlike in the first phase of trial, wherein the evidence about mental condition, in order to be relevant, had to pertain specifically to a mental disease which robbed an ability to appreciate the nature and quality or wrongfulness of conduct, at the second phase of trial, that same evidence would be relevant if related to any aspect of the defendant's background, record or character which might be found by the jury to mitigate against imposition of the death sentence. 18 U.S.C. 3592(a)(8); *Lockett v. Ohio*, supra; *Skipper v. South Carolina*, supra. Finally, the government chooses to forget that, at the penalty phase of trial, the defendant is entitled to present "information" which may not rise to the standards of "evidence" under the Federal Rules. 18 U.S.C. 3593(c). In light of the details provided already about Dr. Gur's findings, it is clear that, even if it could be argued that that information should not

Case 5:05-cr-06002-GAF   Document 396   Filed 03/06/08   Page 41 of 77

have come to the jury in the first phase of the trial, it was clearly admissible in the second phase.

What the government may be arguing, by implication, is that this Court would have been justified in prohibiting the Gur presentation under the premise, as set forth under 18 U.S.C. 3593(c), that the probative value of the information was outweighed by the danger of creating unfair prejudice, confusing the issues or misleading the jury. In response to that allegation, Mrs. Montgomery refers to the preceding arguments. Those arguments satisfy the heavier burden of demonstrating that this was admissible evidence for the narrower issues addressed in the first phase of trial. Thus, those same arguments make an even stronger case in satisfying the much lesser burden of showing that this was information relevant to the much broader issues of mitigation.

### III. Refusal to permit evidence regarding physical findings from polygraph exam

1. Summary of Mrs. Montgomery's argument

At trial, the government elicited testimony from mental health experts that Mrs. Montgomery expressed to them her belief that her brother Tommy Kleiner accompanied her to Bobbie Jo Stinnett's home in Skidmore, Missouri on the afternoon of December 16, 2004. The government also elicited testimony from Tommy Kleiner's probation officer regarding her belief that Mr. Kleiner was,

42

instead, with her, in Kansas, on the afternoon of December 16, 2004. And, the government elicited opinions from its mental health expert, Dr. Park Dietz, that Mrs. Montgomery knowingly fabricated her claims about Tommy Kleiner's presence on December 16, and that this purported, knowingly false accusation by Mrs. Montgomery against her brother supported his (Dr. Dietz's) position that Mrs. Montgomery appreciated the nature and quality or wrongfulness of her conduct at the time of the offense.

It had been the intention of counsel for Mrs. Montgomery to counter the positions taken by Dr. Dietz's by calling upon polygrapher, Alan Jennerich. Mr. Jennerich administered a polygraph examination to Mrs. Montgomery in standard fashion. The ultimate, unknown issue addressed by the polygraph examination concerned Mrs. Montgomery's belief that Tommy Kleiner was present with her the afternoon of December 16, 2004 at Bobbie Jo Stinnett's home in Skidmore, Missouri. Mr. Jennerich determined that Mrs. Montgomery's physiological responses to the question about Tommy Kleiner's presence were the same as Mrs. Montgomery's physiological responses to other questions for which Mrs. Montgomery made known, true responses, and therefore Mr. Jennerich concluded that Mrs. Montgomery was not deceptive in her response to that critical question. Counsel for Mrs. Montgomery proposed to offer the entirety of Mr. Jennerich's

43

findings and conclusions or, in the alternative, to offer testimony regarding the questions and physiological responses, without providing the ultimate conclusions regarding lack of deception. This Court prohibited presentation upon this matter at both phases of trial. For her third point in her motion for new trial, Mrs. Montgomery challenges the first phase evidentiary prohibition as violative of her rights under the Fifth and Sixth Amendments to the Constitution of the United States (Doc. 360, p. 6-7). For her sixteenth point, Mrs. Montgomery argues that prohibiting use of this information at the penalty phase of trial violated Mrs. Montgomery's rights to present mitigation evidence protected by the Constitution and by 18 U.S.C. 3593(c) (Doc. 360, p. 18-19).

2. Summary of the government's response

In response, the government first urges that the suggestion of the defense, that the presentation be limited to just an explanation of Mrs. Montgomery's physical responses to the questions, would not have had any ameliorative effect since "it is physical responses that make up the polygraph test results" (Doc. 368, p. 12). Thereafter, the government focuses most of its attention on Mrs. Montgomery's arguments that the polygraph information should have been permitted at penalty phase (Doc. 368, p. 12-14). Particularly the government urges that this Court's decision to prohibit this presentation in penalty phase is

Case 5:05-cr-06002-GAF   Document 396   Filed 03/06/08   Page 44 of 77

supported, as against a Constitutional challenge, by decisions made by the Fourth

Circuit and the District of Puerto Rico, (Doc. 368, p. 12-13).  The government also

claims that the Court's refusal of the polygraph information does not violate the 18

U.S.C. 3593(c) right to present mitigation information since, as the government

sees it, the polygraph information would have been confusing, misleading and

unreliable (Doc. 368, p. 13-14).

3. Contrary to the government's position about the supposed universal unreliability
of polygraphs, the Federal Courts generally take a case-by-case approach to their
admissibility, particularly because the government itself regularly uses and relies
upon polygraph testing results in other contexts

The government seems to argue that polygraphs are universally disdained,

and that universal disdain justifies a court to reject any polygraph results as

"confusing, misleading and unreliable" (Doc. 368, p. 12-14).  Surely, the

government knows better.

