IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                    ---

UNITED STATES OF AMERICA       :   CRIMINAL ACTION
                               :
        vs.                    :
                               :
VINCENT WILLIAMS,
JAMAIN WILLIAMS,               :
ANDRE COOPER                   :   NO. 01-512


              PHILADELPHIA, PENNSYLVANIA
                    May 10, 2006
         BEFORE HONORABLE J. CURTIS JOYNER, J.
              DAY TWELVE - PENALTY PHASE


APPEARANCES:


FOR THE GOVERNMENT:   OFFICE OF THE U.S. ATTORNEY
                      BY: NANCY BEAM WINTER, ESQUIRE
                      FAITHE MOORE TAYLOR, ESQUIRE
                      615 Chestnut Street, Suite 1250
                      Philadelphia, Pennsylvania 19106



FOR JAMAIN WILLIAMS:  CLAYTON SWEENEY, JR., ESQUIRE
                      P.O. Box 55441
                      Philadelphia, Pennsylvania 19127

                      GILROW, KAMMEN & HILL
                      BY: ROBERT HILL, ESQUIRE
                      One Indiana Square, Suite 105
                      Indianapolis, Indiana 46204

1

2     APPEARANCES CONTINUED:

3

4     FOR ANDRE COOPER:     PATRICK J. EGAN, ESQUIRE
                            239 South Camac Street
5                           Philadelphia, Pennsylvania 19107

6                           ANTHONY RICCO, ESQUIRE
                            EDWARD D. WILFORD, ESQUIRE
7                           20 Vesey Street, Suite 400

8                           New York, New York 10007

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23             GREGG B. WOLFE, RPR, CM
               Official Court Reporter
24          601 Market Street, Room 1234
            Philadelphia, Pennsylvania 19106
25                  (215) 925-6409

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    (The Court began the proceedings at
2  9:30 a.m.)
3    THE COURT:  Counsel, are we ready for
4  the jury?
5    MR. HILL:  We are, Your Honor.
6    THE COURT:  Let's get started then.
7    (The jury entered the courtroom at
8  9:25 a.m.)
9    THE COURT:  Good morning, ladies and
10  gentlemen.  Welcome back this morning.  We are
11  ready to resume with the closing summation of
12  counsel.
13    Mr. Hill, you may proceed.
14    MR. HILL:  Thank you, Your Honor.
15    Good morning, everyone.  I wanted to
16  just touch on a couple of things to remind you,
17  to bring you right back to where I was yesterday
18  when we were closing.
19    We had talked about family discord.  We
20  talked about Linda moving out.  We had talked
21  about the loss of positive role models and
22  mentors and the ascendancy, if you will, of
23  negative role models.
24    We had talked about how Jamain was
25  upset, and reminded you of the testimony of

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1 Juanita Simpkins, how Jamain went to her on a

2 number of occasions crying, why did my mom move

3 out, why did this have to happen?  We talked

4 about what that meant to the structure of the

5 household.

6 　　　　　We reminded you of cousin Kevin saying

7 the boys weren't required to do anything, slept

8 all day.  We reminded you that Gladstone

9 admittedly was a passive person, depressed,

10 smoking marijuana.

11 　　　　　We reminded you of these things only to

12 create the impression of the household as it

13 was.  All right?

14 　　　　　It's in this environment that we see

15 that we lose Jamain to the corner.

16 　　　　　Now, I wanted to, at this point, remind

17 you of a couple other things.

18 　　　　　Heather Kasarda, the probation officer,

19 testified that she not only told the school

20 people about this -- and we showed you Josette

21 Springer's note and we gave you Heather's live

22 testimony here -- told the school people about

23 the need for remediation and the problems there.

24 She also told Linda and nothing happened.  Linda

25 didn't take steps to address the issue.  That's

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1   what Heather told you.

2          Also, I want to remind you of the

3   testimony of Caroline Saunders, about when she

4   wanted to intervene for Jamain about school with

5   Linda, and Linda basically said, no thanks.

6          I say these things so that you have a

7   clear picture of what was going on regarding the

8   school issues.  I tell you these things so that

9   you have a clear picture of what was happening

10  at age 13, how all these things -- when I say

11  "age 13," I'm not saying, you know, April 1st,

12  on his 13th year of life.  I'm saying in this

13  time period, 12, 13, 14.  Okay?  And that's what

14  everyone's testimony is.

15         Frankly, the family members aren't

16  well-equipped to be good, accurate historians in

17  terms of date, time and place.  Okay?

18         But during this time period, 12, 13,

19  14, we lose Jamain to the corner.  We lose

20  Jamain to the corner for all these reasons.

21         I think you can see that.  I think

22  those of you that are parents, those of you who

23  know children, those of you who have raised

24  children, know the importance of what I'm

25  talking about, the importance of structure and

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    how that structure was gone.

2         Waverly Duck told a story from the

3    witness stand about Jamain and his first

4    endeavor on the corner, about how he was

5    arrested because some older guy gave him some

6    drugs to hold.

7         The police officer took him down, and

8    Jamain said nothing.  He comes home; Linda goes

9    down and gets him, brings him home.  What

10   happens?  Jamain ends up going right back

11   outside, right back to the corner.

12        Waverly told you that the Oldhead gave

13   him some dope and said, way to go, good job.

14   This is Jamain's stake.  This is his own to

15   sell.  That's the process of how this worked.

16        That's the process that Dr. Anderson,

17   Dr. Duck said that they understand from other

18   stories about these situations, and other

19   research that they've done into street corner

20   drug dealing.

21        Now, we understand, and I've gone

22   through a number of these issues with you about

23   the family, about Chester.  I'm not going to

24   belabor Chester and about the school.  We

25   understand that, I think.  I think you can see

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  where that is compelling mitigation, compelling

2  mitigation for you to make moral determination

3  about Jamain, about whether or not he is worthy

4  of a life sentence, about whether or not there

5  are certain things in him that we need to

6  understand to make this reasoned moral judgment

7  on punishment.

8          We also presented stories about Jamain.

9  The issue throughout the entire trial was point

10  a finger at Jamain, point a finger at Jamain,

11  keep pointing that finger at Jamain again.

12          I think throughout that whole trial,

13  you heard a couple of stories about Jamain that

14  were positive stories from the government's

15  witnesses.

16          Remember the story about Bird's mom,

17  Stephanie Jones?

18          If you could get that Power Point

19  slide, which is Slide 17, please.

20          Sometimes this technology doesn't

21  necessarily work the way you want it to.

22          Yesterday I threw up a slide that had

23  nothing to do with what I was talking about, but

24  I explained it anyhow.

25          This slide, however, this is Stephanie

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  Jones' testimony from March 14th.  Read this,
2  please and remember this.
3          Stephanie Jones had a breakdown.  She
4  had a breakdown because her father, I think it
5  was, had passed away, a relative had passed
6  away.  She said, I couldn't walk, I couldn't
7  eat, couldn't get around.  I couldn't do
8  nothing.
9          He, Jamain, would help me out with my
10 two little boys.  He made sure they got up and
11 got ready for school.  He would sit there on the
12 outside of the house, or him and my son, and
13 that would be Bird.  They would sit there, more
14 or less, and try to get me something to eat.
15 They would watch the house so I wouldn't get out
16 and hurt myself.
17         How long did that go on for?  That went
18 on for a year and a half.  That whole time
19 Jamain was helping you?  Yes.
20         That shows a little something else
21 about Jamain, something else that we don't see
22 in the indictment and see in the accusations.
23 There's something good there.  There is
24 something good there that would do this for
25 Stephanie Jones; go out of his way to help her

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    out, go out of his way to get her kids ready for

2    school, to go out of his way to make certain she

3    didn't hurt herself and had, as she said, stuff

4    to eat.

5            Felicia Bowman lives across the street

6    from Gladstone Williams in Highland Gardens.

7    Felicia Bowman is older than Jamain by four

8    years.

9            She testified that she had an elderly

10   mom who lived there, and for a while Felicia

11   moved away.  When she moved away, Jamain would

12   routinely check on her mom to make certain that

13   she had groceries, make certain if she needed

14   something, Jamain would go to the store for her.

15   Make certain she was okay.

16           There's something good there in a

17   person that does that.  She said that Jamain,

18   when her daughter was out playing, would give

19   her daughter a hug, would play with her

20   daughter, kissed her.  There's something good

21   there in that sort of person.

22           He bought diapers and clothes for her,

23   probably with drug money, I would concede that.

24   He bought diapers and clothes for her kids when

25   she had no money.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    He would loan money.  He would loan

2    money to her.  He took her nephew to the

3    hospital, and waited at the hospital with her

4    until the nephew is patched up to bring them

5    back home.

6         One time she was locked out of the

7    house.  Jamain helped her get back in, checked

8    the house out to make certain that it was okay,

9    that there wasn't someone inside the house that

10   could harm her.

11        She described him as protective and

12   quiet.

13        Laveer White testified that -- with

14   drug money probably because we know Jamain never

15   had a job -- Jamain bought what he called two

16   basketball courts.  Do you remember that?

17   Jamain put them up down on the other end of

18   Boyle, put them up down where they were not in

19   front of someone's house, but in between houses,

20   put it on the street so that everyone could

21   play.

22        He told you that he saw the police come

23   by and tear down the first basketball court that

24   Jamain bought with drug money, and Jamain bought

25   a second one and put it up.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    You also heard stories about how Jamain

2    bought basketball shoes for kids playing in the

3    summer league who couldn't afford basketball

4    shoes.  He probably bought it with drug money,

5    probably, but it's something that he didn't have

6    to do.

7         It's something where he reaches out to

8    another.  It's something where it shows some

9    goodness.

10        Lavere told you about the importance of

11   religion in his life, the importance of his

12   mother pushing him as a mentor, keeping him on

13   the right path.

14        You also heard from Aaron McCarey.  He

15   was into rap music.  Do you remember that?

16        Now, before I tell you Aaron's story,

17   and tell you about how he had nothing but good

18   things to say about Jamain and Jamain's

19   encouragement of him in rap music, I want to

20   step back and remind you of Heather Kasarda.

21        Remember the job fair?  Jamain was

22   going to go to the job fair and didn't go.  He

23   didn't go because they couldn't find his birth

24   certificate, nor his Social Security card.  He

25   didn't go.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    Aaron went to a similar program.  I

2  asked him, I said, what did you need to go?  He

3  said, well, you needed documents.  What

4  documents?  Birth certificate and Social

5  Security card.  Aaron, where did you get it?  My

6  mom sent off to Harrisburg.  My mom sent off to

7  Harrisburg to get the documents for me.

8    That's quite the contrast to what you

9  heard Jamain say, well, we just couldn't find

10 them.

11    Jamain encouraged him in his rap music.

12    There's a young man down the street.

13 His mother was standing outside one night or one

14 afternoon, and a gentleman friend of hers was up

15 in her face yelling.  Greg is about three or

16 four years younger than Jamain.

17    Greg, fearing for his mom, steps in and

18 tries to separate this situation.  Greg said, I

19 was afraid the guy was going to come on me.

20 Jamain walking down the street walks in, steps

21 in and mediates the dispute.  I said, was there

22 violence?  He said, no.  Jamain just calmed him

23 down, calmed things down.

24    That could be a risky thing to do.

25 That could be a very risky thing to do on Boyle

1    Street.  Jamain did it.  Yeah, it was on the

2    same street where they were selling drugs, but

3    Jamain did it.

4           There's a certain bit of goodness there

5    for someone to step in at their own risk for the

6    benefit of another.

7           Davina Terry, who is Shawanna's sister

8    and Jamain's sister-in-law, told you the story

9    about how Jamain, when she had her child -- she

10   was very young when she had her child.  She had

11   her child, and Jamain would come over and take

12   him to get haircuts, play basketball with him,

13   buy diapers for him, do things as kind of a big

14   brother.

15          This is before Jamain had his own kids.

16   He made some sort of impact there.  That is a

17   good thing.

18          Felicia Johnson -- excuse me, Davina

19   said one other thing, too.  She said that Jamain

20   was a good parent.  We're going to talk about

21   this in a minute.

22          She told you that Jamain was good with

23   his children, would do things with him, was an

24   attentive, loving father.

25          Felicia Johnson testified -- remember

1   Brian Rogers?  Do you remember that guy?  He's

2   no longer facing the death penalty.  He could

3   get out in 25 years.  He beat up her dad, put

4   him in the hospital, busted ribs.

5          Jamain goes to visit him in the

6   hospital.  When her dad comes home from the

7   hospital, she said he had this thing like hooked

8   up to him to -- I don't know what it is, but it

9   was like a machine for his recovery, a drain or

10  something.  I don't know.

11         Jamain helped carry him into the house,

12  helped get him settled into the house.  Jamain

13  helped him, and he didn't have to.  That's a

14  good thing.

15         She has a brother who has cerebral

16  palsy and mental retardation and really can't

17  speak.  I believe she said her brother's name

18  was Ronald.  Ronald would get out of the house

19  and wander down to the corner where they were

20  selling drugs.  He wandered down to the corner,

21  and Jamain brought him home time and time again.

22         Like Jamain ran his sister off the

23  corner because it was dangerous, Jamain would

24  bring Ronald home.  It's a little thing, but

25  it's a good thing.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    Brenda Pagan told you about Jamain
2  giving her advice about boys.  It's a little
3  thing, but it's certainly a good thing.  Watch
4  out for that guy.  You know what guys want.
5    These things go to show you a different
6  side of Jamain.  These things go to show you
7  what I told you in my opening in this part, that
8  I hoped I could get you to see, that there's a
9  different side of this coin.  That's where the
10  moral dilemma comes in for you, for you, for all
11  of you.
12    In this same vein, we presented
13  Dr. Lynn Bornfriend.  Remember we had that
14  25-minute video clip of the kids showing the
15  handdrawn cards that Jamain had sent to them,
16  Happy Birthday, I love you, and phone calls?
17  This is so important.  Please bear with me.
18    I've cut it down to, I think, just
19  under ten minutes.  You have the whole disc.
20  You can play the whole disc, if you choose.  I
21  just want to play segments of it to remind you
22  of certain things about this.
23    So if we could please put -- you don't
24  know what video number that is.  It's an excerpt
25  from 180.  If we could play this?

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1          THE COURT:  Yes, it may be displayed to

2    the jury.

3          (Whereupon the videotape was played.)

4          MR. HILL:  I want to tell you why I

5    want to play this for you.  Sorry.

6          (Whereupon the videotape was played.)

7          MR. HILL:  That's a hand-colored card

8    from Jamain.  This is another hand-colored card

9    that Jamain colored.  Another hand-colored card.

10   That's Jamain and the Dumbo elephant back there.

11   The other card wasn't hand drawn.  This one is.

12         It's a little thing, but last weekend

13   for my wedding anniversary, I was a last-minute

14   shopper for a card.  I didn't have time.  I

15   didn't have inclination to draw a card for my

16   wife.  I think it says something about someone

17   who would take the time to do that.

18         You have to have the time to do it,

19   first of all, yes.  But you have to have the

20   inclination, more importantly.  And that's very

21   important.  It's a little thing, but it's a good

22   thing.

23         It's a good thing, as Dr. Bornfriend

24   pointed out, that even though this is not the

25   perfect situation for parenting, but there are

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1 positive aspects to this parenting situation,

2 encouraging school, encouraging minding your

3 mom, being respectful, encouraging love.

