6223

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CRIMINAL NO. O3-836

3 UNITED STATES OF AMERICA     :
                               :
4          -vs-                :
                               :
5 WILLIAM BASKERVILLE,         : TRANSCRIPT OF PROCEEDING
                               :
6             Defendant.       :
                               :
7                              :
- - - - - - - - - - - - - - - -

                          Trenton, New Jersey
                          May 8, 2007

10
        B E F O R E:


          THE HONORABLE JOEL A. PISANO
        UNITED STATES DISTRICT COURT JUDGE
13

        A P P E A R A N C E S:

15
        CHRISTOPHER CHRISTIE, U.S. Attorney
        BY:  JOSEPH N. MINISH, Assistant U.S. Attorney
             ROBERT L. FRAZER, Assistant U.S. Attorney
             For the Government.

        CARL J. HERMAN, ESQ.,
        KENNETH W. KAYSER, ESQ.,
        For the Defendant.



        Pursuant to Section 753 Title 28 United States
        Code, the following transcript is certified to be
        an accurate record as taken stenographically in the
        above-entitled proceedings.

24

                Joanne M. Caruso, CSR, CRR
                Official Court Reporter


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6224

Case 5:05-cr-06002-GAF  Document 396-57  Filed 03/06/08  Page 1 of 157

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|

JOHN GAY
By Mr. Minish    6257              6282,6308
By Mr. Herman          6264

SHAWN MANSON
By Mr. Minish    6294

5

PAUL DAVIS
By Mr. Minish    6311              6323
By Mr. Kayser          6318

7

JOHNNIE DAVIS
By Mr. Frazer    6334

LAKIESHA WILSON
By Mr. Frazer    6345

10

NIESHA MC CRAY
By Mr. Frazer    6351

SHAWN MANSON
By Mr. Minish    6367

13

14

15

| EXHIBIT | DESCRIPTION | EVD. |
|---------|-------------|------|
| P-3 | Arrest Record | 6312 |
| P-52 | Photo | 6357 |
| P-50 | Photo | 6358 |
| P-51 | Photo | 6376 |
| P-15A & B | Presentence Report | 6376 |
| P-30 through 35 | Documents | 6377 |
| P-37, 19, 1, 4, | Documents | 6377 |
| P-16 through 18 | Documents | 6377 |
| P-11, 12 and 15 | Documents | 6377 |

22

23

24

25

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6225

May 8, 2007

Page 2

2          THE CLERK:    All rise.

3          (The following takes place out of the presence of the

4  jury.)

5          THE COURT:    Good morning.

6          Have a seat, relax.

7          Yes, Mr. Minish?

8          MR. FRAZER:  We have two very brief issues.  I handed

9  counsel, and I have a cases of cites and blurbs and what their

10 holdings are regarding the issues of juvenile adjudications

11 being used.  I haven't found one that said it can't be used.

12         THE COURT:    Okay.

13         MR. FRAZER:  Secondly, we just want to raise, John

14 Gay is the first witness and I think we touched on this

15 briefly that there wouldn't be any questions from the defense

16 regarding pending investigations.  Obviously, Mr. Gay can't

17 talk about the facts of pending investigations.

18         THE COURT:    Okay.

19         MR. FRAZER:  We don't want the question to be asked

20 and him say I can't answer it.  I assume it's not relevant and

21 wouldn't be asked.

22         THE COURT:    Any problem with that?

23         MR. HERMAN:  Nothing beyond today.  Whatever is

24 charged as of today.

25         THE COURT:    Okay.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6226


1          MR. FRAZER:  Right.  That's it.

2          MR. HERMAN:  I got a call from Mr. Minish at 6:30

3  last night on my cell phone, a message that they were seeking

Page 3

4  to introduce from Shawn Manson the fact that Horatio Joines

5  had been threatened or intimidated and he gave me two other

6  names.  I don't know whether the Government intends to go into

7  it.

8          I got some discovery first thing this morning about

9  Horatio Joines, nothing about him being intimidated.  There's

10  information about another potential name, Mark Joseph being

11  called to the Grand Jury, nothing about him being intimidated.

12          I don't want them to go into it in their opening

13  unless your Honor believes there's a basis for it.

14          MR. MINISH:  The proffer, Judge, is basically what I

15  told Mr. Herman yesterday.  He's mischaracterizing it a little

16  bit.

17          The idea is basically that Shawn Manson will testify

18  to the idea of the impact that the defendant's actions had on

19  her case, which included the lack of willingness of Horatio

20  Joines to testify based on what happened, the lack of

21  willingness of Mark Joseph to testify and Eric Dock unwilling

22  to testify when and until his family was moved to safety.

23          I think that very clearly goes to obstruction of

24  justice under that.

25          THE COURT:   Well, but you have to get -- what's the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6227

1  basis for her conclusion that they were unwilling to testify?

2          MR. MINISH:  They told her.

3          THE COURT:   They told her what?

4          MR. MINISH:  I am unwilling to testify.

5          THE COURT:   Okay.

Page 4

6          But why?

7          MR. MINISH:  I am unwilling to testify because I am

8  afraid of the defendant.

9          THE COURT:  Were they -- are -- is she going to give

10  testimony that they told her they're unwilling to testify

11  because they're afraid because somebody on behalf of William

12  Baskerville intimidated them?

13         MR. MINISH:  No, because of the defendant's specific

14  act of having Kemo killed, that that spill-over effect of that

15  --

16         THE COURT:  Based on the circumstances of the case,

17  they were reluctant to get involved?

18         MR. MINISH:  Exactly.

19         MR. HERMAN:  Well, Judge, frankly, we're hearing

20  about this for the first time.  We have been asking for

21  discovery for a week.  There is no documents which support

22  that, so I don't -- I ask it be excluded.

23         We haven't had a chance to investigate that.  I have

24  been on the phone with Horatio Joines' lawyer on and off

25  during the course of this case.  That's never come to my

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6228

1  attention.

2         I don't know, I learn about this at 6:30 the night

3  before we're supposed to start the penalty phase.  Mark Joseph

4  I think is in Haiti, that's my understanding.  He's not even

5  in the country.  No?

6         We talked about -- they said they don't have a chance

7  to rebut something.  How can we do any investigation?  I think

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 5 of 157

8  they should be precluded or put this off a week and we'll fly

9  to Haiti and talk to Mark Joseph and see whether --

10          THE COURT:    Is it true that you told defense about

11  Horatio Joines and Mark Joseph's reluctance to testify last

12  night?  Is that true?

13          MR. MINISH:    That is true.

14          THE COURT:    Then you're not to open on it, on Mark

15  Joseph or Horatio Joines' reluctance to testify and you're not

16  to get into it with Agent Manson.

17          MR. MINISH:    Judge, I think before your Honor rules

18  in that manner, we have to be a little realistic about what

19  we're talking about here.

20          THE COURT:    We have to be realistic?  Go ahead, Mr.

21  Minish, let's be realistic.

22          MR. MINISH:    What happened here is that I spoke with

23  the agent last night.  We went through penalty phase number

24  one, which we would not have had Agent Manson's testimony.  We

25  were preparing as best as we can, we provided information

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6229

1  immediately.

2          The information I got came yesterday after the phone

3  call.  As soon as I got off of the phone with the agent, I

4  asked her what, if anything, can she speak to about

5  obstruction of justice or things along those lines?  This is

6  what she told me.

7          THE COURT:    I'll tell you what we'll do.  Don't open

8  on it.  When Agent Manson testifies, don't get into Mark

9  Joseph or Horatio Joines with her.  We'll finish what's going

Page 6

10  on today and if you want to bring Agent Manson back out of the

11  presence of the jury, we'll hear about this.

12         MR. MINISH:  Certainly we wouldn't have an objection

13  to defense counsel now spending as much time as they wish

14  interviewing her personally.

15         THE COURT:  That might have to be done, but let's

16  find out what she has to say, but I'm not just going to launch

17  into this in front of the jury when it comes so late,

18  literally late in the day.  That's what we're going to do.

19         MR. MINISH:  Just so you know, at this point I think

20  we should not call Agent Manson at all because that's largely

21  her testimony.  The ruling should be made, I guess

22  realistically if your Honor wants to speak to her outside the

23  presence of the jury, that should be done prior to her

24  testifying at all.

25         THE COURT:  Okay.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                            6230


 1         Put everybody else on and then we'll talk to Agent

 2  Manson while the jury has lunch.  We'll do something like

 3  that.

 4         MR. MINISH:  That's fine.

 5         THE COURT:  Okay?

 6         All right, Mr. Herman?

 7         MR. HERMAN:  Thanks, Judge.

 8         THE COURT:  Let's get the jury, the alternates are

 9  out there.

10         You have been given a draft -- you have been given my

11  intended charge on the introductory instructions as to stage

                            Page 7

12    two.
13         Any objections to these?
14         MR. FRAZER:   No, Judge.
15         THE COURT:   All right.
16         MR. FRAZER:   I assume there's none from the defense
17    as well, your Honor?
18         THE COURT:   I'm asking.
19         MR. HERMAN:   No.
20         THE COURT:   I'm not hearing anything.
21         MR. HERMAN:   No.
22
23
24
25


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                           6231


1          THE CLERK:   All rise.
2          (The following takes place in the presence of the
3    jury.)
4          THE COURT:   Good morning, folks.
5          Where are the alternates?
6          In the jury box, please.
7          Good morning, folks.
8          Sorry for the delay in getting started, but there
9    apparently was some troubles on the highways here and some
10    folks who are necessary couldn't get here any earlier.  We
11    apologize for that.
12         I'm told by counsel that what needs to be done today
13    can be done even though we've had a delayed start.  We're

                        Page 8

14  going to get started right now on what is continuing with the

15  penalty phase of this trial, what I'm referring to as stage

16  two or the penalty selection phase.

17          Again, so you have an idea of what we're doing today,

18  we're going to be giving you preliminary instructions which

19  will be about the same length as the preliminary instructions

20  I gave you yesterday.

21          You're then going to have very brief opening

22  statements from counsel and then the Government will be

23  introducing some further information, some further evidence

24  and you may hear the testimony of some witnesses.

25          I'm going to give you some preliminary instructions

JOANNE M. CARUSO, CSR, CRR, OFFICIAL COURT REPORTER, TRENTON, N.J.

6232

1  as to stage two, the penalty selection phase, penalty

2  selection stage of the penalty phase of this trial.

3          Now, in the eligibility stage of the trial which you

4  conducted yesterday, you found the defendant, William

5  Baskerville, eligible for consideration of a death sentence on

6  the following counts of the indictment:   Count one,

7  conspiracy to murder a witness and count two, conspiracy to

8  murder a witness in retaliation against an informant.

9          Therefore, in this penalty selection stage you must

10  now consider whether or not a sentence of death or the

11  sentence of life in prison without the possibility of parole

12  should be imposed for commission of these crimes.

13          Again, this decision is left under our law

14  exclusively to you, the jury.  If you find that a death

15  sentence should be imposed on either count one or count two, I

Page 9

16  am required to impose that sentence.  However, you are never

17  required to impose a death sentence on either count and if you

18  find that the death sentence should not be imposed on either

19  count, then I will impose a sentence of life imprisonment

20  without the possibility of parole for that count.  That's why

21  I'm calling it the penalty selection phase, because you've got

22  to choose one or the other.

23          In these instructions, I'm going to introduce you to

24  some of the factors that you must consider and some of the

25  issues that you must decide in determining which sentence

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6233

1  shall be imposed.  At the end of this stage of the trial, I'm

2  going to give you some additional written instructions on

3  these matters.  You must consider these and all the

4  instructions I gave during the penalty phase as a whole.

5          Again, definitions of terms are intended to apply

6  throughout the penalty phase of the case.  I'm instructing you

7  that you're to consider the two sets of instructions I gave

8  you yesterday as a whole with all of the legal instructions

9  I'm giving you today and the legal instructions that I will

10  give you at the conclusion of the selection stage, probably

11  Thursday morning.

12          You must consider all of those instructions as a

13  whole and again, the definitions that I've provided to you

14  apply throughout the penalty phase of the case.  I do that so

15  I don't have to repeat the definitions over several times.

16          Now, as to the nature of these proceedings, you must

17  give separate consideration to whether a sentence of death or

Page 10

18  a sentence of life in prison without the possibility of parole

19  should be imposed on each count, count one or count two, on

20  which you have found the defendant eligible for consideration

21  of the death sentence.

22          Therefore, you must return a separate penalty verdict

23  on each count.  Your determination of which sentence to impose

24  on a particular count will proceed in three steps which I'm

25  going to explain briefly now.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                                    6234


1          You may remember yesterday I told you that the death

2   penalty laws is written in such a way that a jury has to

3   narrow and focus on various issues and I told you that there

4   would be a sequence in which your decisions would have to be

5   made.  We're getting further into that sequence now and I tell

6   you there are three separate steps during the penalty

7   selection phase.

8          Now, these steps that I'm going to explain to you

9   will require you to consider whether certain aggravating

10  factors or mitigating factors exist in this case.  These

11  factors concern the circumstances of the crime or the personal

12  traits, character or background of Mr. Baskerville, and the

13  effect of the offense on the victim and the victim's family.

14          The word "aggravate" means to make worse or more

15  offensive or to intensify.

16          The word "mitigate" means to make less severe or to

17  moderate.

18          An aggravating factor then is a factor or

19  circumstance that would tend to support the imposition of the

                          Page 11

20  death penalty.  A mitigating factor, on the other hand, is any

21  aspect of the defendant's character or background, any

22  circumstance of the offense in question or any other relevant

23  fact or circumstance that might indicate that the defendant

24  should receive a sentence of life in prison without the

25  possibility of parole instead of the death sentence.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6235


1          The three steps that you must go through to make your

2  final determination of which sentence should be imposed on

3  each count are the following:   Step one, you'll be

4  considering what we call non-statutory aggravating factors.

5  In step one, you must consider whether the prosecution has

6  proved beyond reasonable doubt one or more non-statutory

7  aggravating factors.

8          These aggravating factors are called non-statutory

9  because they are not identified by the death penalty law,

10  although they are identified by other applicable law.

11  Remember yesterday, I instructed you about statutory

12  aggravating factors which are specifically held and

13  specifically provided for in the death penalty law.  We're now

14  talking about, in step one, non-statutory aggravating factors.

15          In this case, the prosecution contends that the

16  following non-statutory aggravating factors will be proved.

17  They are three:   One, obstruction of justice; second, future

18  dangerousness;  third, victim impact evidence.

19          You may consider in step three, that we'll be getting

20  to, any non-statutory aggravating factor that you unanimously

21  find that the prosecution has proved beyond reasonable doubt.

Page 12

22          Now, step two is the consideration of mitigating

23   factors.  In step two, you must consider whether the defense

24   has proved by a greater weight of the evidence any mitigating

25   factors.  Now, I just used the phrase -- you have been hearing

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6236

1    all about the Government's burden of proof beyond reasonable

2    doubt.  When considering mitigating factors, you should note

3    that there is a different and lesser burden of proof on the

4    defense to prove mitigating factors.  That is by a greater

5    weight of the evidence or by preponderance of the evidence and

6    I'm going to define those terms in my final instructions to

7    you.

8          You are specifically instructed that the following

9    list of mitigating factors is only preliminary.  Defense

10   counsel have indicated that there is going to be the

11   introduction of evidence and testimony on these mitigating

12   factors.  They've given me a preliminary list of those and I'm

13   going to give them to you.

14         Now, the defense may ultimately assert that there are

15   more, fewer or different mitigating factors for you to

16   consider.  I'll give you a final list of mitigating factors in

17   the final instructions for this stage.  However, as a

18   preliminary list, Mr. Baskerville contends that the following

19   mitigating factors would be proved in this case by the greater

20   weight of the evidence:   One, that if Mr. Baskerville is not

21   executed, he will spend the rest of his life in a federal

22   prison without the possibility of release.  By the way, this

23   is a list of 12 factors.  That's the first one.  Second, Mr.

Page 13

24 Baskerville did not personally shoot Kemo McCray; third, the
25 individual who shot and killed Kemo McCray, Anthony Young,

JOANNE M. CARUSO, CSR, CRR, OFFICIAL COURT REPORTER, TRENTON, N.J.

6237

1 will not be sentenced to death and may not even receive a life
2 sentence; four, others responsible for contributing to the
3 death of Kemo McCray have not been charged with murder or any
4 other crime associated with his murder; five, based upon his
5 prison and jail record, it is unlikely that Mr. Baskerville
6 will present any risk to prison officials or other inmates if
7 he is sentenced to life in prison without the possibility of
8 release; six, Mr. Baskerville is a loving father to his three
9 children, Keliah, Assad and E'nyah, who will suffer grief and
10 loss if he is sentenced to death; seventh, the growth and
11 development of Mr. Baskerville's three children will be
12 adversely affected if he is executed; eighth, there are a
13 number of Mr. Baskerville's family members who will suffer
14 grief and loss if he is executed; ninth, there is lingering
15 doubt about Mr. Baskerville's specific intent, although it
16 does not rise to the level of reasonable doubt; 10th, Mr.
17 Baskerville grew up in a home without a constant or positive
18 father figure, with an often absent mother and was left as the
19 oldest child to be a parental figure to his six siblings;
20 11th, Mr. Baskerville's childhood was characterized by
21 poverty, frequent moves and wasn an unstable home environment;
22 12th, Mr. Baskerville's life will have value to others if he
23 is sentenced to spend the rest of his life in prison without
24 the possibility of release.
25         Now, in addition to these mitigating factors, you may

Page 14

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6238

1   also find as an additional mitigating factor any residual or
2   lingering doubts that any of you have as to Mr. Baskerville's
3   guilt or innocence or his role in the offense in determining
4   whether or not to impose the sentence of death, even though
5   those doubts did not rise to the level of reasonable doubt
6   under the instructions that I gave you during the guilt phase
7   of the trial.
8           Finally, you are permitted to find anything else that
9   is established by the greater weight of the evidence or the
10  preponderance of the evidence about the commission of the
11  crime or about the defendant's background or character that
12  would mitigate in favor of a sentence of life imprisonment
13  without the possibility of release and against the death
14  penalty, whether or not specifically argued by defense
15  counsel.
16          Now, unlike aggravating factors which you must
17  unanimously find have been proved beyond reasonable doubt, the
18  law does not require unanimous agreement with regard to
19  mitigating factors.  Any juror who finds the existence of a
20  mitigating factor must personally consider it in this case
21  regardless of the number of jurors who agree that the factor
22  has been established.  Furthermore, any juror may consider a
23  mitigating factor found by another juror, even if the first
24  juror did not find the factor to be mitigating.
25          Now, into step three, weighing of the factors.  In

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

Page 15

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 15 of 157

1  step three for each count, you must personally consider
2  whether one or more statutory aggravating factors that you
3  found for that count during the eligibility stage yesterday,
4  together with any of the non-statutory aggravating factors for
5  that count that you find to exist in step one that I've just
6  described to you above, taken together sufficiently outweigh
7  any mitigating factors that you may find in step two, so that
8  a sentence of death is justified for that count.
9       In the absence of any mitigating factors, you must
10  consider whether the aggravating factors are themselves
11  sufficient to justify a sentence of death.
12       Based upon your weighing of all the factors, you will
13  decide whether to impose a sentence of death or a sentence of
14  life imprisonment without the possibility of parole for the
15  count in question.  Furthermore, you must not simply count the
16  number of aggravating factors or mitigating factors to reach
17  your decision.  Rather, you must consider the weight and value
18  of each factor.  Regardless of your findings with respect to
19  aggravating factors and mitigating factors, you are never
20  required to impose a death sentence.
21       Your determination of the appropriate sentence for
22  each count is a decision that each of you must make
23  independently, after consulting with your fellow jurors and
24  individually engaging in the weighing process that I've
25  described in this instruction.  You cannot consider imposing a

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6240

Page 16

1  death sentence unless and until you personally find that the
2  aggravating factors outweigh the mitigating factors or in the
3  absence of mitigating factors, that the aggravating factors
4  are themselves sufficient to justify a sentence of death.

5          A determination to impose a death sentence must be
6  unanimous.  If you each find that a death sentence should be
7  imposed for a particular count, then I am required to impose a
8  death sentence for that count.  On the other hand, if, after
9  weighing the aggravating factors proved in the case, and all
10 of the mitigating factors found by any juror, any one of you
11 finds that a sentence of death is not justified on a
12 particular count, then the death sentence cannot be imposed on
13 that count and I will impose a sentence of life imprisonment
14 without the possibility of parole for that count.

15         In making all of the determinations that you are
16 required to make in this penalty phase of the trial, you may
17 consider any evidence that was presented during the guilt
18 phase as well as evidence that is presented to you in the
19 penalty phase.  In deciding what the facts are, you may have
20 to decide what testimony you believe and what testimony you do
21 not believe.  You may believe all of what a witness says, only
22 part of it or none of it.

23         In deciding what testimony to believe, consider the
24 witness' intelligence, the opportunity the witness had to see
25 or hear the things testified about, the witness' memory, any

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6241

1  motives that witness may have for testifying a certain way,
2  the manner of the witness while testifying, whether that
                            Page 17

3  witness said something different in an earlier time, the

4  general reasonableness of the testimony and the extent to

5  which the testimony is consistent with any evidence you

6  believe.

7          In deciding whether or not to believe a witness, keep

8  in mind that people sometimes see or hear things differently

9  or forget things.  You need to consider, therefore, whether a

10  contradiction results from an innocent misrecollection or

11  sincere lapse of memory or instead from an intentional

12  falsehood or pretend lapse of memory.

13          The task of determining whether to impose a death

14  sentence or sentence of life in prison without the possibility

15  of parole for any count in this case is an extremely important

16  one.  Therefore, please keep an open mind until you've heard

17  all of the evidence in this penalty phase, carefully consider

18  that evidence and the evidence presented in the guilt phase,

19  and discuss all the evidence with your fellow jurors.

20          Remember, whether or not the circumstances in this

21  case justify a death sentence or a sentence of life in prison

22  without the possibility of parole on either of the counts in

23  question is entirely yours.

24          You must not take anything I've said or done during

25  the guilt phase of the trial or anything I may say or do

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6242

1  during the penalty phase of the trial as indicating what I

2  think of the evidence or what I think the sentence on any of

3  the counts in question should be.  You must still follow all

4  of my prior instructions about how you must conduct yourself

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 18 of 157

5    during this trial.

6          Therefore, among other things, I previously told you,

7    don't talk to anyone about this case or let anyone talk to you

8    about it until after you have completed your penalty phase

9    deliberations.