Ten years ago, eight of nine Justices of the Supreme Court decided that,

because there was at that point lack of consensus regarding the scientific reliability

of polygraph examination results, they would not find, in the case before them, that

the military's rule of *per se* exclusion of such results was violative of the Sixth

Amendment right to present evidence.  ***United States v. Scheffer***, 523 U.S. 303,

308-317 (1998).  However, a clear majority of the Court, four concurring Justices

and one dissenting Justice, rejected the invitation to wholly reject admissibility of

polygraph evidence, noting particularly the government's own extensive use of, and reliance upon, polygraph examinations, and approving at the least the prevailing *status quo*, allowing Courts to determine propriety of use of polygraph results on a case-by-case basis. *United States v. Scheffer*, 318-320 *concurrence by Justice Kennedy for himself and Justices O'Connor, Ginsberg and Breyer*, 320-339 *dissent by Justice Stevens*. Moreover, these same five Justices rejected the notion advanced by the other four Justices, that polygraph results should be excluded as invading the province of the jury, finding that "..this tired argument had long since been given its deserved repose…" in light of the enactment of F.R.E. 704(a). *United States v. Scheffer*, 319. In light of the positions taken by these five Justices in *United States v. Scheffer*, most Courts of Appeals, including the Eighth Circuit, continue to this day to consider issues of polygraph admissibility on a case by case basis. *United States v. Dacre*, 187 F.Appx. 674, 675 (8th Cir. 2006); *United States v. Henderson*, 409 F.3d 1293, 1301-1304 (11th Cir. 2005); *United States v. Cordoba*, 104 F.3d 225, 227-228 (9th Cir. 1997); *United States v. Posado*, 57 F.3d 428, 432-434 (5th Cir. 1995); *United States v. Messina*, 131 F.3d 36, 42 (2nd Cir. 1997).

Since the government itself extensively relies upon polygraph in other contexts, and since the Courts accept evidence of polygraph under certain

46

circumstances, the government's universal argument against polygraphs falls flat.

### 4. Polygraph evidence has been accepted, particularly at the penalty phase of trial, where, as here, it serves a legitimate rebuttal purpose

In its response, the government fails to address the fact that Mrs. Montgomery did not propose to offer this polygraph evidence in the first instance. Rather, the offer was made only after the government came forward with its three-part presentation: first, the testimony about Mrs. Montgomery's representations regarding her brother's presence, second, the contrary testimony from the parole officer about the brother's presence with her, and third, the conclusion by the government's expert and the argument by government counsel that these circumstances proved knowing fabrication on Mrs. Montgomery's part, demonstrating her lack of mental illness. The offer of the polygraph results was made to rebut the contention that Mrs. Montgomery's representations about her brother were knowingly false. To the contrary of the contentions made by the government expert and government counsel, Mrs. Montgomery's physical responses to the question about her brother's presence were the same as those which she registered in making known, truthful responses to control questions. In addition, the polygraph expert determined that Mrs. Montgomery showed no signs of deception in answering the question about her brother's presence.

The Courts have been receptive to receipt of polygraph evidence when such

Case 5:05-cr-06002-GAF   Document 396   Filed 03/06/08   Page 47 of 77

evidence is received for the limited purpose to counter a position taken by the opposing party. *United States v. Estrada-Lucas*, 651 F.2d 1261, 1264 (9th Cir. 1980); *United States v. Barger*, 931 F.2d 359, 370-371 (6th Cir. 1991); *United States v. Piccinonna*, 885 F.2d 1529, 1535-1537 (11th Cir. 1989); *Rupe v. Wood*, 93 F.3d 1434, 1441 (9th Cir. 1996); *Paxton v. Ward*, 199 F.3d 1197, 1211-1216 (10th Cir. 1999). The holdings in *Rupe v. Wood* and *Paxton v. Ward* are particularly noteworthy.

In *Rupe v. Wood*, 1439, the state trial court excluded penalty phase presentation concerning a prosecution informer failing a polygraph question over his own involvement in the charged killing. The District Court granted, and the Ninth Circuit upheld, penalty phase habeas relief, finding the exclusion of the polygraph evidence prejudicially robbed Rupe of his only available means to support his own arguments, and counter prosecution arguments, regarding the relative culpability between Rupe and the informer. *Rupe v. Wood*, 1440-41. As part of the ruling, the District Court, and then the Ninth Circuit upon *de novo* review, determined that polygraph results constitute reliable evidence. *Rupe v. Wood*, 1440.

In *Paxton v. Ward*, 1202-1203, Paxton had been convicted in state court for capital murder in the killing of a girlfriend, and at penalty phase faced, as an

Case 5:05-cr-06002-GAF   Document 396   Filed 03/06/08   Page 48 of 77

aggravating factor, his purported involvement in the prior death of his wife. At the penalty phase, the trial court refused Paxton's offer of evidence, that he had passed a polygraph concerning his wife's death, and that in reliance upon the results of that polygraph, the prosecution had dismissed charges against him. *Paxton v. Ward*, 1203. The District Court granted, and the Tenth Circuit affirmed, penalty phase habeas relief for Paxton, finding that polygraph results should have been allowed to support Paxton's version, and to rebut the prosecution's version, with respect to the circumstances surrounding the death of Paxton's wife. *Paxton v. Ward*, 1211-16. The Tenth Circuit particularly found the polygraph results sufficiently reliable to constitute proper evidence at penalty phase. *Paxton v. Ward*, 1215. The Tenth Circuit also specifically found that there was nothing in the Supreme Court's holding in *United States v. Scheffer* which was contrary to the grant of relief for Paxton. *Paxton v. Ward*, supra.

The circumstances in *Rupe v. Wood* and *Paxton v. Ward* are strikingly similar to the facts in this case. Here, thanks to this Court's prohibition of the polygraph evidence, the government's expert, and then government's counsel were permitted to argue with impunity that Mrs. Montgomery had accused her brother of complicity full well knowing that accusation was false. Those premises were then used to support the government's first phase attacks against the mental defense, as

49

well as the government's aggravating factors related to state of mind at the time of the offense. Under these circumstances, prohibiting Mrs. Montgomery from using these polygraph results denied her critical rebuttal evidence for both phases of trial, denying her rights under the Sixth and Eighth Amendments.