4 These are small things, but they are

5 very important. These are things that you can

6 see in Jamain.

7 I think one of the things that we

8 wanted to convey is that Jamain is a caring

9 person, and he is. You've heard different

10 stories about Jamain. You've seen two sides of

11 him. You've convicted the one, and you're going

12 to be asked to punish the other. That's the

13 kind of punishment that you'll be doing here

14 shortly.

15 We have submitted -- I want to say one

16 more thing. Dr. Bornfriend talked about

17 something, and, in all fairness, I want to bring

18 this up.

19 Dr. Bornfriend talked about that this,

20 what you see here, and her interviews with the

21 kids and her interview with Jamain, is a

22 positive parent-child relationship.

23 She said that it would be damaging to

24 these kids should that relationship end. That's

25 true. It's also true for Tracy Saunders' kids.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  That's true.  I can't change what's happened.

2           As I told you at the beginning of this,

3  we can only look forward and look forward with

4  hope.

5           We're going to submit -- and members of

6  my defense team debated this -- I was going to

7  put up all of our mitigating factors on an

8  overhead and show them to you and you can go

9  through them, but I don't think I'm going to do

10  that.

11           I think I'm going to leave it to you to

12  read through these, to understand and recall

13  what I've told you, the evidence that I

14  presented, and make your moral judgments, your

15  individual moral judgments about Jamain.

16           I'm not going to go through all of

17  these.  I do want to talk about a couple of

18  things.

19           Brian Rogers, Mark Rogers aren't here.

20  Jamain grew up in a very dysfunctional

21  neighborhood, household, school system, and he

22  was suffering with this learning disability, a

23  learning disability that Mary Lazar and

24  Dr. Benedict both told you puts him at a higher

25  risk for violent behavior.  There are studies

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  that they cited that demonstrate that.

2         I want to also get you to think about

3  another general area where Jamain has had a

4  positive influence on people.  Jamain is capable

5  of developing relationships.  Jamain is capable

6  of being a good parent, presenting a good

7  message.  These are all positive things.

8         You're going to be asked to make an

9  individualized determination here.  It means

10  that each of you, each of you, each and every

11  one of you, is making an independent moral

12  judgment about life punishment for Jamain.  Each

13  of you.

14         If there's going to be a death

15  sentence, it has to be unanimous.  Any one of

16  you can give life.  You are, each and every one

17  of you, life givers.  That is your power here.

18  That is your role, and that's what the law says.

19         You have to deliberate, you have to

20  discuss, you have to put together the evidence.

21  You have to make an independent, individual

22  decision, not a decision that is overwhelmed by

23  majorities, not overwhelmed by people who have a

24  stronger personality.  It's your individual

25  decision.  It's a decision as much of the heart

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    as it is of the mind.  It's your individual

2    decision on life.

3            You all have to respect each other's

4    individual thought processes on this.  One vote

5    for life means life sentence.  Each of you can

6    influence the future to that extent.

7            This is not a mechanical determination

8    where you just lay out these flow sheets and

9    check and check and add, plus this, plus that

10   and add and add and add.  In the end, you can

11   make your determination as to what mitigation is

12   most controlling to you based on concepts of

13   mercy and hope, based on concepts that we

14   presented in mitigation.

15           You know what else?  You'll see this.

16   If I messed up, and I haven't given you a

17   mitigating factor that you think should be on

18   there, you, as an individual, can write it in

19   here.  That's what the blanks are for.  And that

20   loan factor is enough for life.  That's the way

21   the law is, because this is an independent,

22   moral determination by you, by each of you.

23           In the end, the government is going to

24   get up here, and I'm not going to be able to say

25   anything else.  Mr. Ricco will not be able to

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  say anything else, and they get rebuttal.  They

2  get rebuttal.

3        Ask yourself, as they are doing this

4  rebuttal, what would Mr. Hill say in response to

5  that?  What did the evidence tell me in response

6  to that rebuttal?  Because I get no other

7  chance.  I have no other chance to respond.

8        I told you earlier, this is not about

9  choices.  This is a case about how choices are

10  limited.  We are what we learn.  We are what we

11  are taught.  You all know this as parents and as

12  people growing up in stable houses.  We are what

13  we are taught, and 90 percent of that comes from

14  home.

15        We make our choices based on what we've

16  learned in that environment under those

17  circumstances.  Yeah, people make choices, but

18  the issue is how well-equipped are they to make

19  those choices?

20        That's the issue that comes up, and

21  comes to the forefront when you're making this

22  individual, moral determination on sentencing.

23  We're not talking about guilt or innocence here.

24  You have decided that.  You have decided that.

25  We're talking about life punishment.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    In this circumstance, our choices are

2  moderated and constrained.  Our choices are

3  limited from our circumstances from where we

4  come from.  I didn't choose to be born in Texas,

5  but I was.

6    Jamain, asking when he is 15, why do we

7  have to live here, didn't choose to be born with

8  a learning disability, didn't choose to be born

9  to parents living on Boyle Street, crying, why

10 do we have to live here?

11    Our choices -- yeah, we make choices,

12 but our choices are constrained by our

13 background, by what we've learned.

14    I talked to you about hope.  I talked

15 to you about hope.  I talked to you about -- I

16 see hope.  I showed you photographs with Jamain

17 and his kids.  Dr. Bornfriend has talked about

18 this.  I see hope there.  I see hope that Jamain

19 can lead his kids.  I see hope that there is a

20 positive relationship there.  In death, there is

21 no hope.  In death, it's over.

22    Lou, if you could play this?

23    This is one of the phone calls that we

24 played for you during the trial.

25    (Whereupon the tape was played.)

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1     MR. HILL:  This is a conversation

2   between Jamain and his wife about their little

3   boy.  You've been telling him to be good in

4   school.  That's a positive message.  That's a

5   positive parent conversation.  It's not an

6   argument.  It's not a discussion about

7   extraneous things.  It's a positive

8   conversation.

9           Go ahead, please.

10          (Whereupon the tape was played.)

11          MR. HILL:  That's his son.

12          (The tape continued playing.)

13          MR. HILL:  That's hope.  That's hope.

14   If you kill Jamain, you kill that kernel of

15   goodness that's in his heart, and that's not

16   what this is about.  If you kill Jamain, you

17   kill hope.  You kill the guy that helped Felicia

18   Johnson's dad into the house.  You kill

19   goodness.

20          I am not excusing what happened, and I

21   apologize to the victims.  My heart goes out to

22   them.  I can't change it, but you can impact

23   what happens next.  Please, don't kill hope,

24   don't kill that goodness, no matter how small

25   you think it is, that's in Jamain's heart.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    That's not what this is about.

2            Thank you, Judge.

3            THE COURT:  Thank you, Mr. Hill.

4    Ms. Taylor?

5            MS. TAYLOR:  Good morning, ladies and

6    gentlemen.

7            THE JURORS:  Good morning.

8            MS. TAYLOR:  As you see, the attorneys

9    feel very passionate about this portion of the

10   case, and, because unlike anything you've ever

11   had to do, you are now confronted with making a

12   moral judgment on the lives of two men.

13           Yet, we approach this in two very

14   different ways.  The government is seeking death

15   based on their conduct on the street.  Counsel

16   for these men ask you now to look at the hope,

17   to look at the good that is in them, to look at

18   their good deeds, to look at their children, and

19   to consider the impact that your decision will

20   have on the lives of those that they love and

21   those that love them.

22           There's nothing wrong, I submit to you,

23   with them asking you to do that, because, as I

24   told you in my initial remarks, Jamain Williams

25   is not a monster.  Andre Cooper is not a

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1   monster.  They are men.  If you pinch them,

2   they'll say ouch.  If you cut them, they will

3   bleed.  If you hurt them, others will hurt.

4   There is no denying that.

5            I asked you when you sentenced to look

6   them in their eyes and see human beings because

7   I want you -- I submit to you, it's only fair

8   and just that you treat them not as they treated

9   others, but as all human beings are entitled to

10  be treated.

11           Now, by asking you to sentence human

12  beings, the government in no way means to

13  insinuate to you that the mitigating factors

14  that they have presented come close to the

15  aggravating factors that we've presented.

16           Now, before I get there, I would be

17  remiss if I didn't respond to some things that

18  counsel said yesterday.

19           When Mr. Ricco made his remarks, he

20  spent a good 20 to 30 minutes on double-talk and

21  misleading you.

22           Let me be clear.  To the extent that

23  you believe I misled you, disregard it.  Throw

24  it out.  But to the extent that you believe they

25  did the same, I challenge you, disregard it.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    Throw it out.

2            Now, I don't know what we call it here.

3    I thought we called it advocacy, but Mr. Ricco

4    wants to call it double-talk so let's call it

5    double-talk.

6            The government never mentioned the word

7    "hate" to you, not once.  Never asked you to

8    hate these men, but only asked you to judge them

9    fairly.

10           Hate came from there.  Hate came from

11   Mr. Ricco's mouth, again and again and again.

12   If I didn't ask you to hate them, why does he

13   testimony you I want you to?

14           Double-talk or advocacy?  You decide.

15           They show Chester High School

16   statistics.  They did it.  Spent half of a day

17   on Chester High School.  Andre Cooper never

18   spent a day there.  Never spent a day there.

19           Double-talk or advocacy?  You decide.

20           They never showed you the Wilmington

21   School District statistics, never.  But we know

22   from sixth grade on, that's where he was.

23           Double-talk or advocacy?  You decide.

24           They chose a college student, Tanvir

25   Rahman, to put together some stats, but they

1  forgot to tell him to check them.

2          Double-talk or advocacy?  You decide.

3          They said Rashee Grant went to Delaware

4  to get the van.  You have Mark Rogers'

5  testimony.  Rashee Grant didn't go to Delaware

6  to get the van.  Andre Cooper, Jamain Williams,

7  Vincent Williams and Mark Rogers went to

8  Delaware.

9          Double-talk, advocacy?  Honest mistake?

10  You decide.

11          They say -- and Mr. Ricco was adamant

12  about this, you know in jury selection we made

13  you promise that just because there were three

14  or more murders you wouldn't automatically vote

15  for death.  And what does the government do?

16  They ask you to consider it.

17          Now, what does the aggravator of

18  contemporaneous convictions mean?  It means that

19  you have found more than one death.  And how

20  many did you find?  Three.  And what is that?  A

21  lawful aggravator.  And who knows that?  He

22  does.

23          He tells you that we have done

24  something wrong.  He tells you that we have done

25  something improper when he full and well knows

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  this Court will instruct you on that aggravator.

2          Double-talk or advocacy?  You have to

3  decide.

4          How come Tanvir Rahman knows all the

5  counties you live in, but he doesn't know that

6  Andre Cooper wasn't living in Chester?  How

7  come?  And if he did know that Andre Cooper was

8  in Wilmington, how come he didn't compare

9  anything to Wilmington?  But he knows where you

10  live.

11          Double-talk or advocacy?  You have to

12  decide.

13          How come during the guilt phase when a

14  defense cross-examines our witnesses on

15  everything under the sun, Mr. Ricco says, hey,

16  we're just putting the government to their

17  burden.  But when we cross-examine witnesses in

18  a penalty phase, it's ridicule.

19          Double-talk or advocacy?  You have to

20  decide.

21          Why shouldn't you know that Dr. Mark

22  Cunningham had half a million dollars in taxable

23  income from going all around the country

24  testifying in these types of cases?  Aren't you

25  entitled to know that?  Isn't that evidence of

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  bias or interest?

2          Double-talk or advocacy?

3          Why does the defense continue to call

4  Mr. Aiken a warden, when the man has been

5  retired for ten years and is nothing but a

6  defense consultant?  Why?

7          Double-talk, advocacy?

8          But, more importantly, why does

9  Mr. Aiken call himself a warden?

10          Double-talk or advocacy?

11          Why does Mr. Ricco look at me and tell

12  you, if we wouldn't have played those phone

13  calls, you wouldn't have heard them.  Who gave

14  them to him?  If we're running from the phone

15  calls, ladies and gentlemen, why do I put them

16  in his hands?  Why?

17          Double-talk or advocacy?

18          Why does Mr. Ricco attack the

19  government?  Why?  I'm not even going to answer

20  that question.  I'm going to leave that question

21  to you.

22          I submit this to you, because Mr. Ricco

23  and I do agree on one, one very key point.  This

24  is important.  This is huge.  This is huge.  It

25  is not to be taken lightly, and, I submit to

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    you, not one person in this room has, but

2    certainly not the government.

3            We filed the notice.  We bear the

4    burden.  We challenged their mitigation.

5            You know what, we're not going to

6    apologize for that.  We're not going to

7    apologize for believing that when you commit

8    three premeditated murders, that the question

9    should be asked, do you deserve to live or do

10   you deserve to die?

11           We won't apologize for that.  We won't

12   run from that reality because in this society

13   there are certain things that we, as citizens,

14   do that begs that question.  I submit to you

15   three premeditated murders beg the question:  Do

16   you deserve to live or do you deserve to die?

17           Now, Mr. Ricco also said the government

18   keeps saying "substantially" when they know it's

19   "sufficiently."  I said "substantially," and

20   "overwhelmingly," just so we can be correct,

21   because we have more than sufficiently shown

22   that all of their mitigators do not outweigh

23   sufficiently, substantially, whatever, our

24   aggravators, even if you just take one.

25           Now, there's a lot of testimony here

1  about Chester.  We didn't put one expert up

2  there to say Chester was good.  Chester is bad.

3  Chester is bad.  We knew it when we went there

4  in 2001; we know it now.  Chester is bad.

5  Chester is full of poverty.  Chester is full of

6  poor people.  Chester is full of everything that

7  is wrong in America.

8         But, ladies and gentlemen, use your

9  common sense.  There is nothing unique about

10  Chester.  There's a pocket of poverty in every

11  major city in this country.  There are poor

12  people who live in Chester, who work, most of

13  them, who don't kill people, who don't commit

14  crimes, because if that were not true, then

15  there wouldn't be nine homicides in Chester,

16  there would be 90.

17         These guys aren't the only drug dealers

18  in Chester.  There's drug dealers on every

19  corner.  We don't contest that.  The difference

20  is, these kill.  That's the difference.  These

21  kill.

22         So, yes, they present the mitigator

23  that Chester is bad.  I accept it.  Chester is

24  bad.

25         I tell you something else that they

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    said that I agree with 100 percent.  When you

2    live in poverty, surrounded by drug dealing, and

3    you have limited other resources, drug dealing

4    is a viable option, absolutely.

5            But drug dealing doesn't equal killing.

6    Drug dealing doesn't equal killing three times,

7    and it certainly doesn't equal three

8    premeditated murders.

9            So they seek to bring in Chester's bad,

10   but it only explains why do you become a drug

11   dealer?  Nothing, nothing they presented

12   explains why do you become a premeditated

13   murderer three times?  Nothing.  Not one

14   mitigator.

15           You look at them.  Not one expert got

16   up there and said and gave us that why.

17   Because, you see, Mr. Ricco told you, only they

18   had the why.  Only they had the why.

19           You look at their evidence because it

20   certainly explains why people sell drugs.  It

21   doesn't explain why you commit premeditated

22   murder, and it certainly doesn't explain why you

23   do it three times in two years.