10          Your decision about what sentence to impose must be

11    based exclusively on the evidence presented in court during

12    the guilt phase and the penalty phase and not on anything

13    else.

14          Those are the preliminary instructions leading up to

15    the penalty selection stage of the penalty phase of the case.

16    I gave you those -- I give you these instructions so that you

17    understand the process that you are necessarily going to

18    engage in, in making your fact findings and in reaching your

19    ultimate conclusion as to the sentence to impose.

20          I now leave it to counsel to give you brief opening

21    statements.

22          Thank you, for your attention.

23          Mr. Minish.

24          MR. MINISH:  Your Honor, counsel, members of the

25    jury, good morning.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                        6243


1          You've now reached the final stage of the trial.  As

2    the Judge told you, today and through the balance of the trial

3    there's going to be testimony about additional aggravating

4    factors that the Government seeks to present to you that will

5    support a finding that the death penalty is appropriate.  The

6    Judge told you what they are.  They are obstruction of

                          Page 19

7  justice, future dangerousness and victim impact.

8          It's our understanding that defense counsel is going

9  to provide a number of mitigating factors to you.

10          Now, I will leave to Mr. Frazer to argue the value of

11  those mitigating factors should they be submitted to you, but

12  do keep in mind during the course of this process what the

13  Judge told you; that ultimately this is not a math equation of

14  count up the number of aggravating factors, count up the

15  number of mitigating factors and make a decision based on

16  which there's more of.

17          What you really have to do is look a little further

18  into them and find, as the Judge said, the value of these

19  factors when you are weighing them.  Does one actually have

20  some impact?  Do others not have impact?

21          When you're doing that process and during the course

22  of this selection phase, remember that it's the law and your

23  obligation to follow the law, not sympathy or bias or

24  prejudice or anything along those lines that controls your

25  decision.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                    6244


1          Now, number one, the obstruction of justice.  What

2  the defendant did was not just have Kemo DeShawn McCray

3  killed.  What he did was actually attack the criminal justice

4  system, because as you probably knew before you got here, but

5  certainly know now, that without witnesses, this system just

6  could not work.

7          What the defendant did was attempt to rig the system,

8  was to take away the evidence that a jury could hear about

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 20 of 157

9   him, a jury sitting for the drug case would be unable to hear

10  from Kemo McCray.  Just in case the thought is going through

11  your mind, well, ultimately it wasn't obstructed because the

12  jury did hear, keep in mind, members of the jury, that the

13  fact that he failed is not something that should be rewarded.

14  Obstruction of justice is what defendant was going after,

15  plain and simple.

16          The evidence from the guilt phase and the little

17  evidence you heard yesterday make that very clear, as will

18  additional evidence that you hear today.

19          Now, for the future dangerousness factor, again, this

20  is specifically to the defendant and what danger he poses in

21  the future.  It's a very plain, simple statute.  The idea,

22  though, keep in mind is that the context for his future

23  dangerousness has to be kept in mind that it will be from the

24  jail cell.

25          The Government is not alleging, nor would it be

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6245

1   proper, for us to allege that somehow or another the defendant

2   is going to be on the street causing problems.  Now, for I

3   suppose many, many defendants, incarcerated individuals, that

4   would pose a great deterrent to their ability to be a danger

5   in the future, but as the defendant has demonstrated very

6   clearly, the jail cell is in no way, shape or form something

7   that precludes him from committing crimes.

8           The fact that he will be in jail for the rest of his

9   life does not prevent him from being a danger in the future.

10          Along those lines, beside the fact what you already

Page 21

11  know the defendant is able to do from a jail cell, we will

12  present to you the defendant's criminal history.  I know

13  you've heard random snippets.  Yesterday you heard about a

14  robbery or a crime with a gun, I'm sorry.  It was a robbery, a

15  shooting.  You will -- you heard about two drug charges

16  previously, but you'll hear now about from beginning to end.

17        And the reason that's presented to you is really just

18  to show sort of a pattern, that you can draw a conclusion from

19  the way the defendant has acted in society, from his early

20  teen years through today, that he has no regard for breaking

21  the law, or is not concerned, that's a better way of saying

22  it, not concerned with breaking the law and that is something

23  you can consider when determining whether or not the defendant

24  poses a danger in the future.

25        Finally, the victim impact evidence.  What you're

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6246

1  going to hear is evidence from the defendant -- excuse me,

2  from Kemo DeShawn McCray's family.  You're going to hear about

3  the impact that the loss that the defendant caused, Kemo being

4  removed from these peoples' lives by the murder, the impact

5  that it has and how their lives have been affected and how his

6  children's lives have been affected.

7        It's also important, members of the jury, because

8  during the course of this trial, you've heard the name Kemo

9  DeShawn McCray, Kemo McCray, Kemo.  You've heard a name,

10  you've seen a picture, you heard him referred to as CI, CW,

11  informant, but what you'll see today is that Kemo DeShawn

12  McCray was a real person, not just those names, not just those

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 22 of 157

13  pictures, with a real life and real impact on the people in
14  his life.

15          Ultimately, members of the jury, the idea, as the
16  Judge told you, is you're going to weigh these factors out;
17  that you'll do so with the law and only the law as your
18  guidance.  While you're doing that and during the course of
19  the testimony and the evidence you hear, there's a couple of
20  things I want you to remember.

21          One, the reason why we're here.  The reason why we're
22  here, very simply, is the decision of the defendant.  It was
23  his free will.  He made a decision to have Kemo killed.  He
24  could have taken responsibility for his criminal charges, the
25  drug charges, but he made a choice, a cold, calculated choice

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6247

1  that a shot at freedom in getting out of jail for him was
2  worth the murder of Kemo.

3          At the end of the case, members of the jury, the
4  Government is going to ask you to impose the sentence that
5  will make the defendant pay for that decision, pay the price
6  for his decision to have Kemo killed, a decision that at the
7  beginning of the case when we were doing jury selection,
8  everyone sitting here told us if the evidence supports it, I
9  will be able to make the decision; that if justice demands it,
10  I will be able to make the decision.

11          At the end of the case, members of the jury, the
12  Government is going to ask you to live up to that promise
13  because what evidence supports and what justice demands is
14  that the defendant be sentenced to death.
                            Page 23

15      Thank you.

16      THE COURT:   All right.

17      Mr. Kayser.

18      MR. KAYSER:   Thank you, Judge.

19          Mr. Baskerville, Mr. Herman, members of the

20  prosecution team, members of the jury, unfortunately, the cold

21  sore throat or whatever that has been bouncing around this

22  case for months now has come my way and I'm going to do the

23  best I can to work through it.

24          You can all recall in jury selection process those

25  questions that we asked about your attitudes about the death

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6248

1  penalty.  At times there were answers that came from you which

2  assumed that there was some defense which was not part of this

3  case, a defense like self-defense, a defense like provocation

4  of some sort.

5          In some instances I or Mr. Herman or the Court itself

6  pointed out that if you got to this stage, you would have

7  already found Mr. Baskerville guilty of an intentional murder.

8  I remember asking at least some of you that question and I

9  know Mr. Herman asked you and I believe the Judge as well

10  asked you and stated those facts; that no justification

11  defense would be relevant.

12          Those were not comfortable questions for us to ask at

13  the time, obviously, because Mr. Baskerville at that time was

14  presumed to be innocent.  We had to ask those questions

15  because we knew that we might get to this stage and we hoped

16  that we wouldn't, but we're here, we did get to this stage.

17          We're disappointed, no question about that.  Perhaps

18   not so surprised.  We accept your verdicts, we respect your

19   verdicts, we have to live with them and we have to move on.

20          We address you now with respect to the most serious

21   question in this case, which is the sentence that you will

22   recommend imposition of and actually not recommend but

23   whatever sentence you select is going to be the sentence

24   that's imposed by the Court.

25          Death by lethal injection or life without the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6249

1   possibility of release, both of those sentences I think

2   everyone would agree are harsh sentences, very harsh

3   sentences.  It's the finality of death, however, that I guess

4   gives us all pause and which makes it the most severe

5   punishment that we can impose in our system of justice.

6          Obviously, we're going to be asking you to spare the

7   life of Will Baskerville.  The Government asks for justice, we

8   ask for justice also, justice tempered with mercy.  The

9   decision is yours and it's yours alone.  Ultimately the

10   decision can rest with just one, any one of you who

11   deliberates on this jury.  That is all it takes, one juror who

12   decides that death is not the appropriate sentence can have

13   that effect.

14          Each one of you is going to make a unique,

15   individual, personal judgment for life or for death.  Each one

16   of you makes that decision yourself, in your own heart as to

17   whether the death penalty is the only appropriate sentence to

18   make.  The decision is final, it's not going to be changed by

Page 25

19  the Judge.

20          You may respectfully agree to disagree.  You're not
21  required to be unanimous.  The Judge talked about unanimity
22  and the difference in the concept of unanimity at this stage
23  and at the prior stage.  You are to deliberate obviously, talk
24  about your feelings, your judgments about what should be done
25  with each other and try to come to a unanimous verdict, if you

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6250

1  can, but if you're not unanimous, it's still a verdict.  It's
2  just a verdict for a life sentence without the possibility of
3  release instead of death.

4          Remember that a life sentence without the possibility
5  of release is not in one of these county jails that we've
6  heard so much about, where sometimes things perhaps are a
7  little bit lacks.  It's in a federal penitentiary, a maximum
8  security federal penitentiary.

9          At this stage, your function is different than in the
10  guilt phase.  In the guilt phase, your function was to
11  determine whether or not the Government has proven each and
12  every element of the offense beyond a reasonable doubt.  At
13  the first stage of the penalty phase, which we completed
14  yesterday, your function was to determine whether the
15  Government had proven that gateway factor beyond a reasonable
16  doubt, and at least one statutory aggravating figure --
17  factor.

18          Now, at this stage of the penalty phase, you'll be
19  determining whether or not aggravating factors exist and you
20  have to make that determination, as the Judge explained,

21  beyond a reasonable doubt.  You have to determine whether or
22  not mitigating factors exist.  You determine that by a lesser
23  standard of evidence, by a preponderance of the evidence or
24  the greater weight of the evidence is the way the Judge
25  explained.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6251

1          You're not going to just be finding whether
2   aggravating factors or mitigating factors exist, you're going
3   to be weighing them, assigning weights to them and balancing
4   them, determining how much weight to give each, whether or not
5   to give any weight at all to some of them or any weight to any
6   of the factors that you determine and to balance them in
7   making your findings.
8          You're done with the gateway factor, that doesn't get
9   found.  It was if it exists, you go forward; if it doesn't
10  exist, you don't go forward.  It's no longer part of the
11  process at this stage.
12         The weighing and the balancing process, again, is
13  totally individual.  You each have to do this yourself, in
14  your own mind, in your own heart.  Congress hasn't said how
15  much weight to attach to any particular particular factor that
16  you may find.  You have to decide those things personally.
17  It's a community of decision.
18         Congress hasn't limited the mitigating factors.  You
19  can come up with your own, the Judge explained.  You don't
20  have to accept the ones we provided if you don't want.  You
21  can make one up yourself, put it to a vote, see how many
22  jurors agree with it or don't agree with it and even if only

Page 27

23  one juror finds that a mitigating factor exists, whether or

24  not other jurors agree with that, whether or not we have

25  suggested it, you can come up with it yourself, it can be used

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6252

1  by you in this weighing and balancing process.

2          Even if no other juror agrees with you, even if you

3  and any one juror find a mitigating factor which you are

4  satisfied tips the balance to life instead of death, that's an

5  appropriate sentence.

6          Mitigation is not an excuse for a terrible crime.

7  It's not justification.  You can't justify the death of a

8  human being.  Mitigation doesn't explain, it doesn't blame,

9  it's a reason not to impose a sentence of death.  It's about

10  the determination of proper punishment in this case.

11          It's a system, I guess, of guided discretion in which

12  you're free to make up mitigating factors on your own.  You're

13  not free to make up aggravating factors on your own.  The

14  presumption is for a life sentence.  If there is no

15  aggravating factor found, then the appropriate penalty is life

16  without the possibility of release.

17          The death penalty can never be automatic.  If someone

18  killed five people, ten people, a building full of people,

19  it's not automatic.  You have to go through this process.

20  There may be a lot of weight if there were that many deaths

21  caused assigned to an aggravating factor, it's still not

22  automatic.  It's a function of each juror making up their own

23  mind with respect to those factors.

24          For example, in this case, one of the factors that's

Page 28

25  going to be presented under future dangerousness is a robbery

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6253

1   which took place 20 years ago, when Mr. Baskerville was a

2   juvenile.  It happened in 1986, sentenced in 1987, so he was,

3   I think at the time that it occurred, 17 years old, waived up

4   as an adult.  How much weight do you attach to something that

5   happened 20 years ago when Mr. Baskerville was 17 years old?

6          How much weight do you attach to the planning done by

7   those who we know participated in the conspiracy to kill Kemo

8   DeShawn McCray?  They were on the street, they were able to

9   make a lot of detailed plans and so forth.  Obviously, they

10  did so, based on the testimony of the witnesses and based on

11  what happened.  How much weight do you assign that with

12  respect to Mr. Baskerville's conduct here?

13         Now, the function of an opening is not to argue, it's

14  to layout what we expect to set forth for you.  We're going

15  to be presenting evidence and witnesses to show that William

16  Baskerville is not a future danger when locked in prison.

17  That's the issue.  It's not whether he's a future danger if

18  he's out on the street because he's not going to get out on

19  the streets.  No matter what, at the very least, Mr.

20  Baskerville is going to spend the rest of his life in a

21  federal, maximum security federal penitentiary.

22         He's going to die in jail.  The only question is

23  whether he dies from natural causes, whenever they may occur,

24  however they may occur, or whether you make the determination

25  that he should be strapped to a gurney and his veins filled

Page 29

1   with poison.

2           MR. FRAZER:  Objection, Judge.

3           THE COURT:  Sustained.

4           Disregard that comment, ladies and gentlemen.

5           Go ahead.

6           MR. KAYSER:  Thank you.

7           That decision is up to you and you alone.  We'll be

8   presenting some brief testimony, some family members, his

9   children, one of his brothers, relatives of Will Baskerville

10  who will speak to some of the mitigating circumstances that

11  the Judge has spoken about.  You're going to see a videotape

12  of Mr. Baskerville's youngest child, seven years old.  We felt

13  it more appropriate to have a videotape made of her rather

14  than bring her into this courtroom to get on that witness

15  stand and testify because of her age.

16          You're going to learn a little bit about how it was

17  for Will Baskerville growing up, the unfortunate influences in

18  his life and certainly he made a lot of bad choices in his

19  life and we're not backing off of that.  It's obvious.

20          I think you'll see through the testimony of his

21  younger brother, Tariq, how much influence the environment has

22  in making some of those choices.  Tariq, you'll learn, was

23  fortunate enough to have a good mentor, to be separated from

24  the family for a period of time, to get involved with the

25  church and you'll find that he's been able to lead a

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 30 of 157

1  responsible life, never been arrested and yet he grew up for a
2  significant period of time in the same household. The
3  differences are pretty dramatic.
4          Judge Pisano has read the mitigating factors that we
5  thought of.  They're not final.  I'm not going to address all
6  of them now.  You're not limited to those factors.
7          One we did not list, for example, but which you might
8  agree should be added, is that Will Baskerville was ill served
9  by his original attorney in this case, who you've heard so
10 much about, Paul Bergrin, a person who, by his education, by
11 his training, by the ethical and moral standards he's supposed
12 to have, by the oath he took as an attorney, should have been
13 directing Will Baskerville down a different path than he did.
14 He owed a duty of loyalty to Will Baskerville.  Instead, his
15 loyalties were to others and to himself.
16         A key mitigating factor for all of you to consider is
17 that Anthony Young, the person who testified in this case, a
18 person who was out on the street, actually participated in the
19 killing of Kemo McCray, actually put the bullets into him that
20 resulted in his death, will never face the death penalty,
21 ever.  He may not even face a true life sentence.  That's
22 going to be up to this Court ultimately.
23         Regardless of any aggravating factors which may exist
24 and any other mitigating factors which may exist, doesn't that
25 mitigating factor alone weigh heavily and suggest that Mr.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 31 of 157

1  Baskerville should not face a greater penalty than Anthony

2  Young?  That's for you to decide.

3          We've heard the testimony about Bergrin, about Jamal

4  McNeil, Jamal Baskerville, Rakeem Baskerville, Hakim Curry.

5  At this point none of those people have been charged with this

6  murder.  I can't say for sure whether they some day will be or

7  not.  I don't think you should be speculating about it, but at

8  this point they're not facing the punishment that Mr.

9  Baskerville is facing.

10          You have to ask the question, is that fair and just

11  to impose the death penalty on Mr. Baskerville under those

12  circumstances?

13          The choice is yours.  We submit the evidence gives

14  and will give you sufficient and good reasons to choose a life

15  sentence over a death sentence.

16          We thank you.

17          THE COURT:    All right.

18          Thank you, Mr. Kayser.

19          MR. MINISH:  At this time the Government calls John

20  Gay to the stand.

21          THE COURT:    All right.

22          J O H N    G A Y, sworn.

23          THE CLERK:    State your full name and spell it for

24  the record.

25          THE WITNESS:    John Gay, G-a-y.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                              6257


1          DIRECT EXAMINATION BY MR. MINISH:

2  Q    Good morning, Mr. Gay.

3   A    Good morning, Mr. Minish.

4   Q    By whom are you employed?

5   A    United States Attorney's Office for the District of New

6   Jersey.

7   Q    How long have you been so employed?

8   A    Over three and a half years.

9   Q    What's your current position with the U.S. Attorney's

10  Office?

11  A    I am the chief of the drug unit, called the OCF unit.

12          THE COURT:    Mr. Gay, pull the microphone up.

13          THE WITNESS:    Sorry, your Honor.

14  Q    In that supervisory position, you're, in fact, both my

15  supervisor and Mr. Frazer's supervisor?

16  A    Yes.

17  Q    Prior to getting to the U.S. Attorney's Office, did you

18  have any prosecution experience?

19  A    Yeah.   I was a prosecutor for 13 years with the Manhattan

20  DA's Office, before joining the United States Attorney's

21  Office.

22  Q    And what position did you hold at that office prior to

23  leaving?

24  A    I was the chief of the drug unit, a specialized drug unit

25  in the Manhattan DA's Office.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6258


1   Q    I'm going to direct your attention to January of 2003.

2          Were you involved in an investigation into the drug

3   activities of William Baskerville?

4   A    Yes, I was.

Page 33

5  Q    Could you briefly explain to the jury what was involved

6  in that investigation?

7  A    We had information from an individual named Kemo DeShawn

8  McCray that William Baskerville was a supplier of crack

9  cocaine in the Newark area.  We then set about to try to

10  gather evidence against Mr. Baskerville to prove that he was,

11  in fact, a drug dealer.

12        Mr. McCray felt that he would be able to make

13  undercover purchases from Mr. Baskerville, so a plan was

14  developed by the F.B.I. to do that.

15        We then basically set about to try to get corroborating

16  evidence of Mr. McCray.  So, for example, one of the things

17  that we used was that the F.B.I. tape recorded any

18  conversations that they could between Mr. McCray and Mr.

19  Baskerville, telephone conversations.  There were also any

20  face-to-face meetings between Mr. McCray and Mr. Baskerville

21  they also tried to tape record.

22        There were a number of other things like that, some

23  videotape was used, too, but primarily the case was centered

24  around Mr. McCray making purchases of crack from Mr.

25  Baskerville and the F.B.I. using various methods to try to

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6259

1  corroborate Mr. McCray.

2  Q    When that investigation was ultimately wrapped up, did

3  you seek a complaint in federal court?

4  A    Yes, we did.

5        We sought a complaint before a magistrate judge and

6  also an arrest warrant for Mr. Baskerville for a charge of

Page 34

7  distribution of crack cocaine.

8  Q    And based on that arrest warrant, was the defendant, in

9  fact, arrested?

10  A    Yes, he was.  I believe it was November 25th of 2003 he

11  was arrested by the F.B.I.

12  Q    And then ultimately after that, was the investigation

13  presented to a Grand Jury?

14  A    That's correct.

15        We presented evidence to the Grand Jury and the Grand

16  Jury issued an indictment for, if I'm remembering correctly,

17  one count of conspiracy to distribute over 50 grams of crack

18  and six substantive counts of distribution of over five grams

19  of crack cocaine.

20  Q    And was a post-indictment, after the indictment was

21  handed down, was a trial date set?

22  A    Yes, there was a trial date set.  I believe the initial

23  trial date was for sometime in February of 2004.

24  Q    And ultimately, was that trial date adjourned?

25  A    Yes, it was.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6260


1        At the request of the defense attorney and also with

2  the consent of the Government, the case was adjourned for, I

3  don't recall exactly how long the adjournment was, but it was

4  adjourned at that time.

5  Q    Now, what was your position going into the case at that

6  time?

7  A    I was the lead prosecutor on the case.

8  Q    And as lead prosecutor, would you be the person who would

Page 35

9  make decisions with respect to evidence that you presented at

10  trial?

11  A    Yes.

12  Q    Explain to the jury what, at the time prior to Mr. McCray

13  being killed, how you intend to present the evidence

14  generally?

15  A    The primary witness in the case was going to be Kemo

16  DeShawn McCray, since he was the person that was the eye

17  witness to all of the events.

18       We would also, obviously, introduce the corroborating

19  evidence of Mr. McCray, which included the tape-recorded

20  conversations, both on the telephone and during the buys

21  themselves.

22       We would also introduce the videotape surveillance by

23  the F.B.I., we would also introduce the drugs themselves and

24  the laboratory tests for the drugs, as well as physical

25  surveillance by the F.B.I. agents out there during the buys.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6261


1  That would be primarily the way the evidence would have been

2  presented.

3  Q    On March 2, 2004, Kemo DeShawn McCray was murdered.

4       How did that affect your case?

5  A    Well, I guess the most obvious way is that our primary

6  witness was now not somebody that we could call to the stand

7  to testify because he was dead.

8       We then basically -- the way the investigation was

9  built was around Kemo DeShawn McCray, all the other evidence

10  was gathered to corroborate what his testimony was going to be

Page 36

11   at trial.

12       Since Mr. McCray was no longer available to testify, we

13   were left with the corroborating evidence, but not the main

14   witness.  There were significant things.  For example, some of

15   the buys that took place, although there was audio recordings

16   of them and physical surveillance generally, Mr. McCray was

17   the only person that actually was an eye witness to the

18   hand-to-hand transactions in Mr. Baskerville's vehicle, so we

19   were -- it had an enormous impact on our ability to prove this

20   case, the drug portion of the case.