The government urges that this Court should find support for its ruling from the rejections of polygraph evidence by the Fourth Circuit and the District of Puerto Rico (Doc. 368, p. 12-13).  However, neither case is apposite.  In *United States v. Fulks*, 454 F.3d 410, 434-435 (4th Cir. 2006), polygraph results were rejected because they were offered merely to support Fulks' general claims of innocence.  Similarly, in *United States v. Catalan-Roman*, 368 F.Supp.2d 119, 121-124 (D.Puerto Rico 2005), polygraph results, which were not obtained until after the first phase of trial was completed, and supported only the defendant's denial of participation in a related robbery, were rejected primarily because of lack of relevance to the pled aggravating and mitigating factors.  Unlike in those cases, the polygraph presentation here bore directly upon issues in the case which the government raised in the first instance.  Thus, for the reasons described above, the circumstances here bear much closer resemblance to those in *Rupe v. Wood* and *Paxton v. Ward*, and call for a result similar to that had in those cases.

5. Evidence about physical responses to questioning, even during polygraph examinations, has long been deemed to be relevant, admissible evidence

50

The government appears to argue that the Court was right in rejecting Mrs. Montgomery's offer to limit the polygraph expert testimony to only evidence regarding Mrs. Montgomery's physical responses to questioning, purportedly because even that limited presentation still amounted to impermissible polygraph evidence (Doc. 368, p. 12). As the government puts it, "it is physical responses that make up the polygraph test results" (Doc. 368, p. 12). However, on the heels of that representation, the government finds it necessary to also concede, albeit in a footnote, what the Supreme Court itself has clearly found, that polygraph results constitute not just the subject's physical reactions, but also the polygrapher's interpretation of those reactions with relation to the ultimate question of the subject's deception (Doc. 368, p. 12, fn. 3). *United States v. Scheffer*, 313. Plainly, the limited offer made by Mrs. Montgomery would have presented to the jury only the physical reactions, leaving it to the jury to consider and decide the meaning of those reactions, without the interpretation of those reactions by the expert.

The Courts have long held that relevant evidence about the believability of a witness is generated from the witness' physical reaction to questioning as compared to the witness' normal physical reactions. *United States v. Mejia*, 69 F.3d 309, 315-316 (9th Cir. 1995); *United States v. Velarde-Gomez,* 269 F.3d

51

1023, 1030 (9th Cir.2001); ***United States v. Fabel***, 2007 WL 313934, *2

(W.D.Wash. 2007).  The Eighth Circuit itself has gone so far as to find that, even

when polygraph results may not be admissible, the subject's physical reactions to

questions, as compared to normal reactions, amount to relevant, admissible

evidence.  ***Rothgeb v. United States***, 789 F.2d 647, 650-651 (8th Cir. 1986).  Thus,

even if it could be argued that the ultimate conclusions of the polygrapher could

not be received, Mrs. Montgomery still was entitled to present evidence about her

physical responses to the questions for the jury's independent consideration.

### *IV. Permitting Evidence Regarding e-mails from Vanessa Boman*

#### 1. Summary of Mrs. Montgomery's point

  For her fourth point in her motion for new trial, Mrs. Montgomery

challenged this Court's having permitted the government to spew forth to the jury,

without limitation, the invective-laden e-mail communications to Mrs.

Montgomery from her ex-husband's wife, Vanessa Boman (Doc. 360, p. 8).  Mrs.

Montgomery argues that she was profoundly prejudiced in both phases of trial by

these diatribes, the accusations from which came into evidence, without limitation,

and without counterpoint of confrontation and cross-examination.

#### 2. The government failed to make a limited offer of the e-mail evidence

  All of the arguments made by the government are premised upon the notion

that the government made a proper, limited offer of these e-mails for a non-hearsay purpose (Doc. 368, p. 15-16). The trouble is that the government never made such a proper, limited offer of the e-mails.

Reference to the very cases cited by the government makes clear that, to the extent that a proponent wishes to avoid the obvious hearsay character of evidence, and make it admissible by limiting its purpose, it must make certain that the jury is properly instructed about the limited use to which the evidence is being put. *United States v. Looking Cloud*, 419 F.3d 781, 787-788 (8th Cir. 2005); *United States v. Biondo*, 483 F.2d 635, 643 (8th Cir. 1973). See also *United States v. Amahia*, 825 F.2d 177, 181 (8th Cir. 1987). One needs only look at the instructions actually given the jury to see that no such advice was contained therein (Doc. 338). Whatever the government's subjective intention about the e-mails evidence may have been, the government never secured the requisite instruction to the jury about the limitation essential to its reliance upon that approach to the evidence, and therefore the government cannot now try to justify the evidence in that fashion.

3. The e-mails did not qualify for admission as non-hearsay since they could constitute relevant evidence only if the accusations made therein were assumed to be true

The government appears to argue that hearsay can be converted to non-hearsay by the mere expedient of claiming that the evidence is to be received for a

Case 5:05-cr-06002-GAF   Document 396   Filed 03/06/08   Page 53 of 77

so-called non-hearsay purpose, such as to prove motive, state of mind or conduct (Doc. 368, p. 15-16).  However, if one troubles to look more carefully than does the government at the line of cases upon which it relies, one finds that this conversion of hearsay to non-hearsay is much more difficult than mere assignment of a purported purpose for the evidence.  What the proponent of the evidence must do is not only demonstrate its purpose for the evidence, it must also show that the evidence is relevant for that purpose regardless of whether the declarations contained in the evidence are true or untrue.

For example, the government rightly indicates that the Iowa Supreme Court permitted the victim in a kidnapping case to testify about conversations between her and another person, not a witness in the case, regarding the futility of attempts to escape.  *State v. Mitchell*, 450 N.W.2d 828, 832 (Iowa 1990).  The Iowa Supreme Court found this otherwise hearsay presentation to be proper, in part because of the purpose of the presentation, to explain the inactions of the victim, countering arguments of consent being made by the defense related to the victim's failure to take advantage of certain opportunities for escape which presented themselves during the kidnapping ordeal.  *State v. Mitchell*, supra.  There was, however, an additional, crucial component to the calculus made by the Iowa Supreme Court, in keeping with its previous holdings on the subject.  It was

54

essential that the relevance of the statement not be tied to whether the hearsay statement was true or untrue. *State v. Mitchell*, supra; *State v. Sowder*, 394 N.W.2d 368, 371-373 (Iowa 1986); *State v. Horn*, 282 N.W.2d 717, 724-725 (Iowa 1979). In the Mitchell case, the Court found this criterion met because, whether it was true or untrue that an attempt at escape was futire, the companion's notion and communication in that regard was relevant to explain the victim's inaction. *State v. Mitchell*, supra.