24           Now, Mr. Ricco said to you, Karriem

25   Washington would have shot Andre Cooper if he

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  had a chance.  What does that have to do with

2  Andre Cooper's goodness, with Andre Cooper's

3  entitlement to life?  What does that have to do

4  with that?  Is that an excuse?  I don't know.

5          Is that double-talk?  I don't know.

6          But I'll say this.  The testimony was

7  that Karriem Washington was in and out of

8  Highland Gardens looking at him, staring at him,

9  challenging him.  If he wanted to shoot Andre

10  Cooper, he should have, would have, could have.

11  He could have.  He didn't.

12          See, that's the issue.  Not can we read

13  Karriem Washington's mind, but look at the

14  evidence.  He didn't.  He didn't shoot Andre

15  Cooper.

16          And do you want to throw in there that

17  people even love Karriem Washington, the thug,

18  go ahead.  I don't know what that has to do with

19  the goodness left in Andre Cooper.  But go

20  ahead.

21          Now, you don't have to earn the right

22  to life, but your conduct certainly can earn it.

23  That was the gravamen of my remarks.  If you

24  want to turn the words around, go ahead.  If you

25  want to use the word "worthy," let's never,

1    ever, never, ever -- I'm never going to say

2    "earn" again.  "Worthy."  I like "worthy" better

3    anyway.  So forget when I say "earn."  Put

4    "worthy" in there, and then we all agree.

5              Now, there was a lot of talk about

6    things that weren't done for Andre Cooper and

7    the things that weren't done for Jamain

8    Williams.

9              Andre Cooper's attorney said to you,

10   some of us have light shed on us all the time;

11   some of us have light shed on us none of the

12   time.  Andre Cooper never had a light shed on

13   him.  I sat there and I thought, then where have

14   I been?  Because we have been told about the

15   light that was shed on Andre.

16             Now, maybe that light wasn't enough.

17   That's for you to decide.  But let's be clear

18   that there were people, circumstances in Andre

19   Cooper's life over the years that tried to shed

20   some light on him.

21             His Uncle Mark coached him in

22   basketball.  You saw the clips of him playing.

23   He's in those basketball leagues.  According to

24   the experts, that's a positive influence.

25             Delores Cooper Lewis tried for the time

1  she had him.  He was on a schedule.  He ate

2  right.  He went to school.  He did his homework.

3  She showed him a different life.

4         His father, who is either -- if you

5  listen to little Kevin, my dad would take us to

6  the restaurants, me and Andre.  He would do

7  things with us.  We had a good time.  Or, you

8  listen to Mr. Ricco, Kevin Cooper never saw that

9  boy because he was working.

10        I don't know.  You have to decide.  But

11  one thing is clear.  Kevin Cooper loved that

12  boy.  He went to Chester to get him.  He may

13  have went to work after he got him, but he loved

14  that boy enough to go and get him.

15        He loved that boy enough -- and you go

16  back and look at the expert's testimony -- to

17  try to talk to him about right from wrong, to

18  try to tell him to stay away from these boys in

19  Chester.

20        The notes say, he stayed in touch with

21  that boy's mother, trying to talk about what is

22  going on with Andre.  Maybe it wasn't enough.

23  But let's not say that Kevin Cooper didn't try.

24        When Andre was in Wilmington, there was

25  after-school recreation.  He went to it.  It's

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    in the expert's notes.

2            You know what else was positive on

3    Andre, that no one can deny?  He fathered two

4    boys.  He had two reasons to do right, little

5    Dre and Tahaj.  Two reasons to do right.

6            Was a light shed on Andre Cooper when

7    those boys came into this world?  He had to

8    decide, am I going to be the father who leads by

9    example, or the father who does my own thing,

10   despite the light of life that I brought into

11   this world?

12           Andre Cooper had people, circumstances

13   and things that tried to help him.

14           Now, I'm going to go to Jamain, even

15   though I'm jumping around a little bit.

16           Jamain comes from a home that has some

17   trouble.  I submit to you if you look at your

18   common experiences, having parents that argue,

19   it's not enough to turn me into a murderer.

20   Having a father that cheats, okay, having

21   brothers or sisters, maybe out there somewhere,

22   okay.  Not enough.

23           But he still had two people that he

24   called Mom and Dad, who stayed in that house

25   with him for most of his life.  They took care

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    of his needs, at times thought he was better

2    than the other kids around the neighborhood.

3    They were there, raising him, doing their best.

4           He had an Aunt Juanita who he could go

5    to.  He had Caroline Saunders.  He had her son

6    Conrad.

7           You know what else he had?  A wife who

8    he had been with for most of his teen life, who

9    was positive, who was working while he's on the

10   corner, who's living her life the right way.

11          He had a probation officer who he had

12   the good fortune of running into early enough in

13   her career where she wanted to save him.

14          Heather Kasarda, on more than one

15   occasion, Jamain, let me help you get your GED.

16   Jamain goes to summer school.  She helps him

17   with summer school.  She encourages him to do

18   better.  She checks on him at school.  She

19   believes in him.  She takes extra time with him.

20   She goes to his house.  She is about Jamain.

21          Ten years later, that woman still

22   remembers the one she tried to save.  He gets

23   caught with drugs.  Jamain, are you selling

24   drugs?  Nope.  She believes him.  Positive

25   influence on his life?  I submit to you, yes.

1    Laveer White came in here and told you,
2  we lived down the street from Jamain most of my
3  life.  My dad saw me trying to talk to Jamain
4  about going to church.  Jamain wasn't
5  interested.
6          These guys had positive influences in
7  their lives.
8          Let's talk for a second about Gladstone
9  Williams who may use marijuana, who may have
10  been depressed.  He still is trying to get this
11  boy a job at the docks.  Interested, Jamain?
12  No.
13          Whatever decision you make, I simply
14  ask that you make it with the facts, because
15  everybody walks through this life with baggage.
16  Each and every one of us, when we look back on
17  what our parents did for us, can make a list of
18  the things that they hoped would have been done
19  because with experience, we realize maybe where
20  our parents failed.
21          But parents who do their best, I submit
22  to you, is all any parent can do.  When you look
23  back on your life, on what you have done for
24  your kids, you can say, I should have handled
25  that differently, or I should have pushed them

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1 more or I should have done that. That's real.

2 They are not making that up. That's real.

3 But it is a reason. Is it a reason

4 enough to become a premeditated murderer? I

5 submit to you, it's simply not.

6 Now, I want to go back to Mr. Cooper's

7 case because I have a few more points there.

8 Mr. Ricco said, there will be those who

9 will challenge Dr. Hope Hill. Well, here I am.

10 Here I am. I'm going to tell you why.

11 When you look at Dr. Hill's resume, she

12 is a million percent qualified to come into this

13 courtroom and to talk about violence and its

14 impact on children, no doubt. I didn't

15 challenge her credentials, didn't ask her one

16 question about them.

17 But Dr. Hill told you something that I

18 believe shaped her testimony. Dr. Hill told you

19 all the hours she spent with Andre Cooper. But

20 something happened along the way because what

21 Dr. Hill gave you on direct was expert

22 testimony.

23 Expert testimony: "Violence in a

24 child's life early on makes him more likely to

25 commit violent acts."

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    The government didn't challenge that.

2    Now, on cross, all of a sudden

3    Dr. Hill, when confronted with her own notes, a

4    woman with a doctorate and a post-doctorate

5    degree, can't read her writing.  Dr. Hill can

6    read.  But Dr. Hill has spent her life looking

7    at what goes wrong with kids and what did this

8    trial give Dr. Hill an opportunity to do?  To

9    save one.

10   You look back at her cross-examination.

11   Dr. Hill, did you write this?  I really can't

12   read my own writing.  Dr. Hill, does it say

13   this?  I am really not sure.  Dr. Hill, you told

14   this jury that when James Rice was murdered,

15   Andre Cooper never went back outside again.  It

16   was a life altering event.  Yes.

17   Dr. Hill, didn't he go back outside to

18   plan the murder of Karriem Washington?  Wasn't

19   he still on the corner?  Wasn't he in Delaware?

20   Wasn't he running through Highland Gardens?  I

21   don't know anything about that.

22   I'm not challenging what the doctor's

23   opinion is.  I'm challenging the fact she's

24   basing it on.  But Dr. Hill is fighting me tooth

25   and nail because she's going to save that boy.

1        Dr. Hill, she says, by the time Andre

2   was 20, he never had hope, no hope.  Dr. Hill,

3   here in your notes it says, at 19, Nakira is

4   pregnant, feeling hopeful for the first time,

5   got to get a job, got to make money.  She

6   doesn't want to admit that.

7        When an expert doesn't want to admit to

8   the things that they have written and relied on,

9   then I submit to you that expert has been

10  compromised.

11       Is Hope Hill an expert on violence and

12  children?  Yes.  Should you question her

13  motivations where she just wants to save Andre?

14  I submit to you, yes.

15       Now, what does that mean?  Do you

16  disregard her testimony?  It's up to you.  I'm

17  not asking you to do that.  I'm asking you to

18  understand that when put in this situation,

19  someone who has never been here before, like

20  Dr. Hill, maybe her thoughts and beliefs color

21  how she wants to be challenged on the basis of

22  her testimony.

23       Now, Mr. Ricco talked to you about

24  people who aren't here.  And I'm not going to

25  go -- well, I'm not going to go into a lot of

1   detail on that now, but the one thing he did say

2   was that we already know what sentences Mark,

3   Brian and Shane are going to get.

4           Ladies and gentlemen, we don't know

5   that.  That's simply not right.  Because Mark,

6   Shane and Brian have not yet been sentenced.

7           What we do know is that the judge who

8   sentences them will know what they have done.

9   We know that Mark and Shane are facing a

10  mandatory life, but upon the filing of a motion

11  from the government, that judge could sentence

12  them to mandatory life or anything else he

13  thinks he or she believes is appropriate.

14  That's what we know.

15          We know that no matter what the judge

16  thinks about how much Brian Rogers did to aid

17  the government in this prosecution, the minimum

18  he will get is 25 years, and the maximum he will

19  get is life.  That's what we know.

20          We know that the judge who makes that

21  decision will have at his or her at disposal

22  every iota of evidence that has been presented

23  in this trial.  That's what we know.

24          So don't go with Mr. Ricco when he

25  tells you what we do know, because we don't

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    know.

2            Now, am I saying to you what you should

3    do with that information?  No.  I simply want

4    you to have the true information.

5            Now, Mr. Hill -- or Mr. Ricco.  Let's

6    go back to Mr. Ricco because he talked about

7    Mr. Hill's witness, and so I want to talk about

8    Dr. Duck.

9            We only presented very limited rebuttal

10   in this case, but we did present rebuttal as to

11   Dr. Duck.

12           Dr. Duck took that stand, and he said

13   things that the government, quite frankly, found

14   fairly astonishing.  I went back to look at the

15   transcript because I wanted to make sure, and

16   you can look at it for yourself, but on May 2nd,

17   at Page 244, Dr. Duck said, "The kids are all

18   dressed in black."  This is on his direct.

19           On May 3rd, he said, "The thing that is

20   so memorable are the kids dressed in black."  He

21   goes on to talk about how that's evidence of

22   this sense of hopelessness.

23           Now, do we care, quite frankly, if ten

24   kids are dressed in black or 20 or if they wear

25   black T-shirts or black pants?  That's not the

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  point.

2         The point is that Dr. Duck became an

3  advocate because, for all the years that

4  everyone else has been out there, nobody has

5  been dressed in all black.  What a powerful

6  message it would be if all the children in

7  Highland Gardens woke up one day and every day

8  just wore black?  That would be overwhelming

9  evidence of a sense of hopelessness that has

10  permeated generations.

11         Ladies and gentlemen of the jury, that

12  simply makes no sense.  And it was too much, too

13  over the top for the government to leave

14  unchallenged.

15         So we sent Agent Updegraff back out

16  there because if, by some stretch in the last

17  few weeks, these kids have all started wearing

18  black, we need to see it.

19         Mr. Ricco may have had fun saying, oh,

20  there's a black T-shirt under a white T-shirt,

21  or somebody has got black pants on, but you saw

22  in those pictures, those people are not all

23  dressed in black.

24         So, yes, I challenge Dr. Duck.  What

25  are you doing, Dr. Duck?  Are you advocating, or

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  are you being an expert?  You want to know what

2  he's doing, so that you can judge his testimony.

3  I submit to you, he was advocating.

4          Then he says to you, "Boyle Street is

5  from here to there."  Now, you sit in this

6  courtroom, at least everyone has been to Boyle

7  Street.  You know that's not true.  Yet, he says

8  it.

9          But you know something else.  You know

10 that if he's really been to Boyle Street, he

11 knows that that's not true.  You sit here, and

12 you have to challenge Dr. Duck because now he's

13 just sitting up there making things up.

14         So, Agent Updegraff, go on back out

15 there because maybe Boyle Street has shrunk.  We

16 need to know.  He goes out there.  Lo and

17 behold, it's the same old Boyle Street, five

18 times this courtroom, not from here to there.

19         What is Dr. Duck doing?  He's

20 advocating.

21         He then says to you, the affidavit,

22 indictment, whatever you government people want

23 to call it, it's the indictment, showed how

24 these people get drawn into this.

25         If we don't know anything else, ladies

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1   and gentlemen, trust that the government knows

2   its own charging document.  Trust -- and you

3   look at it.  Jamain Williams is not one of the

4   people that was sucked in.  Jamain Williams is

5   charged as being the leader of the people who

6   were doing the sucking in.

7           So I say to Dr. Duck, wasn't that

8   Jamain Williams charged with doing that?

9   Absolutely not.

10          Now, maybe Dr. Duck doesn't remember,

11  or maybe Dr. Duck is not being truthful.  You

12  have to decide.

13          But what is he doing?  What is he

14  doing?  He's advocating.

15          Then he talks about this first drug

16  deal at age 11 or 12, and how Jamain was told to

17  hold something and that's how he began from a

18  holder to a distributor and this was critical in

19  Jamain's life.

20          Okay.  You look at the juvenile

21  records.  Jamain is arrested at 11 or 12, but

22  it's for stealing a car.

23          Dr. Duck says, you know what?  I didn't

24  see those records.  But I think it was 13.

25  Well, if you thought it was 13, why did you not

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    say that on direct?

2            If the minute I asked you the question,

3    all of a sudden you're going to back pedal

4    because maybe, just maybe, the government did

5    its homework and read the records?  If you knew

6    it was 13, why didn't you say it first?  Why

7    would he tell you it was 11 or 12, when he knew

8    it wasn't true?

9            Because Dr. Duck, I submit to you,

10   crossed the line.  Dr. Duck is advocating a

11   position, and I do ask you to view his testimony

12   in that light.

13           You look at what he said.

14           Now, Jamain presented a lot of people

15   from the community.  They don't know he's a drug

16   dealer, or they don't want to say.

17           If they don't know he's a drug dealer,

18   they don't know Jamain.  If they don't want to

19   say, are they worthy of your consideration?  You

20   have to decide.

21           Davina Terry, his sister-in-law, he's

22   given money to her, for her son, for a whole

23   family, she said.  But she doesn't know Jamain's

24   a drug dealer?  She doesn't know, or she doesn't

25   want to say?

1    If she doesn't know, she doesn't know

2  Jamain.  If she doesn't want to say, because

3  she's in here trying to save his life, is she

4  worthy of your belief?  You have to decide.