21   Q    Now, with respect to the drug portion of the case, what,

22   if anything, did you or the U.S. Attorney's Office do in an

23   attempt to be allowed to use that evidence?

24   A    Well, there were a couple of issues.  The first was that

25   the tape recordings themselves, in order to introduce them

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6262

1    into evidence, they would have to be authenticated.  The

2    normal way would be a participant in the conversation would

3    testify and say, I had this conversation, I listened to the

4    tape recording, it is an accurate recording of it and,

5    therefore, the tapes would come in.

6        Since we were not in a position to do that, since Mr.

7    McCray was dead, we had to come up with alternate methods for

8    doing that.  Thankfully the F.B.I., when they did the

9    investigation, rather than simply use a recording device

10   alone, they used a recording and transmitting device, so

11   Special Agent Manson actually heard the conversations as they

12   were taking place and that allowed us another method to get

Page 37

13  the tapes into evidence.  That was the first hurdle we had to

14  cross.

15      Again, without that, if we could not cross the hurdle,

16  the tapes would not come into evidence and since McCray was

17  dead, we would not have his testimony either, it would have

18  had enormous impact on our ability to prove the case.

19      In addition, there was a second potential problem which

20  is even if we were able to get the tapes in, to authenticate

21  the tapes, there was still hearsay problems with getting in

22  the actual content of the tape.  There was -- there's a rule

23  of evidence, 804(6)(b) that allows -- allowed us an avenue to

24  possibly get the hearsay into evidence.

25      The problem was we would have to prove that the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6263

1  defendant was the person who caused the unavailability of the

2  witness.  The rule basically is if the Government can prove

3  that the defendant caused the unavailability of the witness,

4  then we can present testimony -- we can present the tapes and

5  other prior statements of the witness.  I'm not sure if I'm

6  explaining that properly, but.

7  Q    Ultimately, the defendant -- the motion was made to

8  prevent the defendant from profiting from his bad act?

9  A    Correct.

10      Now, so the first stage was that we had to then set

11  about investigating the murder for two reasons.  Obviously,

12  first, is we wanted to see that the person who was responsible

13  was brought to justice.

14      The second thing was that in order to get the tapes and

Page 38

15  the other prior testimony of or prior statements of Kemo

16  DeShawn McCray into evidence, we would have to be able to show

17  that Mr. Baskerville was the person who caused the

18  unavailability of Mr. McCray.

19  Q    And was that ultimately presented to the Court?

20  A    It was ultimately presented to the Court, yes.

21  Q    And was the Government's motion granted?

22  A    The Government's motion was granted, that is correct.

23  Q    And then, therefore, we were able to present the evidence

24  that this jury heard?

25  A    Yes.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6264


1  Q    Mr. Gay, why is it that you went from the lead prosecutor

2  in this case to not being involved directly with the trial?

3  A    Well, I was promoted.  While I was still handling this

4  case, I was promoted to be the chief of the unit.  When I was

5  initially handling the case, I was a line assistant.

6       I was promoted partway through the case to be a

7  supervisor of the drug unit and my primary responsibilities

8  then became supervising the unit, not handling cases.

9       The prospect -- in the office I work in is actually in

10  Newark.  The prospect of spending over three months on trial

11  not being able to supervise my unit was something that my

12  bosses felt they needed me to supervise the unit and I had

13  some very experienced attorneys in my unit that could take

14  over this case and that's what happened.

15           MR. MINISH:  I have nothing further, Judge.

16           THE COURT:   Any cross-examination?

Page 39

17          MR. HERMAN:   Thanks.

18          CROSS-EXAMINATION BY MR. HERMAN:

19   Q    Good morning, Mr. Gay.

20   A    Good morning, Mr. Herman.

21          How are you?

22   Q    I'm fine.

23          You?

24   A    Fine, thanks.

25   Q    Congratulations on your promotion.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                              6265


 1   A    Thank you.

 2   Q    We know each other, right?

 3   A    Of course, we do.

 4   Q    I wasn't the first lawyer for Mr. Baskerville, right?

 5   A    No.

 6   Q    Who was that?

 7   A    That would have been Mr. Paul Bergrin was the first

 8   lawyer.

 9   Q    Right.

10          And you had some conversations with Mr. Bergrin when he

11   was Mr. Baskerville's lawyer, right?

12   A    Yes, I did.

13   Q    And at some point you brought a motion in front of the

14   Judge to remove Mr. Bergrin from the case.  Is that right?

15   A    That is correct.

16   Q    And what was the basis of that motion?

17   A    The basis of the motion was a conflict of interest.  We

18   believed that Mr. Bergrin had either some involvement in the

                      Page 40

19  murder or at the very least was a witness to his own client's
20  criminal activity.
21      It was the Government's position that he could not be
22  both the lawyer and a witness/participant in the crime.
23      We made a motion before the Court indicating that,
24  which was ultimately granted.
25  Q    So ultimately Mr. Bergrin was not permitted to represent

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6266

1  Mr. Baskerville.  Is that right?
2  A    Well, if I'm not mistaken, I believe that it may have
3  been a combination of the choice of Mr. Baskerville and -- I
4  don't recall whether it was the choice of Mr. Baskerville
5  ultimately or but he ultimately was not permitted to represent
6  Mr. Baskerville, that is correct.
7  Q    That's when I was appointed and Mr. Kayser was appointed?
8  A    Correct, yes.
9  Q    And that was maybe December of 2004?
10  A    I believe it might have actually been 2000 -- yeah, I
11  think it was 2004, correct.  Yes.
12  Q    Okay.
13      And now, you said that you believed that Mr. Bergrin
14  might have had some participation in crimes.  Is that correct?
15  A    Yes.
16  Q    And what was the basis of your belief?
17  A    Well, we had some intercepted conversations over a
18  wiretap in which Mr. Bergrin, in essence, said, I just spoke
19  to Will.  He told me -- he was speaking to another individual,
20  Hakim Curry.

Page 41

21        The conversation he said, I just spoke to Will.  The

22   name of the informant is.   He pronounced it K-Mo rather than

23   Kemo.   That he passed this information on to Hakim Curry.

24        That was the general gist of the motion.

25   Q    Of the motion?


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                              6267


 1   A    Correct.

 2   Q    But you also -- at some point, did you have Anthony

 3   Young, was he a witness in the case at that time?

 4   A    At that time, I don't believe Mr. Young was a witness at

 5   that time.  I think Mr. Young came later, if I'm remembering

 6   correctly.

 7   Q    Okay.

 8        Were you still in the case when Mr. Young emerged as a

 9   witness in this case?

10   A    Yes, I was.

11   Q    And did Mr. Young tell you that Paul Bergrin had had a

12   meeting with other individuals in which he said something like

13   no Kemo, no case, right?

14   A    Yes, he did tell me that.

15   Q    And did that appear to be some criminal involvement in

16   the murder?

17   A    Yes, absolutely.

18   Q    So do you believe, based on what you know about this

19   case, that Paul Bergrin had criminal involvement in the murder

20   of Kemo?

21   A    Yes.

22   Q    And it turns out that the phrase, if it was said, no

                          Page 42

23  Kemo, no case, that as you've explained, that didn't actually

24  turn out to be true, right?

25  A    I'm not sure I understand the question, Mr. Herman.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6268


 1  Q    Well, the jury has convicted Mr. Baskerville of the drug

 2  charges, right?

 3  A    Yes.

 4  Q    All right.

 5      And, obviously, Kemo was not available to testify at

 6  the trial, right?

 7  A    That is correct.

 8  Q    Did you follow the trial as the supervisor at all?

 9  A    Yes, I did.  I wasn't present during anything but the

10  opening statement, but I was in contact with the assistants

11  practically on a daily basis, yes.

12  Q    So you may be aware that during the course of the trial

13  Mr. Minish and Mr. Frazer introduced drugs, actual drugs,

14  crack cocaine?

15  A    Yes.

16  Q    And they played about 30 audio tapes that have been

17  obtained by the F.B.I.?

18  A    Yes.

19  Q    And they played a number of videotapes of surveillance of

20  Mr. Baskerville?

21  A    Yes, I'm aware of that as well.

22  Q    And Agent Manson was on the stand two or three days

23  describing exactly what she saw for every one of those

24  transactions?

Page 43

25   A     Correct.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6269


 1   Q     Right.
 2         So that was the evidence that, as far as you know, was
 3   presented to the jury, which ultimately resulted in the jury
 4   finding Mr. Baskerville guilty.  Is that right?
 5   A     Yes.
 6   Q     Part of the evidence?
 7   A     Well, yes.  I know that evidence was presented.
 8         I guess I can't -- it would be speculation as to
 9   whether they relied on that to find him guilty, I don't know.
10   But I know that was what was presented and they ultimately
11   found him guilty.
12   Q     Okay.
13         Now, you're now a supervisor in the U.S. Attorney's
14   Office?
15   A     Yes.
16   Q     And who's your immediate supervisor?
17   A     My immediate supervisor is Nancy Hoppock, the deputy
18   chief.  Above her is Amy Winkelman, who is the chief of the
19   criminal division.
20   Q     Who is the head of the whole U.S. Attorney's Office
21   A     Christopher Christie.
22   Q     Okay.
23         How many assistants work for the U.S. Attorney's
24   Office?
25   A     I'd have to guess.  I think it's somewhere around 120 to


Page 44

DNJ 03-836 Vol II
JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6270

1  130.

2  Q    Okay.

3       So these are 120 or 130 federal prosecutors in the
4  State of New Jersey.  Is that right?

5  A    Correct.

6  Q    And some are in Newark, right?

7  A    Yes.

8  Q    Some are right here in Trenton, right?

9  A    Yes.

10 Q    And you have an office in Camden as well.  Is that right?

11 A    Correct.

12 Q    And your office is in charge of prosecuting federal
13 crimes, right?

14 A    That's correct.

15 Q    Which could be drug dealing, right?

16 A    Yes, that's a federal crime.

17 Q    Okay.

18      And weapons possession?

19 A    Also a federal crime, yes.

20 Q    Politicians or crooked politicians and politicians who
21 are on the take.  Is that right?

22 A    That's not my area of expertise, but we do that type of
23 prosecution as well, yes.

24 Q    Fraud cases.  Is that right?

25 A    Yes.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6271

Page 45

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 45 of 157

1  Q    Income tax fraud, any kind of fraud involving federal

2  institutions or federal documents.  Is that right?

3  A    That would be correct.

4  Q    Okay.

5       Inner city drug gangs?

6  A    Yes, we target them as well under the right

7  circumstances, yes.

8  Q    Okay.

9       And organized crime?

10  A    Also, yes.

11  Q    That's all within the jurisdiction of your office?

12  A    Under the right circumstances, yes.

13  Q    When you say "the right circumstances," what do you mean,

14  if you can explain?

15  A    On each crime, it depends.  We have to establish that we

16  have federal jurisdiction to prosecute a crime.  For some

17  crimes we have it, sometimes we don't.  But there is a hurdle

18  we have to cross, that it has to be something we can prosecute

19  federally.

20       There are a number of crimes we can do that, but the

21  reason why I'm not giving a blanket statement is there are

22  some occasions when we may not be able to prosecute a crime

23  because we don't have federal jurisdiction over it.

24  Q    Okay.

25       Federal jurisdiction would mean crossing a state line,

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                                6272


1  that's one way?
                    Page 46

2    A    That's certainly one way, yes.

3    Q    So if it was drugs going from out of state into New

4    Jersey or out of New Jersey, that could give you jurisdiction

5    over a case?

6    A    That's true.

7         Generally drug crimes we have jurisdiction over, even

8    if I can't prove necessarily that they've travelled in

9    interstate commerce, but yes.

10   Q    Does your office have a fair amount of discretion in

11   terms of what cases they prosecute?

12   A    I don't know -- there is discretion, yes.

13   Q    I mean, you're not really like the local police

14   department where someone makes a complaint and then they have

15   to follow-up on it, right?

16   A    Well, it depends.

17        On some crimes, we are the only ones with jurisdiction,

18   then we would follow-up on it.  If I understand your point,

19   Mr. Herman, it's true, there are certain crimes that if we

20   don't prosecute them, the local prosecutor could also

21   prosecute them and in that instance, there is some give and

22   take as to whether we would take a case or not.

23   Q    All right.

24   A    But there are some cases that that's not the

25   circumstance.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6273


1    Q    Okay.

2         But in the case of let's say the murder case here, the

3    murder of Mr. McCray?

                         Page 47

4    A    Yes.

5    Q    That was originally being prosecuted or investigated by

6    the Essex County Prosecutor's Office.  Is that right?

7    A    They were certainly involved in it, yes.

8    Q    Okay.

9         And then at some point the federal Government got more

10   involved in the case, right?

11   A    Well, I mean, what I would say, Mr. Herman, is that from

12   the beginning, since Mr. McCray was a federal witness, there

13   was a federal presence in this investigation from the

14   beginning.  There was also a local presence, which included

15   the Newark P.D. and the Essex County prosecutor, but I don't

16   think it would be accurate to say that at some point we

17   stepped in.  We were in from early on, although I wouldn't say

18   that the federal Government had control of every single aspect

19   of the case.

20   Q    All right.

21        So that could have been characterized as a joint

22   investigation, at least at the beginning?

23   A    Yeah, I guess that would probably be accurate.

24   Q    And in terms of charging decisions --

25   A    Yes.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.


6274


1    Q    -- as to who would be charged, who makes that decision

2    within the U.S. Attorney's Office?

3    A    Well, it depends on the type of case it is.

4         If you're talking about this one specifically, I can go

5    through that or I can give you the general way it works.

Page 48

6  Q    Well, tell us, this case specifically, who has made

7  decisions as to who would be charged in the murder of Kemo

8  McCray?

9  A    The decisions were made by, obviously, line assistant had

10  input in consultation with the supervisor, which at the time

11  when we initially charged this case was me, with consultation

12  with those above me, including Nancy Hoppock, Amy Winkelman

13  and also individuals in the executive as well, including Mr.

14  Christie.  That would be for charging him.

15        As far as in this case, since it's a death penalty

16  eligible case, there is an entire other level of review as

17  well which I can discuss if you would like, Mr. Herman.

18  Q    No, I'm actually just talking about the charging process.

19  A    Okay.

20  Q    Let me ask you this, Mr. Gay:  When Mr. Baskerville was

21  first charged with the drug charges, how was that done?  How

22  was that accomplished?

23  A    Well, initially we charged him with a complaint.  He was

24  arrested on the complaint and then within probably a week or

25  so, we presented the evidence to the Grand Jury and the Grand

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6275

1  Jury issued an indictment.

2  Q    So initially you can charge and arrest somebody based on

3  a complaint.  Is that right?

4  A    That is correct.

5  Q    How is it obtained in this case?

6  A    Well, it was obtained -- basically, the complaint is we

7  set forth facts, we give -- the complaint has the actual legal

Page 49

8  charge, the statute that we're saying the defendant violated

9  and then a factual basis, paragraphs, written paragraphs about

10 facts supporting why we believe he committed the charges.

11      We then present that to a magistrate judge.  The agent,

12 an agent swears to it and signs it and if the judge finds that

13 there is probable cause to believe that the defendant

14 committed the crime, then the magistrate judge signs off and

15 issues an arrest warrant as well.

16 Q    All right.

17      So that doesn't involve any Grand Jury proceeding.  Is

18 that right?

19 A    No, not at that time.

20 Q    All right.

21      So according to your procedures, if you believe there's

22 probable cause to arrest someone and a magistrate judge agrees

23 with that, the F.B.I. can go out and arrest somebody.  Is that

24 right?

25 A    That is correct.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6276


1  Q    And then they're brought in front of a judge.  Is that

2  right?

3  A    That's correct.

4  Q    And at some point the case is presented to a Grand Jury.

5  Is that correct?

6  A    Yes.

7  Q    All right.

8       Now, you've told us that based on your involvement with

9  the case, which is not currently in charge of the case, but

Page 50

10   you've had involvement, that you believe that Paul Bergrin was

11   involved with a conspiracy to murder. Is that correct?

12   A     Yes.

13   Q     And do you also believe that Hakim Curry was involved

14   with a conspiracy to murder?

15   A     Yes, there was evidence to that, to support that, yes.

16   Q     That he paid $7,500 to Anthony Young to shoot and kill

17   Kemo McCray. Is that right?

18   A     That was what Mr. Young told me and I believe that's also

19   what he testified to, yes.

20   Q     And that Rakeem Baskerville was also involved in a

21   conspiracy to murder Mr. McCray. Is that right?

22   A     Yes, according to Mr. Young's -- what Mr. Young told me,

23   Rakeem Baskerville was the driver of the get-away car and also

24   paid him, I believe, $7500 as well.

25   Q     All right.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6277


1          So based on what you know about this case, Paul

2   Bergrin, Rakeem Baskerville, Hakim Curry had involvement in

3   this, not only conspiracy murder, but the actual murder?

4   A     That's correct.

5   Q     And are you aware of any involvement by a man named Jamal

6   McNeil?

7   A     Yes, I am aware based on what Mr. Young told us, I

8   believe Mr. McNeil was somebody who was acting as a look-out

9   during the murder.

10   Q     And under the law, would he have complicity in the

11   conspiracy to murder Mr. McCray?

Page 51

12  A    Well, I mean, yes, the short answer is yes.

13       Whether or not it could be proven beyond a reasonable

14  doubt, I can't say, but.

15  Q    Well, would it be fair to say that you have probable

16  cause, you could go to a magistrate judge and ask a magistrate

17  judge to arrest Jamal McNeil based on the information that you

18  have?

19  A    Yes, that's correct, but that's not necessarily the

20  standard that we follow as prosecutors for when we seek an

21  arrest warrant.  That is the legal minimum that is required is

22  probable cause.

23       However, when we make charging decisions in cases, we

24  don't charge an individual unless we feel we can prove the

25  case beyond a reasonable doubt at trial.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6278


 1  Q    And you're aware of Anthony Young's testimony in this

 2  case.  Is that correct?

 3  A    Yes, I am.

 4  Q    And that he testified that he shot Kemo McCray, right?

 5  A    Correct.

 6  Q    That the get-away driver was Rakeem Baskerville, right?

 7  A    Yes.

 8  Q    And that the look-out was Jamal McNeil?

 9  A    Yes.

10  Q    And that the person who was also on the scene and who

11  paid him was Hakim Curry?

12  A    Yes.

13  Q    And have any of those people, Paul Bergrin, Jamal McNeil,

Page 52

14  Rakeem Baskerville, or Hakim Curry, have they been charged

15  with any offense associated with the murder of Kemo McCray?

16  A    None of those individuals are currently charged.

17  Q    And no Grand Jury has been convened to determine their --

18  to check the evidence against them?

19  A    I can't comment on that, Mr. Herman.

20  Q    Okay.

21        As of today, this is how many years after the murder?

22  A    I guess it would be a little over three years after the

23  murder.

24  Q    All right.

25        And the only people who have been charged are Mr.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6279


1  Baskerville, right?

2  A    Yes.

3  Q    And Anthony Young?

4  A    That is correct.

5  Q    And Anthony Young will not receive the death penalty.  Is

6  that correct?

7  A    That is correct.

8  Q    And that's because of a deal or a negotiation that was

9  conducted between your office and Anthony Young.  Is that

10  correct?

11  A    Yes, in exchange for his cooperation and other factors,

12  yes.

13  Q    And he may or may not get a life sentence.

14        Is that your understanding?

15  A    That would be up to the judge presiding over the case.

Page 53

16  Q     But it's your intention or the intention of your office,

17  if they believe that he has cooperated substantially with this

18  prosecution, that either Mr. Minish or Mr. Frazer would write

19  a letter to the sentencing judge and make the judge aware of

20  his cooperation.  Is that correct?

21  A     That is correct.

22  Q     And that's called a 5K motion or a downward departure

23  motion.  Is that right?

24  A     Yes.

25  Q     And if the judge granted that motion, the Government

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6280

 1  motion, the judge could, if he or she wanted to, give the

 2  shooter in this case less than a life sentence?

 3  A     That is correct.

 4  Q     Now, William Baskerville did not personally shoot Kemo

 5  McCray.  Is that correct?

 6  A     The evidence that I know of, he did not personally shoot

 7  him, yes.

 8  Q     Well, do you have any evidence that he did personally?

 9  A     No, absolutely not, Mr. Herman.

10  Q     Are you relying on what Anthony Young told this jury to

11  be the best of your knowledge as?

12  A     Absolutely.  I don't believe Mr. Baskerville was the

13  shooter, but since I wasn't there, I can only rely on what

14  other people have told me about it.

15  Q     When people are convicted of federal crimes, they go to

16  federal prison.  Is that right?

17  A     Yes.

                        Page 54

18  Q    Have you ever done defense work at all?

19  A    No, I haven't.  I have been a prosecutor since I got out

20  of law school.

21  Q    Okay.

22       But you have been to federal prisons, right?

23  A    Actually, I have not been to a federal prison, Mr.

24  Herman, but I've been to some federal detention centers.

25  Q    Not a place that you would necessarily want to go to?

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6281

1  A    Probably not, no.

2  Q    All right.

3       And as it turns out, Mr. Curry, Hakim Curry is in

4  federal prison now.  Is that right?

5  A    That is correct.

6  Q    And do you know where he is, by the way?

7  A    I'm not sure exactly which facility he is in.  I know he

8  was slated to go to Florence, in Arizona, but I believe he got

9  moved to maximum security prison in Colorado, if I'm not

10  mistaken.

11  Q    So that's what they call the administrative maximum, the

12  ad max?

13  A    Yes.

14  Q    The super max, have you heard that?

15  A    Yes, I've heard that as well.

16  Q    That's a prison in Colorado, about two and a half hours

17  from Denver, way in the foothills?

18  A    I understand it's in Colorado.  I'm not sure exactly

19  where it is.

                        Page 55

20 Q    But it's the most secure federal prison in the United

21 States.  Is that correct?

22 A    That's my understanding, yes.

23 Q    That's where Mr. Curry is or is headed?

24         MR. MINISH:  Judge, we object to this line of

25 questioning.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6282


1         THE COURT:   Where are we going?

2         MR. HERMAN:  I can make a proffer.

3         THE COURT:   All right, go ahead.

4         I'll permit it.

5 Q    Is that where you believe Mr. Curry is or is headed?

6 A    Yes.

7 Q    All right.

8         And Rakeem Baskerville, he's also doing a life

9 sentence.  Is that right?