On the other hand, in its other, previous cases upon this use of hearsay subject, the Iowa Supreme Court found that, despite the prosecution's protestations about a supposed non-hearsay purpose of the evidence it was offering, that evidence had to be called inadmissible hearsay because its relevance depended upon the truth of the contained declarations. *State v. Sowder*, supra; *State v. Horn*, supra.

To satisfy the purpose element of its burden, the government claims it was offering the Vanessa Boman e-mails to supposedly establish the reason behind Lisa Montgomery committing the charged offense, that she had to produce a baby in order to counter and deal with the accusations made in the e-mails (Doc. 368, p. 20-21). What the government does not acknowledge, but necessarily follows from its line of argument, is that the truthfulness of the content of the accusations in the

e-mails is crucial to the viability of this logic.[2]  If it is assumed that the accusations by Vanessa Boman were untrue, it would be expected that the recipient of those accusations would have simply laughed off such claptrap. Only if the recipient believed the accusations to be true could the recipient be expected to react in the extreme fashion postulated by the government.  Therefore, the e-mails were inadmissible hearsay, dependent upon their truth to be relevant.  *State v. Sowder*, supra; *State v. Horn*, supra.

The Iowa Supreme Court also devised a formula of sorts for determining whether a prosecutor might be making a sham claim of a non-hearsay purpose for evidence in order to hide an ulterior motive to misuse prejudicial hearsay. According to the Iowa Supreme court, needless overuse of detail in light of the purported non-hearsay purpose should be seen to evince a true motive to use the evidence for an improper purpose.  *State v. Sowder*, 371.  In this case, the government fails this test miserably.  The government could have easily made its point and still cut out 95% of Vanessa Boman's incessantly repetitive, personal harangue against Mrs. Montgomery.  That the government chose to not so sanitize

---

[2] The government seems to believe that the admissibility of the e-mails somehow turns on the fact that it was unimportant whether Vanessa Boman or some other person was the author of the e-mails (Doc. 368, p. 19-20).  However, the question over admissibility is one, not over the author of the communication, but rather over the content of the communication.  *State v. Sowder*, supra; *State v. Horn*, supra.

56

its presentation amounts to substantial proof that this presentation was actually an effort to use the Vanessa Boman e-mails for an improper hearsay purpose, to smear Mrs. Montgomery using the horrible invective authored by Vanessa Boman. ***State v. Sowder***, supra.

### 4. Mrs. Montgomery was profoundly prejudiced by the Vanessa Boman e-mail presentation, the government's claims to the contrary notwithstanding

At the last, the government also argues that its resort to the Vanessa Boman e-mails should not be considered prejudicial in light of the fact that it had elicited virtually the same information from Vanessa Boman's husband, Lisa Montgomery's ex-husband, Carl Boman (Doc. 368, p. 24-25).

This argument actually amounts to a profound admission in support of Mrs. Montgomery's point, made just above, that the government's claim about a non-hearsay purpose for this evidence was mere pretext to mask the government true, hearsay purpose for the evidence, to use the Vanessa Boman slurs to impugn Mrs. Montgomery. Resorting again to the logic of the Iowa Supreme Court, since the e-mails were merely redundant of other evidence already received for the non-hearsay purpose, it can be assumed that the government resorted to this additional, needless detail, not for the non-hearsay purpose already fulfilled by Carl Boman's testimony, but rather for the hearsay purpose, an attempt to impugn Mrs. Montgomery's character through the invective of Vanessa Boman. ***State v.***

***Sowder***, supra.

That the Vanessa Boman e-mails were redundant for the non-hearsay purpose does not mean that the improper prejudice of the evidence was thereby muted. Mr. Boman's representations about his wife, though negative, were flattering by comparison to the shrill, ugly and vicious rants against Mrs. Montgomery made in the Vanessa Boman e-mails.

What is more, thanks to the fact that Mr. Boman made his accusations through his own testimony, Mrs. Montgomery was afforded all of the benefits which the Sixth Amendment offers a defendant, testing his testimony "in the crucible of cross-examination", permitting the jury to see the accuser's demeanor, and hear the accuser have to backtrack on certain allegations, and explain his self-serving and anti-Montgomery motivations accounting for certain other allegations. ***Crawford v. Washington***, 124 S.Ct. 1354, 1370-74 (2004); . ***Davis v. Alaska***, 415 U.S. 308, 316-317 (1974); ***Cook v. McKune***, 323 F.3d 825, 832 (10th Cir. 2003). Of course, because of the second-hand manner in which the Vanessa Boman e-mails were presented, the Constitutional imperative/palliative, opportunities for confrontation and cross-examination, were never afforded. This plainly violated Mrs. Montgomery's rights under the Sixth Amendment. ***Crawford v. Washington***, supra; ***Davis v. Alaska***, supra. The prejudice does not get any greater than that.

58

5. The government cites to a host of cases which have no applicability

To this point, undersigned counsel has addressed and explained many of the authorities cited by the government in support of its argument upon this point. Undersigned counsel will now address the remaining cases cited by the government. Undersigned counsel finds it necessary to separately address these cases because they bear so little connection to the issues joined here, being as they are so clearly factually and legally distinguishable. Since, in citing to these cases, the government does not give a page reference to alert concerning the portion of the case thought to be germane, it may be that the government's reliance upon these cases is more boilerplate than truly sincere. Nevertheless, undersigned counsel will address each of the cases, and explain why each is inapposite.