5    Now, Ms. Terry said something else.

6  She said, he would even get Rakia.  He had a

7  relationship with that little girl.  He cared

8  for that little girl.  He took her out when he

9  took his own daughter out.

10    We know who Rakia is.  That's Karriem

11  Washington's daughter.  So when we talk about

12  the impact that their execution will have on

13  their children, I want you to think about

14  something.  It didn't matter to Jamain.  Rakia's

15  tears, loss, the affects that that child will

16  have, according to Dr. Bornfriend, didn't matter

17  to him.

18    There's no evidence that Andre Cooper

19  spent time with Rakia, but there is clear

20  evidence from his own witness that he knew that

21  child.  Yet, he made a decision to deprive her

22  of her father.

23    If he thought about the effect it would

24  have on her, whatever he thought, it wasn't

25  enough to stop him from making sure that her

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1   father died.

2           Counsel is correct.  These children

3   have done nothing wrong to anyone.  Jamaia,

4   Artease and Jamain love their father.  Little

5   Dre and Tahaj love their father and, yes, make

6   no mistake about it.  The loss of their fathers

7   will have an affect on them.

8           But Tracy's kids loved her, too.

9   Rock's kids loved him, too.  Maybe Antonio would

10  have had some kids.  Who knows?  Maybe Randolph

11  would have had some kids.  Who knows?

12          But the bottom line is this.  When they

13  pulled the trigger, they weren't concerned about

14  their kids or anybody else's.  He wasn't

15  concerned about Jamaia, Artease or Jamain when

16  he was out there killing people.  He wasn't.  If

17  he was, it wasn't enough.  He wasn't concerned

18  about Dre and Tahaj.  And if he was, it wasn't

19  enough to stop him.

20          They come before you and say, look at

21  the impact on these children.  Look at it

22  because it is real.  They're clients.  Neither

23  of these defendants cared about that.  Do they

24  love their children?

25          Based on the phone calls, I would have

1   to say yes.  I think he loves his children, and

2   I think he loves his children.  Does he love

3   them enough not to be a murderer?  I submit to

4   you, the evidence says no.

5          Now, I just have two more points.

6          There are more people on Boyle Street

7   than Jamain Williams and Andre Cooper.  There

8   are other people on Boyle Street on that

9   indictment who were charged with the same crimes

10   they were charged in.

11          Counsel says to you, where are they?

12   The easy answer is, they are not here.  The

13   question for you, because it is clearly one of

14   their mitigators, is whether or not these people

15   who are equally culpable do not sit here facing

16   death.

17          Now, to answer that question, you have

18   to look at each murder and each person's role in

19   the murder.  For example, when counsel says to

20   you, where is Mark Rogers?

21          Well, Mark Rogers is not involved in

22   the murder of Antonio Rykard.  You don't have to

23   think about Mark Rogers in that murder because

24   he doesn't come on that scene until after

25   Antonio Rykard is dead.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    So the question there is, is Vincent

2  equally culpable to Andre?  You have to decide.

3    Mr. Ricco said Vincent is the guy who

4  sat here and stared throughout the trial.  I

5  didn't look at him that much.  I don't know.

6  But is the guy who they said sat here and stared

7  throughout the trial more culpable than the guy

8  that picked the day the boy would die?  He's not

9  just a driver.

10    Remember Mr. Ricco said that?  "The

11  driver."  Is he just a driver?  I'm sorry, I

12  thought the evidence was that Andre Cooper chose

13  the day that Antonio Rykard would die.  You look

14  back at the evidence.

15    Andre Cooper picked up Antonio Rykard

16  off the street and delivered him, knowingly and

17  intentionally, into the arms of Vincent

18  Williams.

19    Andre Cooper drove that car out of

20  Chester because they had just killed somebody

21  three days earlier.  Andre Cooper picked the

22  day, the place and the time that Antonio Rykard

23  would die.

24    Is he just a driver?  You have to

25  decide.

1  Vincent Williams, no doubt, pulled that

2  trigger.  Are they equally culpable, or is he

3  more?  You have to decide.

4  In the murder of Tracy Saunders,

5  everybody in that gang had a role.  But there

6  were years of participation.  There were the had

7  to do it, didn't have to do it, and the had to

8  do its.  What group are they in?  The didn't

9  have to do its.  Who wielded the power?  They

10  did.  Who chose who's sitting there?  They did.

11  MR. RICCO:  Your Honor, I object to

12  "they."

13  MS. TAYLOR:  Andre Cooper and Jamain

14  Williams did.

15  THE COURT:  Overruled.

16  MS. TAYLOR:  That's who the "they" is.

17  Who decided who was going to take

18  shifts and when they would begin?  Jamain

19  Williams.

20  Who sat out there every night to make

21  sure it was done?  Jamain Williams.

22  And who was going to drive away Mark

23  Rogers?  Andre Cooper.

24  Who told Brian Rogers, the guy who

25  didn't want to do it, who took the last shift

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1 after there was nobody left, who told Brian

2 Rogers -- first of all, who gave him the stuff?

3 Andre Cooper.  Gun, gloves, mask.  He put it in

4 his hands.

5          Who discussed the escape route with

6 him?  Andre Cooper.

7          Who was sitting out there the whole

8 time Brian Rogers is laying in wait?  Andre

9 Cooper.

10          Who was holding Brian Rogers' stuff?

11 Andre Cooper.

12          Who was about to call the shift off?

13 Only one man had that power, Jamain Williams.

14          Who saw Tracy Saunders and said get

15 her?  Jamain Williams.

16          Who drove the killer away to safety?

17 Andre Cooper.

18          Who told him what to wash with?  Who

19 told him to wash with bleach to get the stuff

20 off of him?  Andre Cooper.

21          Ladies and gentlemen, Brian Rogers

22 pulled that trigger.  There is no doubt about

23 that.  But Brian Rogers was not in charge.

24 Jamain Williams was in charge, and Andre Cooper

25 was in charge.  Ultimately, you have to decide

1  that.

2          Now, I don't believe Mr. Hill made an

3  argument as to equal culpability with regard to

4  Randolph Harris.  If he did, you will recall the

5  testimony because, as to that homicide, I submit

6  to you, there is no doubt that there is no one

7  more culpable than Jamain Williams.

8          Now, let me comment on Mr. Hill's

9  points, the goodness that is Jamain.  He buys

10  Pampers for people.  He helps people into the

11  house.  He gets food for ladies who are

12  depressed.  He buys basketball courts for the

13  neighborhood.  He buys basketball sneakers for

14  some kids on a team.  What's that about?  What's

15  that about?

16          Mr. Hill says it's about goodness.  Let

17  me offer you an alternative.  It's about

18  control.  It's about a benevolent kid.  I run

19  this neighborhood.  I take care of my people.

20  What does that engender to me?  Loyalty.

21          When the cops want to know who did

22  something, I ain't telling on Jamain.  Jamain is

23  an all right drug dealer.  There's a thing in

24  the ghetto called the good drug dealer.  Think

25  about it.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1          Jamain told those people on that block,

2   I run this.  This is my block.  And so he took

3   care of --

4          MR. HILL:  Your Honor, I'm going to

5   object.  There is no evidence in the record.

6          MS. TAYLOR:  Your Honor, Stephanie

7   Jones testified to it.

8          THE COURT:  Overruled.

9          MS. TAYLOR:  He took care of those

10  people.  When niceness didn't work, he used

11  force and he used threats.  Is it the goodness

12  in Jamain?  Maybe it is.  Is it more control?  I

13  submit to you, it is.

14          Now, in the end, the Court, in a few

15  minutes, is going to give you the law of this

16  case.  Unlike anything else you have ever had to

17  do, this is a moral judgment.  There is no doubt

18  about that.  It's a judgment that you could base

19  on mercy.  The Court will tell you that.  It's a

20  judgment that you can base on hope.  The Court

21  will tell you that.

22          As Mr. Ricco said -- and I wrote it

23  down because I wanted to read it to you

24  properly.  "The death penalty can be appropriate

25  if it is a reasoned, moral response to the crime

1    and the person convicted of doing it."

2         The question that the government has

3    for you is simply this:  Is the death penalty a

4    reasoned, moral response to three murders?  Is

5    the death penalty a reasoned, moral response to

6    three planned and premeditated murders?  Is it a

7    reasoned, moral response to killing two people

8    solely, solely because they were cooperating

9    with law enforcement?  Because it's certainly

10   not a numbers game.

11        If you would go back and add up all of

12   the mitigators, each of these defendants

13   probably has more than 20.  The government has

14   but four.  So don't go back there, I submit to

15   you, and say, all things being equal, 20 is

16   bigger than four, 20 is bigger than four, so the

17   penalty is life.  No.

18        Go back there, and accept every

19   mitigator they give you, consider it, and then

20   weigh it against each of the government's

21   aggravators.  Weigh it, and then make your

22   decision.

23        Now, one of you, just one -- counsel is

24   so correct about that -- just one of you can

25   stop this process.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    MR. RICCO:  Objection to that term,

2  Judge --

3    MS. TAYLOR:  I'll rephrase it.

4    MR. RICCO:  -- "stop this process."

5    MS. TAYLOR:  I'll rephrase it.

6    Just one of you, by your verdict, can

7  vote and the sentence for each of these

8  defendants would be life.

9    The government would ask you to do

10  this:  Before you find reasons, before you

11  search for reasons for life, be honest with

12  yourself.  Be honest with yourself.

13    This is a hard decision.  It is a

14  decision that we trusted you all with.  It is

15  not easy, I submit to you, to sentence a man to

16  spend the rest of his life in prison.  That's

17  not easy.  But it certainly is not easy to

18  decide that, because of what they have done,

19  they must die.

20    Now, just because it isn't easy,

21  doesn't mean that it isn't necessary, doesn't

22  mean that it isn't appropriate, doesn't mean

23  that it isn't proper.  You are not killing them.

24    Counsel over and over, "if you kill

25  them."  You're not killing them.  Don't think

1    that.  Don't say, I couldn't kill, so I won't

2    kill.  Think; what is the appropriate penalty

3    for what they have done?

4           Mr. Ricco says, "Be radical.  Do

5    something radical.  Vote for life."  I say, be

6    true to yourself, and vote for justice.  If

7    justice is life, sobeit.  Sobeit.

8           If justice is life for Jamain Williams,

9    give him life.  If justice is life for Andre

10   Cooper, give him life.

11          But if it is not, don't hide behind

12   justice.  Don't hide behind fears, if it's not.

13   If what is right, if what is just, if what is

14   fair, is that Jamain Williams should be

15   sentenced to death, then do something radical.

16   Do something courageous.  Sentence him to death.

17   Not because it's easy, but because it's right.

18          If what is right, if what is fair, if

19   what is just is that Andre Cooper should be

20   sentenced to death, then, in Mr. Ricco's words,

21   "Do something radical."   Sentence him to death.

22          But whatever you do, be true.  Be true

23   to who you are and what you believe is right

24   under the law.

25          Thank you.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1        THE COURT:  Thank you, Ms. Taylor.

2        Ladies and gentlemen, we're going to

3    take our morning break now.  We'll be in recess

4    for 15 minutes.

5        Please do not talk about the case among

6    yourselves or with others.  We'll see you

7    shortly.

8        You're excused.

9        (The jury exited the courtroom at

10   11:05 a.m.)

11       THE COURT:  Are there any objections

12   that you want to place on the record, pursuant

13   to Ms. Taylor's argument, other than the ones

14   that were made during the course of the

15   argument?

16       MR. SWEENEY:  If we could have a brief

17   moment?

18       THE COURT:  Sure.

19       MR. RICCO:  Judge, while they are

20   taking their moment, I have just one thing.

21       Judge, I raise this objection.  I'm

22   pretty sure that Ms. Taylor, in describing the

23   contemporaneous convictions, made the comment

24   that the death penalty should be imposed with

25   three murders, and then she went on to talk

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1   about contemporaneous convictions.

2           Earlier in the case, what we requested

3   is that if the government is going to argue that

4   three murders, in and of itself, qualifies the

5   defendant for the death penalty, then we should

6   have had an opportunity to show that where there

7   are circumstances where there are more murders,

8   it is not a qualifier.

9           Now, Ms. Taylor said the term, but then

10  she went into the facts of this case.  I'm not

11  sure if she just misspoke, or if that's just,

12  you know, of the moment.

13          But, Judge, my position is that the

14  government certainly is entitled to argue that,

15  in this case, three murders can be a basis for

16  the jury to find the death penalty, but the

17  government cannot argue that three murders, in

18  and of themselves, does that.  I think when you

19  take the government's argument in the whole,

20  that's what they conveyed.

21          But the statement was made, and we

22  object to it for the same reasons that we

23  objected to the opening arguments that

24  Ms. Winter made, because we wanted to have an

25  opportunity to present that evidence.

1          THE COURT:  Very well.

2          MR. RICCO:  But I would concede that,

3   on the whole, what Ms. Taylor, I believe, was

4   attempting to argue to the jury was that, in

5   this case, the death penalty should be --

6          THE COURT:  Very well.

7          Any comments in that regard,

8   Ms. Taylor?

9          MS. TAYLOR:  No, Your Honor, just that

10  that was the government's argument in this case,

11  that the three murders were linked to the

12  non-statutory aggravator of contemporaneous

13  convictions.

14         THE COURT:  Very well.

15         Your objection is overruled.

16         And do you join in that?

17         MR. HILL:  Yes.

18         THE COURT:  Any additional ones?

19         MR. HILL:  Yes.

20         THE COURT:  Yes, Mr. Hill?

21         MR. HILL:  Judge, as I objected during

22  the argument, there is no evidence in the record

23  about "good drug dealer" and "control."  There

24  is no evidence about any impact on Rakia that

25  was argued here in rebuttal.  There is no

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    evidence to that in the record at all.

2          Ms. Taylor indicated that she thought

3    that this was a one-on-one weighing process, the

4    jury was supposed to do that.  In other words,

5    the implication is that one aggravator should be

6    weighed against one mitigator, but that's not

7    the way it works.  It's the totality and

8    whatever other thing they want to do.  It's up

9    to them.  And so, that is misleading.

10          She instructed the jury not to hide

11    behind their fears.  I think that's an improper

12    argument at this time.

13          What they have to be instructed on is

14    how to go about weighing these aggravators and

15    mitigators, and look inside themselves to find

16    out what is important.

17          She made an argument that is unfair to

18    Mr. Williams, because she said the killing of

19    two people cooperating with police is enough

20    reason to give a death penalty.

21          Well, Jamain has not been convicted of

22    two killings of people cooperating with police.

23    That's not true here.  And so her argument was

24    an argument that she did not sufficiently

25    distinguish from Jamain.

1    I think it's an improper argument

2  because of that, that the implication now is

3  that he's wrapped up in that as well.

4    THE COURT:  Before you go, just so that

5  everybody knows, there's not going to be any

6  running in and out while the Court is

7  instructing the jury on the law in this case.

8    I noticed that there was some running

9  in and out while counsel was closing, but there

10  will be none of that when I instruct the jury.

11    So if you are coming in, be here before

12  I instruct the jury.  If not, you'll be locked

13  out or kept out by the Marshal.  All right.

14    That goes for anybody in the audience.

15  Yes?

16    MR. HILL:  I think the government

17  improperly diminished the jury's role in the

18  sentencing function here when she told them,

19  you're not going to be killing anyone.  I think

20  what she is doing is minimizing their role in

21  this.  The jury will be the entity that issues

22  that decision.