10 A    That is correct.

11 Q    On a case that you handled, right?

12 A    Yes.

13 Q    And he's in federal prison as well.  Is that correct?

14 A    Yes, he is.

15 Q    Paul Bergrin is still practicing law in Newark as far as

16 we know?

17 A    As far as I know he is, yes.

18         MR. HERMAN:  That's all I have.

19         Thank you, Mr. Gay.

20         THE COURT:   Any redirect?

21         MR. MINISH:  Yes.

Page 56

22          REDIRECT EXAMINATION BY MR. MINISH:

23  Q    Mr. Gay, Mr. Herman asked you about the process that you

24  don't need the Grand Jury for, if you have probable cause you

25  can go get a complaint.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                                    6283


1          Could you explain, as the supervising Assistant United

2   States Attorney, how the process works and what it is you look

3   for?

4   A    Normally, an assistant would come to me, agents will come

5   to an assistant and present a case to them.  They will make an

6   evaluation of whether they believe there's sufficient evidence

7   to prove the case.

8          They then draft a complaint, come to me.  They discuss

9   the case with me and if there is sufficient evidence, I

10  approve the complaint.

11         As I said, normally, although the probable cause is the

12  legal standard for getting an arrest warrant, our standard of

13  prosecution is significantly higher, because it doesn't make

14  any sense for us to issue an arrest warrant for somebody if we

15  don't think ultimately we can prove the case against them at

16  trial.

17         So the realistic standard for a prosecutor is do we

18  believe we can prove the case beyond a reasonable doubt?  If

19  we believe that, we then will get a complaint signed, which

20  establishes probable cause and seek an arrest warrant from the

21  magistrate judge.

22  Q    Now, how many witnesses -- let me ask this:   Who made a

23  charging decision to ultimately charge at the Grand Jury the

                              Page 57

24    defendant with the counts involving murder?  Who was the lead
25    attorney at that time?


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6284


 1    A     Well, I was the lead attorney at that time.
 2    Q     How many witnesses did you speak to who spoke of Mr.
 3    Baskerville's involvement before making that decision?
 4    A     Well, I mean, we spoke to -- I mean, well over, I'd say,
 5    ten to 15 witnesses at least, probably more than that before
 6    making a decision.
 7          Some of them were individuals that had direct
 8    knowledge, some of them had knowledge of things.  We spoke to
 9    the eye witnesses to the murder, we spoke to individuals that
10    Mr. Baskerville had spoken to in jail, we spoke to obviously
11    Mr. Young, who was the participant in the crime, we spoke to
12    various law enforcement officers, but it was significant -- it
13    was a significant number of witnesses.
14    Q     Among those witnesses, were there witnesses who provided
15    to you admissions with respect to the murder made by the
16    defendant?
17    A     Yes.
18    Q     Let's take Anthony Young to the side.
19          Prior to him coming forward as a witness, what was your
20    decision, if any, with respect to charging the defendant?
21    A     Based on the evidence we had before we spoke to Mr.
22    Young, we had decide -- had made a decision we were going to
23    indict Mr. Baskerville for the murder of Kemo DeShawn McCray,
24    for conspiring to murder Kemo DeShawn McCray.
25    Q     So was your case ultimately, when it was presented to the
                              Page 58

JOANNE M. CARUSO, CSR, CRR, OFFICIAL COURT REPORTER, TRENTON, N.J.

6285

1  Grand Jury, based solely on Anthony Young's statements?

2  A    No, it was not. I mean, we had made the decision

3  beforehand, but Mr. Young actually before we presented the

4  case to the Grand Jury, Mr. Young had come forward, so we did

5  -- it was basically the Grand Jury presentation had some of

6  Mr. Young, but it also had the other witnesses, including Eric

7  Dock, Eddie Williams, Rick Hosten, plus we had other

8  information from Troy Bell and Ramaine York and I don't recall

9  who else, but we had other witnesses as well.

10 Q    But you had other witnesses to corroborate Mr. Young?

11 A    Correct.

12 Q    Mr. Herman asked you about the process for charging and

13 then he stopped you at the death penalty thing.

14      I'd like you to continue and explain to the jury what

15 the process is involved in seeking the death penalty from the

16 prosecution side.

17      MR. HERMAN:   Objection, Judge.

18      THE COURT:   What's the purpose of this?

19      MR. MINISH:   Defense counsel has gone to great length

20 to question how and when charges are made and specifically who

21 and when people are charged with a death penalty. He went to

22 great length to do that. Mr. Gay should certainly be able to

23 explain the actual process.

24      MR. HERMAN:   I didn't ask anything about the death

25 penalty, just the charge.

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 59 of 157

1          MR. MINISH:  That they're not charging --
2          THE COURT:   Let's take a break, folks.  You can go
3     into the jury room, the alternates can go into chambers.
4          THE CLERK:   All rise.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 60 of 157

1          (Jury is excused and the following takes place out of
2     the presence of the jury.)
3          THE COURT:    Have a seat.
4          Here's what he asked.   This is page 48 according to
5     the daily transcript that I'm looking at on my screen.
6          "It could have been characterized as a joint
7     investigation, at least in the beginning?
8          "ANSWER:    Yeah, I guess that could probably be
9     accurate.
10          "QUESTION:    And in terms of the charging decisions?
11          "ANSWER:    Yes.
12          "QUESTION:    And to who would be charged, who makes
13    that decision within the U.S. Attorney's Office.
14          "ANSWER:    Well, it depends on the type of case it
15    is.  If you're talking about this one specifically, I can go
16    through that or I can give you the general way it works.
17          "QUESTION:    Tell us, this case specifically, who has
18    made decisions as to who would be charged in the murder of
19    Kemo McCray?
20          "ANSWER:    The decisions were made by, obviously, the
21    line assistant had input in consultation with the supervisor,
22    which at the time was, when we initially charged this case,
23    was me, with consultation with those above me, including Nancy
24    Hoppock, Amy Winkelman and also individuals in the executive
25    as well, including Mr. Christie.   That would be for charging

JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, TRENTON, N.J.

6288

1    him.
                                Page 61

2          "As far as in this case, since it's a death penalty

3   eligible case, there is an entire other level of review as

4   well, which I can discuss if you would like, Mr. Herman.

5          "QUESTION:    No, I'm actually just talking about the

6   charging process."

7          Then he gets into a line of questioning about the

8   complaint and going to the Grand Jury.

9          Mr. Minish.

10         MR. MINISH:   That's sort of the point, Judge.   The

11  defense counsel wants to walk up to the line and say basically

12  tell us about the charging, use that information to argue that

13  other people have not been charged, and sort of imply that

14  they're also not facing the death penalty, but conveniently

15  leave that factor out.

16         Obviously, and factually inaccurate, but I think it's

17  unfair to limit the Government now to follow-up and explain

18  what the actual process is.

19         THE COURT:    But the actual process, I'm assuming,

20  Mr. Gay would get into the actual process which would be the

21  Attorney General's committee and that presentation, but that's

22  really neither here nor there, because there wasn't, to my

23  knowledge, anybody else presented to that committee other than

24  Mr. Baskerville.

25         MR. MINISH:   Well --


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                        6289


1          THE COURT:    Right?

2          MR. MINISH:   It's actually not factually accurate,

3   but not my point.

                        Page 62

4          Because Mr. Young also has to go through the process.

5          THE COURT:    Okay.

6          MR. MINISH:    But that's not really the point.

7          THE COURT:    What's the point?

8          MR. MINISH:    The point, Judge, is that ultimately

9     defense counsel is going to stand up and at minimum, imply

10    that these other people are not facing the death penalty.

11          They can carve out their mitigating factor as they

12    have with saying they have not been charged, but the clear

13    implication is they're not facing the death penalty, so you

14    can't find it for my client.

15          So the process to cut off Mr. Gay and not allow him

16    to explain the entire process, albeit not having been employed

17    for these other people, is certainly relevant to the line of

18    questioning, that there is layers, there are decisions being

19    made.  It's, I'm sure, not much more than 30 seconds.

20          THE COURT:    Is it your intention, you want to elicit

21    from Mr. Gay that in addition to the charging process that he

22    testified about, with respect to death penalty authorization,

23    he had to go to Washington?

24          MR. MINISH:    Correct, Judge.

25          THE COURT:    All right.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                          6290


1          MR. MINISH:    And then, yes.  Absolutely.

2          THE COURT:    Anything wrong with that?

3          MR. HERMAN:    Sure.  We're not -- you can't go to

4     Washington on a case that you don't have, that they haven't

5     brought, number one.  It's going to give the jury the

                        Page 63

6 impression that the Attorney General of the United States

7 himself authorized the death penalty be sought in this case,

8 which is true but irrelevant.

9      THE COURT:   Then why did you even ask him all of

10 that?

11      MR. HERMAN:  What?

12      THE COURT:   Why did you ask him then?

13      MR. HERMAN:  All I asked him, in line with our

14 mitigating factor four, others responsible for committing the

15 death of Kemo or any other crime associated with his murder.

16 That's all I'm asking.

17      What's the process, how do you charge somebody and he

18 described the process.  He says they haven't been charged.

19 That's all I'm saying.

20      MR. MINISH:  Judge, factuallu, again to be accurate,

21 it's incorrect to say we have to charge somebody before we

22 present a case to Washington.  That's not actually true.

23      THE COURT:   I'm trying to understand the probative

24 value and the relevance of any of this procedural, this course

25 on criminal procedure that's being given to the jury.  I'm

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6291

1 trying to understand -- I understand Mr. Gay's testimony with

2 respect to obstruction of justice as to the effect on the

3 investigation caused by the death of Mr. McCray and I

4 understand the line of cross-examination with respect to the

5 mitigating factor as to equal culpability of others, but I

6 don't understand, frankly, the balance of his testimony and

7 how it has any probative value to any issue in this case.

Page 64

8          MR. MINISH:  Again, Judge, it's an area that defense

9  counsel opened up.

10          THE COURT:   I understand that.

11          MR. MINISH:  The Government's position is very simply

12  that while the mitigating factor may be carved out

13  specifically to charge, I don't think it's a great leap of

14  logic to imply that charging also means they're not facing the

15  death penalty.

16          Mr. Gay can explain that process, the balance of it

17  and again, this is --

18          THE COURT:   What is he going to explain?  They're

19  not charged.  Therefore, they are not facing the death

20  penalty.  That's a given.

21          MR. MINISH:  Well, the process.

22          THE COURT:   Why do we need to go into another

23  process?

24          MR. MINISH:  Why did we go into the process at all

25  about charging?  The same reason.  Defense counsel didn't


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6292


1  simply ask the question are they charged, he went through the

2  entire process.

3          THE COURT:   I understand.

4          I'm sustaining the objection.  I don't find it to be

5  pertinent, probative or relevant.

6          MR. FRAZER:  Are we going to raise now Agent Manson's

7  testimony?

8

9

Page 65

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JOANNE M. CARUSO, CSR, CRR, OFFICIAL COURT REPORTER, TRENTON, N.J.

6293

1        THE COURT:   Yes, this might be a good opportunity

2  to do that.

3        Mr. Gay, step down, take a break.

4        Agent Manson is here.

5        Step up, Agent.

6        She's already under oath.

7        Is that all right with you?

8        MR. HERMAN:   Yes, sir.

9        THE COURT:   Agent Manson, previously sworn.

10        S H A W N   M A N S O N, previously sworn, resumes

11  the stand.

Page 66

12          THE COURT:  Have a seat, Agent.

13          THE WITNESS:    Thank you.

14          MR. MINISH:  I'm not sure what you would like me to

15  do.

16          THE COURT:   We got into this -- let's make a proffer

17  as to what is the issue here?

18          MR. MINISH:  Well, the issue, Judge, under the

19  obstruction --

20          THE COURT:   She's going to testify, as I understand

21  it, that Horatio Joines and Mark Joseph, two individuals with

22  whom the defendant has been associated, as I understand it,

23  told her that they were somehow intimidated?

24          MR. MINISH:  Well, they are unwilling to come forward

25  because of the act specifically.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

1          THE COURT:   Let's get into that.

2          Go ahead.  That's the issue.

3          MR. MINISH:  I don't want to -- that was defense

4  counsel's words, intimidate.  I don't want to misstate this

5  for the Court.

6          The idea is that because of Kemo's murder these

7  witnesses --

8          THE COURT:   Let's get it in context from Agent

9  Manson.  When did she speak to these people?  What did they

10  tell her?  When did this come out?  How is it probative,

11  relevant and to what aggravating factor?  That's what I'd like

12  to know.

13          MR. MINISH:  The legal part from me would be the

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 67 of 157

14  obstruction of justice.

15          THE COURT:    I understand.

16          Let's find out what the context of this is.

17          VOIR DIRE DIRECT EXAMINATION BY MR. MINISH:

18  Q    Did there come a time when you spoke to an individual

19  named Mark Joseph?

20  A    Yes, there did.

21  Q    Okay.

22          And did you -- how did you get in contact with Mark

23  Joseph or how did he come to your attention?

24  A    He came to my attention through Eric Dock, when we had

25  interviewed Eric Dock.  He mentioned there was another

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6295

1  individual that William Baskerville confided in on a regular

2  basis and was very close to.

3          He gave me his name as Supreme and then we were later

4  able to determine that that was Mark Joseph.

5          So once we had determined his identity, I went down to

6  speak to Mark Joseph at Monmouth County jail where he was

7  incarcerated on federal charges.

8  Q    Did you ask him whether or not he did, in fact, have

9  information relating to the defendant and the murder of Kemo

10  McCray?

11  A    Yes, I did.

12  Q    And what did he tell you?

13  A    He said that he had information relating to the murder of

14  a federal informant and information regarding William

15  Baskerville's involvement in that murder.

Page 68

16  Q    And did you ask him what that information was?

17  A    Yes, I did.

18  Q    And did he tell you?

19  A    He said that he would not provide that information to me

20  until I could guarantee that he not be deported, because at

21  that point he was facing deportation, and that I could

22  guarantee his safety and the safety of his family.

23  Q    Did you make any attempts to make Mr. Joseph and his

24  family feel safe?

25  A    What I did is after I had met with Mr. Joseph, I went to

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6296

1  John Gay, who was the prosecuting attorney at that time, and

2  explained this to him and yes, I did make efforts with I.N.S.

3  at that time to see what we could do as far as deportation.

4       And I also started the process of trying to make his

5  family safe, yes.

6  Q    Okay.

7       I guess the wording --

8       THE COURT:    May I ask a question?

9       Was he eventually removed?  Was he deported?

10       THE WITNESS:    Yes.

11       THE COURT:    When was he deported?

12       THE WITNESS:    I don't know the exact date, but he

13  was deported.  I know it was fairly recently.  Most likely

14  within the past year or so.

15       THE COURT:    All right.

16  Q    At the time did you make known to Mr. Joseph what the

17  F.B.I. would be willing to do with regard to safety?

Page 69

18   A     Absolutely.  I explained to him the whole process of if

19   he is not deported and he stays in the country, we could

20   relocate him, we could relocate his family, he would be

21   eligible for Witness Security or the Witness Protection

22   Program.

23        I also explained to him if he was still incarcerated,

24   there's ways to protect his safety while incarcerated.

25   There's a facility that we use that keeps cooperators in a

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6297

1   whole different federal prison to keep them safe.

2   Q     Okay.

3        That's Wit Sec?

4   A     The prison version of Wit Sec, yes.

5        THE COURT:    May I ask a question?

6        You say -- did you intercede with Customs, the Bureau

7   of Customs and Immigration?

8        THE WITNESS:    I had started the process of talking

9   to them.

10        THE COURT:    Do you have the ability, do you have the

11   jurisdiction to intercede into a removal proceeding?

12        THE WITNESS:    No, I do not.

13        THE COURT:    Because I know I don't.  I'm curious to

14   know whether you do.

15        THE WITNESS:    At this stage in the investigation, I

16   was merely trying to find out why he was being deported and

17   what the underlying facts were and what we could do, if

18   anything, to assist him in staying in this country legally, if

19   there was any way to do that.  That was a process I had

Page 70

20  started, it never got further than that.

21          I talked to his defense counsel who I can't recall

22  their names, but they were defense counsel in New York and I

23  spoke to them.  I know his case had been under several

24  different appeals.  Maybe two or three times it was appealed.

25          THE COURT:  His immigration case?

1          THE WITNESS:  Yes.

2          THE COURT:  And he was eventually removed, which is

3  why he's not available?

4          THE WITNESS:  Well, it was his choice.  I can't say

5  that I promised him he could stay in the country, but he made

6  the choice that he would feel safer being deported back to his

7  country of origin rather than testifying.

8  Q   Did he, in fact, ever express to you why he was concerned

9  about testifying?

10 A   Yes, because they would kill him.

11 Q   What -- when you say "they," who is they?

12 A   They meaning the Baskerville family, William Baskerville,

13 his associates.

14 Q   And what, if anything, did he tell you specifically made

15 him think that?

16 A   He knew that they had killed a federal informant already

17 and that if he testified or cooperated in any way, that they

18 would kill him as well.  He was very close to William

19 Baskerville and knew that this is how William Baskerville

20 operated.

21         THE COURT:  Close to him how?

Page 71

22        THE WITNESS:   Close to him as far as being a

23   confidente.   He had himself told me that.   He said, I know him

24   very well.   I have been incarcerated with him.   He and I speak

25   on a regular basis.


JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, TRENTON, N.J.

                                                        6299


 1        THE COURT:   He wasn't on the street with Mr.

 2   Baskerville, he met him in jail?

 3        THE WITNESS:   In jail, yes.

 4        MR. MINISH:   That's basically it, Judge.

 5        THE COURT:   How about Mr. Joines?

 6        VOIR DIRE DIRECT CONTINUES BY MR. MINISH:

 7   Q    Agent, did there come a time when Mr. Joines became --

 8   got on the F.B.I.'s radar with respect to perhaps having

 9   information regarding the murder of Kemo McCray?

10   A    Well, we arrested Horatio Joines subsequent to the arrest

11   of William Baskerville and we knew he had information about

12   William Baskerville's drug activity and we believed he also

13   had information about the death of Kemo.

14        We arrested him --

15   Q    I want to interrupt you for a second so the Judge has

16   context.

17        When you say subsequent to the defendant's arrest, was

18   it also subsequent to Kemo's murder?

19   A    Yes, it was.

20   Q    Okay.

21   A    It was.

22   Q    And after the arrest, did you get the opportunity to

23   speak with Horatio Joines?

                          Page 72

24  A    We spoke to Horatio Joines, he provided us information

25  regarding his involvement with William Baskerville and his


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6300


1   drug dealing activities and he also made it be known that he

2   would not cooperate against William Baskerville out of fear

3   for his life and his family's life.

4   Q    So just so the Judge is clear, he indicated he had

5   information, but was unwilling to provide it?

6   A    Exactly.

7           THE COURT:    Has he been charged, Horatio Joines?

8           THE WITNESS:    Yes, he has.

9           THE COURT:    He's been prosecuted?

10          THE WITNESS:    He has not yet pled guilty, I believe,

11  but.

12          MR. MINISH:    Actually, that's an area for the Court

13  to consider.

14  Q    Could you explain to the Judge what the status of Mr.

15  Joines' plea is?

16  A    Several months ago, he was scheduled to be in court to

17  enter his plea.  When it came time for him to allocute to the

18  factual basis, there was a statement in there regarding his

19  involvement in the conspiracy with William Baskerville and at

20  that point he pulled back his plea and said that he will not

21  allocute to his involvement with William Baskerville and did

22  not want to implicate William Baskerville.

23          I spoke to him briefly afterwards while he was at the

24  defense table.  He motioned for me to come over.  I went over

25  and spoke to him and he said, I'd like to speak to you.  I'd

Page 73

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6301

1  like to proffer, I'd like to cooperate.

2      So at that time we then brought him in to the United

3  States Attorney's Office and we interviewed him.

4      He said that he does not want to go to jail, he does

5  not want to go to trial, he has no problem saying what he has

6  done, but that he is not comfortable implicating William

7  Baskerville out of fear for his life.  And to this day he has

8  not entered his plea as a result of that.

9  Q    And the strategy, so the Court's clear, was to wait until

10  after this trial and then allow him to plead?

11  A    Right.

12  Q    Without implicating the defendant?

13  A    Yes.

14      THE COURT:    Let me ask you this question, as to Mr.

15  Joines, as to Horatio Joines:  When did you tell Mr. Minish

16  and Mr. Frazer about all of this?

17      THE WITNESS:    Well, they have been involved in the

18  whole process with Mr. Joines.

19      THE COURT:    They knew about this business with Mr.

20  Joines all along?

21      MR. MINISH:  The plea, Judge, is different.  I was

22  present initially at the plea.

23  Q    I think what the Judge is asking about our conversation,

24  specifically about your testimony.

25  A    About how he feared for his life?

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

Page 74

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 74 of 157

 1          THE COURT:    Yes.

 2          THE WITNESS:    You know, I can't recall if I raised

 3   it back when he came into our -- when he came to proffer

 4   because we cut the proffer short because it was clear he was

 5   not going to be truthful with us.  At that point he had --

 6          THE COURT:    My question to you is:  To your

 7   knowledge, to your knowledge, how long has Mr. Minish and Mr.

 8   Frazer known about Horatio Joines being a reluctant witness

 9   because of some fear or intimidation from Mr. Baskerville and

10   his associates?

11          THE WITNESS:    I would say, again going back to that

12   time we proffered.

13          THE COURT:    How long ago was that?

14          THE WITNESS:    That was many months ago.

15          THE COURT:    What about the other person, Mark

16   Joseph?  When did you speak to Mr. Minish or Mr. Frazer about

17   Mark Joseph?

18          THE WITNESS:    That was very recent.

19          THE COURT:    How recent?

20          THE WITNESS:    Within the past few days.

21          THE COURT:    Okay.

22          Anything further?

23          Do you have anything you want to ask, Mr. Herman?

24          MR. HERMAN:    Mr. Dock, are they proffering with

25   regard to Mr. Dock?


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6303

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 75 of 157

1          THE COURT:   I'm sorry?

2          MR. FRAZER:   As far as obstruction of justice?

3          MR. MINISH:   Yes, he's another person that the agent
4    can testify to.   That the defendant was -- based on the
5    defendant's actions, he was reluctant to testify when and
6    until he -- again, it's my proffer is basically this:   That
7    while Eric Dock provided the log in May of '04, when he was
8    contacted by the agent, what he said was I'm not talking to
9    you or cooperating or starting to go down this witness road
10   when and until my family is moved to safety.