The first of these cases is *United States v. Wright*, 783 F.2d 1091(D.C. Cir. 1986). In *Wright*, there were four hearsay questions raised. Three of those were claims by Wright, all rejected by the lower and appeals courts, that hearsay testimony should have been received. *United States v. Wright*, 1098-1100. The fourth issue involved Wright's objections to a psychiatrist's relation of statements, made by Wright, upon which the psychiatrist relied in making a diagnosis, making that hearsay admissible under F.R.E. 703. *United States v. Wright*, 1100. None of these holdings assists this Court in deciding the very different issue in this case

59

pertaining to the Vanessa Boman e-mails. Moreover, as to the Rule 703 matter, the *Wright* case is further distinguishable from the case at bar since proper objections were not made to the evidence by counsel for Wright, resulting in only plain error review of the issue. *United States v. Wright*, 1100-1101. There is one teaching from *United States v. Wright*, supra which bears significance here: unlike in this case, the jury was properly instructed regarding the limited purpose of the Rule 703 evidence.

*United States v. Lynn*, 608 F.2d 132, 135-136 (5th Cir. 1979) is distinguishable because, even though hearsay statements were received, in each instance the involved witnesses actually testified at trial, and was subjected to cross-examination over the matters, thereby directly correcting any error. Of course, Vanessa Boman did not testify in this case.

The distinguishing features *United States v. Rodriguez*, 484 F.3d 1006, 1013-14 (8th Cir. 2007), amount to a combination of those from *Wright* and *Lynn* above: plain error review due to no contemporaneous objection made, and subsequent testimony at trial by the witness who made the hearsay statement, making the issue moot.

*State v. Hernandez*, 823 P.2d 1309, 1314-15 (Ariz.App. 1991), like the *Wright* and *Rodriguez* cases above, and unlike the case at bar, involved a situation

in which proper objections were not made, and therefore the issues were considered for plain error; in addition, unlike the case at bar, the subject hearsay statement could not be considered prejudicial in that it did not even refer to the defendant.

*Gray v. Maxwell*, 293 N.W.2d 90, 92 (Neb. 1980), unlike the case at bar, was a civil adoption case, and therefore the Sixth Amendment right to confrontation was not considered by the Court.

*Moore v. Plaster*, 313 F.3d 442, 444 (8th Cir. 2002) was also a civil case, specifically a motion for summary judgment in a 1983 action claiming retaliatory discipline, and therefore was also not a case in which the Sixth Amendment right to confrontation attended. In addition, there was separate justification for admission of this hearsay evidence, to support that prison officials, who may rely upon such evidence in disciplinary actions against inmates, had some evidence to support their finding that Moore was being disciplined, not for a retaliatory purpose, as he claimed, but instead for repeated drug usage in prison. Of course, that exception would not apply in the Montgomery case.

Similarly too, *Nyama v. Ashcroft*, 357 F.3d 812, 815-816 (8th Cir. 2004) did not involve a Sixth Amendment claim since it concerned an application for asylum before an immigration judge. Moreover, the hearsay here was plainly not offered

61

for the truth of the matter since it involved evidence about use of precisely the same information, including the same name, date of birth, parental information, etc., in applications made by others, used for the purpose to call into question Nyama's already shaky grounds for asylum. Obviously, the circumstances and evidence were quite different in the Montgomery case.

*United States v. Thomas*, 451 F.3d 543, 547-48 (8th Cir. 2006) is distinguishable from the case at bar for three reasons: the hearsay at issue was contained in admissible business records, proper objection was not lodged at trial concerning the alleged hearsay upon hearsay portions of the records addressed on appeal, and the portions of the records in controversy concerned commands made by a Thomas coconspirator to bank employees, and not representations made by the coconspirator or Thomas which were important for the truth of the matters asserted.

### *V. Sustaining Challenges for Cause against Venirepersons*

For Mrs. Montgomery's point five, undersigned counsel challenged this Court's removal of three venirepersons for cause, accounting to the best of his recollection the answers given by the venirepersons which justified their retention on the panel (Doc. 360, p. 9). In response, the government presents a somewhat different account of the answers of the venirepersons, and argues in favor of them

Case 5:05-cr-06002-GAF    Document 396    Filed 03/06/08    Page 62 of 77

being struck (Doc. 368, p. 26-27).  Since there is still not a transcription of this portion of the trial, there is as yet no way to directly resolve the conflicting recollections.  Undersigned counsel proposes that this Court direct that this portion of the record be transcribed to resolve the controversy.

### *VI. Government argument impinging upon right to present mitigating factor witnesses and evidence*

For her point six, Mrs. Montgomery has argued that the government argument, that Mrs. Montgomery had "dragged" her children into Court to testify on her behalf at penalty phase, did violence to Mrs. Montgomery's rights to present witnesses and mitigation evidence protected under the Sixth and Eighth Amendments as well as 18 U.S.C. 3592(8) (Doc. 360, p. 10-11).  In response, the government claims that its argument was a permissible means to counter what the government believed was Mrs. Montgomery's mitigation contention "that she was a good mother to her children" (Doc. 368, p. 27-28).  The government's contention is unsound factually and legally.

Factually, the government has it wrong because Mrs. Montgomery never contended "that she was a good mother to her children".  Rather, the pled mitigating factors related to the children were as follows:

> 8. Despite having been the victim of significant sexual, physical and emotional abuse, Lisa Montgomery raised four good children and worked many jobs to support her children

…
13. Lisa Montgomery continues to attempt to offer advice, nurturance and emotional support to her children, even while she has been incarcerated.