23    THE COURT:  They won't be killing

24  anyone, though.  They will be issuing a sentence

25  of death.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1          MR. HILL:  Technically, it will be

2     someone else that pushes the buttons,

3     technically.  But that button can't be pushed if

4     their verdict is a life verdict.  That button

5     can only be pushed if they have the

6     responsibility for doing it.

7          She minimized that responsibility,

8     trying to act like, hey, it's okay.  It's okay,

9     somebody else will take responsibility for this.

10    That's an improper argument in a death penalty

11    case because the responsibility is theirs

12    completely, totally and 100 percent.  We can't

13    instruct them in any other way, but that.

14         THE COURT:  Very well.  Your objections

15    are overruled.

16         I think the argument of the government,

17    in toto, not picking out one word or one

18    sentence or one phrase, was an appropriate

19    argument in this case.

20         Further, this Court will instruct the

21    jurors on the appropriate law to apply in their

22    deliberation process.

23         We will be in recess for ten minutes

24    now.

25         Yes, Mr. Egan?

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    MR. EGAN:  Your Honor, we didn't get a
2 corrected verdict sheet.
3    THE COURT:  I'm getting ready to pass
4 those out now before we pass them out to the
5 jury.
6    If counsel will assist me, take one
7 each.
8    (Recess was held at 11:13 a.m.)
9    (The Court resumed the proceedings at
10 11:20 a.m., at which time the jury entered the
11 courtroom.)
12    THE COURT:  Good morning, again, ladies
13 and gentlemen.
14    Ladies and gentlemen, now that you have
15 heard all the evidence in the case and the
16 arguments of counsel, it now becomes my duty to
17 give you instructions as to the law applicable
18 to the most serious questions upon which you
19 must decide.
20    One, whether Jamain Williams should be
21 put to death or imprisoned for life without the
22 possibility of release.
23    Two, whether Andre Cooper should be put
24 to death or imprisoned for life without the
25 possibility of release.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1        Regardless of any opinion you may have

2   as to what the law may be or should be, it would

3   be a violation of your oath as jurors to base

4   your verdict upon any view of the law, other

5   than that given to you in these instructions.

6        Some of the legal principles that you

7   must apply to the sentencing decision duplicate

8   those you followed in reaching your verdict as

9   to guilt or innocence.

10        While I'm on this point, let me remind

11   you, ladies and gentlemen, the statements and

12   arguments of counsel are not evidence.  It is

13   your recollection of the testimony in evidence

14   and evidence that governs.

15        Is that understood?

16        THE JURORS:  Yes, Your Honor.

17        THE COURT:  I further instruct you that

18   if you find any difference in the statements of

19   law that counsel has given you in their closing

20   summations, it is the instructions of the Court

21   that you must follow.

22        Is that understood?

23        THE JURORS:  Yes, Your Honor.

24        THE COURT:  As I was saying, some of

25   these legal principles that you applied in the

1  earlier phase apply to this phase, the

2  sentencing phase.  Others are different.

3         The instructions I am giving you now

4  are a complete set of instructions on the law

5  applicable to the sentencing decision.  I have

6  prepared them to insure that you are clear in

7  your duties at this extremely serious stage of

8  the case.

9         I have also prepared a Special Verdict

10  Form that you must complete in reference to each

11  of these individual defendants.  The form

12  details special findings you must make in this

13  case, and will help you perform your duties

14  properly.

15         Ladies and gentlemen, I'm going to pass

16  out now to you these Special Verdict Forms as

17  they pertain to each of these defendants.

18         I tell you this, also.  You will each

19  get a copy of the Court's instructions in your

20  deliberations so you'll have the Court's

21  instructions, and you'll have an individual

22  verdict slip and I will go through the verdict

23  slip in a brief form because, as you will see,

24  it is very detailed.  All right?

25         Mr. Wolfe, if you would be so kind,

1    would you pass out those Special Verdict Forms.

2           (The Special Verdict Forms were

3    distributed to the jury.)

4           Ladies and gentlemen, I'll give you a

5    moment just to open them up and look at them

6    briefly.  I'm going to go through it briefly

7    with you as I instruct you on the law applicable

8    to each section that you will have in the

9    verdict slip and what your duties and

10   responsibilities are.

11          (Jurors complied.)

12          Ladies and gentlemen, as you can notice

13   and as you should notice, they are different,

14   and the reason being that these two defendants

15   were found guilty of different counts.

16          As you can see from the first page,

17   dealing with Jamain Williams, your findings will

18   be based on Count 10, dealing with the murder of

19   Tracy Saunders in the aid of racketeering;

20          Count 11, Murder of the witness, Tracy

21   Saunders, to prevent testimony;

22          Count 18, The murder of Randolph Harris

23   in the aid of racketeering;

24          Count 19, Using and carrying a firearm

25   during and in relation to the murder of Randolph

1  Harris;

2         And Count 22, The murder of Karriem

3  Washington in aid of racketeering.

4         Those are the counts that you found

5  Jamain Williams guilty of.

6         As to Andre Cooper, your findings will

7  pertain to Count 10, Murder of Tracy Saunders in

8  aid of racketeering;

9         Count 11, Murder of the witness, Tracy

10  Saunders, to prevent testimony;

11         Count 15, The murder of Antonio Rykard

12  in aid of racketeering;

13         Count 22, The murder of Karriem

14  Washington in aid of racketeering;

15         And Count 23, Using and carrying a

16  firearm during and in relation to the murder of

17  Karriem Washington.

18         Ladies and gentlemen, as you can see

19  from the Special Verdict Form, each of these

20  forms is broken up into seven sections.

21         The first section deals with the

22  Defendants' Age at the Time of the Offense.

23         The second deals with Gateway Factors.

24         The third deals with Statutory

25  Aggravating Factors.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    The fourth deals with Non-statutory

2  Aggravating Factors.

3    The fifth deals with Mitigating

4  Factors.

5    The sixth deals with Determination of

6  Sentence.

7    The seventh section deals with

8  Certification.

9    I will now instruct you on each of

10  these sections.  I tell you this also, that the

11  Court's instructions will be captioned dealing

12  with the sections that you will be considering,

13  also, so that it correlates to the particular

14  section of the verdict slip, if you are

15  considering that portion of the verdict slip.

16  All right?

17    Starting off with Section I.  Ladies

18  and gentlemen, before you may consider the

19  imposition of the death penalty, you must first

20  unanimously agree beyond a reasonable doubt that

21  the defendant was 18 years of age or older at

22  the time of the offense.

23    If you unanimously make that finding,

24  you should so indicate on the appropriate page

25  of the Special Verdict Form and continue your

1    deliberations.

2         If you do not unanimously make that

3    finding, you should so indicate on the

4    appropriate page of the Special Verdict Form,

5    and follow the directions on the form.

6         No further deliberations will be

7    necessary on those offenses that you find the

8    defendant was not over the age of 18, 18 or

9    older.

10        Ladies and gentlemen, as you can see,

11   in the Special Verdict Form, Section I deals

12   with the defendant's age at the time of the

13   offense.  It has directions at the top of the

14   page.  It pertains to each of the counts that

15   you have to deal with, with each individual

16   defendant on each individual Special Verdict

17   Form.  You are to respond pursuant to your

18   deliberations.  All right?

19        At the bottom of the page -- this is

20   consistent with each of these sections.  There

21   are instructions at the top of the page.  There

22   are directions at the bottom of the page.

23        On some of the pages, you will see

24   oblong boxes that are doubled boxes.  They will

25   be reminders that you have to do a certain -- or

1  find a certain fact or perform a certain

2  function before you can proceed on to the next

3  area.  All right?

4          Moving on.  That's Section I.

5          Section II deals with Gateway Factors,

6  or finding of the requisite mental state.

7          Ladies and gentlemen, as you know, the

8  defendants, Jamain Williams and Andre Cooper,

9  have each been convicted of murders of three

10 people; Jamain Williams, of the murder of Tracy

11 Saunders, Randolph Harris, and Karriem

12 Washington; Andre Cooper, of the murders of

13 Tracy Saunders, Antonio Rykard, and Karriem

14 Washington.

15         Before you may consider the imposition

16 of the death penalty for any one or all of those

17 murders, you must unanimously find beyond a

18 reasonable doubt that the defendant either

19 intentionally killed the victim named in the

20 indictment, or intentionally participated in an

21 act contemplating that the life of a person

22 would be taken in one of the manners described

23 below.

24         If you unanimously make that finding,

25 you should so indicate on the appropriate page

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    of the Special Verdict Form, and continue your

2    deliberations.

3            If you do not unanimously make that

4    finding, you should so indicate on the

5    appropriate page of the Special Verdict Form,

6    and follow the directions on the form.  No

7    further deliberations will be necessary as to

8    any count for which you do not unanimously make

9    that finding.

10            I will now outline for you the intent

11   which the government alleges -- and I say

12   "alleges" because that's what they allege -- you

13   have to determine whether or not it's been

14   proven or not.  They allege as to each of the

15   two defendants for each of the counts.

16            As to Counts 10 and 11, involving the

17   murder of Tracy Saunders, the government alleges

18   that Jamain Williams intentionally participated

19   in an act contemplating that the life of a

20   person would be taken, or intending that lethal

21   force would be used in connection with a person,

22   other than one of the participants in the

23   offense, and that Tracy Saunders died as a

24   direct result of that act, by ordering or

25   directing that another should kill Tracy

1  Saunders by shooting her, or by providing

2  assistance and direction to the shooter of

3  Tracy, which directly resulted in the death of

4  Tracy Saunders.

5         The government must prove that the

6  defendant deliberately directed or ordered the

7  killing of Tracy Saunders or provided assistance

8  and directions to the shooter of Tracy Saunders

9  with a conscious desire that a person be killed,

10 or that lethal force be employed against a

11 person.

12        The phrase "lethal force" means an act

13 or acts of violence capable of causing death.

14        The government further alleges that

15 Jamain Williams intentionally and specifically

16 engaged in an act of violence knowing that the

17 act created a grave risk of death to a person,

18 other than one of the participants in the

19 offense, such that participation in the act

20 constituted a reckless disregard for human life,

21 and Tracy Saunders died as a direct result of

22 the act, by ordering or directing that another

23 should kill Tracy Saunders by shooting her, and

24 by providing assistance and direction to the

25 shooter of Tracy Saunders.

1       The government alleges that Andre

2  Cooper intentionally participated in an act

3  contemplating that the life of a person would be

4  taken or intending that lethal force would be

5  used in connection with a person other than one

6  of the participants in the offense, and that

7  Tracy Saunders died as a direct result of that

8  act, by ordering or directing that another

9  should kill Tracy Saunders by shooting her, or

10  by providing assistance and direction to the

11  shooter of Tracy, which directly resulted in the

12  death of Tracy Saunders.

13       The government must prove that the

14  defendant deliberately directed or ordered the

15  killing of Tracy Saunders, or provided

16  assistance and direction to the shooter of Tracy

17  Saunders with a conscious desire that a person

18  be killed, or that lethal force be employed

19  against a person.

20       Remember, again, the phrase "lethal

21  force" means an act or acts of violence capable

22  of causing death.

23       The government further alleges that

24  Andre Cooper intentionally and specifically

25  engaged in an act of violence, knowing that the

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

 1   act created a grave risk of death to a person,

 2   other than one of the participants in the

 3   offense, such that participation in the act

 4   constituted a reckless disregard for human life,

 5   and Tracy Saunders died as a direct result of

 6   the act, by ordering or directing that another

 7   should kill Tracy Saunders by shooting her, and

 8   by providing assistance and direction to the

 9   shooter of Tracy Saunders.

10           As to Count 15, involving the murder of

11   Antonio Rykard, the government alleges that

12   Andre Cooper intentionally participated in an

13   act contemplating that the life of a person

14   would be taken, or intending that lethal force

15   would be used in connection with a person, other

16   than one of the participants in the offense, and

17   that Antonio Rykard died as a direct result of

18   that act, by deciding when Antonio Rykard would

19   be killed, selecting the location where Antonio

20   Rykard was to be killed, and driving Antonio

21   Rykard to the location where he was to be

22   killed, which directly resulted in the death of

23   Antonio Rykard.

24           The government must prove that the

25   defendant deliberately decided when Antonio

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1   Rykard would be killed, selected the location

2   where Antonio Rykard was to be killed, or drove

3   Antonio Rykard to the location where he was to

4   be killed with a conscious desire that a person

5   be killed, or that lethal force be employed

6   against a person.

7         The phrase "lethal force" means an act

8   or acts of violence capable of causing death.

9         The government further alleges that

10  Andre Cooper intentionally and specifically

11  engaged in an act of violence, knowing that the

12  act created a grave risk of death to a person,

13  other than one of the participants in the

14  offense, such that participation in the act

15  constituted a reckless disregard for human life,

16  and that Antonio Rykard died as a direct result

17  of the act, by selecting the location where

18  Antonio Rykard was to be killed, and driving

19  Antonio Rykard to the location where he was to

20  be killed.

21        As to Counts 18 and 19, involving the

22  murder of Randolph Harris, the government

23  alleges that Jamain Williams intentionally

24  killed Randolph Harris by shooting him multiple

25  times.

1    To establish that the defendant

2  intentionally killed the victim, the government

3  must prove that the defendant killed the victim

4  with a conscious desire to cause the victim's

5  death.

6    The government alleges that Jamain

7  Williams intentionally inflicted serious bodily

8  injury that resulted in the death of Randolph

9  Harris, by shooting Randolph Harris multiple

10  times which resulted in the death of Randolph

11  Harris.

12    The government must prove that the

13  defendant deliberately caused serious injury to

14  the victim's body, which, in turn, caused the

15  victim's death.

16    "Serious bodily injury" means a

17  significant or considerable amount of injury,

18  which involves a substantial risk of death,

19  unconsciousness, extreme physical pain,

20  protracted and obvious disfigurement or

21  protracted loss or impairment of a body member,

22  organ, or mental faculty.

23    As to Count 22, involving the murder of

24  Karriem Washington, the government alleges that

25  Jamain Williams intentionally participated in an

1  act contemplating that the life of a person

2  would be taken, or intending that lethal force

3  would be used in connection with a person, other

4  than one of the participants in the offense, and

5  that Karriem Washington died as a direct result

6  of that act, by driving the vehicle so that he

7  enabled the shooter, Andre Cooper, to be in a

8  position to shoot at Karriem Washington, which

9  directly resulted in the death of Karriem

10  Washington.

11        The government must prove that the

12  defendant deliberately drove the vehicle

13  containing the agreed-upon shooter with a

14  conscious desire that a person be killed, or

15  that lethal force be employed against a person.

16        Recall the definition of "lethal

17  force."  It means an act or acts of violence

18  capable of causing death.

19        Further, the government alleges that

20  Jamain Williams intentionally and specifically

21  engaged in an act of violence, knowing that the

22  act created a grave risk of death to a person,

23  other than one of the participants in the

24  offense, such that participation in the act

25  constituted a reckless disregard for human life,

1    and Karriem Washington died as a direct result

2    of the act, by driving the vehicle so that

3    enabled the shooter, Andre Cooper, to be in a

4    position to shoot at Karriem Washington.

5         The government alleges that Andre

6    Cooper intentionally killed Karriem Washington

7    by shooting him multiple times.