11          THE COURT:   Didn't he testify about something like
12   that?  He talked about, Mr. Dock, about having his lawyer
13   present, he gave the log to his lawyer, he wouldn't give it to
14   anybody else?

15          MR. MINISH:   The log was out there.   I'm not talking
16   about the log, but when Agent Manson went to speak to him
17   because we have to remember that there is a, what do you call
18   -- there was another AUSA and another F.B.I. agent who were
19   involved in reading the log, to make sure there was no
20   information that the trial team could not get, there was a
21   separation of that.

22          The idea was that they were doing what they were
23   doing, AUSA Brian Howe and the Taint Team was set up for the
24   log, but when Agent Manson went to speak to Eric Dock to
25   basically say, what do you have, what's going on?  He said, I

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6304

1    am not going to testify out of fear until you move the family.

2          THE COURT:   Okay.
Page 76

3          MR. MINISH:  Judge, just so it's clear and I don't

4    know if you want to send the agent out or you have follow-up

5    questions with the information, but the information again as

6    far as Mr. Frazer or I receiving the information about the

7    witnesses, I was well aware that the defendant, Mr. -- Mr.

8    Joines, the defendant in another matter, did not plea and was

9    unwilling to implicate Mr. Baskerville in that drug

10   allocution.

11         With respect to him actually saying I have murder

12   information, but I'm not willing to talk to you about that,

13   which is what we're seeking to elicit, not about the drug

14   information because that's not appropriate, that's what our

15   conversation was last night that I spoke of with your Honor.

16         Again, we basically asked the agent was what, if any

17   information, do you have that implied or the implication of

18   the defendant's actions caused problems in the case?  That's

19   when Mark Joseph came up and that's when Horatio Joines

20   specifically saying, I have murder information also.

21         I have been aware, as I'm sure defense counsel has,

22   if he has spoken to Mr. Joines' defense counsel, because the

23   only reason he has not pled is because we said, he's unwilling

24   to implicate Mr. Baskerville in a drug charge, which we would

25   not seek to put before this jury or any implication of the

6305

1    death penalty.

2          We were limiting very specifically as to the murder

3    as we felt it was appropriate.  That is when the information

4    came up.

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 77 of 157

5          Again, I don't see there's any great prejudice to
6    defense counsel.  They've now gotten far more than a fair
7    proffer.  They certainly can cross Agent Manson with respect
8    to these things and it also, the information is certainly fair
9    information to go before this jury, that while perhaps not the
10   direct intention -- actually, I'll tell you, I won't concede
11   that.
12         It was the direct intention of William Baskerville to
13   take out Kemo as a witness, that a message was very clearly
14   sent to all who can hear, that if you mess with me, there's
15   problems and I think it's fair that the agent can testify to
16   the problems that again the defendant's direct actions had on
17   her investigation.
18         THE COURT:  All right, I'll think it over.
19         I have to tell you, I'm having trouble with Mr. --
20   more trouble with this Mr. Joseph than I am with Joines, but
21   I'll think about it.
22         Dana, please tell the jury we're taking a break and
23   we'll be with them momentarily.
24         THE CLERK:  All rise.
25         (Recess.)


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                        6306


1          THE COURT:  What's going on?
2          THE CLERK:  The lunch has just arrived.
3          THE COURT:  About how much longer with Mr. Gay do
4    you think you have?
5          MR. MINISH:  Thirty seconds, a couple minutes.
6          THE COURT:  I don't want to hold him hostage.
                        Page 78

 7          MR. MINISH:  I'm sure he would appreciate that.

 8          THE COURT:  Who's next?

 9          MR. MINISH:  Inspector from the East Orange Police

10  Department, who would also presumably be very short.

11          THE COURT:  Let's get Mr. Gay finished and the

12  Inspector from East Orange and then we'll have lunch.

13          Tell them we'll have short testimony and a lunch

14  break.  That will give us a chance to discuss this Agent

15  Manson's problem, not her problem, the problem presented by

16  the testimony of Agent Manson.

17          After the person from East Orange, then what?

18          MR. FRAZER:  I'm not sure yet, because we have

19  civilian witnesses, obviously.  It's not clear.  I'm not sure

20  yet.  We have certainly Agent Manson obviously and we have

21  three civilian witnesses.

22          MR. MINISH:  We prefer to put the civilians on even

23  if it's out of order.

24          THE COURT:  I don't blame you.  Put them on and then

25  we'll deal with Manson, if that's okay.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                              6307


 1          Let's get the jury and the alternates.

 2          Is Mr. Gay outside?

 3          MR. FRAZER:  Yes.

 4          You want me to get him?

 5          THE COURT:  Sure.

 6

 7

 8

                         Page 79

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6308

1          J O H N   G A Y, previously sworn, resumes the

2  stand.

3          THE CLERK:   All rise.

4          (The following takes place in the presence of the

5  jury.)

6          THE COURT:   Take your seats, folks.

7          We've had a chance to work out the legal issues

8  presented, we've also had a chance to take our morning break.

9          What we're going to do is this:   Conclude the

10  testimony of Mr. Gay.  There is another witness who is billed

Page 80

11  as a very brief witness and then we'll take a lunch break.

12  Lunch is going to be short today, I caution you in advance.

13          Okay, Mr. Minish, go ahead.

14          MR. MINISH:  Thank you.

15          REDIRECT EXAMINATION CONTINUES BY MR. MINISH:

16  Q    Mr. Gay, on cross-examination, Mr. Herman seemed to imply

17  you got all the evidence in, what was the big deal?

18          MR. HERMAN:  Objection.

19          THE COURT:  Rephrase the question.  I don't know

20  what the context --

21  Q    I'll just ask the question.

22          What problem, prior to the Court's ruling of letting

23  Kemo DeShawn McCray's evidence come in, what issues did you

24  personally have to deal with?

25  A    Well, there were, I guess, three primary issues.  The

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6309

1   first is that since Kemo DeShawn McCray was dead, testimony or

2   things that only he was a witness to were not going to be

3   admissible at trial because I just couldn't recreate that in

4   any manner.

5           The second thing is although the F.B.I. during their

6   investigation had done things to corroborate what Mr. McCray

7   said, there were also getting those into evidence.  As I said

8   before, the tape-recorded conversations, number one, there was

9   an issue with respect to authenticating those tapes, which

10  although ultimately we overcame, initially it certainly was

11  not a foregone conclusion that those tapes were going to come

12  into evidence at trial.

Page 81

13      The second hurdle or the third hurdle, I guess, is the
14  actual hearsay problem.  Since the statements of Mr. McCray
15  were out-of-court, they couldn't necessarily be introduced in
16  court unless we met a certain burden.  Again, that burden was,
17  at least partially, we had to show, among other things, that
18  Mr. Baskerville had caused the unavailability of Mr. McCray.
19      We were able to ultimately meet that hurdle, but it was
20  not a foregone conclusion that we would have been able to do
21  that.  If we hadn't met either of those hurdles, then we
22  wouldn't have been able to introduce the tapes or any
23  testimony or other prior statements of Mr. McCray, we
24  basically would not have had a case, a drug case against Mr.
25  Baskerville.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                               6310


1       MR. MINISH:  Nothing further.
2       THE COURT:   Anything further?
3       MR. HERMAN:  No.
4       THE COURT:   Thank you, Mr. Gay.
5       You're excused.
6       THE WITNESS:   Thank you, your Honor.
7
8
9
10
11
12
13
14
                        Page 82

15

16

17

18

19

20

21

22

23

24

25

JOANNE M. CARUSO, CSR, CRR, OFFICIAL COURT REPORTER, TRENTON, N.J.

6311

1          THE COURT:    Next witness.

2          MR. MINISH:    Judge, at this time the Government calls

3   Inspector Paul Davis of the East Orange Police Department.

4          P A U L    D A V I S, sworn.

5          THE CLERK:    State your full name and spell it for

6   the record.

7          THE WITNESS:    Paul Davis, D-a-v-i-s.

8          DIRECT EXAMINATION BY MR. MINISH:

9   Q    Sir, I just ask you to speak as close to the microphone

10  as you can.

11  A    Okay.

12         THE COURT:    It's hard to get too far away from it in

13  that seat.

14  Q    Mr. Davis, by whom are you employed?

15  A    East Orange Police Department.

16  Q    Okay.

Page 83

17        How long have you been employed by the East Orange

18   Police Department?

19   A    Twenty-eight years.

20   Q    What is your current rank?

21   A    Inspector.

22   Q    And what does that involve, what duties are you involved

23   in?

24   A    I'm in charge of operations, street operations,

25   day-to-day.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6312


1    Q    I'm going to refer you back to December 7, 1991.

2         At the time were you employed as an East Orange police

3    officer?

4    A    Yes, I was.

5    Q    Do you recall what your rank was?

6    A    Sergeant.

7         MR. MINISH:   I move Government exhibit P-3 into

8    evidence.

9         THE COURT:    Have you shown it to counsel?

10        MR. MINISH:   We provided them a book.

11        MR. KAYSER:   No objection.

12        (P-3, arrest record, is marked in evidence.)

13   Q    Do you recognize what that is?

14   A    Yes, I do.

15   Q    Could you tell the jury what it is?

16   A    It's an East Orange Police Department arrest record.

17   Q    Now, during the course of your testimony, if you need to

18   refer to that, just let us know.

Page 84

19  A    Okay.

20  Q    Specifically, again going back to the day of December 7,

21  1991, were you on duty on that day?

22  A    I was working a part-time job.

23  Q    Okay.

24       So no, you were not acting as a -- well, you

25  characterize it, what was your employment, were you working as

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6313

1  an East Orange police officer that day?

2  A    It's a part-time employment.  I'm a police officer but

3  it's part-time, not directly for the police department.

4  Q    But you're a police officer 24 hours a day?

5  A    That's correct.

6  Q    Now, what day of the week was December 7th of 1991, do

7  you recall?

8  A    Saturday.

9  Q    What was -- you said part-time job.

10       Explain to the jury what your part-time job was that

11  day.

12  A    We were working for an auto auction on Central Avenue in

13  East Orange.

14  Q    What did auto auction all actually do?

15  A    Auction their cars, used cars.

16  Q    If you can paint the picture a little for the jury, what

17  did the set up look like with the cars?

18  A    It's a large parking lot and they have a number of

19  vehicles, all makes and models.  They're all used cars.

20       They're out in a lot and the people who wish to buy

Page 85

21  them, they get to look at them before they bring them into the

22  building, which is when the auction starts.  They bring them

23  in one at a time, they'll drive them in.

24      The people already had a chance to look at the cars.

25  Q    And what was -- you said it was a part-time job.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.


6314


1       What was your responsibility at auto auction?

2  A    Security.

3  Q    And why was there a need for security?

4  A    There was a great deal of money involved in the business,

5  a lot of people use cash to buy the cars.

6  Q    On that day, December 7, 1991, did you come in contact

7  with a man you later knew to be identified as William

8  Baskerville?

9  A    Yes, I did.

10  Q   I know it's a long time ago, but do you see him in court

11  today?

12  A   I believe so.

13      The gentleman with the beard.

14  Q   You're not sure?

15  A   At the time there was no beard, but he looks familiar

16  from here.

17  Q   Explain to the jury how you were dressed that day.

18  A   Plain clothes, badge on the chain around the neck.

19  Q   Okay.

20      Like in TV, those thin metal chains?

21  A   Absolutely.

22  Q   Did there come a time when something drew your attention

Page 86

23   to William Baskerville?

24   A     Yes.

25   Q     Could you explain to the jury what you did when you

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6315

1   approached Mr. Baskerville?

2   A     I identified myself as a police officer, informed him

3   that he would have to leave the auction.

4   Q     Okay.

5         Was he by himself?

6   A     There were two other individuals.

7   Q     Who were with the defendant or with you?

8   A     They were actually with him.  Later on I realized they

9   were with him.

10   Q     And what was the defendant's reaction to you telling him

11   he had to leave?

12   A     Questioning me in reference to why he had to leave.

13   Q     And what did you tell him?

14   A     He had to leave.

15   Q     And did he, in fact, leave?

16   A     Again, I advised him that he had to leave and he became

17   aggravated and upset and basically refused.

18   Q     Did you put, at this point in the facts you've given to

19   the jury, had you physically touched the defendant?

20   A     No.

21   Q     Did there come a time when the defendant touched you?

22   A     Yes.

23   Q     Okay.

24         Could you explain that to the jury?
                    Page 87

25  A     Again, I explained to him that he would have to leave.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6316


 1  Suddenly he shoved me onto a hood of one of the cars in the

 2  lot and started swinging on me.

 3  Q     Okay.

 4        You say he shoved.

 5        How did he actually do it?

 6  A     In the chest, which sent me over the hood -- on top of

 7  the car, on the hood of the car.

 8  Q     You were close to the vehicle when he pushed you?

 9  A     Yes, I was.

10  Q     Okay.

11        So you're falling backwards across the front or the

12  side?

13  A     The front of the vehicle.

14  Q     Where -- once you fell on your back, where was the

15  defendant in relation to you?

16  A     On top of me.

17  Q     You said he was trying to swing at you.

18        If you can tell the jury what happened after that?

19  A     All right.  The hood of the vehicle, I'm on my back and

20  he's -- when he shoved me, I went on my back and he

21  immediately jumped on me and started swinging.  I'm grabbing

22  my hands, trying to prevent him from striking me.

23  Q     And were you able to prevent him from striking you?

24  A     Yes.

25  Q     Okay.


Page 88

1      What happened -- go through the version of what
2  happened to you.
3  A    I grabbed his arms.  I was able to gain leverage on him.
4  Once my -- once I was able to push him back and get my feet
5  back on the ground.
6  Q    And did any officers come to your assistance?
7  A    Soon after that, one of the officers observed me
8  struggling with this individual and came to assist me.
9  Q    Was that another part-time employee officer?
10 A    It was another East Orange police officer, yeah.
11 Q    Okay.
12       Not part-time officer, doing a part-time job?
13 A    Yes.
14 Q    As a result of that action, was the defendant arrested?
15 A    Yes, he was.
16 Q    And what was he charged with?
17 A    Aggravated assault on a police officer.
18 Q    Okay.
19       Did you receive any injuries?
20 A    Minor, you know, bruises.  Nothing serious.
21 Q    Ultimately, why was it aggravated assault if you were not
22 injured?
23 A    Excuse me?
24 Q    Why was he charged with aggravated assault if your
25 injuries were so minor?

1  A    Assaulting a police officer in the duty, the charge is

2  aggravated assault.

3        I clearly identified myself that I was an East Orange

4  police officer and I was assaulted.

5  Q    So ultimately the extent of your injuries did not affect

6  the charge?

7  A    That's correct.

8  Q    Now, ultimately, the defendant did not plead to

9  aggravated assault.  Is that correct?

10 A    I don't recall the actual outcome of the matter.  I know

11 he was charged.  Whether he pled to it, I don't recall.

12 Q    Okay.

13       Did you ever testify?

14 A    No, I didn't.

15 Q    Okay.

16       So were you not personally involved in the resolution

17 of the case?

18 A    That's correct.

19          MR. MINISH:  I have nothing further.

20          THE COURT:   Any questions?

21          MR. KAYSER:  Yes, a couple.

22          CROSS-EXAMINATION BY MR. KAYSER:

23 Q    Is it Inspector Davis?

24 A    Yes, sir.

25 Q    Now, Inspector of the East Orange Police Department?


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6319


Page 90

1  A    That's correct.

2  Q    At the time you were working part-time off duty at this

3  auction, car auction, correct?

4  A    That's correct.

5  Q    It was a regular auction that takes place on a regular

6  basis in East Orange?

7  A    No longer, but at the time I would work on the Saturday.

8  Q    And it's used cars being auctioned off, is that my

9  understanding?

10  A    That's correct.

11  Q    These cars have been seized or something by the police

12  department in East Orange or abandoned cars?

13  A    It has nothing to do with the police department.  It's a

14  private business that auctions cars.

15  Q    Okay.

16      You were working, it's a side job for you?

17  A    That's correct.

18  Q    Which is normal for police officers to work side jobs,

19  correct?

20  A    I'd say so.

21  Q    You're not in uniform?

22  A    That's correct.

23  Q    All you have is a badge hanging a under your neck on a

24  chain or rope or something like that?

25  A    It's a chain.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6320


1  Q    Do you remember what else you were wearing that day, by

2  chance?

Page 91

3   A    More than likely, jeans, jacket, that's about it.

4   Q    Looked like a regular guy, just at the auction, right?

5   You didn't have -- were you wearing any security guard

6   insignia or anything like that?

7   A    No, I was not.

8   Q    Okay.

9        And there was a dispute about payment for a car or

10  something at the time?

11       Do you recall that?

12  A    I don't remember exactly what the problem was.  I do know

13  he was creating a disturbance and I responded to that and

14  advised him that he'd have to leave.

15  Q    You don't know what the merits of that dispute were at

16  this point at all?

17  A    I don't recall.

18  Q    It was just -- and at the time he was a young guy, he was

19  like 20, 21 years old, something like that, correct?

20  A    I don't recall the exact age, but he was a young man.

21  Q    1991, right?

22  A    Yeah.

23  Q    You were a lot younger than?

24  A    Sure I was.

25  Q    And you wound up arresting him, the original charge was

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6321

1   aggravated assault on a police officer, right?

2   A    That's correct.

3   Q    That was downgraded to resisting arrest, correct?

4   A    I really don't know.

Page 92

5  Q    Well, let me show you what's been marked P-3.

6        Do you recognize that document?

7  A    It's an East Orange police arrest record.

8        You know what, this is in addition to the assault, the

9  resisting.

10 Q    Okay.

11       So was he wound up being charged with both aggravated

12 assault on a police officer and resisting arrest?

13 A    Yes.

14 Q    Resisting arrest is a lesser included offense of

15 aggravated assault on a police officer?

16 A    It goes -- you have the aggravated assault and there was

17 a struggle afterwards and the resisting, in addition to the,

18 it's two charges.

19 Q    Okay.

20       And you never had to appear in court, correct?

21 A    I don't recall appearing on this matter.

22 Q    And do you know what the outcome was?

23 A    No, I don't.

24 Q    Well, if I represented to you -- that incident occurred

25 on 12/7/91, correct, December 7, 1991.  Am I correct?


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                    6322


1  A    I'd have to take a look at the report again.

2        That's correct, December 7, 1991.

3  Q    That's correct, right?

4  A    That is correct.

5  Q    And if I represented to you that a court record indicates

6  in prior court history for Mr. Baskerville that on 12/7 -- for

                          Page 93

7  an incident that occurred on December 7, 1991, East Orange,

8  New Jersey, have you got the complaint there in front of you?

9  A    Do do you mean the arrest record?

10 Q    Yes.

11 A    Yes, I do.

12 Q    Is there a W470966 on it?

13 A    I don't know what you're -- I don't see it.

14 Q    Okay.

15      In any event, if I represented to you that this record

16 shows an offense for count one, aggravated assault on a police

17 officer, East Orange Municipal Court on July 14, 1993, it was

18 a guilty count, six months suspended sentence, $150 fine.

19      Does that make sense to you?

20 A    I really can't answer that.  I don't remember going.

21      MR. MINISH:  Judge, the inspector has indicated he

22 doesn't know, but we'll certainly stipulate to the record that

23 we were going to put in evidence anyway.

24      THE COURT:  Okay.

25      MR. KAYSER:  Thank you.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                6323


1       No further questions.

2       THE COURT:  Anything further?

3       MR. MINISH:  A couple.

4       REDIRECT EXAMINATION BY MR. MINISH:

5  Q    When you identified yourself as a police officer to the

6  defendant, how close were you to him?

7  A    Arms-length.

8  Q    Okay.

Page 94

9        Did you make it as clear as you know how that you were

10   a police officer?

11   A     More than once.

12   Q     Mr. Kayser asked you about the merits of the dispute.

13        Is there an exception in the aggravated assault, if you

14   have a dispute with merits, that you're allowed to assault a

15   police officer?

16   A     No, there isn't.

17        MR. MINISH:    Nothing further, Judge.

18        THE COURT:     Anything?

19        MR. KAYSER:    Nothing further.

20        THE COURT:     Thank you, Mr. Davis, you're excused.

21        We're going to take a lunch break now.  I'm going to

22   try to finish lunch -- can it be done in 30 minutes?  We're

23   going to have everybody back here ready to go at 12:45.

24

25


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6324


1        THE CLERK:    All rise.

2        (Jury is excused and the following takes place out of

3   the presence of the jury.)

4        THE COURT:    Have a seat.

5        I'm going to rule on the testimony of Agent Manson.

6        The statute says, "The rules of evidence do not apply

7   in the penalty phase of the case, except that information may

8   be excluded if its probative value is outweighed by the danger

9   of creating unfair prejudice, confusing the issues or

10  misleading the jury."

Page 95

11        The statute goes on to say, "that both sides are

12   entitled to rebut any information received at the hearing and

13   shall be given fair opportunity to present argument as to the

14   adequacy of the information to establish the existence of any

15   aggravating or mitigating factors."

16        I find with respect to the testimony of Agent Manson

17   on the question of the obstruction of justice aggravating

18   factor that the proffer with respect to the statements

19   attributed to Mark Joseph are these:   That Mark Joseph was an

20   individual who was in jail; that he met the defendant while in

21   jail; that according to the agent, Mr. Joseph told the agent

22   that the defendant made statements to Mr. Joseph from which

23   Mr. Joseph concluded that Mr. Baskerville was complicit in the

24   elimination of a witness against him.

25        If that were as far as it goes, it probably would be

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6325

1   admissible.  The testimony wants to go another couple of steps

2   to say that Mr. Joseph was although in possession of that

3   information, did not want to come to court to testify about it

4   because he was fearful of retaliation himself.

5        Now, again, if that were as far as it went, it might

6   not be problematic, but we go yet another step and Agent

7   Manson testifies that Mr. Joseph, although would have been a

8   reluctant witness, would have at least been around and she was

9   taking efforts to insure his safety and give him some comfort

10   as to his circumstances.

11        Ultimately, however, it turns out that Mr. Joseph was

12   not a legal resident in the United States and was subject to

Page 96

13  being deported; that although Agent Manson attempted to
14  intercede on his behalf with the immigration authorities, she
15  was unable to have any affect on his removal proceeding and he
16  was ultimately removed.

17          I note also her testimony that there appears to be
18  something in her testimony that Mr. Joseph told her that he
19  was so fearful, he would rather be deported to Haiti than come
20  to court, but suffice it to say, the reason he's not here,
21  notwithstanding the efforts that have been demonstrated on
22  behalf of other witnesses who expressed concerns for their
23  safety, the reason he's not here is because of his removal.