14. If Lisa Montgomery is sentenced to life imprisonment without possibility of release, she will continue to reach out to her children, to offer advice, nurturance and emotional support to her children, even while incarcerated. (Doc. 355, p. 20-21)

Moreover, the defense never asked the children whether Lisa was a good mother. Therefore, the argument did not relate, factually, to the pled and proven mitigating factors, and thus cannot be justified on that basis. Essentially, the argument asked the jury to decide the case, not upon the law and the pled aggravating and mitigating factors, but upon emotion, the anger over Mrs. Montgomery's supposed mistreatment of her children. Such pleas to emotion are consistently found to amount to reversible prosecutorial misconduct. *Antwine v. Delo*. 54 F.3d 1357, 1363-1364 (8th Cir. 1995); *Newlon v. Armontrout*, 885 F.2d 1328, 1336-1338 (8th Cir. 1989); *State v. Storey*, 901 S.W.2d 886, 901 903 (Mo. 1995). Moreover, arguments which mislead regarding consideration of mitigating factors amount to prosecutorial misconduct worthy of reversal. *People v. Robertson*, 655 P.2d 279, 300-302 (Cal. 1982).

From a legal standpoint, it cannot be debated that the defendant has the rights, protected by the Sixth and Eighth Amendments, and by Federal Statute, to present witnesses and mitigation evidence. *Washington v. Texas*, 388 U.S. 14, 17-

64

22 (1967); *In re Oliver*, 333 U.S. 257, 273 (1948); *United States v. Hang*, 75 F.3d 1275, 1281-82 (8th Cir. 1996); F.R.Cr.P. 17(a) and (b);  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Atkins v. Virginia*, 536 U.S. 304, 318-319 (2002); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982); *Skipper v. South Carolina*, 476 U.S. 1, 5-6 (1986); *Wiggins v. Smith*, 123 S.Ct. 2527, 2542 (2003); 18 U.S.C. 3592 and 3593. It also must be remembered that impermissible burdens cannot be placed upon the exercise of a Constitutional right.  *Griffin v. California*, 380 U.S. 609 (1965) (comments on silence unduly burden Fifth Amendment privilege); *Spevack v. Klein*, 385 U.S. 511 (1967) (forcing attorney to relinquish bar license due to invocation of Fifth Amendment privilege unduly burdens right); *United States v. Fratello*, 44 F.R.D. 444, 447 (S.D.N.Y. 1968) (refusal by prosecution to provide discovery to defendant who invoked Fifth Amendment privilege unduly burdens right); *United States v. Jackson*, 390 U.S. 570, 572 (1968) (provision in kidnapping statute, that death penalty only available if right to jury trial invoked, unduly burdens Sixth Amendment right); *Burns v. Gammon*, 260 F.3d 892, 896-898 (8th Cir. 2001) (defendant's right to trial unduly burdened by prosecution argument that jury should consider against defendant that, in exercising his right to trial, he forced victim to appear and testify against him, and thereby relive the attack).  The government's argument, irrelevant to any pled aggravating or

65

mitigating factor, placed just such an impermissible burden upon Mrs. Montgomery's exercise of her rights to present witnesses in support of her pled mitigating factors.

*Burns v. Gammon*, supra presents a fact situation eerily similar to the one here, and thereby provides much guidance as to the proper outcome here. The Eighth Circuit answered in the affirmative that prosecutorial misconduct is to be found in an argument which chastised Burns for his exercise of his Sixth Amendment right to confront adverse witnesses at trial. *Burns v. Gammon*, 895-896.[3] In fact, the Eighth Circuit found that misconduct of this sort, impinging as it did on a Constitutional right, was so egregious as to constitute plain error, justifying habeas relief grounded in the prejudicial ineffectiveness of Burns' counsel for failing to object to the improper argument. *Burns v. Gammon*, 896-897. The Eighth Circuit also found that the prejudice of the error was compounded, infecting the entire trial, since no objection was lodged, and therefore no opportunity presented itself to purge the error by an instruction to the jury to disregard. *Burns v. Gammon*, 896.

Here, there can be no question that the otherwise irrelevant argument

---

[3] *Burns v. Gammon* thereby clearly answers questions raised by the government over the manner in which prosecutorial misconduct should be judged in a case like this (Doc. 368, p. 28).

impinged upon Mrs. Montgomery's right to present mitigation evidence. Since the Court refused to sustain objection to the argument, the jury was permitted to hold against Mrs. Montgomery her exercise of her rights. Such trammeling on fundamental rights plainly warrants reversal of Mrs. Montgomery's sentence of death.

### VII. Erroneous Instructions Requiring Sentence of Death if Aggravating Factors found to Outweigh Mitigating Factors

For her point seven, Mrs. Montgomery challenged as erroneous the Court's instruction to the jury that it must return a sentence of death if aggravating factors outweigh mitigating factors, arguing that the law requires to the contrary, that the jury be informed that it is never required to sentence to death (Doc. 360, p. 11-12). Undersigned counsel also provided to the Court suggestions in support of the point, noting the overwhelming weight of the law to the contrary outside of the Eighth Circuit, particularly the hefty number of Courts which have instructed Federal Capital case juries that they are never required to return a sentence of death (Doc. 361).

In response, the government notes what Mrs. Montgomery has acknowledged, that the Eighth Circuit has held to the contrary of Mrs. Montgomery's position, and has upheld the giving of the very instructions used in this case (Doc. 368, p. 29-30). However, the government utterly fails to address

67

the other arguments, made by Mrs. Montgomery in her suggestions, regarding the predominant contrary practice outside of the Eighth Circuit (Doc. 368, p. 29-30). Because the government has chosen not to respond to these suggestions, Mrs. Montgomery simply asks the Court to consider those suggestions in deciding this issue. Also, in support of those suggestions, Mrs. Montgomery provides, as separately appendices to this pleading, copies of the penalty phase instructions, directing the jury that it is never required to sentence to death, given in the Federal cases across the country. Those instruction packets are as follows:

Appendix A          ***United States v. Johnson***, W.D.Va. Case #00-26

Appendix B          ***United States v. Simmons***, W.D.Va. Case # 04-30014

Appendix C          ***United States v. Britt***, N.D.Tx. Case # 00-260

Appendix D          ***United States v. Denis***, S.D.Fl. Case # 99-714

Appendix E          ***United States v. Wilk***, S.D.Fl. Case # 04-60216

Appendix F          ***United States v. LeCroy***, N.D.Ga. Case # 02-38

Appendix G          ***United States v. Fulks***, D.S.C. Case # 02-992

Appendix H          ***United States v. Fields***, W.D.Tx. Case # 01-164

Appendix I          ***United States v. Hargrove***, D.Ks. Case # 03-20192

Appendix J          ***United States v. Catalan-Roman***, D.P.R. Case # 02-117

Appendix K          ***United States v. Medina-Villegas***, D.P.R. Case # 02-117

Appendix L        *United States v. Ayala-Lopez*, D.P.R. Case # 03-55

Appendix M      *United States v. Fell*, D.Vt. Case # 03-12

Appendix N       *United States v. Mayhew*, S.D.Oh. Case # 03-165

Appendix O       *United States v. Mikos*, N.D.Il. Case # 02-137

Appendix P       *United States v. Barrett*, E.D.Ok. Case # 04-115

Appendix Q      *United States v. Lentz*, E.D.Va. Case # 01-150

Appendix R       *United States v. Williams*, E.D.Pa. Case # 01-512

Appendix S       *United States v. Aguilar*, E.D.N.Y. Case # 01-1367

Appendix T       *United States v. Wilson*, E.D.N.Y. Case # 04-1016

Appendix U      *United States v. McGriff*, E.D.N.Y. 04-966

Appendix V       *United States v. Krylov*, C.D.Ca. Case # 02-220

Appendix W     *United States v. Bridgewater*, C.D.Ca. Case # 02-938

Appendix X       *United States v. Friend*, S.D.W.V. Case #05-107

Appendix Y       *United States v. Moonda*, N.D.Oh. Case # 06-395

Appendix Z-1    *United States v. Baskerville*, D.N.J. Case # 03-836-Volume 1

Appendix Z-2    *United States v. Baskerville*, D.N.J. Case # 03-836-Volume 2

### *VIII. Erroneously submitting to the jury issue of heinousness*

For her point eight, Mrs. Montgomery challenges the Court's failure to dismiss the government's pled aggravating factor related to heinousness, arguing

69

that the government failed in its requisite burden to prove that the level of violence used against the victim Bobbie Jo Stinnett was greater than that required to commit the act charged in the indictment (Doc. 360, p. 12-13). The government replied by describing, in detail, the causes of Bobbie Jo Stinnett's death (Doc. 368, p. 30-31). However, the government failed to address the essential point made, that the acts as described in the government's account were no more than were necessary to complete the charged act, and therefore cannot constitute proof of the aggravating factor of heinousness.

## *IX. Failure to Prohibit Seeking Death Penalty due to Indictment Clause Violation*

As to this issue, the parties have both requested (Doc. 360, p. 13; Doc. 368, p. 32) that the Court reconsider their respective arguments made in the pleadings previously submitted to the Court, those being Mrs. Montgomery's original motion (Doc. 104), the government's response (Doc.112), Mrs. Montgomery's reply (Doc. 126), the Magistrate's Report and Recommendation (Doc. 177), Mrs. Montgomery's objections to the Report and Recommendation (Doc. 184), and this Court's Order overruling the motion (Doc. 197).

## *X. Failure to Prohibit Seeking Death Penalty due dispensing with Federal Rules of Evidence pertaining to proof of aggravating factors*

As to this issue, the parties have both requested (Doc. 360, p. 13-14; Doc.

368, p. 32) that this Court reconsider their respective arguments made in the pleadings previously before the Court, those being Mrs. Montgomery's original motion (Doc. 105), the government's response (Doc.113), Mrs. Montgomery's reply (Doc. 127), the Magistrate's Report and Recommendation (Doc. 177), Mrs. Montgomery's objections to the Report and Recommendation (Doc. 182), and this Court's Order overruling the motion (Doc. 197).

## XI. Failure to Prohibit Seeking Death Penalty due danger of execution of the actually innocent

As to this issue, the parties have both requested (Doc. 360, p. 14; Doc. 368, p. 32) that this Court reconsider their respective arguments made in pleadings previously before this Court, those being Mrs. Montgomery's original motion (Doc. 103), the government's response (Doc.111), Mrs. Montgomery's reply (Doc. 123), the Magistrate's Report and Recommendation (Doc. 177), Mrs. Montgomery's objections to the Report and Recommendation (Doc. 182), and this Court's Order overruling the motion (Doc. 197).

## XII. Failure to Dismiss Aggravating Factor due to Duplication of Element of Offense

As to this issue, the parties have both requested (Doc. 360, p. 14-15; Doc. 368, p. 33-34) that this Court reconsider their respective arguments made in pleadings previously before this Court, those being Mrs. Montgomery's original

71

motion (Doc. 185), the government's response (Doc.214), Mrs. Montgomery's reply (Doc. 220), the Magistrate's Report and Recommendation (Doc. 268), Mrs. Montgomery's objections to the Report and Recommendation (Doc. 270), and this Court's Order overruling the motion (Doc. 271).

## *XIII. Failure to Dismiss Aggravating Factor concerning kidnapping resulting in death due to failure of proof in light of statutory language*

As to this issue, the parties have both requested (Doc. 360, p. 15; Doc. 368, p. 34) that this Court reconsider their respective arguments made in pleadings previously before this Court, those being Mrs. Montgomery's original motion (Doc. 187), the government's response (Doc.212), Mrs. Montgomery's reply (Doc. 219), the Magistrate's Report and Recommendation (Doc. 268), Mrs. Montgomery's objections to the Report and Recommendation (Doc. 276), and this Court's Order overruling the motion (Doc. 285).

## *XIV. Failure to Dismiss Aggravating Factor concerning danger to another person due to failure of proof in light of statutory language*

As to this issue, the parties have both requested (Doc. 360, p. 16; Doc. 368, p. 34) that this Court reconsider their respective arguments made in pleadings previously before this Court, those being Mrs. Montgomery's original motion (Doc. 186), the government's response (Doc.211), Mrs. Montgomery's reply (Doc. 218), the Magistrate's Report and Recommendation (Doc. 268), Mrs.