8         To establish that the defendant

9    intentionally killed the victim, the government

10   must prove that the defendant killed the victim

11   with the conscious desire to cause the victim's

12   death.

13        The government further alleges that

14   Andre Cooper intentionally inflicted serious

15   bodily injury that resulted in the death of

16   Karriem Washington, by shooting Karriem

17   Washington multiple times, which resulted in the

18   death of Karriem Washington.

19        The government must prove that the

20   defendant deliberately caused serious injury to

21   the victim's body, which, in turn, caused the

22   victim's death.

23        "Serious bodily injury" means a

24   significant or considerable amount of injury,

25   which involved a substantial risk of death,

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1 unconsciousness, extreme physical pain,

2 protracted and obvious disfigurement, or

3 protracted loss or impairment of a body member,

4 organ, or mental faculty.

5          As to Count 23, members of the jury,

6 involving the murder of Karriem Washington, the

7 government alleges that Andre Cooper

8 intentionally killed Karriem Washington by

9 shooting Karriem Washington multiple times.

10          To establish that the defendant

11 intentionally killed the victim, the government

12 must prove that the defendant killed the victim

13 with the conscious desire to cause the victim's

14 death.

15          The government further alleges that

16 Andre Cooper intentionally inflicted serious

17 bodily injury that resulted in the death of

18 Karriem Washington, by shooting Karriem

19 Washington multiple times, which resulted in the

20 death of Karriem Washington.

21          The government must prove that the

22 defendant deliberately caused serious injury to

23 the victim's body, which, in turn, caused the

24 victim's death.

25          "Serious bodily injury" means a

1    significant or considerable amount of injury,

2    which involved a substantial risk of death,

3    unconsciousness, extreme physical pain,

4    protracted and obvious disfigurement, or

5    protracted loss or impairment of a body member,

6    organ, or mental faculty.

7            Intent or knowledge may be proved like

8    anything else.  You may consider any statement

9    made and acts done by the defendant and all the

10   facts and circumstances in evidence, which may

11   aid in the determination of the defendant's

12   knowledge or intent.

13           You may, but are not required to, infer

14   that a person intends the natural and probable

15   consequences of acts knowingly done or knowingly

16   omitted.

17           So, ladies and gentlemen, as it relates

18   to Section II, dealing with the Gateway Factors,

19   as you go through this section, if you get to

20   this section, pursuant to your deliberations --

21   and I say that because obviously you have to

22   find the first section, the Age Requirement --

23   when you go through this, you have to answer

24   each of the questions posed to you, each of the

25   statements posed to you, and you have to respond

1    to whether or not it's proven or not proven. how

2         As I stated, each of these Special

3    Verdict Forms pertain to each individual

4    defendant.  I will instruct you on that a little

5    later in these instructions, that these

6    defendants are separate, and you should consider

7    them separate in all aspects; the aggravating

8    factors, the mitigating factors.  All right?

9         Moving on.  The next section of these

10   Special Verdict Forms deals with Section III.

11   These are Statutory Aggravating Factors.

12        Again, ladies and gentlemen, if you

13   unanimously find beyond a reasonable doubt that

14   a defendant intentionally committed the murder

15   of or committed acts resulting in the death of

16   any of the victims in the manner described in

17   the preceding instructions, you must then

18   proceed to determine whether the government has

19   proved beyond a reasonable doubt the existence

20   of the following alleged statutory aggravating

21   factors with respect to the same murders.

22        The government has alleged the

23   statutory aggravating factors of substantial

24   planning and premeditation as to all four

25   murders.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    The government also alleges an

2    additional statutory aggravating factor

3    applicable to the murder of Randolph Harris.

4    That statutory aggravating factor is that the

5    defendant, Jamain Williams, knowingly created a

6    grave risk of death to another person, David

7    Jones, in the commission of the offense.

8    If you unanimously make that finding in

9    the affirmative, you should so indicate in

10    Section III, on the appropriate page of the

11    Special Verdict Form, and continue your

12    deliberations.

13    If you do not unanimously make that

14    finding in the affirmative, you should so

15    indicate on the appropriate page of the Special

16    Verdict Form, and follow the directions on the

17    form.

18    No further deliberation will be

19    necessary as to any murder for which you do not

20    unanimously make a unanimous finding as to that

21    alleged statutory aggravating factor.

22    The law directs you to consider and

23    decide, at this point, the existence or

24    non-existence of only the statutory aggravating

25    factors specifically claimed by the government.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1     You are reminded that to find the

2  existence of a statutory aggravating factor,

3  your decision must be unanimous and beyond a

4  reasonable doubt.

5     Ladies and gentlemen, the government

6  alleges that the defendants committed the

7  offenses charged in Counts 10 and 11, regarding

8  the murder of Tracy Saunders;

9     Count 15, regarding the murder of

10  Antonio Rykard;

11     Counts 18 and 19, regarding the murder

12  of Randolph Harris;

13     And Counts 22 and 23, regarding the

14  murder of Karriem Washington of the indictment,

15  for which you have found them guilty after

16  substantial planning and premeditation to cause

17  the deaths of the victims named in those counts.

18     This is the first statutory aggravating

19  factor that the government has alleged.  I

20  define planning and premeditation and

21  substantial to you at this time.

22     "Planning" means mentally formulating a

23  method for doing something or achieving some

24  end.

25     "Premeditation" means thinking or

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  deliberating about something and deciding

2  whether to do it beforehand.

3        "Substantial planning and

4  premeditation" means a considerable or

5  significant amount of planning and

6  premeditation.

7        The government alleges an additional

8  statutory aggravating factor applicable to

9  Counts 18 and 19 regarding the murder of

10  Randolph Harris.

11        That statutory aggravating factor is

12  that the defendant, Jamain Williams, knowingly

13  created a grave risk of death to another person,

14  David Jones, in the commission of the offense

15  when Jamain Williams shot Jones while killing

16  Randolph Harris.

17        To establish the existence of this

18  factor, the government must prove that the

19  defendant knowingly created a grave risk of

20  death to one or more persons in addition to the

21  victim of the offense in committing the offense.

22        Persons, in addition to the victim,

23  include innocent bystanders in the zone of

24  danger created by the defendant's acts.

25        "Grave risk of death" means a

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  significant and considerable possibility that

2  another person might be killed.

3        "Knowingly creating such a risk" means

4  that the defendant was conscious and aware that

5  his conduct in the course of committing the

6  offense might have this result.

7        Knowledge may be proved like anything

8  else.  You may consider any statement made and

9  acts done by the defendant and all the facts and

10  circumstances in evidence, which may aid in the

11  determination of the defendants' knowledge.

12        So, ladies and gentlemen, consider

13  Section III, Statutory Aggravating Factors, if,

14  pursuant to your deliberations again, you get to

15  this section, and follow the instructions at the

16  top and indicate, pursuant to your

17  deliberations, if you get to this page, whether

18  or not the government has proven these statutory

19  aggravating factors or not as to each of the

20  individual defendants on each of their Special

21  Verdict Forms.

22        Moving along to the Non-Statutory

23  Aggravating Factors, which is Section IV.

24        Members of the jury, if you have found

25  the existence of one statutory aggravating

1   factor, unanimously and beyond a reasonable

2   doubt, you must then consider whether the

3   government has proved the existence of any

4   non-statutory aggravating factors.

5           As in the case for statutory

6   aggravating factors, you must unanimously agree

7   that the government has proved beyond a

8   reasonable doubt the existence of any of the

9   alleged non-statutory aggravating factors before

10  you may consider such factors in your

11  deliberations on the appropriate punishment for

12  the defendants in this case.

13          In addition to any statutory

14  aggravating factors you have found, or may find,

15  you are permitted to consider and discuss only

16  the non-statutory aggravating factors

17  specifically claimed by the government, and

18  listed below.

19          You must not consider any other facts

20  in aggravation which you think of on your own.

21          I will now list for you the

22  non-statutory aggravating factors alleged by the

23  government.

24          In Counts 10 and 11, involving the

25  murder of Tracy Saunders, the government

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    alleges -- again, they allege -- and you have to

2    make that determination, pursuant to your

3    deliberations, ladies and gentlemen, obviously

4    if you get to this portion of the verdict form.

5         The government alleges three

6    non-statutory aggravating factors, all of which

7    apply to both Andre Cooper and Jamain Williams.

8    Those three non-statutory factors are:

9         1) Impact on the Victim.  The

10   government alleges that the defendants caused

11   injury, harm and loss to the family of the

12   victim because of the victims' personal

13   characteristics as an individual human being and

14   the impact of the death upon the victim's

15   family.  The murder of the victim has caused the

16   victim's family extreme emotional suffering, and

17   the victim's family has suffered severe and

18   irreparable harm.

19        2) Obstruction of Justice.  The

20   government alleges the defendants committed the

21   offense with the intent to prevent the victim

22   from providing information and assistance to law

23   enforcement authorities in regard to the

24   investigation or prosecution of the commission

25   or possible commission of another offense.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1          3) Contemporaneous Convictions.  The

2    government alleged that the defendants committed

3    and have been convicted of additional murders as

4    charged in the indictment.

5          In Count 15, involving the murder of

6    Antonio Rykard, the government alleged the same

7    three non-statutory aggravating factors.

8    However, in Count 15, those factors apply only

9    to Andre Cooper and with respect to the

10   "Obstruction of Justice" aggravating factor, it

11   is alleged by the government that Cooper

12   committed the offense with the intent to both

13   prevent the victim from providing information

14   and assistance to law enforcement, as well as

15   with the intent to retaliate against the victim

16   for having provided information to law

17   enforcement.

18         In Counts 18 and 19, involving the

19   murder of Randolph Harris, the government

20   alleges two non-statutory aggravating factors,

21   which apply only to Jamain Williams.  Those two

22   factors are:

23         1) The Impact on the Victim, and

24         2) The Contemporaneous Convictions.

25         The explanation of those factors that I

1    have just given you applies here as well.

2              In Counts 22 and 23, involving the

3    murder of Karriem Washington, the government

4    alleges the same two non-statutory aggravating

5    factors as it alleges in Counts 18 and 19.

6    However, in Count 22, those factors apply to

7    both defendants, Andre Cooper and Jamain

8    Williams, while, in Count 23, they apply only to

9    Andre Cooper.

10             Members of the jury, you must record

11   your findings regarding whether you unanimously

12   find that the government has proven beyond a

13   reasonable doubt the existence of any of these

14   non-statutory aggravating factors.  Please enter

15   that finding on the appropriate page of the

16   Special Verdict Form, and continue your

17   deliberations.

18             Obviously, if the government has failed

19   to prove unanimously those particular

20   non-statutory aggravating factors, you're to

21   indicate so by indicating not proven.

22             Moving on, ladies and gentlemen, to

23   Section V, dealing with Mitigating Factors.

24             Members of the jury, before you may

25   consider the appropriate punishment, you must

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  consider whether the defendant has established

2  the existence of any mitigating factors.

3          A mitigating factor is a factor that

4  favors a punishment of life imprisonment without

5  release rather than the death penalty.

6          A mitigating factor is not offered to

7  justify or excuse the defendant's conduct in

8  committing murder.  Rather, a mitigating factor

9  is a fact about the defendant's life or

10 character or about other circumstances that you

11 find relevant that would suggest that a sentence

12 of life in prison without any possibility of

13 release is a more appropriate punishment than

14 death.

15         Unlike aggravating factors, that I just

16 went over with you, both the statutory and

17 non-statutory, which you must unanimously find

18 proved beyond a reasonable doubt in order to

19 consider them in your deliberations, the law

20 does not -- I repeat, does not -- require

21 unanimous agreement with regard to mitigating

22 factors.

23         Any juror persuaded of the existence of

24 a mitigating factor must consider it in this

25 case.  Any one of you may individually and

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    independently find the existence of a mitigating

2    factor, regardless of the number of other jurors

3    who may agree, and any juror who so finds may

4    weigh that factor.

5            Thus, if even a single member of the

6    jury finds that a mitigating factor has been

7    proved by a preponderance of the evidence, that

8    member of the jury is allowed to weigh that

9    factor in making up his or her own mind in

10   weighing whether or not to vote for a death

11   sentence.

12           Members of the jury, it is the

13   defendant's burden to establish any mitigating

14   factors, but only by a preponderance of the

15   evidence.  This is a lesser standard of proof

16   under the law than proof beyond a reasonable

17   doubt.  A factor is established by a

18   preponderance of the evidence if its existence

19   is shown to be shown more likely so than not so.

20           In other words, "a preponderance of the

21   evidence" means such evidence, as when

22   considered and compared with that opposed to it,

23   produces in your mind the belief that what is

24   sought to be established is more likely than not

25   true.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1           In Part V of the Special Verdict Form

2    relating to mitigating factors, you are asked,

3    but not required, to report the total number of

4    jurors that find a particular mitigating factor

5    established by a preponderance of the evidence.

6           As a matter of fact, let me check that

7    out.  You are required to put down the number of

8    jurors who so find.

9           Looking at Section No. V, dealing with

10   the mitigating factors, under each of these

11   mitigating factors, you're to indicate the

12   number of jurors who so find these mitigating

13   factors.

14          Obviously, each of these mitigating

15   factors are listed in the Special Verdict Form,

16   but they are also included in the Court's

17   instructions, and I will go over them for you at

18   this time, and include it in the record.

19          The mitigating factors enumerated for

20   Jamain Williams are as follows:

21          The defendant, Jamain Williams,

22   asserted that he has proven by a preponderance

23   of the evidence the following mitigating

24   factors:

25               1.  With respect to the murder of

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1 Karriem Washington, Mark Rogers, an equally

2 culpable individual, was not charged with the

3 offense of the murder of Karriem Washington, and

4 does not face either the death penalty or life

5 imprisonment for that offense.

6          2.   With respect to the murder of Tracy

7 Saunders, Brian Rogers, an equally culpable

8 individual, does not face the death penalty.

9          3.   Jamain Williams grew up in an

10 impoverished and dysfunctional environment.

11          4.   Neither Jamain Williams' mother,

12 nor his father, provided parental guidance or

13 protection.

14          5.   Jamain Williams was neglected in

15 his youth and allowed to run the streets,

16 thereby learning the ways of the street at an

17 earlier age.

18          6.   Jamain Williams' childhood was

19 influenced by poor and/or indifferent parenting.

20          7.   Jamain Williams grew up in a

21 community in which drugs and violence were

22 commonplace.

23          8.   Jamain Williams suffered from a

24 learning disability.

25          9.   Jamain Williams' learning

1    disability went untreated.

2         10.  After the sixth grade, Jamain

3    Williams had consistently poor attendance at

4    school and consistently received poor grades.

5         11.  Jamain Williams' untreated

6    learning disability contributed to academic

7    failure and his eventual dropping out of school.

8         12.  Jamain Williams did not receive

9    adequate support and structure from his parents

10   to assist him in overcoming his learning

11   disability.

12        13.  Jamain Williams did not receive

13   adequate support and structure from the school

14   district to assist him in overcoming his

15   learning disability.

16        14.  Jamain Williams is a good parent.

17        15.  Jamain Williams has a good

18   relationship with his children.

19        16.  Jamain Williams' life has value to

20   his extended family.

21        17.  Jamain Williams' family, including

22   his children, who are innocent of any

23   wrongdoing, would be harmed if he were killed.