24          With respect to Mr. Joseph at least, it appears to me
25  that the testimony of Agent Manson as to what he would have

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6326

1   said or what he told her is the kind of evidence that is
2   appropriate for the Court to exclude under even the death
3   penalty statute because it creates, in my view, unfair
4   prejudice and presents the defendant with a situation where
5   the defendant is utterly unable to rebut the testimony of
6   Agent Manson on the question of why Mr. Joseph may have been
7   reluctant or why he's ultimately not here.

8           I'm going to preclude Agent Manson from testifying as
9   to the unavailability or the reluctance of Mr. Mark Joseph.

10          The situation with respect to Horatio Joines,
11  however, I find to be different.  Horatio Joines was an
12  individual who was mentioned during the course of this trial.
13  Indeed, Agent Manson herself characterized Horatio Joines as
14  one of the principle co-conspirators with the defendant in the

Page 97

15  drug conspiracy.

16       Mr. Joines expressed to Agent Manson the knowledge

17  that he had about the case and the reason that he was not only

18  reluctant to come to court, but adamantly refused to testify

19  in any way to cooperate or implicate Mr. Baskerville.

20       Mr. Joines is an individual known to the defendant,

21  known to the defense and for that reason, it appears to me

22  that the reference to Mr. Joines is not subject to exclusion

23  under the death penalty statute and the language that I have

24  cited to.

25       With respect to those two subject matters, I will

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6327

1  permit Agent Manson to testify as to her conversations with

2  Mr. Joines, but not her conversations as to Mr. Joseph.

3       Try to be back at 12:45.

4       MR. MINISH:  Also Mr. Dock, Judge?  Mr. Dock falls

5  under Mr. Joines' ruling?

6       THE COURT:   Yes, Mr. Dock has been throughout this

7  record and she may testify as to her statements with Mr. Dock.

8       MR. HERMAN:   Judge, I have something to put on the

9  record.  I can do it after lunch.

10       THE COURT:   What's that?

11       MR. HERMAN:   It doesn't seem to me -- the Government

12  is proffering this testimony to substantiate their obstruction

13  of justice.  Now, this might be general obstruction of

14  justice, but the way we have been noticed on the aggravating

15  factor is the motive for the murder was to eliminate the

16  principle witness against the defendant in the federal

Page 98

17  narcotics conspiracy charge pending against the defendant and

18  an additional motive was to retaliate against Kemo DeShawn

19  McCray.

20          THE COURT:    What are you reading from?

21          MR. HERMAN:    On June 19, 2006.

22          THE COURT:    I'm simply asking you what is the

23  document you're reading?

24          MR. HERMAN:    Notice of attempt to seek the death

25  penalty.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                                    6328


1          THE COURT:    Okay.  I have it.

2          Your point is that the obstruction of justice that

3  they've given notice of in the case is limited to the

4  obstruction of justice via the murder of Mr. McCray?

5          MR. HERMAN:    Exactly.

6          THE COURT:    Not general obstruction of witnesses

7  willy-nilly threatening witnesses and witnesses being in fear

8  of their lives?

9          MR. HERMAN:    Thank you.

10          THE COURT:    I have to tell you, I did not take that

11  into account.

12          MR. MINISH:    We can respond to that.

13          Again, we're not talking about -- defense counsel

14  keeps trying to characterize this as the defendant making

15  specific threats to other witnesses.  That's not what we're

16  talking about.

17          We are talking about the effects that the murder of

18  Kemo DeShawn McCray had, beginning and end.

                        Page 99

19      We're not saying in any way, shape or form, that

20 William Baskerville went to Joines or to Dock, Joseph, all

21 it's irrelevant at this point and said, hey, listen, don't

22 testify.  It's the exact thing that the defendant was charged

23 with.

24      THE COURT:   I understand that.

25      The argument Mr. Herman makes is that the notice of

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6329

1 intention to seek the death penalty on obstruction of justice

2 as an aggravating factor talks about eliminating the principle

3 witness against the defendant in the drug case.  Your argument

4 that it was the effect of that would be to have had a chilling

5 affect on the ability of other witnesses to testify about the

6 murder.

7      MR. MINISH:   Correct.

8      THE COURT:   I want you to think about whether the

9 point made is well taken here.  Think about that.

10      I, frankly, didn't consider that, Mr. Herman.

11      MR. HERMAN:   Thank you.

12      THE COURT:   I'm going to reconsider this.

13      THE CLERK:   All rise.

14      (Luncheon recess.)

15

16

17

18

19

20

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 100 of 157

21

22

23

24

25


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6330


1           AFTERNOON SESSION.

2           THE CLERK:   All rise.

3           (The following takes place out of the presence of the

4   jury.)

5           THE COURT:   I have taken the lunch break to review

6   the notice of Intent to Seek the Death Penalty and taking into

7   account Mr. Herman's argument with respect to the obstruction

8   of justice notice.

9           He makes a good point that if it were limited to the

10  obstruction of justice argument that the testimony of Agent

11  Manson as to statements about people who were in intimidated

12  due to the -- due to their circumstances in connection with

13  the murder of McCray, I can follow the argument, but the

14  notice of intention also speaks in terms of future

15  dangerousness, where it specifically says, "Given the nature

16  of the charges, it is likely that the defendant will attempt

17  to retaliate against any individuals who cooperate with the

18  Government in connection with the murder charges."

19          Now, it would seem to me that that is the intent,

20  that is the intent that Agent Manson's testimony would purport

21  to service, so having reconsidered this, the ruling remains

22  the same.

Page 101

23          I'm going to permit her to testify as to the

24     statements of Horatio Joines and Eric Dock, but not Mark

25     Joseph.


  JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                        6331


     1          MR. HERMAN:  If I can just be heard?

     2          I don't think Joines, as far as I know, was a witness

     3     with regard to the murder.  I think he was a witness with

     4     regard to the drug charges; that that's my understanding and

     5     the plea that he supposedly was going to put through was going

     6     to implicate William Baskerville in a drug conspiracy.

     7          I don't know if Joines knows anything, was ever asked

     8     anything about the murder.  I think his purpose was solely the

     9     drug charges.

    10          THE COURT:   Do you know?

    11          MR. MINISH:  I do know.  He did have information

    12     about the murder.

    13          Judge --

    14          THE COURT:   What, are you going to call the victim

    15     impact witnesses?

    16          MR. MINISH:  Correct.

    17          THE COURT:   Let's get those people here.  If we need

    18     to put Manson on for a brief proffer, we can do it.

    19          MR. MINISH:  I would like to put something on the

    20     record that would obviate the need.

    21          I went back and read the statute that controls the

    22     notice.  The statute simply --

    23          THE COURT:   What's the statute?

    24          MR. MINISH:  3593(a)(2).

                              Page 102

        JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                    6332

 1          MR. MINISH:  All it requires very clearly is setting
 2    forth the aggravating factors or factors that the Government,
 3    if the defendant is convicted, proposes to prove as justifying
 4    a sentence of death.  Literally, if we had just listed
 5    obstruction of justice and the other things, there would be no
 6    further requirements so I think by giving some information, to
 7    require more, sort of puts this on its heads.
 8          THE COURT:  I understand, but nevertheless, I'll
 9    think about it some more.  I'm keeping out the references to
10    Mr. Joseph for the reasons that I've stated.
11          My inclination is to permit the testimony about
12    Joines and Dock.
13          MR. MINISH:  The only favor the Government would ask
14    is that if Agent Manson is only going to be in for a short
15    proffer and then the victims and she wound up testifying
16    today, she can provide whatever information.
17          THE COURT:  Whatever you want to do.  If she's a
18    short witness, let's get it.
19          MR. MINISH:  If there was proffered information,
20    we're assuming she'll be on tomorrow.
21          THE COURT:  Why tomorrow?
22          MR. MINISH:  Well, I guess it depends on how late the
23    Court will go.
24          THE COURT:  We have two hours.
25          MR. MINISH:  Okay.  She'll stay.

                            Page 103

DNJ 03-836 Vol II
JOANNE M. CARUSO, CSR, CRR, OFFICIAL COURT REPORTER, TRENTON, N.J.

6333

1          We can call Agent Manson if you made a final ruling

2     on that.

3          THE COURT:  That's the way I'm inclined to rule.

4          MR. HERMAN:  Well, Judge, I think we need a proffer

5     from Agent Manson with regard to whether Joines was a witness

6     on the murder case or only on the drug case.

7          THE COURT:  Okay, if you want that.

8          Is she here?  Get Agent Manson.

9          Let's get the jury and put the other witnesses on.

10          MR. HERMAN:  I think with regards to the other

11     witnesses, the Government should caution them not to be

12     excessively emotional as we will do with our witnesses.

13          MR. FRAZER:  Does that apply to the videotape as

14     well, Judge?

15          I have a motion as to that.

16          THE COURT:  Excuse me.  Let's -- we've avoided --

17          MR. FRAZER:  It's somewhat disingenuous to ask that

18     at this time.

19          THE COURT:  Let's have the witnesses testify.  I'm

20     assuming they know how to behave themselves.  If they don't, I

21     have the ability to control them.

22          Let's get the jury and the alternates.

23

24

25

JOANNE M. CARUSO, CSR, CRR, OFFICIAL COURT REPORTER, TRENTON, N.J.

6334

Page 104

1           THE CLERK:   All rise.

2           (The following takes place in the presence of the

3  jury.)

4           THE COURT:   Have a seat, folks.

5           Take your seats.

6           You may call a witness.

7           MR. FRAZER:  The Government calls Johnnie Davis.

8           J O H N N I E   D A V I S, previously sworn, resumes

9  the stand.

10          THE COURT:   Good afternoon, sir.

11          Mr. Davis has been previously sworn.

12          MR. FRAZER:  Please have a seat, sir.

13          DIRECT EXAMINATION BY MR. FRAZER:

14  Q    Try to stay close to the microphone, okay.

15  A    Okay.

16  Q    How are you, sir?

17  A    I'm blessed.

18  Q    Mr. Davis, you testified in the guilt phase of this case,

19  right?

20  A    Yes, I did.

21  Q    And you recall for the jury where you were on March 2nd,

22  2004?

23  A    Yes.

24  Q    Tell us again, where were you on that day?

25  A    On 2004, I was on the corner of -- we was coming down

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                                      6335

1  South Orange Avenue and 19th Street.
                        Page 105

2  Q    Now, you've already recounted, you were with your -- with

3  Kemo McCray at that time?

4  A    Yes, I was.

5  Q    All right.

6         You actually were a witness to his death?

7  A    Yes, I was.

8  Q    I'm not going to go through that again with you.  You've

9  testified and the jury can consider that.

10       What I want to ask you, sir, is from that day forward,

11  tell the jury how that day has affected you.

12  A    Well, made me realize, keep track of my children which is

13  important.

14       It also made me realize that you don't trust no one,

15  especially in Newark, New Jersey.

16       Cause any time something like that can happen, with you

17  at two o'clock in the afternoon, in broad daylight, that's a

18  problem.

19       Now, I don't know the defendant, I don't know his

20  family, I don't know nothing about him, but I do know this

21  here.  No one, no one is allowed to do that at two o'clock in

22  the afternoon in broad daylight.

23  Q    Sir, let me ask you, tell the jury how long have you

24  known Kemo DeShawn McCray?

25  A    I knew Kemo ever since the year 1972, when I met his

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                          6336

1  mother.

2  Q    And how old was Kemo in 1972?

3  A    He was born, just born.

                        Page 106

4  Q    So you've known him since he was a baby?

5  A    Yes.

6  Q    Explain to the jury what your relationship was like with

7  Kemo.

8  A    Well, me and Kemo had bond as he grew.  You know, he was

9  a good kid at one point.  I don't know what happened as the

10 years went by, cause I left the family to pursue work

11 purposes.

12 Q    When did you leave the family, about?

13 A    I left back in 1986 to be exact.

14 Q    And did there come a time that you came back into Kemo's

15 life?

16 A    Yes, I did.

17 Q    About when was that?

18 A    That was prior to, let's see, back in '90.

19 Q    I'm sorry?

20 A    In 1990.

21 Q    So you left for a period of years and then you were back

22 with Kemo's family?

23 A    No, I was just in his life.

24 Q    In his life?

25 A    Yes.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6337


1  Q    So you maintained a relationship with him?

2  A    Yes, I did.

3  Q    Tell the jury what did you consider Kemo?

4  A    Well, when Kemo decided that he wanted to stop doing what

5  he was doing and he asked me to teach him my trade, which is

Page 107

6  building houses --

7  Q    We'll get to that in a second.

8        My question, though, sir, was:  What were you to him?

9  A    Oh, I was more like a father.

10  Q    Okay.

11        Did he have a father?

12  A    Yes, his father is deceased.

13  Q    Do you know if he had any contact with his real father,

14  prior to him being deceased?

15  A    I don't know that.

16  Q    So what types of things would you do with him, with Kemo?

17  A    Well, we went to amusement parks together and we did a

18  lot of things such as we would go out, you know.  We did a lot

19  of fun things.

20  Q    Okay.

21        What did he like to do?

22  A    He liked the amusements parks, loved the clubs, loved

23  listening to his rap music.  He was more like a fun guy.

24  Q    Now, you said you were aware that he had gotten into some

25  trouble?


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6338


1  A    Yes.

2  Q    All right.

3        Were you -- did he talk to you about that at all?

4  A    Yes, he did.

5  Q    Okay.

6        And did you advise him at all?

7  A    I advised him, I said to him, I said, look, if you

8  started something, then you finish it, but keep in mind the

9  consequences behind it, okay.

10  Q    Did you -- were you aware, sir, prior, in the year prior

11  to his death, that he had been working for the F.B.I.?

12  A    No, I was not aware of all that.

13  Q    Did there come a point when you became aware that there

14  was something going on?

15  A    Yes.

16  Q    Tell the jury about that.

17  A    Well, the night before his death, we had a sit down and

18  we talked.  He explained to me, he said, daddy, I did

19  something wrong.

20       I said, what was that, son?

21       He said, I told on the wrong people and they're going

22  to kill me.

23  Q    You have to keep your voice up.

24  A    I said, okay.  I said, what do you want to do?  I did

25  make an attempt to have him removed from Essex County.  As a

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6339

1  matter of fact, he was going to be removed that day before he

2  got killed.  The same day, I'm sorry, the same day.  But he

3  wanted to go to work with me that day.

4  Q    Now, explain to the jury how did he become involved with

5  working on the house that you --

6  A    He came to me and he asked me, and said, daddy, I want

7  you to teach me how to do floors and walls, cause he kind of

8  liked it, what I was doing.

9       I said, okay, I will show you.

10  Q    Now, when was that?  When did he start becoming

11  interested in construction?

12  A    A week prior to his death.

13  Q    Okay.

14       How did that come about?

15  A    Well, Uncle Johnny told him.

16  Q    Who's Uncle Johnny?

17  A    A friend of his.  They call him Uncle Johnny.  Anyway, he

18  told him --

19       MR. HERMAN:  Objection, Judge, hearsay.

20       MR. FRAZER:  Hearsay is permissible.

21       THE COURT:  Overruled.

22  Q    Continue.

23  A    Okay.  Uncle Johnny said to him, he said, well, I have a

24  job I want you to do, working on a house.

25       He said, we'll call my step-father because he has all

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6340

1  the tools anyway, give him the job and I'll just work beside

2  him.

3  Q    So Kemo thought of coming to you?

4  A    Yes, he did.

5  Q    And you had a background, you had some business in

6  construction?

7  A    Yes.

8  Q    How long have you been doing that?

9  A    Well, I worked for Molten Construction out in Rumson, New

10  Jersey.

11  Q    So you had been doing that type of work?

Page 110

12  A    I had been doing that work all my life.

13  Q    So when Kemo came to you, tell the jury what happened.

14  A    When he came to me and asked me about doing construction,

15  I laid it out for him what we had to do.  We had to gut the

16  house and redo the house.  So we started gutting the house.

17  That's when his death came about.

18  Q    Now, to that day, March 2nd, were you teaching him how to

19  do that type of work?

20  A    Yes, I was.

21  Q    Tell the jury what Kemo wanted to do specifically in that

22  construction business.

23  A    Well, he chose plumbing, dealing with pipes.  That's what

24  he wanted to do.  He wanted to be a plumber.

25  Q    Now, were you able to teach him some of that?

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6341

1  A    Yes, I was able to teach him some of those.

2  Q    Was he interested in that type of work?

3  A    Yes, he was.

4  Q    Did he tell you what his future goals were, what he

5  wanted to do with that?

6  A    Well, he said he wanted to -- his future was to build his

7  house, to build a house for him and his family.

8  Q    He told you that?

9  A    Yes, he did.

10  Q    You said that the night before he was killed, which I

11  assume you mean March 1st of 2004?

12  A    Yes.

13  Q    He came to you and told you something about his

Page 111

14   involvement in what he was doing with the F.B.I.?

15   A    Yes.

16   Q    Just tell us what that was.

17   A    He said he was working with the Government to bring down

18   the drug organization.

19        I said, okay.  I said, but do you understand what

20   you're doing?  I said, cause you must understand something, we

21   live by code, so you have to understand what you're doing.

22   Q    What did he say?

23   A    He said, pop, I fully understand what I'm doing.  So then

24   I took it for face value that you had knowledge of what you

25   was doing.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                                    6342


 1   Q    Did he seem upset or fearful in any way?

 2   A    Oh, yes.  He was definitely in fear for his life.

 3   Q    Did he express that to you in words?

 4   A    Yes, he did.

 5   Q    What did he say?

 6   A    He said to me, he said, pop, I don't think I'm going to

 7   make it.  He said, because they be looking for me.

 8        I said, Kemo, I can get you out tonight, providing that

 9   you leave.

10   Q    Now, had he thought about leaving?

11        MR. HERMAN:   Objection to what he thought.

12        THE COURT:   Sustained.

13   Q    Did he tell you whether he thought about leaving?

14   A    Yes, he did.

15   Q    And what was it, what kept him from leaving?

                        Page 112

16  A    Well, prior to he had no money, his girlfriend.  He

17  wanted her to go with him and I don't know whether or not she

18  was ready so I can't speak about that.

19  Q    Did you have any contact with Kemo's children?

20  A    Yes, I do.

21  Q    Let's talk about his natural child.

22  A    Jasmine.

23  Q    Jasmine?

24  A    Yes.

25  Q    How old is Jasmine?

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6343

1  A    Jasmine is now 11, nine.

2  Q    Okay.

3        And does he have other stepchildren as well?

4  A    Yes.  Nonna.

5  Q    Nonna?

6  A    Nonna, Niasine.

7  Q    Niasine?

8  A    Yeah.

9  Q    That's not his own child?

10  A    That's not his own child.  That's his step child.  Then

11  he has Koran.

12  Q    How would you describe the relationship between Kemo and

13  his family and his children?

14  A    Oh, his children, he loved them.  He loved them.  I think

15  the boy would did anything for his children.

16  Q    Did he have siblings?

17  A    Yes, he did.

Page 113

18  Q    Who were they?

19  A    You're speaking of his kids, right?  No.

20  Q    Brothers and sisters?

21  A    Oh, yes.  There was Miss Niesha, Miss Iesha, Miss Anna

22  Davis and you have Lakiesha.

23  Q    So he had several sisters?

24  A    Yes.

25  Q    Did he have a brother?


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6344


1  A    Yes, Craig.

2  Q    Is Craig deceased?

3  A    Yes, he is.

4  Q    Was he close with his siblings, his brothers and sisters?

5  A    Yes, he was.

6  Q    Sir, as you sit here today, what has the loss of Kemo

7  meant to you?

8  A    Well, it means a lot because each day I have to look at

9  my grandkids in the face and I have to explain to them what

10  happened to daddy.

11       I remember his -- the day of his death and we didn't

12  tell Nonna cause Nonna was the last child that he had spoken

13  with that morning and kissed him before he went to work.

14       We didn't tell Nonna until afterwards.  Then Nonna

15  broke down and he was in tears.  That hurt, you know, because

16  for a kid to die that young and he had little kids that looked

17  up to him, that really hurt, you know.  Each day I have to

18  look at my grandkids' face and I have to explain to tell them

19  why and how their father died.

                    Page 114

20          MR. FRAZER:   Thank you.

21          No further questions.

22          THE COURT:   Any questions?

23          MR. HERMAN:   No.

24          THE COURT:   Thank you, Mr. Davis.

25          You're excused.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                        6345


1           THE WITNESS:   Thank you.

2           THE COURT:   Mr. Frazer.

3           MR. FRAZER:   Yes, the Government calls Lakiesha

4    Wilson.

5           L A K I E S H A   W I L S O N, sworn.

6           THE CLERK:   State your name for the record and spell

7    it.

8           THE WITNESS:   Lakiesha Wilson, L-a-k-i-e-s-h-a,

9    W-i-l-s-o-n.

10          DIRECT EXAMINATION BY MR. FRAZER:

11   Q    Please have a seat, ma'am.   Move up and put the

12   microphone right in front of you.

13          Good afternoon, Miss Wilson.

14   A    How you doing?

15   Q    Tell the jury how you knew Kemo DeShawn McCray?

16   A    Kemo DeShawn McCray was my fiancee.   I met him through

17   his sister.

18   Q    You have to keep your voice way up.

19   A    I had met him through his sister.

20   Q    When did you first meet Kemo?

21   A    When I was 17.

                        Page 115

22  Q    What year was that about?

23  A    '97.

24  Q    1997?

25  A    Yes.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6346

1  Q    Keep your voice way up.

2       So you said his sister introduced you?

3  A    Yes.

4  Q    Were you friendly with his sister?

5  A    Yes, that's like my step sister because her father deals

6  with my mother, but they never got married.  I still had call

7  her sister.

8  Q    What's her name?

9  A    Niesha.

10  Q    She's also here today, right?

11  A    Yes.

12  Q    So Niesha introduced you to her brother?

13  A    Yes.

14  Q    And you've known him since 1997?

15  A    Yes.

16  Q    All right.

17       When did you first start dating?

18  A    In 2000, in the year 2000.

19  Q    You really have to talk as loud as you can.

20  A    I'm trying.

21  Q    You're nervous, right?

22       Have you ever testified before?

23  A    No.

Page 116

24  Q    In 2000, did you -- do you have any children, ma'am?

25  A    Yes.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6347


1   Q    Who is your child?

2   A    My son name is Koran Cooper.

3   Q    Koran?

4   A    Yes.

5   Q    How old is Koran?

6   A    He's eight.

7   Q    At some point at the beginning of your relationship with

8   Kemo, did you actually live together?

9   A    Yes, we did.  We lived together for four years.

10  Q    Until his death?

11  A    Yes.

12  Q    Tell -- where was that that you lived?

13  A    In Bradley Court.

14  Q    Where is Bradley Court?

15  A    In Newark, New Jersey, North Munn Avenue in Newark, New

16  Jersey.

17  Q    M-u-n-n?

18  A    Yes.

19  Q    And describe Kemo's relationship with your son.

20  A    Well, Kemo relationship with my son since his father was

21  never really there, he was like a father to my child.