72

Montgomery's objections to the Report and Recommendation (Doc. 275), and this Court's Order overruling the motion (Doc. 285).

### XVII. Government questions of Mrs. Montgomery's children regarding Mrs. Montgomery's failure to apologize for killing of Bobbie Jo Stinnett

For her seventeen point, Mrs. Montgomery challenges the government's querying her children, at the penalty phase of trial, about whether she had apologized for killing Bobbie Jo Stinnett, arguing that impinged upon Mrs. Montgomery's rights to present mitigation evidence by probing matters irrelevant to the pled aggravating and mitigating factors, and misleading the jury into improperly basing their penalty determination upon emotion rather than the pled aggravating and mitigating factors (Doc. 360, p. 20-21).

The government accuses undersigned counsel of mischaracterizing and twisting its questions (Doc. 368, p. 36). Actually, there has been no need to do so. The question posed, verbatim, was as follows:

> Has your mom ever apologized for what she did to Bobbie Jo Stinnett and Victoria Jo Stinnett as she counseled you an emotionally supports you?

After objection was overruled, the child ultimately answered as follows:

> No she didn't. She doesn't remember doing it.

As undersigned counsel has argued already to this Court, the government's question addressed no pled aggravating or mitigating factor. It most closely bore

73

on the question of whether Mrs. Montgomery had remorse for the crime committed. Unfortunately, that was an issue which was never pled by the government, and thus was an issue which never should have been broached by the government. Actually, it is the government counsel, not defense counsel, who is playing with words, seen now to be fumbling desperately to concoct what at best would be a marginally creditable excuse for what was a patently improper question (Doc. 368, 36).

The government also falsely tries to create a basis for its post hoc machinations, the supposed emotional problems of Lisa Montgomery's children. However, if the government's true purpose had been to inquire upon that subject, it could have directly inquired upon that subject with the children. The government did not pose such direct questions to the children, or to anyone else for that matter. Instead, it calculatingly chose the highly improper question, implying lack of remorse, and then, once called on the carpet, scrambled to otherwise justify the obviously improper question.

This was, once again, an invitation to the jury to base its decision, not on the pled aggravating and mitigating factors, but upon emotion, something which amounts to reversible prosecutorial misconduct. *Antwine v. Delo*. 54 F.3d 1357, 1363-1364 (8th Cir. 1995); *Newlon v. Armontrout*, 885 F.2d 1328, 1336-1338 (8th Cir. 1989); *State v. Storey*, 901 S.W.2d 886, 901 903 (Mo. 1995). This also was a

tactic designed to mislead regarding consideration of mitigating factors, amounting to prosecutorial misconduct worthy of reversal. *People v. Robertson*, 655 P.2d 279, 300-302 (Cal. 1982).

As already noted above, it cannot be debated that the defendant has the rights, protected by the Sixth and Eighth Amendments, and by Federal Statute, to present witnesses and mitigation evidence. *Washington v. Texas*, 388 U.S. 14, 17-22 (1967); *In re Oliver*, 333 U.S. 257, 273 (1948); *United States v. Hang*, 75 F.3d 1275, 1281-82 (8th Cir. 1996); F.R.Cr.P. 17(a) and (b); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Atkins v. Virginia*, 536 U.S. 304, 318-319 (2002); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982); *Skipper v. South Carolina*, 476 U.S. 1, 5-6 (1986); *Wiggins v. Smith*, 123 S.Ct. 2527, 2542 (2003); 18 U.S.C. 3592 and 3593. It also must be remembered that impermissible burdens cannot be placed upon the exercise of a Constitutional right. *Griffin v. California*, 380 U.S. 609 (1965) (comments on silence unduly burden Fifth Amendment privilege); *Spevack v. Klein*, 385 U.S. 511 (1967) (forcing attorney to relinquish bar license due to invocation of Fifth Amendment privilege unduly burdens right); *United States v. Fratello*, 44 F.R.D. 444, 447 (S.D.N.Y. 1968) (refusal by prosecution to provide discovery to defendant who invoked Fifth Amendment privilege unduly burdens right); *United States v. Jackson*, 390 U.S. 570, 572 (1968) (provision in kidnapping statute, that death penalty only available if right to jury trial invoked,

Case 5:05-cr-06002-GAF   Document 396   Filed 03/06/08   Page 75 of 77

unduly burdens Sixth Amendment right); ***Burns v. Gammon***, 260 F.3d 892, 896-898 (8th Cir. 2001) (defendant's right to trial unduly burdened by prosecution argument that jury should consider against defendant that, in exercising his right to trial, he forced victim to appear and testify against him, and thereby relive the attack). The government's arguments here, irrelevant to any pled aggravating or mitigating factor, placed just such an impermissible burden upon Mrs. Montgomery's exercise of her rights to present witnesses in support of her pled mitigating factors.

## *CONCLUSION*

WHEREFORE, in light of the foregoing, and in light of the premises set forth in her previous pleading (Doc. 360), Mrs. Montgomery prays that this Honorable Court grant her an acquittal upon the charge brought in the indictment. In the alternative, Mrs. Montgomery prays that this Court grant her a new trial in the above captioned cause. In secondary alternative, Mrs. Montgomery prays that this Court grant her a new penalty phase trial.

Respectfully submitted

/s/Frederick A. Duchardt, Jr.
FREDERICK A. DUCHARDT, JR.
MO Bar Enrollment Number 28868
P.O. Box 216
Trimble Mo. 64492
Phone: 816-213-0782
Fax: 816-635-5155
ATTORNEY FOR MRS. MONTGOMERY

## *CERTIFICATE OF SERVICE*

I hereby certify that a copy of the foregoing Motion was served electronically upon the following

Matt Whitworth
Roseann Ketchmark
Cynthia Cordes
Assistant United States Attorneys
Charles Evans Whittaker Courthouse
400 E. 9th St., Fifth Floor
Kansas City, MO  64106

/s/Frederick A. Duchardt, Jr.
FREDERICK A. DUCHARDT, JR.