24        18.  Jamain Williams is capable of

25   establishing and sustaining meaningful and

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1   positive personal relationships.

2         19.  Jamain Williams has demonstrated

3   the ability to make a positive adjustment to

4   incarceration.

5         20.  Jamain Williams has demonstrated

6   the ability to make positive contributions to

7   others while he has been incarcerated.

8         21.  If Jamain Williams is sentenced to

9   life imprisonment, without the possibility of

10  release, he will never be free again.

11        Members of the jury, you are permitted

12  to consider anything else about the commission

13  of the crime or about the defendant's background

14  or character that would mitigate against

15  imposition of the death penalty.

16        If there are any such mitigating

17  factors, whether or not specifically argued by

18  defense counsel, which are established by a

19  preponderance of the evidence, you are free to

20  consider them in your deliberations.

21        In Part V of the Special Verdict Form,

22  you are asked to identify any mitigating factors

23  that any one of you find have been proven by a

24  preponderance of the evidence.

25        Ladies and gentlemen, in looking at

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1   Section V, after the listed mitigating factors

2   there, on the next page, it says, list

3   additional mitigating factors and the

4   defendant's background or character, the

5   circumstances of the crime, or other relevant

6   facts or circumstances identified by the

7   defendant as mitigation.

8          If you have any, you're to include

9   those in there.

10          The next page says, the following extra

11  spaces are provided to write in additional

12  mitigating factors, if any found by any one or

13  more jurors, and it gives you directions as to

14  follow therein.

15          Let's move on now to the Mitigating

16  Factors Enumerated:  Andre Cooper.

17          The mitigating factors that the

18  defendant, Andre Cooper, asserts he has proven

19  by a preponderance are as follows:

20          1.  Andre Cooper has two children,

21  Tahaj Cooper and Andre Cooper, Jr., who are both

22  six years of age.

23          2.  If spared execution, Andre Cooper

24  will have an opportunity to continue to be a

25  father to his two young children.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1        3. Andre Cooper, Jr. was severely

2 injured in the automobile accident that killed

3 his mother, Nakira Grabel.

4        4. Executing Andre Cooper will make

5 Andre Cooper, Jr. an orphan.

6        5. Andre Cooper grew up in a community

7 that suffers from the conditions of poverty.

8        6. As a young boy, Andre Cooper was

9 raised in a community that had and continues to

10 have the highest per capita murder rate in the

11 country and the highest levels of violent crimes

12 in Pennsylvania.

13        7. Exposure to violence and drug abuse

14 at a young age can negatively harm a child's

15 development.

16        8. At a young age, Andre Cooper was

17 exposed to exceptional levels of violence and

18 drug crimes.

19        9. Andre Cooper grew up in Chester,

20 one of the worst communities in the Commonwealth

21 of Pennsylvania in which to raise children.

22        10. Andre Cooper was born to teenage

23 parents who did not provide a stable and safe

24 home environment.

25        11. At an early age, Andre Cooper was

1  exposed to drugs and drug use in his own home in

2  Chester.

3          12.  When he was 11, Andre Cooper went

4  to live with his father's family in Delaware

5  where he was united and lived together, as a

6  family, with his younger brother Kevin and his

7  sister Kierstin and Brittany, until there was a

8  marital separation.

9          13.  During the marital separation,

10  Andre Cooper lived with his father, in the home

11  of his paternal grandmother, where there was

12  little or no supervision.

13          14.  When there was a marital

14  reconciliation, Andre Cooper was not included,

15  remained separated from his brother and sisters,

16  and left in a situation where there was little

17  or no supervision.

18          15.  Andre Cooper was influenced to

19  participate in drug dealing by Anthony "Stone"

20  Thomas, his uncle.

21          16.  Although legally an adult, Andre

22  Cooper was quite young at the time he committed

23  the criminal conduct charged in this case.

24          17.  Andre Cooper has no significant

25  history of criminal conduct, other than charged

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    in this case.

2         18.   Andre Cooper has a close, loving

3    relationship with his younger brother and

4    sisters, and has encouraged them towards a life

5    away from drugs, violence and away from the

6    streets.

7         19.   Executing Andre Cooper will cause

8    great grief and loss to those who love him.

9         20.   Andre Cooper will continue to make

10   a positive adjustment to incarceration.

11        21.   While serving a life sentence,

12   Andre Cooper can have a positive impact on the

13   lives of other prisoners, his family and the

14   community.

15        22.   Andre Cooper is a person who is

16   and will continue to be capable of redemption.

17        23.   Others who were of equal or

18   greater culpability in the murders will not be

19   sentenced to death.

20        24.   Brian Rogers, the man who shot and

21   killed Tracy Saunders, does not face the death

22   penalty.

23        25.   Vincent Williams, the man who shot

24   and killed Antonio Rykard, does not face the

25   death penalty.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1       26.  Mark Rogers is not facing the

2   death penalty in connection with any of the

3   murders.

4       27.  Andre Cooper should not be

5   executed, based upon the fact Brian Rogers, who

6   was involved in the murder of Tracy Saunders,

7   may have the opportunity to be released from

8   prison in 25 years.

9       28.  Andre Cooper should not be

10  executed, based upon the fact that Brian Rogers,

11  who was involved in the murder of Antonio

12  Rykard, may have the opportunity to be released

13  from prison in 25 years.

14      Ladies and gentlemen, you are permitted

15  to consider anything else about the commission

16  of the crime or about the defendant's background

17  or character that would mitigate against the

18  imposition of the death penalty.

19      If there are any such mitigating

20  factors, whether or not specifically argued by

21  the defense counsel, which are established by a

22  preponderance of the evidence, you are free to

23  consider them in your deliberation.

24      Likewise, there are additional spaces

25  on the verdict slip for you to add any

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  additional factors that you may find pursuant to

2  your deliberations.

3          All right, moving on to Section VI.

4  This deals with Weighing the Aggravating and the

5  Mitigating Factors.

6          Members of the jury, if you find,

7  unanimously and beyond a reasonable doubt, that

8  the defendant was 18 years of age or older when

9  he committed the offenses, that he acted with

10  the requisite intent, and that the government

11  proved the existence of at least one statutory

12  aggravating factor, and after you then determine

13  whether the government proved the existence of

14  the non-statutory aggravating factor submitted

15  to you, and whether the defendant proved the

16  existence of any mitigating factors, then you

17  will engage in a weighing process.

18          In determining the appropriate

19  sentence, members of the jury, all of you must

20  weigh the aggravating fact or factors that you

21  unanimously found to exist, whether statutory or

22  non-statutory, and each of you must weigh any

23  mitigating fact or factors that you individually

24  found to exist.  In engaging in the weighing

25  process, you must avoid any influence of

1  passion, prejudice or undue sympathy.

2        Your deliberations should be based upon

3  the evidence that you have seen and heard and

4  the law on which I have instructed you.

5        Again, whether or not the circumstances

6  in this case justify a sentence of death is a

7  decision that the law leaves entirely to you,

8  ladies and gentlemen.

9        The process of weighing aggravating and

10 mitigating factors against each other or

11 weighing aggravating factors alone, if there are

12 no mitigating factors, in order to determine a

13 proper punishment is not a mechanical process.

14       In other words, you should not simply

15 count the number of aggravating and/or

16 mitigating factors and reach a decision based on

17 which number is greater; you should consider the

18 weight and the value of each factor.

19       Ladies and gentlemen, the law

20 contemplates that different factors may be given

21 different weights or values by different jurors.

22 Thus, you may find that one mitigating factor

23 outweighs all aggravating factors combined, or

24 that the aggravating factors proved do not,

25 standing alone, justify imposition of a sentence

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    of death.

2         If one or more of you so find, you must

3    return a sentence of life in prison without the

4    possibility of release.  Similarly, you may

5    unanimously find that a particular aggravating

6    factor sufficiently outweighs all mitigating

7    factors combined to justify a sentence of death.

8         You are to decide what weight or value

9    is to be given to a particular aggravating or

10   mitigating factor in your decision-making

11   process.

12        If you unanimously conclude that the

13   aggravating factor or factors found to exist

14   sufficiently outweigh any mitigating factor or

15   factors, which any of you found to exist, to

16   justify a sentence of death, or in the absence

17   of any mitigating factor, that the aggravating

18   factor or factors alone are sufficient to

19   justify a sentence of death, and that,

20   therefore, death is the appropriate sentence in

21   this case, you must record your determination

22   that a sentence of death shall be imposed in

23   Section VI on the Special Verdict Form.

24        Likewise, if you determine that death

25   is not justified, you must complete Section VI

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  of the Special Verdict Form, and record your

2  determination that the defendant be sentenced to

3  life imprisonment without the possibility of

4  release.

5        Members of the jury, regardless of your

6  findings with respect to "Aggravating Factors"

7  and "Mitigating Factors," you are never required

8  to impose a sentence of death.  Thus, even if

9  you find that a sentence of death would be

10  justified after this weighing process, you are

11  never required to return a verdict imposing a

12  sentence of death.

13        Again, whether or not the circumstances

14  of a particular count justify a sentence of

15  death or a sentence of life imprisonment,

16  without the possibility of parole, is a decision

17  that the law leaves entirely to you.

18        Ladies and gentlemen, in deciding

19  whether aggravating or mitigating factors have

20  been proved, you may consider any evidence that

21  was presented during either the guilt or penalty

22  phase of the trial.  You may also weigh

23  inferences and reach conclusions that reason and

24  common sense leads you to draw from the facts

25  that have been established from testimony and

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    other evidence in the case.

2           As you have, throughout this trial, you

3    may consider both the direct and circumstantial

4    evidence, as I defined that to you earlier on in

5    the earlier phase of this trial.

6           While you must consider all the

7    evidence, you are not required to accept any of

8    the evidence as -- strike that.

9           While you must consider all of the

10   evidence, you are not required to accept any of

11   the evidence that you find not to be true or

12   accurate.  You alone determine issues of

13   credibility and decide how much weight, if any,

14   to give testimony and other evidence.

15          As in the guilt phase, the questions

16   and arguments, again, of the attorneys are not

17   evidence.  If there is any difference between

18   the attorneys' recollection of the evidence, or

19   my recollection of the evidence to the extent

20   that I comment on it, and I have not -- and I

21   will not -- and your recollection, you are to be

22   guided by your recollection of what the evidence

23   was.

24          I want to particularly underline

25   another important point to you at this time,

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    ladies and gentlemen.  In determining whether to

2    impose a death sentence or life imprisonment

3    without the possibility of release, you must

4    avoid any influence of passion, prejudice, or

5    sympathy, as I mentioned earlier.

6           It is extremely important for you to

7    remember this, as some of the testimony in the

8    final phase of this case, and even some of

9    counsel's arguments, have been somewhat

10   emotional.  It is perfectly natural to be

11   touched by emotional testimony or arguments.  We

12   are human beings, not machines.

13          But remember, that your ultimate

14   decision must be made in a calm, objective and

15   dispassionate way.  No jury can ever return a

16   verdict based on sympathy, anger, or bias.  Your

17   deliberations must be based upon the evidence

18   seen and heard and the law on which I have

19   instructed you.

20          Members of the jury, always remember

21   there are two separate death penalty phases that

22   have been presented, one for each of the

23   defendants.  Each is entitled to separate

24   considerations by you, the jury.

25          The government has the burden of proof

1   as to each individual defendant.  Each defendant

2   has the burden of proof as to any mitigating

3   factor pertaining to him.

4          Any consideration of aggravating and

5   mitigating factors are unique to each individual

6   defendant.  It would be improper, members of the

7   jury, for any juror to compare or consider one

8   defendant's listed mitigating factors against

9   another defendant's.

10          Again, you must give separate and

11  individual consideration to each defendant.

12          Members of the jury, I instruct you

13  that the government has withdrawn its notice of

14  intent to seek the death penalty against Vincent

15  Williams.  After evaluating reports by various

16  experts, retained by both Vincent Williams and

17  the government, it was determined and agreed to

18  by them that Vincent Williams is legally

19  "mentally retarded."

20          This determination is binding on all

21  parties, the government and the defendants.

22          Ladies and gentlemen, at the end of

23  your deliberations, if you unanimously determine

24  that the defendant should be sentenced to death,

25  or if you determine that life imprisonment

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  without the possibility of release is the

2  appropriate sentence, the Court is required to

3  impose that sentence.

4        Lastly, ladies and gentlemen, as you

5  can see, as to each of these Special Verdict

6  Forms, there's Section No. VII, and that deals

7  with Certification.  I now instruct you on that

8  section.

9        In your consideration of whether the

10 death penalty is justified, members of the jury,

11 you must not consider the race, color, religious

12 beliefs, national origin, or sex of either the

13 defendant or the victims.  You are not to return

14 a sentence of death unless you would return a

15 sentence of death for the crime in question

16 without regard to the race, color, religious

17 belief, national origin or sex of either the

18 defendant or any victim.

19        To emphasize the importance of this

20 consideration, Section V of the Special Verdict

21 Form contains a Certification Statement.  Each

22 juror should carefully read the statement, and

23 sign with your juror number in the appropriate

24 place, if the statement accurately reflects the

25 manner in which each of you reach your decision.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1        Ladies and gentlemen, I further

2   instruct you that Jamain Williams and Andre

3   Cooper did not testify during the penalty phase.

4   A defendant has the Constitutional right to

5   remain silent.  Also, there is no burden upon a

6   defendant to prove that he should not be

7   sentenced to death.  The burden is entirely on

8   the prosecution to prove that a sentence of

9   death is justified.

10       Accordingly, the fact that Jamain

11  Williams and Andre Cooper did not testify must

12  not be considered by you in any way, or even

13  discussed, in arriving at your decision on

14  whether to impose a death penalty or a sentence

15  of life imprisonment without the possibility of

16  parole for any count in this case.

17       Even though the defendant has the

18  burden of establishing mitigating factors by a

19  preponderance of the evidence, our law does not

20  impose a burden upon the defendant to testify in

21  connection with the presentation of mitigation,

22  mitigation evidence.

23       Ladies and gentlemen, I'm going to take

24  a brief break now.  Let me see counsel at

25  sidebar.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1          (Sidebar conference was held.)

2          THE COURT:  Other than my concluding

3    remarks in reference to their going out and

4    deliberating, is there anything additional?

5          MR. WILFORD:  Yes, Your Honor.  One

6    point.  The Court did not indicate that an

7    individual juror has a right to vote for life,

8    but it would require all the jurors,

9    unanimously, to vote for death.  I think it's

10   important --

11         THE COURT:  I'll mention it again.

12   Affirmed, all right?

13         MR. SWEENEY:  With respect to the juror

14   never being required to impose, that

15   instruction, together with the sympathy

16   instruction, I think it needs to be clarified so

17   that mercy and hope can be considered by the

18   jury.

19         THE COURT:  That's your objection.  I

20   believe that there's an adequate record for them

21   to consider it, each separately and distinct, as

22   opposed to combining them.  Go ahead.

23         MR. RICCO:  I needed him to read that.

24   Your Honor, when we submitted that proposed

25   verdict form, this statement was a part of it,

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    and this statement, as a mitigator, the fact

2    that either of these men, if they are not

3    sentenced to death, would spend the rest of

4    their life in prison without the possibility of

5    release, is a mitigator.

6              That was part of our instructions we

7    submitted.