22  Q    What types of things would Kemo do with your son?

23  A    We would go to the amusement parks together, we had snow

24  ball fights.  He'd take him out, go to the movies, you know,

25  he was there.

Page 117

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 117 of 157

6348

1        My son looked up to him as his own father.

2  Q    How would you describe Kemo as a father?

3  A    Kemo being a father, he's very good at it.  Like it was

4  certain times that my son would listen to me, but he would

5  listen to him because he had like a more, how do you say it?

6  A stronger version of planning the father because I couldn't

7  do both.  He was very good as a father, to my child and to his

8  kids as well.

9  Q    So he would keep them in line?

10 A    Yes, he did.

11 Q    At some point you said that you had plans to marry Kemo?

12 A    Yes, I did.

13 Q    And when did that come about?

14 A    Well, we was supposed to get married on my birthday,

15 which was October 1st.  So we was engaged for two years before

16 prior to what happened to him.  We was supposed to get married

17 on my birthday.

18 Q    Now, did he just prior -- the marriage was then scheduled

19 for approximately seven months after he had passed?

20 A    Yes.

21 Q    Did he confide in you in what he had been doing with the

22 F.B.I. in the year prior to his death?

23 A    No, he did not.  He didn't tell me anything.

24 Q    When you found out -- did you find out after his death?

25 A    Yes, I did.

1  Q     What reaction -- did that surprise you?

2  A     Yes, it did.  I was really devastated because he's not

3  that type of person at all to be involved with anything of

4  that nature.

5  Q     Okay.

6        When you mean that nature, you mean drugs?

7  A     Exactly.

8  Q     Now, you were aware, though, that he had gotten into some

9  trouble with the law at some point?

10  A     Yes, I was aware of that.

11  Q     Tell the jury what the impact of Kemo's death had on your

12  son, Koran.

13  A     My son Koran, he doesn't like fully understand that once

14  you're gone, there is no coming back.  And he really started

15  struggling in school as far as him doing what he need to do in

16  school.  He started falling off and --

17  Q     Had he been a good student?

18  A     Before, yes.

19  Q     How old is Koran?

20  A     He's eight now.

21  Q     What grade is he in?

22  A     He's in the second.

23  Q     Did you -- did he ask questions about Kemo?

24  A     Yes, he did.  Every time the doorbell would ring or,

25  every time the doorbell ring or the phone would ring, he

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 119 of 157

1  always asked was that Kemo, is he coming back?

2      I try to explain to him that he's in heaven now, but he

3  don't understand.  He's been having a hard time as well as I

4  have.  Everyday I talk to him, I let him know, my babies here.

5  Q    Are you still close with Kemo's family?

6  A    Yes, I am.

7  Q    Do you know his mother?

8  A    Yes, I do.

9  Q    And are you still close with his sisters?

10  A    Yes, I am.

11  Q    Thank you.

12          MR. FRAZER:  I have no further questions.

13          THE COURT:   Any questions?

14          MR. HERMAN:  No.

15          THE COURT:   Thank you, very much, Miss Wilson.

16  You're excused.

17

18

19

20

21

22

23

24

25


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                    6351


1          MR. FRAZER:  Government would call Niesha McCray.

                    Page 120

2          N I E S H A   M C C R A Y, sworn.

3          THE WITNESS:   Niesha McCray, M-c-c-r-a-y.

4          DIRECT EXAMINATION BY MR. FRAZER:

5  Q    Good afternoon, Miss McCray.

6  A    Good afternoon.

7  Q    How old are you?

8  A    Twenty-five.

9          THE COURT:   You have to keep your voice up.   Speak

10 into the microphone.

11 A    Okay.

12 Q    Keep your voice way up.

13 A    All right.

14 Q    You're 25 years old.

15          Where do you work?

16 A    Right now I own my own business.

17 Q    What type of business?

18 A    A cleaning business, Sister and Sisters Cleaning Business

19 and I work for Palmer's Cocoa Butter Factory.

20 Q    We cannot hear you.

21 A    I work for Palmer's Cocoa Butter Factory.

22 Q    So you work for the Palmer's factory?

23 A    Cocoa Butter Factory, yes.

24 Q    Where is that?

25 A    That's in Pennsylvania.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6352


1  Q    And you also have your own business?

2  A    Yes.

3  Q    How long have you had your own business?

4   A    Two years.

5   Q    Do you have children?

6   A    Yes.

7   Q    How many children?

8   A    I have three that's originally mine and two that I

9   adopted.

10  Q    Tell the jury who Kemo McCray was to you.

11  A    My brother.

12  Q    He's your?

13  A    First he was my father and my brother.  He raised me.

14  Q    Explain to the jury how that came about.

15  A    I was a trouble teen, I was bad, so my mom couldn't

16  control me.  So I got to live with my brother that raised me

17  until I was 16.

18  Q    Let me stop you.

19       At some point you said you got in trouble?

20  A    Yes.

21  Q    With the law?

22  A    No, I just was bad, done teenage things.

23  Q    How old were you when you went to live with your brother?

24  A    Twelve.

25  Q    And how old was your brother at that time, how much older

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6353

1   was he than you?

2   A    Well, I believe he's like seven years older than me.

3   Q    Okay.

4        So at some point your mother sent you to live with

5   Kemo?

Page 122

6  A    Yes.

7  Q    You lived women Kemo from the age of 12 to what?

8  A    Sixteen.

9  Q    So describe for the jury, you said he was like a father

10  to you?

11  A    Yes.

12  Q    Tell the jury about that.

13  A    I didn't have no father with me.

14  Q    You have to keep your voice up.

15  A    I knew who my fathers was, but I just didn't have him

16  with me.  I never lived in the household.

17      Put it like this, when I became a would woman for the

18  first time, I didn't go to my mother, I went to my brother,

19  that's how much closer I was with my brother than anybody

20  else.

21      My father wasn't there so everything that I had to deal

22  with a man, went towards him instead of anyone.

23  Q    Let me ask you, Miss McCray, you said you had been in a

24  lot of teenage trouble?

25  A    Yes.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6354

1  Q    How did living with Kemo impact that?

2  A    Cause he, for instance, my business.  He always talked to

3  me about being stupid and trying to follow behind other people

4  and to learn how to take my own route than do what everybody

5  else do.

6      So it took at least a year and a half before I actually

7  grasped what he was saying and to getting in more and more

Page 123

8  trouble, realize it wasn't my trouble, but the trouble to my

9  friends.

10    So one day he sat me down and he's telling me that my

11  mom, she at the time was upset with me about this stuff I was

12  getting into, so I was hurt because I couldn't be around more

13  than five minutes without her yelling at me.  He told me you

14  got to understand why.  She hurt that you are being so stupid

15  and embarrassing her the way you are.

16    So I thought about it and he told me that even though

17  he would never be embarrassed or feel something toward me, she

18  does and I just didn't want my brother or my mother to feel

19  that way.

20  Q    So he was trying to help you through your relationship

21  with your mother?

22  A    Yes.

23  Q    Would he discipline you or yell at you?

24  A    Yeah.

25  Q    Tell us about that.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6355


1  A    Okay.  If -- one time he used to pick me up from school.

2  I wasn't allowed to go to school and come home by myself, he

3  had to take me and pick me up.  Embarrassing.

4    So one day I tried to sneak out of school back door and

5  he caught me and I ended up in a garbage can.  Then I went

6  home, I was on punishment.  Everywhere he went, I had to

7  follow him.  It was horrible.

8  Q    But ultimately as you got older --

9  A    As I got older.

Page 124

10  Q    How did that type of influence, how did that influence

11  you?

12  A    As I got older, I got his trust, he started trusting me

13  again.  So I had got my first job.

14       The first month of the job he would take me to work,

15  pick me up from work, but then as it got deeper into my job,

16  he trusted me more where I can go home, go to work by myself

17  and he knew that I was doing what I was supposed to be doing.

18  Q    Let's talk about your family.

19       Your other sisters, who are they?

20  A    Iesha McCray, Anna McCray.

21  Q    Did he -- was his relationship with his other sisters

22  similar to yours?

23  A    Somewhat.

24       I just was always under him, that's why.

25  Q    You were kind of under his wing?

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6356

1   A    Yeah.

2   Q    But was he close with his other sisters as well?

3   A    Yes.

4   Q    Tell the jury about Kemo's children.

5   A    Jasmine.

6   Q    How old is Jasmine?

7   A    She's nine.

8   Q    Okay.

9        And was that Kemo's natural child?

10  A    Yes.

11  Q    And did he have other children?

Page 125

12  A    Yes.

13  Q    That he considered his own?

14  A    He was with a girl when she was two months pregnant, he

15  met her and she had a son, Niasine and he raised that boy.

16  Q    Is he also known as Nonna?

17  A    Nonna, yes.  He raised him until the age he was.

18  Q    And was there any other child in his life?

19  A    Koran.  He was his fiancee's son.  He was with her, he

20  was a year old and he raised him.

21  Q    Let's talk about Kemo when he was growing up.

22       Who was he raised by?

23  A    Grandmom and my mom.

24  Q    Your grandmother and your mother?

25  A    Yes.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6357


1  Q    What was his relationship like with his grandmother?

2  A    He was very close to my grandmother.  That was -- he

3  basically looked at my grandmother as his mother.  He was very

4  close with her.

5       When she passed, it was hard on him more than it was

6  for the other kids.

7  Q    Tell us what types of things you would do with Kemo, what

8  he enjoyed doing?

9  A    Well, we used to go to the movies together, we ride

10  around, hang out at the house, play games, go to the amusement

11  parks.  He loved amusement parks.

12  Q    Would he take his kids to the amusement parks?

13  A    Yes.

Page 126

14  Q    I'm going to show you Government exhibit P-52.

15        MR. FRAZER:  If there is no objection, I'll move it

16  in.

17        MR. HERMAN:  No objection.

18        (P-52, photo, is marked in evidence.)

19  Q    Do you recognize that photo, who's in that?

20  A    Yes.

21  Q    Can you tell us who's in that photo?

22  A    Jasmine.

23  Q    That's not Kemo in the Sponge Bob?

24  A    No.

25  Q    But that was taken at an amusement park?


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                                    6358


1  A    Yes.

2  Q    I want to show this.  That's Jasmine, Jasmine?

3  A    Jasmine.

4  Q    And who's that?

5  A    Niasine.

6  Q    Or Nonna?

7  A    Right.

8  Q    Okay.

9        That was taken several years ago?

10  A    Yes, not too long ago.

11  Q    Let me show you another picture, which is P-50.

12        MR. HERMAN:  No objection if it goes into evidence.

13        (P-50, photo, is marked in evidence. )

14  Q    I don't know if you can see that from where you are.

15        Can you see that?

Page 127

16  A    Yes.

17  Q    It might be on the screen in front of you also.

18       Tell the jury the story behind that picture.

19  A    That was when I was living with him.  I was living with

20  him when I was 15.  That's when the picture was taken.

21  Q    And what is it about that picture that you remember?

22  A    Because he was mad at me about something, I was joking

23  around with him.

24  Q    Keep your voice up.

25  A    He was mad at me about something and me and his daughter

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6359

1  Jasmine's mom was joking around with him, snapping pictures

2  and he don't like pictures.

3       So he told us if we took the picture, he was going to

4  hit us with the weights, so we snapped the pictures and then

5  we ran in the back.

6  Q    Did he like to lift weights?

7  A    Yes.

8  Q    You mentioned that he liked to go to amusement parks.

9  You told me something about him cooking.

10      Can you tell the jury about that?

11  A    He can cook a little bit.  But all I remember eating when

12  I live with him was eggs and chicken and that's all he cooked

13  for me.

14      He cooked eggs chicken and noodles of oodles.  We ate

15  that all the time, unless we go out to eat.

16  Q    Now, tell the jury he had a pet?

17  A    Kato.

Page 128

18   Q     What's the name?

19   A     Kato.

20   Q     Kato?

21   A     Yes.

22   Q     Tell the jury about Kato.

23   A     He always wanted a son, never had a son, so he had a dog

24   that he had bought out of the newspaper.  It was I think it

25   was a Pit Bull, and he named him Kato.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6360

1          One day Kato got killed, so he was going crazy with

2   this dog.  So we went to the amusement park and he won me a

3   teddy bear that was almost my size and he named it teddy bear

4   Kato because it looked just like the dog.

5   Q     Okay.

6          Let's talk about Jasmine and Nonna and Koran.

7          Can you tell the jury as far as Jasmine, what impact

8   Kemo's death has had on her?

9   A     Well, Jasmine, I can't really -- she's, right now she's

10   in counseling because she went to a depression mood because

11   okay, the weekend that he passed, he was supposed to pick her

12   up and he didn't come that weekend, but she just thought he

13   just didn't come that weekend.

14   Q     Keep your voice up.

15   A     So she keeps saying if he would have picked her up, he

16   would have still be alive.  If he would have came early, she

17   didn't know he was at work, that's the reason he didn't show

18   up at the time.

19          Right now she's in therapy because she gained weight

Page 129

20 afterwards and she -- it's kind of hard for me to explain
21 because I can't really explain to her to help her, so I just
22 try to talk to her sometimes and let her know that he loves
23 her, regardless, I'm here, grandma's here, aunts, cousins are
24 still here, but I told her that dad is here, but she just --
25 when I went over her house Friday, I went over her house.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6361

1        I gave her pictures of him because she didn't have any
2 pictures.  So we got pictures, I gave her a picture and I'm
3 looking around the house for the picture to find out that she
4 stuck the picture in the back of her closet because she says
5 so long as the picture is up in the house, she feel things are
6 happening to her, things are falling, so she going through
7 therapy right now.  She's messed up right now.
8 Q    The stuffed animal you mentioned, tell us what happened.
9 A    Well, I know she didn't want the picture because she was
10 saying she was scared to have the picture in the house, so my
11 brother before he passed, six months before he passed he was
12 living with me.
13       So he had left Kato, the teddy bear, he left the teddy
14 bear at my house.  So I just gave her the teddy bear and I was
15 looking for the teddy bear at her house.  No teddy bear is
16 nowhere to be found.  She stuffed that away.  She does not
17 want anything, she's scared.
18 Q    You told me about -- I don't know if you were able to
19 find it, about a letter that you had had from Kemo?
20 A    Yes.
21 Q    He had written to someone?

Page 130

22   A      Yes.

23   Q      Who did he write the letter to?

24   A      He wrote it to Jasmine, to his daughter.

25   Q      Tell us the circumstances.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6362

1   A      I don't know where the letter was written, I don't know,

2   but I do know she never received it.  When he passed, Lakiesha

3   found the letter and I went and got all his items from the

4   house and I read the letter.

5         I misplaced the letter and I wanted to give it to her

6   but the letter was pertaining to her, about how he was going

7   to try to change different things about his life for her, like

8   as far as him and her relationship.  He wanted to make it

9   stronger, get closer than what it was.

10   Q      Nonna, tell the jury what the impact of Kemo's death was

11   on his stepson.

12   A      Niasine, he was used to always being with him.

13   Q      Describe that relationship.

14   A      He was like his son.  Basically he was his son.  He was

15   his son.

16         Kemo had split up with Nonna mother at least a year

17   before he passed, but Nonna lived with Kemo.  He took care of

18   Kemo -- Nonna everyday.  Wherever he went, he had him.

19         In fact, the day he passed, he had just dropped Nonna

20   off to a baby-sitter so Nonna was with him everyday.

21         Right now they having problems with Nonna as far as

22   school.  He not listening and stuff, you know.  His mom can't

23   control him.  He's not used to his mom controlling him, he's

Page 131

24  used to Kemo controlling him so it's hard for her to try to

25  get him to listen to what she's saying.  They're having

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6363

1  problems with him as far as that.

2  Q     Your children, how old are they?

3  A     My eldest is seven, six, two.

4  Q     Did any of them really know Kemo, they were young when he

5  passed?

6  A     They knew him and everything.  My daughter remembered him

7  because he bought a chain.  He used to call my daughter little

8  girlfriend.  She was the first niece in my family.  He used to

9  call my daughter little girlfriend and he bought her a chain.

10  They pretty much remember him.

11  Q     Tell us -- you told me about their names.

12  A     Well, my brother never had a son so me and my other

13  sister, we all decided that when we had kids, we were going to

14  name them after him, but he would never let us name his full

15  name, because he said he was going to have a son, so we

16  couldn't name them the full name.

17      My son, my seven-year-old, his name is DeShawn and my

18  11-year-old nephew name is DeShawn, then I had a baby after

19  Kemo passed, so we named him Kemo.

20  Q     You were on one of the tapes that the jury heard?

21  A     Yeah.

22  Q     We talked about that.  Something about a pizza?

23  A     Yeah.

24  Q     He was at your house that day?

25  A     Yeah.

Page 132

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6364

1 Q    Were you aware he was working for the F.B.I.?

2 A    No.

3 Q    There was a story about the pizza and something about a

4 wig.

5       Can you tell the jury what that was?

6 A    I used to wear wigs.  I used to wear a lot of different

7 color wigs and one day we were hanging out and he was saying

8 that we was going to order pizza.

9       So I used to try to walk around like I was all cute and

10 walking down the stairs to go pick the pizza and he ran up

11 behind me, with the pizza man and pulled my wig off.  He used

12 to call me Rupaul.

13 Q    Rupaul?

14 A    Yeah, because of the wigs.

15 Q    You said that you told me that you learned something from

16 him, stand on your own, never make a fool of yourself.

17       Can you tell the jury about that?

18 A    Yes.  Because before I had my first child, my brother

19 explained to me that if I'm having a child, that I must be

20 able to stand on my own and don't let no one make a fool of

21 you.

22       So before I had my son, I thought about it.  He made me

23 think about it and I thought about it and we decided for me to

24 have my son and then I knew right before he passed, about a

25 month before he passed, he started working.  He told us,

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

Page 133

Case 5:05-cr-06002-GAF  Document 396-57  Filed 03/06/08  Page 133 of 157

1  that's the only thing he told us, he was going to get a job
2  and he wanted us to come over, see him working and stuff.  So
3  we started going over there.
4       Then we went over to a diner close by and he was
5  talking to me and he told me that if he could stand on his
6  own, don't let no one make a fool out of you, I can do it,
7  too.
8       So after my brother passed, that just stuck in my head
9  and the fact that he passed the week of my birthday, the day
10  after the funeral, I decided to move to Pennsylvania and stand
11  on my own.
12  Q    So the week after he died on March 2nd, 2004, was your
13  birthday?
14  A    My birthday was March 6.
15  Q    And you left your home?
16  A    I left the family -- the funeral was March 7.  I left my
17  home March 8.
18  Q    Why?
19  A    There was nothing there for me.  My brother was already
20  gone.  My father is already gone.  There was nobody left in
21  New Jersey for me to be there for.
22  Q    Have you taken his advice, are you standing on your own?
23  A    Yes, I am standing on my own.  I own my own home, I got
24  my own business, I have my own kids, I'm taking care of
25  everything by myself.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

Case 5:05-cr-06002-GAF  Document 396-57  Filed 03/06/08  Page 134 of 157

1  Q    Thank you.

2        MR. FRAZER:    No further questions.

3        THE COURT:    Any questions?

4        MR. HERMAN:    No, your Honor.

5        THE COURT:    Thank you very much, Miss McCray, you're

6  excused.

7        Mr. Minish.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                                            6367


1        MR. MINISH:  At this time the Government calls Agent

2  Shawn Manson to the stand.

                    Page 135

3          S H A W N    M A N S O , previously sworn, resumes the

4    stand.

5          THE COURT:    Agent Manson is previously sworn.

6          DIRECT EXAMINATION BY MR. MINISH:

7    Q    Good afternoon, Agent.

8    A    Good afternoon.

9    Q    I know and the jury does, that you testified for a couple

10   of days here previously.  I want to narrow your testimony

11   today to a specific area, okay?

12   A    Okay.

13   Q    The area I'd like to ask you questions about is the

14   affect, if any, that the murder of Kemo DeShawn McCray had on

15   your investigation.  Okay?

16   A    Okay.

17   Q    I'm going to direct your attention specifically to an

18   individual named Eric Dock.

19   A    Okay.

20   Q    Could you explain to the jury what, if any, affect the

21   murder had on Eric Dock?

22   A    Eric Dock came forward on his own.  He had written a

23   letter saying he had information regarding the death of a

24   federal informant.

25          After we received that letter, we spoke with Mr. Dock

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6368

1    and he told us that, in effect, Mr. Baskerville, William

2    Baskerville was responsible for having Kemo killed.  And that

3    Eric Dock had several conversations with Mr. Baskerville about

4    these events.

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 136 of 157

5    He very much wanted to provide information to us but
6  was so concerned about doing so, because his family was still
7  out, they lived in the Newark surrounding area.  He was very
8  concerned about his family and also his well-being.

9    He was incarcerated.  But he said before I go into
10  great detail as to my conversations with William Baskerville,
11  I need you and the Government to tell me that my family will
12  be relocated to a place of safety, because I can't continue
13  telling you everything about this investigation unless I have
14  the peace of mind that my family will be protected, because I
15  know that William Baskerville had an informant killed.  If he
16  did that to Kemo, he can do that to me.

17    If he can't reach me, then I know he'll reach out for
18  my family and try and harm them.
19 Q    So after Mr. Dock provided that information to you, what
20  did you, in fact, do?
21 A    Right then and there we did a conference call because
22  like I said, Eric Dock was incarcerated.  We were at the U.S.
23  Attorney's Office and we were able to get his mother on the
24  phone.  We did a conference call and we explained to her what
25  was going on.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6369


1    He explained to her in his own words what was going on,
2  that he would like to cooperate with the Government in a case
3  that involved the murder of a federal informant.

4    He feels that it's best that his family relocate.  She
5  is a working woman, she has -- he comes from a large extended
6  family.  He said -- he asked her if she would be comfortable

7  relocating, leaving her job and relocating the family, meaning

8  her children and grandchildren that she was helping raise.  So

9  we had a rather lengthy discussion and she said that he needs

10  to do the right thing and that the family would be willing to

11  relocate.