8              THE COURT:  Yes, I thought that was

9    included within the instruction that I gave,

10   that they would be imprisoned for the rest of

11   their life, but I'll go over it again, if you

12   want it.

13             MR. RICCO:  Please.

14             MR. SWEENEY:  For the record, I believe

15   we have a similar instruction included --

16             THE COURT:  I know yours is included.

17             MR. RICCO:  Ours was not.  I'm sorry,

18   Judge.

19             THE COURT:  I'll add it on.  Anything

20   else?

21             MS. WINTER:  No, sir.

22             MR. RICCO:  No, sir.

23             MR. SWEENEY:  No, sir.

24             (Sidebar conference concluded.)

25             THE COURT:  Ladies and gentlemen, as

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1  you are aware, that is the opportunity that I

2  consult with counsel to see if there is any

3  additional point or points that they wish that I

4  clarify.  There were two points that I want to

5  raise to you at this point in time.

6          There is an additional mitigating

7  factor, and I'll submit this to you in a written

8  form.  I'll have my secretary prepare this.

9          That mitigating factor, it's already

10  included in Jamain Williams' list of mitigating

11  factors.  It pertains to both of them, in any

12  case.  This one also pertains to Andre Cooper.

13          The mitigating factor is that the law

14  mandates that if either Jamain Williams or Andre

15  Cooper is not sentenced to death, either man

16  will spend the rest of his life in a United

17  States Prison without the possibility of

18  release.  That's a mitigating factor for you to

19  consider.

20          As I stated, you'll have the written

21  form also to include in the Court's

22  instructions.

23          The other point was that in order for

24  you to return a verdict of death, the 12 of you

25  who will be deliberating must unanimously find

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1   that decision.  It only takes one of you to

2   return a sentence of life without the

3   possibility of parole.

4           So saying, ladies and gentlemen, it is

5   your duty to consult with one another and to

6   deliberate with one another with a view towards

7   reaching an agreement, if you can do so without

8   violence to your individual judgment.

9           Each of you must decide the case for

10  himself and herself, but do so only after an

11  impartial consideration of the evidence with

12  your fellow jurors.  In the course of your

13  deliberations, do not hesitate to reexamine your

14  own views and to change your opinion, if you are

15  convinced that it is erroneous.

16          If you want to communicate with me at

17  any time during your deliberations, please write

18  down your message or question, pass the note to

19  the Marshal, who will bring it to my attention

20  and, as previously, we will gather everybody

21  together and we'll respond to any questions that

22  you may have.  We'll try to do that as quickly

23  as possible.

24          I caution you, members of the jury,

25  however, with any message or question that you

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    might send, that you should not tell me any

2    details of your deliberation or how many of you

3    are voting in a particular way on any issue.

4           Let me remind you, again, that nothing

5    that I have said in these instructions, and

6    nothing that I have said or done during the

7    trial, has been said or done to suggest to you

8    what I think your decision should be.

9           The decision is yours exclusively.  The

10   decision is your exclusive responsibility,

11   ladies and gentlemen of the jury.

12          So saying, that concludes the Court's

13   instructions to you.

14          Juror No. 4, on the end, I'm going to

15   ask you to step out of the box.  This is

16   becoming old hat with the four of you.  I'm

17   going to ask you to step out of the box.  The 12

18   others are directed to go into the jury room and

19   commence your deliberations.

20          Your lunch should be there, and we're

21   going to provide lunch for the other four.

22          You're directed to go in and begin your

23   deliberations, ladies and gentlemen.

24          (The jurors exited the courtroom at

25   12:35 p.m.)

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1     THE COURT:  Ladies and gentlemen, you
2  can have a seat back there in the jury box for a
3  second.  Everybody else may be seated.
4     Ladies and gentlemen, we're going to --
5  gentleman, only one this time.  You're by
6  yourself.  All right?
7     We're going to put you, I think, in
8  another jury room, and we're going to bring your
9  lunch to you.  We're going to keep you around
10 today.  By the end of the day, you can let me
11 know what your desire is, if you want to
12 continue to come in, as previously, we'll bring
13 you in.
14    We'll see how it goes.  Or you can stay
15 at home or do whatever you want and be reachable
16 by telephone and we'll bring you in if we need
17 to, but I need to know that before the end of
18 the day.  All right?
19    Let me get Ms. Mickie in here and put
20 her to work.  She said that she'll be right out
21 and take you.  I guess you can go back there
22 because there's a hallway right there without
23 going into the jury room.
24    (The alternate jurors were excused from
25 the courtroom.)

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1          THE COURT:  Now, counsel, you can place

2   any exception to the Court's instructions on the

3   record that you want.

4          MR. SWEENEY:  Nothing, Your Honor.

5          THE COURT:  You made the objection on

6   the sidebar, so with that, that will go with the

7   life of this case wherever it goes from this

8   point.

9          Any others?

10          MR. RICCO:  No, Your Honor.

11          THE COURT:  Government?

12          MS. TAYLOR:  No, Your Honor.

13          THE COURT:  All right.  Let Ms. Mickie

14   know where you're going to be.  I tell you this.

15   Obviously, even if they had questions -- and

16   we're going to send out the Court's

17   instructions.  I have that here, and I'll give

18   you a copy.

19          MR. SWEENEY:  May I just step out for a

20   moment to get our exhibit books?

21          THE COURT:  Sure.  That's right, we

22   have to rule on those.

23          (Pause.)

24          THE COURT:  Any objections to the

25   exhibits that have been presented here for

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    consideration by the jury?

2            MS. TAYLOR:  I would ask, Your Honor,

3    that nothing go out until they make a request

4    for it, which I think is what we did last time.

5            THE COURT:  Yes, I can appreciate that.

6            Any objection?

7            They will probably want to see some of

8    it, I would imagine.  When they ask, we'll just

9    give it on out, or if you want to send it out

10   now, you can.  All right?  Your call.

11           MR. WILFORD:  On behalf of Mr. Cooper,

12   we suggest that the exhibits be sent out.

13           THE COURT:  Why don't we just send them

14   out?  They'll have them there; they are

15   available for their perusal, and they can look

16   at them and make that call themselves.

17           They are admitted into evidence, and

18   there is no objection to them.  We'll do that.

19           Both of the defense exhibits -- any

20   government exhibits?

21           MS. TAYLOR:  We'll have to pull it

22   together, Your Honor.

23           THE COURT:  Pull it together, and they

24   can, after they've been reviewed --

25           MR. WILFORD:  Your Honor, we can wait

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1   until the government has their exhibits so it's

2   one set.

3           THE COURT:  All right, that's fine.

4           MS. TAYLOR:  Yes, sir.

5           THE COURT:  If there's any objections,

6   I'll come back out and deal with those.  I tell

7   you now I will be away.  I have an appointment

8   at 1:30 to 2:30, so there will be no questions

9   taken or no verdict taken or anything like that.

10  You can do whatever you want during that hour.

11  If you have anything for me to rule on, get it

12  to me before 1:30 and I'll rule on it.

13          Anything else?

14          MS. TAYLOR:  No, sir.

15          MR. RICCO:  No, sir.

16          MR. HILL:  No, sir.

17          THE COURT:  All right.  We're in

18  recess then.

19          (Recess was held at 12:40 p.m.)

20          (The Court resumed the proceedings at

21  2:45 p.m.)

22          THE COURT:  Counsel, we have received a

23  request, Question No. 1.  It reads as follows:

24          "May we have the verdict slips from

25  each juror from the previous phase?  There are

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    notes on some of them."

2            Each of the jurors, on their verdict

3    slip that they individually had, made notes in

4    the previous phase.  Those verdict slips are in

5    our possession, and they are asking for them

6    back.

7            Any objections?

8            MS. TAYLOR:  No, Your Honor, not from

9    the government.

10           MR. RICCO:  No -- one moment.

11           THE COURT:  Sure.

12           MR. RICCO:  Your Honor, could we have a

13    sidebar for a second?

14           THE COURT:  A sidebar?

15           MR. RICCO:  Yes, I would like to ask

16    the Court a question.

17           THE COURT:  Sure.

18           (Sidebar conference was held off the

19    record.)

20           MR. RICCO:  For the sake of prosperity,

21    it may be what we stated at the sidebar, which

22    was essentially how was the Court going to deal

23    with the fact that we had a new juror in?

24           The Court has indicated what the Court

25    will instruct the jury, and that's fine with the

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    defendant, Andre Cooper.

2              THE COURT:  Very well.  We'll bring

3    them in and address that issue shortly.

4              The second issue deals with a request

5    for Mrs. Saunders' transcript from phase one.

6              Now, I tell counsel that that was not

7    previously requested, so you will have to review

8    the transcript of Ms. Saunders and delete those

9    portions that can't go back to the jury, sidebar

10   conferences, objections that were ruled against,

11   and they are entitled to have that testimony for

12   their deliberation process.  All right?

13             MR. RICCO:  Yes, Your Honor.

14             THE COURT:  Why don't we bring them in,

15   and I'll address both of these issues with them

16   and we'll go from there.

17             Mr. Sweeney?

18             MR. SWEENEY:  I stood up because other

19   people stood up.

20             THE COURT:  All right.

21             (The jury entered the courtroom at

22   2:48 p.m.)

23             THE COURT:  Good afternoon, ladies and

24   gentlemen.  Ladies and gentlemen, your question

25   number one, and it reads as follows:

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    "Number one, may we have the verdict

2    slips from each juror from the previous phase?

3    There are notes on some of them."

4         Ladies and gentlemen, in this regard, I

5    am going to give the 11 of you, who deliberated

6    in the first phase, the opportunity to view your

7    notes.

8         Juror No. 4 wasn't in that first phase,

9    so this is a brand-new phase.  This is a

10   brand-new deliberation process.  What was

11   deliberated previously, it's not now.  You have

12   to start anew with Juror No. 4 in your

13   discussion.

14        These notes, as indicated on this

15   request, are personal to each of the 11 of you

16   that participated in your deliberation process.

17   Any deliberation that takes place now is afresh,

18   anew and from the beginning.

19        Is that understood?

20        THE JURORS:  Yes.

21        THE COURT:  And, secondly, in your

22   request -- is there anything additional in that

23   regard that counsel wants?

24        MR. WILFORD:  No, sir.

25        MR. HILL:  No, Your Honor.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1       MS. TAYLOR:  No, Your Honor.

2       THE COURT:  In reference to your

3   Request No. 2, Mrs. Saunders' transcript from

4   phase one, you'll be given Mrs. Saunders'

5   transcript, but, as in the previous transcripts

6   that we gave to you, counsel and I have to

7   review the transcripts and take out those

8   portions of the transcripts that are sidebar

9   conferences, objections that were sustained.  As

10  soon as that's done, we will give you the

11  transcript.  All right?

12      If you have any further requests,

13  please put it down and we'll address it.

14      You're excused.  You can go back into

15  the jury room and continue with your

16  deliberations.

17      (The jury exited the courtroom at

18  2:50 p.m.)

19      THE COURT:  Now, counsel, I take it

20  we'll have to pull Ms. Saunders' testimony for

21  you.

22      MR. SWEENEY:  We may be able to handle

23  it as we were handling it before, but I need to

24  get together with Gregg and the computer

25  consultants.  That may be the easiest way

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    because I know there were sidebars, I think.

2          THE COURT:  There may have been.  I

3    don't know whether there were sidebars with her

4    testimony or not.  But if there were, then

5    you'll have to address that issue, and you can

6    review it in any format that you need to.  But

7    we have to get it done as soon as possible.

8          MR. RICCO:  Judge, we have the

9    transcript here.

10          THE COURT:  Excellent.  We'll be in

11   recess until you either need me to come out and

12   rule on some portion of this transcript, or if

13   you're in agreement, the transcript can be given

14   to Ms. Mickie so that she can give it to the

15   jury.  All right?

16          MS. TAYLOR:  Yes, sir.

17          THE COURT:  We'll be in recess until

18   further notice.

19          (Recess was held at 2:55 p.m.)

20          (The Court resumed the proceedings at

21   4:25 p.m.)

22          THE COURT:  There was another question,

23   but they said that we can give it to them

24   tomorrow.  We are going to send them home for

25   the evening.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1    May we have the binder, including the

2  plea agreements, or at least the plea

3  agreements?  Essentially, I think it's the plea

4  agreements that they want.

5         So I take it there's no objections to

6  the plea agreements going out?

7         MR. RICCO:  No, Your Honor.

8         MS. TAYLOR:  No, sir.

9         MR. HILL:  No, Your Honor.

10        THE COURT:  Very well, bring them in,

11  Ms. Mickie, and let's send them home.

12        (The jury entered the courtroom at

13  4:25 p.m.)

14        THE COURT:  Good afternoon, ladies and

15  gentlemen.

16        Ladies and gentlemen, you have Question

17  No. 2, and it reads as follows:

18        "May we have the binder, including the

19  plea agreements, or at least the plea

20  agreements?"

21        We're going to provide you with the

22  plea agreements.  If you want the remainder of

23  the binder, we will provide that to you, but at

24  this juncture, we will provide you with the plea

25  agreements.  We'll have those for you tomorrow.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1          Obviously, it's 4:30 now, and we're

2    going to send you home.  It's clearly important

3    that you do not talk about the case among

4    yourselves or with others.  We will see you back

5    tomorrow morning at 9:30.

6          As a matter of fact, I have to talk to

7    the alternate jurors before you leave.  So I'm

8    going to send you back into the jury room, and

9    then we're going to send you home shortly.  All

10   right?  Thank you.

11         (The jury panel exited the courtroom at

12   4:27 p.m.)

13         THE COURT:  Ladies and gentleman, have

14   you decided what your pleasure is as far as

15   coming in tomorrow or --

16         THE JURORS:  We'll come in.

17         THE COURT:  Excellent.  Well, we'll see

18   you tomorrow also at 9:30.  We're going to send

19   you all home now.  It's important that you do

20   not talk with the other jurors.  They are

21   working now, all right?

22         If one of you were to go into the

23   process, you would have to start all over again

24   with that juror.  So don't talk to them at all

25   about what's going on in the jury room.

25fe3ccd-fadf-4446-84db-ef6dfe453dd5

1          Bring out the other jurors.

2          Everybody have a safe trip and a nice

3     evening.  Thank you.

4          Very well, counsel, that concludes our

5     business for today.  We'll be in recess until

6     tomorrow morning.

7          MR. WILFORD:  The government has the

8     plea agreements so we can give them to Ms.

9     Mickie.

10          THE COURT:  You can.  Very well.

11          Anything else before we leave?

12          MR. RICCO:  No, sir.

13          MS. TAYLOR:  No, sir.

14          THE COURT:  Have a nice evening.

15          (Court adjourned the proceedings at

16     4:30 p.m.)

17

18

19

20

21

22

23

24

25

1                            I N D E X

2

3   DEFENSE CLOSING                 PAGE
       By Mr. Hill (continued)          3
4

5

6   GOVERNMENT REBUTTAL
       By Ms. Taylor                    24
7

8

9   JURY INSTRUCTION                    65

10

11

12

13

14

15

16

17

18

    I certify that the foregoing is a correct
19
    transcript from the record of the proceedings
20
    in the above-entitled matter.
21

22   DATE_____

23         Gregg B. Wolfe, R.P.R., C.M.

24

25

25fe3ccd-fadf-4446-84db-ef6dfe453dd5