12       So within a matter of I'd like to say maybe two weeks,

13  we had the entire extended family relocated, meaning again,

14  Eric's brothers and sisters and their children and this meant

15  pulling children out of school.  She left her job.  She

16  brought her husband who was in a nursing home at the time and

17  they have all since been relocated.

18  Q    Now, you told us a couple of things, but without telling

19  us where the relocation is, what's the actual process involved

20  in getting a relocation done?

21  A    What I had to do is write a very detailed memo to my

22  supervisor, who passes it up the chain.  Eventually it goes to

23  the head of our office.

24       What I have to put in that memo is reasons to believe

25  that this informant and this informant's family, meaning Eric

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6370

1  Dock and his family, are at risk.

2       I have to detail why I believe that to be the case and

3  what evidence do I have to substantiate that.  So I wrote a

4  rather lengthy memo explaining what had already happened in

5  this investigation, that there's a federal informant who had

6  been killed at the hands of William Baskerville and his other

7  co-conspirators in this case.

8       If Eric Dock did, in fact, cooperate, we had very good

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 138 of 157

9    reason to believe that he, himself, is in jeopardy as well as

10   his family.  That's the first part.  I have to show why there

11   is good reason to relocate this individual.

12        Then the second part of my memo is more a financial

13   review, what type of money will this family need to relocate,

14   what kind of moving expenses will they incur, what kind of

15   rent will they have to pay or what are there living

16   arrangements going to be and what do we have to provide to

17   them to help them relocate.

18        It's very detailed as far as rent, utilities,

19   grocery, things to help this family leave an area where they

20   have been born and raised and move to a whole new area to get

21   their feet on the ground.

22        After I've written this memo, it goes to my

23   supervisor, who has to approve it.  It then goes to, as I

24   said, his boss, who is the boss of our office, and I also had

25   to get headquarters approval on this particular relocation

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6371

1    just because the dollar amount was rather high.

2    Q    Now, how many people were actually ultimately moved, do

3    you remember?

4    A    I believe there were nine of them.

5    Q    And you said it was a significant amount of money.

6         What specifically did the money go to pay for?

7    A    The money went to pay for, first of all, moving expenses,

8    moving truck, transportation to their new location and that's

9    transportation for nine individuals.  Any sort of food that

10   they would need, lodging.  The trip lasted many days, that's

Page 139

11   the immediate cost.

12       Then long-term, we're able to pay two months' rent,

13   utilities, general living expenses, security deposits, items

14   of that nature.

15   Q    What's the purpose of that two-month payment?

16   A    The two months, that's not my own personal rule, that is

17   a rule that we're governed by when we move an informant or his

18   or her family, we're allowed to go out two months.  That's a

19   rule made by headquarters.  I don't know but that's as far as

20   we can go out.

21   Q    That's to get them on their feet?

22   A    Two months is what the Government feels should be

23   reasonable time for somebody when they're relocated to get

24   their feet on the ground, to find employment, to at least

25   sustain a home or an apartment and like you said, get their

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6372

1    feet on the ground.  That's what it's for.

2    Q    Now, once the move was completed, were there any issues?

3    A    Oh, several issues.  I speak to Eric Dock's mother

4    regularly, probably on a monthly basis.

5         MR. HERMAN:  Objection, relevance.

6         THE COURT:  Sustained.

7    Q    Have you spoken to Eric Dock from the day of the move,

8    whenever that conference was?

9    A    Yes.

10   Q    About things that might affect his willingness to

11   testify?

12   A    Yes, I have.

                          Page 140

13  Q    Tell the jury about that specifically.

14  A    He had grave concern because apparently he had heard that

15  a story aired on Court TV about this investigation.

16       THE COURT:    Excuse me, Agent, please limit your

17  testimony to what he told you.

18  A    He told me that the investigation aired on Court TV, and

19  I spoke to him about that, saying that it was highly unlikely

20  that it had because neither myself or members or the

21  Government had news of that.

22       But regardless, it was enough to make him very, very

23  nervous and he felt that not only his life was in jeopardy,

24  but his family's life was in jeopardy.  So we had to get to

25  the bottom of that and we found out that the story did not, in

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6373

1  a fact, air on Court TV but that was enough to have him

2  extremely, extremely upset.

3  Q    Whether or not he was actually upset, what affect, if

4  any, did he say that had on his willingness to testify?

5  A    He said that if we can't protect him or his family, he

6  will not continue and testify for us.  He just will not put

7  himself or his family in that position.

8  Q    I want to direct your attention to a second individual.

9  A    Okay.

10  Q    Are you familiar with a man named Horatio Joines?

11  A    Yes, I am.

12  Q    Okay.

13       Did he go by any nicknames?

14  A    Ray-Ray.

Page 141

15  Q    Again, first, was he ultimately arrested by you and your

16  group?

17  A    Yes, he was.

18  Q    And why was he arrested?

19  A    On drug conspiracy charges.

20  Q    Do you recall when he was arrested?

21  A    I believe it was March of 2005.

22  Q    Let me ask you this way:   Was it after or before Kemo

23  DeShawn McCray was murdered?

24  A    It was after Kemo was murdered.

25  Q    What nicknames did he go by?

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6374

1  A    Ray-Ray.

2  Q    Now, what, if any, association did you believe during the

3  course of your investigation that was between this man,

4  Ray-Ray, Horatio Joines and defendant?

5  A    I understood Ray-Ray and Will Baskerville to be partners

6  in the drug -- in their drug organization.

7  Q    When he was arrested, where was he taken?

8  A    At his home -- I'm sorry.  We arrested him at his home

9  and he was taken to our office where we processed him, meaning

10  we fingerprinted him, we photographed him, we read him his

11  rights and gave him the opportunity to speak to us if he so

12  chose to do so.

13       Then he was taken to the Marshal's Service.

14  Q    While he was in F.B.I. custody for processing, did you

15  have the opportunity to speak to him?

16  A    Yes, we did.  I did speak to him and he did provide us

Page 142

17  with a statement.

18  Q    Okay.

19        And did you -- what did that statement include?

20  A    The statement -- in the statement he advised that he

21  does, in fact, sell drugs.  He sells coke and that he was with

22  William Baskerville on a lot of occasions where they would

23  make -- where William Baskerville would make drug

24  transactions, but that Ray-Ray said that he was just along for

25  the ride and that he would handle money and sometimes put it


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6375


1  in the glove box, but that was about the extent of his

2  involvement.

3        So he was --

4  Q    I want to ask you a specific question.

5        Was he asked whether or not he had any information

6  about the murder of Kemo DeShawn McCray?

7  A    Yes.

8  Q    Okay.

9        Did he tell you whether or not he had that information?

10 A    He said that he had information, but that he would not

11 provide that to us.

12 Q    Why not?

13 A    Out of fear for his life.

14 Q    From who?

15 A    From William Baskerville and William Baskerville's

16 associates.  He said, you just don't mess with that family.

17            MR. MINISH:  Nothing further, Judge.

18            THE COURT:   Questions?

                    Page 143

19      MR. HERMAN:   No questions, thank you.

20      THE COURT:   Thank you, Agent.

21      You're excused.

22

23

24

25


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                                        6376


1           MR. MINISH:   Judge, that's the last witness we're

2    going to have.  We have a bunch of documents to move.

3           THE COURT:   Go ahead.

4           Are you folks ready to press on?

5           MR. MINISH:   One more photo of Mr. McCray, P-51.

6           THE COURT:   All right.

7           MR. HERMAN:   No problem.

8           (P-51, photo, is marked in evidence. )

9           MR. MINISH:   Judge, I'm going to hand out copies.

10          THE COURT:   What is it you're showing the jury?

11          MR. MINISH:   I'm showing the jury 15A.

12          MR. HERMAN:   No objection if he wants to put it in.

13          MR. MINISH:   And B, all of these things have been

14   provided to defense counsel.

15          MR. HERMAN:   I have to know what they are.

16          THE COURT:   What are they?

17          MR. MINISH:   15AA, one of a presentence report that

18   was done for the defendant and 15B is page two of the

19   presentence report.

20          (P-15A and B, presentence report, is marked in
                          Page 144

21  evidence).

22          THE COURT:   Is that what's on the easel?

23          MR. MINISH:   15A is on the easel.

24          To make this a little smoother, I've shown all these

25  items to defense counsel, with the exception of the one item

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6377

1  before the jury sees it.  These are all acceptable.

2          MR. HERMAN:   Just put their numbers on the record.

3          MR. MINISH:   15A, 15B, P-30, P-31, P-33, P-35, P-37,

4  P-19, P-1, P-4, P-16, P-18, P-17, P-12, P-11 and P-15.

5          THE COURT:   All right.

6          MR. HERMAN:   I have to look at them, there were more.

7          P-1, no objection.

8          Are you offering P-3?

9          I have no objection to A and B; 30, no objection; 31,

10  no objection; 32, no objection, 33, no objection, 34, no

11  objection; 35, no objection; 37, no objection; P-19 I think is

12  in evidence, no objection; P-1, no objection; P-4, no

13  objection; P-16, no objection, it's been redacted; P-18, no

14  objection; P-17 has to be redacted, Judge, so I'll put that

15  aside; P-12, no objection; P-11, no objection; P-15, that has

16  been redacted, no objection.

17          (The above documents are marked in evidence.)

18          MR. MINISH:   I understand the area that defense

19  counsel wants to redact on P-17, the Government agrees and

20  will not refer to this section.

21          THE COURT:   These are in evidence, what are you

22  going to do?

Page 145

23          MR. MINISH:  Explain to the jury what each item is,

24   read certain portions from them.

25          THE COURT:  All right.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                                  6378


 1          MR. MINISH:  Members of the jury, as you can see from

 2   the hand out, the defendant's interaction with the criminal

 3   justice started approximately January 18, 1985.

 4          MR. HERMAN:  It sounds like a summation.

 5          THE COURT:  Mr. Minish, don't make comment on it.  If

 6   you're going to read it, that's fine.  If you want the jury to

 7   read it, that's all right, but you'll have an opportunity to

 8   make argument later on.

 9          MR. MINISH:  This before you now, 15A and 15B is an

10   adult presentence report, which is taken from one of the

11   defendant's presentence reports.

12          P-30, which is in evidence, speaks specifically to a

13   robbery, which is covered on 15A -- excuse me.  Let me skip to

14   15B to make this easier.

15          15B is the second page of that report I spoke of.

16   The documents that are associated with that, that you will get

17   back in evidence are P-30, P-31, P-33, P-34, P-35, and P-37

18   and P -- excuse me, and P-19.  All of those items are

19   associated with this top offense listed on 15B.

20          On page 30, I'm going to read to you a portion which

21   states that a leather bomber was taken with the value of $125.

22          P-31, quoting from that language says, "Suspect was

23   questioned and admitted he shot and robbed the victim."

24          P-32, reading from there, "Above-named victim met at

                        Page 146

25  his home.  He was being treated by wound to his left lower

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6379

1  back.  The victim was approached by suspect who demanded the
2  victim's gray goose down coat with fur collar.  When victim
3  resisted, the suspect produced a handgun and shot the victim
4  and took his coat.  Suspect fled in an unknown direction."
5          Couple of lines from P-33, "Victim was one Ryan
6  Sanders, age 15, of 870 South 17th Street, city, who sustained
7  a gunshot wound of the back.  Victim stated that he was shot
8  by a black youth he knows by the first name of Will.  Victim
9  related Will approached him and his friend and demanded the
10  goose down jacket and he refused."
11          P-34 is a voluntary statement from Louis Gadsden, who
12  is a witness to the crime.  He is asked, "Tell me what
13  happened" and states on P-34, "We were going to Ryan's house,
14  walking up the street.  Will grabbed him and told him to give
15  up the coat.  Ryan refused and they started to wrestle and
16  that's when he got shot."
17          He's asked, "Did Will take Ryan's jacket after he
18  shot him?"
19          He answered, "Yes."
20          He's asked, "Do you know if Will attends school?"
21          The answer is, "He goes to West Side sometimes."
22          Then there's a statement of the defendant, P-35.
23  I'll read a passage from there.
24          "QUESTION:  On Wednesday, October 22, 1986, were you
25  involved in a robbery where you shot the victim?

                        Page 147

DNJ 03-836 Vol II

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6380

1          "ANSWER:    Yes.

2          "QUESTION:    What was the location of the robbery?

3          "ANSWER:    It was 17th Street right by Madison

4    Avenue.

5          "QUESTION:    Were you alone at the time?

6          "ANSWER:    Yes.

7          "Who was the person that you robbed and shot?

8          "ANSWER:    All I know him by is Ryan.

9          "QUESTION:    How long have you known Ryan?

10          "ANSWER:    About two years, not it was before then

11    because his mother used to work at Madison school when I was

12    going there.

13          "QUESTION:    What did you take from Ryan?

14          "ANSWER:    A coat."

15          The coat is described.

16          "QUESTION:    Tell me what happened.

17          "Ryan was coming off the porch and I grabbed him,

18    told him to take off the coat, we were tussling and the gun

19    went off.  I yanked the coat off his arms and ran.

20          "Was Ryan alone at the time?

21          "No, he was with Louis.

22          "What type of gun did you use?

23          "It was a 32 black with short barrel.

24          "What did you do with the coat that you took from,"

25    it says, "Will?

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

Page 148

Case 5:05-cr-06002-GAF  Document 396-57  Filed 03/06/08  Page 148 of 157

1         "I sold it for $75.

2         "What happened to the pistol?

3         "I gave it back to who I got it from.

4         "Who did you get it from?

5         "This guy named John, I don't know his last name and

6    where he lives."

7         The last thing with respect to this charge is from

8    P-37, reading the defendant's statement.  "Before it happened,

9    I was down the street.  I saw the kid.  This other other guy

10   that I was with advised me to rob him.  These guys I was going

11   out robbing, these guys I was with was going out robbing.  I

12   got the gun from one of them.  I didn't mean to hurt him none,

13   I just wanted to scare him.

14        "I grabbed him, he started to tussel, the gun went

15   off.  After it happened, I gave the gun back.  They went and

16   did their thing.  I sold the jacket to somebody for $75."

17        From the victim's statement, "The undersigned officer

18   was contacted by Mrs. Sanders, the mother of the victim.  She

19   indicated that her son has been profoundly affected by the

20   incident.  He required hospitalization for ten days and

21   surgery.  She indicated that her son still carries the bullet

22   in his body which is lodged under his rib cage.

23        "Mrs. Sanders stated that her son has been afraid to

24   leave his house unless in a car, since the date of the

25   incident.  He finds it necessary to take a taxi cab to school

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

Case 5:05-cr-06002-GAF   Document 396-57   Filed 03/06/08   Page 149 of 157

1  each day.  She also relates that his school work has fallen

2  off substantially since the incident occurred.  He has become

3  withdrawn and does not like to talk about the offense."

4         Then P-19 is a judgment of conviction with respect to

5  that crime.

6         With respect to the next incident marked as 11/5/91

7  on page 15B, the Government has a judgment of conviction with

8  respect to that charge that the jury will have.

9         With respect to the 12/7/91 incident which is the

10  incident that was testified to by Inspector Davis, P-3 is

11  already in evidence.  The jury will have that.

12         With respect to the next incident, working our way

13  down, there is a judgment of conviction marked as P-4.

14         P-16, which is another presentence report with

15  respect to that incident.  In that P-16 -- the jury can read

16  that.

17         Working our way down to the 12/31/97 incident, there

18  is a judgment of conviction which speaks to that conviction,

19  P-18.

20         The final incident at the bottom, November 14, 2002,

21  there is an arrest report and to read a passage from page

22  three of P-12, the Newark P.D. incident report, "The units

23  were traveling northbound on South 17th Street when we

24  observed an individual standing in front of 788 South 17th

25  Street.  This individual was holding in his hands what looked

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6383

1  like a stick.  We got closer to the location.  The black stick

2  looked like a black sword.  We exited our vehicles, we asked

Page 150

3   the individual what he was holding.  He stated it was a stun

4   gun that he keeps with him for protection."

5           He was convicted -- judgment of conviction evidencing

6   that conviction is P-11.

7           The last thing is P-17, again, which we will redact

8   and not read from the redacted portion.  P-17 is speaking to

9   the incident on 12/31/97.

10          The charge of conviction was possession of a weapon

11  by a convicted felon in violation of New Jersey statute

12  2C:39-7.

13          Summary of the offense is as follows:  "On 12/31/97,

14  officers of unit 412 were dispatched to a 637 (assault in

15  progress call).  Upon the officers arrival, they observed the

16  defendant insert a black gun in his waistband area and jumped

17  into a 1994 black Cadillac, New Jersey registration RYE 617T.

18  The vehicle fled the scene south on North Munn, then made a

19  right onto Mountain View.  The vehicle then proceeded to

20  travel west, making a right on Chelsea Avenue.

21          "The officers attempted to pull the vehicle over by

22  using their lights and siren.  The officer pulled the vehicle

23  over at 50 Chelsea Avenue and told the defendant to exit the

24  vehicle over the PA system.  Defendant shut off the vehicle,

25  exited the vehicle.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6384

1           "Officers noticed a black handgun sticking out of the

2   defendant's left jacket pocket, which later turned out to be a

3   green Dell Ink 22 magnum automatic handgun.  The weapon

4   contained a clip of 29 hollow point bullets."

Page 151

5          I just have to check the documents, that may be it.

6          THE COURT:   All right.

7          Do you have anything further?

8          MR. MINISH:  Just one second, Judge.

9          There is a legal issue we need to resolve with some

10  documents, but there's nothing we need for the jury.  We can

11  resolve this with your Honor and rest first thing in the

12  morning.

13          THE COURT:   You don't have any further evidence

14  other than what it is you need to discuss with me?

15          MR. MINISH:  Subject to your Honor's ruling, we just

16  may have another document or two going in.

17          THE COURT:   That's it for the Government's

18  presentation?

19          MR. MINISH:  Subject to that, yes.

20          THE COURT:   Fine.

21          We'll break for the day, folks.

22          Would you mind taking that down?

23          MR. MINISH:  Yes.

24          THE COURT:   You are excused for the day and we'll

25  get started tomorrow as soon as close to 9:15, 9:30 as we can.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.


                                   6385


1          As I have been instructing you throughout, again now

2  more than ever, it's important that you keep an open mind, do

3  not begin formulating an opinion as to what your decision is

4  going to be here until you've heard everything, including all

5  of the evidence, arguments and final legal instructions.

6          Don't discuss the case with each other, don't discuss

                        Page 152

7  the case with anybody outside this courtroom nor should you

8  permit anyone to discuss it with you and please, do not come

9  into contact with any newspaper articles, magazines,

10 television shows or movies that touch upon the subject matter

11 of this case in any way.

12        That being said, you're excused.  Travel safely,

13 we'll see you tomorrow.

14

15

16

17

18

19

20

21

22

23

24

25


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                              6386


1         THE CLERK:   All rise.

2         (Jury is excused and the following takes place out of

3  the presence of the jury.)

4         THE COURT:   Have a seat everybody.

5         While we're waiting for the jury to collect

6  themselves, I would ask you, counsel, to start thinking about

7  a verdict form.  If you can give me a draft of a form, I would

8  appreciate it.

                        Page 153

9          The record ought to reflect I had a conversation with

10   counsel about excusing alternate juror number five, who is 65,

11   45, who had a request based on his daughter's graduation in

12   North Carolina.  I understand there's been no objection to me

13   excusing him, so I have told him, based on that conversation,

14   that he's free to leave at the end of the day today.  Okay.

15          MR. HERMAN:   Okay.

16          MR. FRAZER:   One brief application when the jury is

17   gone.

18          THE COURT:   Let's let the jury go and we'll deal

19   with it.  We can talk about whatever it is, this problem is.

20          MR. FRAZER:   Okay.

21          THE COURT:   Fine.

22          MR. FRAZER:   We resolved the documents.  We're not

23   going to actually introduce them for our case in chief so that

24   issue is resolved.

25          The application I had to do with the videotape.  I

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

6387

1    understand your Honor's already made a ruling.  Here's the

2    issue.  It's a discovery issue actually.

3          The Government has not been provided with any notes

4    of the, I don't know if it's a social worker, some term that

5    counsel used yesterday, but the woman in the video is some

6    type of social worker I imagine.

7          We don't know exactly who she is or anything like

8    that.  There's two applications.

9          First is the notes which were clear in the video that

10   she was -- she had, I think we're entitled to.  We're

11 obviously not allowed to cross-examine, I don't want to say

12 not allowed, we consented to the fact that it was a

13 seven-year-old girl, we're not allowed to cross-examine and

14 that's fine.

15         We are entitled to discovery as to anything to do

16 with the creation of that videotape, because we can't combat

17 it otherwise.

18         I would ask for any notes of the social worker.

19         I would also ask, Judge, the Government is

20 contemplating calling that person as a witness on rebuttal.

21 We would ask that the defense give us her information and make

22 her available.  Because of the short notice that we have, we

23 can try to subpoena her but obviously basically tomorrow,

24 maybe Thursday morning and they have control over her.

25         She was hired by the defense I imagine, so we would


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                          6388


1 ask that she be available Thursday morning or late tomorrow

2 afternoon, depending on the Court's schedule because we may

3 call her to rebut some of the things in that tape.  She

4 created the tape, Judge, obviously.  We should be entitled to

5 question her about the tape.

6         MR. HERMAN:   Fine.

7         THE COURT:   All right.

8         Make her available tomorrow?

9         MR. HERMAN:   We will.

10         THE COURT:   What is her name?

11         MR. HERMAN:   Her name is Lois Nardone.

12         THE COURT:   Miss Nardone.

                    Page 155

13          MR. FRAZER:  I'm not trying to inconvenience anybody.

14          THE COURT:    Have her here tomorrow, we'll give you

15  an opportunity to speak to her and see where we go.

16          And the notes, I assume, we can get.

17          MR. HERMAN:  I'll ask her if she has any notes.  The

18  notes of the conversation with the seven-year-old?

19          MR. FRAZER:  Any notes that she created in relation

20  to the conversation with the seven-year-old.

21          MR. HERMAN:  Okay.  Absolutely.

22          THE COURT:    Okay.

23          Thank you.

24          THE CLERK:    All rise.

25          (Trial adjourned until Wednesday morning, May 9,


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, TRENTON, N.J.

                                          6389


1  2007, at 9:30 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

                        Page 156

15

16

17

18

19

20

21

22

23

24

25

JOANNE M. CARUSO, CSR, CRR, OFFICIAL COURT REPORTER, TRENTON, N.J.