IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DISVISION

FILED
AUG 12 2008
U.S.
WEST DISTRICT
OF MISSOURI
SM

UNITED STATES OF AMERICA,          )
                                   )   No. 05-06002
                    Plaintiff,     )
                                   )
                                   )
                                   )
                                   )   October 4, 2007
                                   )
                                   )        Criminal
LISA MONTGOMERY,                   )
                                   )
                    Defendant.     )


TRANSCRIPT ON APPEAL

VOLUME III
(Pages 435 thru 644)


BEFORE THE HONORABLE GARY A. FENNER

UNITED STATES DISTRICT JUDGE.


A P P E A R A N C E S:


For the Plaintiff:                 Mr. Matt Whitworth
                                   Ms. Roseann Ketchmark
                                   Ms. Cynthia Cordes
                                   Assistant U. S. Attorneys
                                   400 East 9th Street
                                   Kansas City, Mo. 64106


For the Defendant:                 Mr. Fred Duchardt
                                   Duchardt & Walker
                                   110 East 6th Street
                                   Kearney, Missouri 64060

                                   Mr. John O'Connor
                                   Wagstaff & Cartmell
                                   4740 Grand Ave.
                                   Kansas City, Mo. 64112

Mr. Dave Owen
Assistant Federal Public
Defender
818 Grand Ave.
Kansas City, Mo. 64106


ELIZABETH SHINN, BA, RPR
U. S. COURT REPORTER
400 EAST 9TH STREET,  ROOM 8435
KANSAS CITY, MO. 64106

# INDEX

| | Page |
|---|---|
| Opening Statement on behalf of Plaintiff | . . . 441 |
| Opening Statement on behalf of Defendant | . . . 474 |
| Plaintiff's Evidence | |
| ZEB STINNETT | |
| Direct Examination | . . . 495 |
| BECKY HARPER | |
| Direct Examination | . . . 512 |
| Cross Examination | . . . 523 |
| BEN ESPEY | |
| Direct Examination | . . . 524 |
| Cross Examination | . . . 541 |
| Redirect Examination | . . . 550 |
| STEVE WHITTINGTON | |
| Direct Examination | . . . 553 |
| Cross Exaination | . . . 558 |
| Redirect Examination | . . . 561 |
| MELISSA COFFELT | |
| Direct Examination | . . . 561 |
| RICHARD HOLMAN | |
| Direct Examination | . . . 570 |
| Cross Examination | . . . 581 |
| KATHY BRAND | |
| Direct Examination | . . . 582 |
| PAUL GATEWOOD | |
| Direct Examination | . . . 587 |
| Cross Examination | . . . 604 |
| Redirect Examination | . . . 610 |
| KATHLEEN HENTGES | |
| Direct Examination | . . . 610 |
| TERRY WHITE | |
| Direct Examination | . . . 617 |
| Cross Examination | . . . 624 |
| AMANDA WHITE | |
| Direct Examination | . . . 624 |
| DAVE MERRILL | |
| Direct Examination | . . . 629 |

E X H I B I T S

| Plaintiff's | Received |
|---|---|
| 1(a) & (b) | 499 |
| 1(c) | 499 |
| 1(d) | 501 |
| 1(e) & (f) | 503 |
| 8(f) | 519 |
| 2(a) | 521 |
| 3(b) | 527 |
| 3(c) & (d) | 528 |
| 3(e) | 529 |
| 3(f) & (g) | 530 |
| 3(g) thru (q) | 553 |
| 7(h) | 558 |
| 12(n) | 573 |
| 13(a) & (b) | 575 |
| 42(o),(v),(n),(p) | 577 |
| 14(e),(f),(g) | 583 |
| 14 (h) & (i) | 584 |
| 14(a) & (b) | 586 |
| 14(c) | 587 |
| 7(a)-1 thru 7(a)-8 | 592 |
| 7(b) thru 7(t) excluding (k) | 598 |
| 7(k) | 602 |
| 4(a),(c),8(a)(b)(c) | 618 |

| Defendant's | |
|---|---|
| 452 & 453 | 550 |

1    THE COURT:    Thank you.  You can be seated.

2  Okay, ready.  Do you have some record you want to make.

3    MR. DUCHARDT:  Actually nothing further.  I just

4  filed that so we would have something in the file for it.

5    THE COURT:  Yes, I think you can clearly talk

6  about intentional, knowingly, premeditated acts.  That's

7  pretty much the stuff other than the expert testimony that

8  is going to counter with.

9    MR. WHITWORTH:    All I am going to say on that

10  issue, like you said, this is the language I am going to

11  use, I don't want to do anything,  if the defendant puts on

12  evidence that she was insane at the time of the crime the

13  government will put on expert witnesses that will say she is

14  not insane and leave it at that, is that okay.

15    THE COURT:  Yes and your motion in limine is filed

16  as a matter of record and it's considered and denied to the

17  extent that I will allow Mr. Whitworth to make those

18  comments in his opening statement.   If he goes beyond that,

19   if you get beyond what I think you should I will let you

20  know.   I don't think you will.  You have an understanding of

21  that.

22    MR. WHITWORTH:    I am going to say witnesses

23  observed before and after the murder didn't notice any

24  unusual behavior or bizarre behavior.  I don't know that's

25  fundamental.

1      MR. DUCHARDT:   You are still allowing a
2 continuing objection.
3      THE COURT:   I allow you a continuing objection,
4 you don't have to renew your objection to any statements
5 relating to a response to a defense of mental insanity.
6      Okay, anything else you need to talk about before
7 we begin.
8      MR. DUCHARDT:   Don't think so.
9      THE COURT:   Okay, all right, thank you.
10      (PROCEEDINGS IN THE HEARING OF THE JURY).
11      THE COURT:   Just for the information of those of
12 you here in the gallery the jury is on the way up and as
13 soon as they come up and are settled we will begin with the
14 trial.   I have asked the marshals to not allow people to
15 come and go who elect to be in this courtroom other than
16 when the court is in recess.   I anticipate that we will be
17 in session this morning for probably about an hour and a
18 half before we take a break.   Those of you who are in here
19 at the beginning I ask that you stay in and that you not
20 come and go while the court is in session and that you only
21 exit the courtroom and return when we are in recess.   And I
22 think it goes without saying but out of an abundance of
23 caution, there is not to be any reaction from anyone in the
24 gallery to anything that takes place in the course of the
25 trial.

1          I don't want anyone showing any emotion towards

2    anything that takes place.  And anyone who feels that they

3    might not be able to comply with that directive should not

4    be present in the courtroom at a time when they feel they

5    might become emotional or might have some reaction to

6    something.   If anyone does react I will consider them to be

7    in contempt of my directive as I just stated.

8          I will be back as soon as the jury is up and ready

9    to go.

10                        RECESS

11         THE COURT:  Thank you.  You can be seated.  Ready

12   to proceed, Mr. Whitworth?

13         MR. WHITWORTH:   Yes, Your Honor.

14         THE COURT:   Mr. Duchardt.

15         MR. DUCHARDT:   Yes, sir.

16         THE COURT:  Bring the jury in, please.

17         MR. DUCHARDT:  While we are waiting could we

18   approach.

19         THE COURT:  Sure.

20         (PROCEEDINGS IN THE HEARING OF THE JURY)

21         MR. DUCHARDT:   I assume in light of your ruling

22   that any neuro-psychological testing that was done by the

23   prosecution is also out.

24         THE COURT:   Right.

25         MR. DUCHARDT:   Like Martell.

1    MR. WHITWORTH:    Those are psychological tests.

2    MR. DUCHARDT:  He also did neuro-psych testing.

3    MR. WHITWORTH:    That's the brain related

4    MR. DUCHARDT:   Right.

5    MR. WHITWORTH:  We will have to talk about that.

6    THE COURT:  Do you intend to present evidence to

7    show that pet scan, she has an abnormal brain.  Stay away

8    from the pet scan.

9    MR. DUCHARDT:   This all started with the

10   neuro-pysch testing, that's what I am assuming if it's out

11   for us it's out for them, too.   I am just raising the

12   issue.

13   MR. WHITWORTH:    We can talk about this later.

14   MR. DUCHARDT:    There is other testing he did I am

15   not arguing about.

16   THE COURT:  It's not going to be a problem in

17   opening statement.

18   MR. WHITWORTH:   I am not going to talk about

19   it.

20   (PROCEEDINGS IN THE HEARING OF THE JURY).

21   THE COURT:   Thank you.  Everyone can be seated.

22   Good morning, ladies and gentlemen.  I appreciate your being

23   here.  As I mentioned to you earlier in the week I know it's

24   inconvenient, to a certain extent a hardship, for all of you

25   to be here but we all appreciate your willingness to serve

1   in this case and your service is certainly important.

2          As you know, Mrs. Diefenbach, or Tracy, as you

3   will get to know her, through the course of this trial is my

4   contact person or the liaison with the jury.  We want to do

5   whatever we can to assist you, make you comfortable

6   throughout the course of this trial.  If you have any

7   problems or there is anything we can do to assist in that

8   regard please let Tracy know.

9          When you all come into the courtroom and exit the

10  courtroom, it's customary for everyone to stand in

11  recognition of our position in this matter.  As you come

12  into the courtroom and get to your seats as soon as you are

13  at your seat and ready to sit down you can go ahead and sit

14  down to your seats.

15          ladies and gentlemen, I have some preliminary

16  instructions in this case I want to read to you and then the

17  attorneys will have an opportunity to make opening

18  statements to outline what they anticipate the evidence will

19  be.  In order we can begin with that process I would like to

20  ask you all to now please stand and receive an oath from

21  Miss Diefenbach.

22          (The jury was sworn and the instructions were

23  read by the court.)

24

25

OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

MR. WHITWORTH:    Members of the jury.    The defendant, Lisa Montgomery, is charged with kidnapping resulting in the death of Bobbie Jo Stinnett.    The United States alleges the murder of Bobbie Jo Stinnett at the hands of the defendant occurred in Missouri.    The kidnapping occurred when this defendant cut the unborn eight month old child of Mrs. Stinnett out of her womb with an ordinary kitchen knife.    The defendant transported the stolen child from Skidmore across the state line to Melvern, Kansas on December 16, 2004.

Bobbie Jo Stinnett was 23 years old at the time of her death.    The events leading to these charges are as follows:

In December of 2004, nearly three years ago, Zeb and Bobbie Jo Stinnett were a young married couple living in Skidmore, Missouri.    Skidmore, Missouri is a town of less than five hundred residents up in northwest Missouri near Maryville.    Zeb worked at the Kawasaki Plant in Maryville as did Bobbie Jo.    She had gone on maternity leave shortly before the murder but she also bred and sold rat terrier dogs on the internet.

Zeb and Bobbie Jo had been high school sweethearts in Skidmore and decided to get married.    They were married in April of 2003 and you can see on the

1  photograph at a small church in Skidmore.

2        In around April or May of 2004 Bobbie Jo learned
3  she was going to have a baby.  Bobbie Jo was 22 years old at
4  the time she received this news.  They were, Bobbie Jo and
5  Zeb were very excited about their first child which was due
6  in January of 2005.  This photo was taken by Bobbie Jo as
7  she was looking into the mirror sometime in the fall of 2004
8  before she was murdered.

9        She began to spread the good news.  And one way
10  she did was to announce on a rat terrier web site message
11  board used by her friends in the dog breeding business.
12  This occurred in the summer of 2004.

13        Shortly thereafter the defendant also announced on
14  the same website that she was also pregnant with twins.
15  However, this was a false claim because the evidence will be
16  that the defendant following the birth of her fourth child
17  in 1990 while married to her first husband, Carl Boman,
18  could not get pregnant because she had undergone a voluntary
19  sterilization after the birth of her fourth child.  She
20  underwent a procedure known as tubal fulguration in which
21  the Fallopian tubes of the female are cauterized and they
22  can no longer have children.  This was her own voluntary
23  act.

24        The evidence will be that the defendant knew
25  Bobbie Jo Stinnett.  That is because the defendant was also

involved in the rat terrier dog breeding business. In fact,
the defendant and Bobbie Jo met at a dog show in Abilene in
April of 2004. In this photograph taken in Abilene, Kansas
on the far right is Zeb Stinnett. Standing next to Zeb
holding the dog is Bobbie Jo Stinnett. Her dog won first
place in that competition. On the far left is Kayla Boman,
the daughter of Lisa Montgomery. Standing next to Kayla on
the second to the left holding the dog is the defendant,
Lisa Montgomery.

Bobbie Jo shortly after this photo was taken
learned she was pregnant and announced on the web site. It
was shortly after that the defendant also announced she was
pregnant. In the weeks leading up to the December 16, 2004
Bobbie Jo continued to work in her dog breeding business out
of her home. She was also busily planning ahead for the
birth of her child. The child, which they decided to name
Victoria Jo Stinnett, was due on January 19, 2004.

Unbeknowst to Bobbie Jo three hours away in a
little town southwest of Kansas City called Melvern in
Kansas she was being targeted by the defendant. You see the
defendant who was in her second marriage with a man by the
name of Kevin Montgomery had been telling her husband,
family, friends, anyone who would listen, she was going to
have a baby.

This is not the first time she had falsely claimed

1  to be pregnant.  The evidence will be she and her husband
2  Kevin each have several children in their first marriage but
3  they didn't have any children together.

4        The evidence the defendant's marriage to Kevin
5  Montgomery was strained.  Finances were very tight.  And the
6  defendant's ex-husband was threatening and in fact had his
7  lawyer prepare a motion to have the custody of some of their
8  children changed from Lisa to him.

9        The evidence will be the battle over the children
10  had started to become quite bitter.  You will hear the
11  defendant was very concerned if she lost custody of her
12  children she would also lose her child support payments.  In
13  fact, just six days before the murder of Bobbie Jo Stinnett,
14  on December 10, 2004, Carl Boman had his attorney serve
15  papers on the defendant, a motion for change of custody to
16  have the children.

17        You see Carl Boman and his second wife were going
18  to expose the defendant's lies about being pregnant in court
19  in an effort to gain custody of the children, they had
20  threatened to do since October.  In fact, in a phone
21  conversation between the defendant and Carl Boman the night
22  before the murder of Bobbie Jo Stinnett the defendant told
23  Carl Boman I'll show you, I will prove you wrong, I'm
24  pregnant.

25        The evidence will be that the defendant actually

convinced her husband and teenage children she was expecting a child in December.

On December 17, 2004, while the defendant had apparently convinced her husband Kevin and her children, most of her other family members and friends did not believe her claims of pregnancy. You see on several occasions in the past she had falsely claimed to be pregnant and when no child was produced she would tell them she had a miscarriage. When people would comment about the fact she didn't look pregnant she would say all her babies were small. She would wear maternity clothes and she would say her babies were small.

The evidence will be that the defendant began to focus on Bobbie Jo Stinnett months before December 16 when the murder occurred.

The evidence will be about a week before Thursday, December 16, 2004 the defendant told her husband Kevin that her doctor had informed her they were going to induce labor. She told him they were going to do this on Friday, December 17, 2004. And truth in fact the evidence will be that the defendant had never visited any doctors for prenatal care because she knew all along she could not be pregnant. Her husband, who believed his wife, asked his boss at Acme Sign Company in Kansas City if he could have Friday, December 17th, off to be with his wife when labor

1  was induced.  The boss agreed.

2          The evidence will be the defendant was obsessed

3  coming up with a child to substantiate a false claim of

4  pregnant.  She spent a great deal of time on the computer

5  preparing for the birth of child.  She looked into the

6  possibility of adoption and a number of other ways to obtain

7  a baby.  She searched the web site on the internet learning

8  how to obtain a birthing kit.  She ordered a birthing kit

9  suitable for home birth.  She studied a great deal how to

10 perform a C. section birth.  She prepared a false sonogram

11 she printed off the computer, adding her name to the

12 sonogram and showed to members of her family and some

13 friends to try to substantiate her false claims of

14 pregnancy.

15         The evidence will be that at the same time the

16 defendant was learning how to perform a C. section birth of

17 a child on her computer she was also starting to do Map

18 Quest searches on her computer for directions to the home of

19 Zeb and Bobbie Stinnett, searches by the defendant for

20 information about Bobbie Jo Stinnett.  And you will hear a

21 great deal of evidence starting in the early summer of 2004

22 and intensified until the day of the murder.

23         Begining in late October the relationship between

24 the defendant and her ex-husband had continued to

25 deteriorate.  Between October 21st and November 17th Carl

Boman and his new wife Vanessa down in Oklahoma sent several
e-mails to the defendant's computer at her home in Melvern.
They informed her they were going to expose her lies about
being pregnant to the judge in their custody battle.  They
also told her they were going to have their attorney file a
motion for change of custody so that Carl would get custody
of the children.  They told her they were going to tell the
defendant's husband Kevin and the kids the defendant was
lieing and she could not be pregnant and she wasn't
pregnant.

On November 8th the defendant sent a message to
Bobbie Jo Stinnett on a web site message board asking her
when the baby was due.  Immediately thereafter she began
doing numerous internet searches looking for directions to
Bobbie Jo Stinnett's home in Skidmore.  On November 16th and
17th after receiving another e-mail from Carl and Vanessa
threatening to expose her lies about being pregnant to the
judge in their custody battle the defendant again began
doing a series of Map Quest searches on her computer looking
for directions to Bobbie Jo Stinnett's home in Skidmore.

The defendant also began visiting a series of web
sites on her computer that teach a viewer how to perform a
C. section birth of a baby.  You probably all know, but in
case you may not, a C. section birth of a baby is not a
natural child birth.  It's a procedure usually performed

when they're complications with the pregnancy where the physician takes a scalpel or knife and cuts the baby out of the mother's womb across the lower abdomen.

On November 16th the defendant also sent an e-mail to Bobbie Jo asking if she could get directions to her home under the pretense of wanting to mate their dogs. Bobbie Jo responded she was not interested and did not provide the defendant with directions to her home.

The defendant's C. section research and search for the defendant's home on the internet intensified up until the date of the murder. She also ordered a home birthing kit on the internet which was delivered to her home. You will hear a great deal of evidence focusing on this defendant's use of the computer. And the evidence will demonstrate to you this defendant spent a great deal of time planning this crime.

On the day before the murder, Wednesday, December 15th, 2004, the defendant drove up to northwest Missouri in her car. It was about a three hour drive from Melvern, Kansas to Skidmore, Missouri. The evidence will be that the defendant used her credit card to purchase gas in Maryville the day before the murder. Maryville is about twenty minutes away from Skidmore. We do not know if the defendant drove by Bobbie Jo's home that day, but we do know from Special Agent Lipanovich after the investigation was

underway he subpoenaed the phone records of the cell phone
the defendant was using that day and also the credit card
receipts, use of her credit card that day. And he will
testify about her movements on December 15th and 16th based
on a review of those records.

After returning home to Melvern on Wednesday
afternoon, on the 15th at approximately three P. M. the
defendant created a hot mail account on her computer for an
alias or false name of Darlene Fischer. The defendant using
the Darlene Fischer alias contacted a rat terrier breeder by
the name of Jason Dawson. The defendant knew Jason Dawson
and Bobbie Jo Stinnett and she figured that Jason Dawson
would direct her to Bobbie Jo Stinnett. In fact, that's
what happened. And you will see those exchanges on the
computer.

The defendant posed over the internet as Darlene
Fischer. She indicated she wanted to purchase a rat terrier
dog. Mr. Dawson referred Darlene Fischer to Bobbie Jo
Stinnett. And then the the defendant used an alias computer
account of Darlene Fischer to send an e-mail to Bonnie Jo
Stinnett.

The evidence later on in that day, on Wednesday
evening about 5:30 P. M. after she returned from northwest
Missouri the defendant sent a message to Bobbie Jo Stinnett.
In the message the defendant, again falsely identifying

herself as Darlene Fischer, wrote she lived in Fairfax, Missouri, which is a small town fairly close to Skidmore. Darlene Fischer wrote she was looking to purchase a rat terrier dog and would like to come to Bobbie Jo's home in Skidmore the following morning. Darlene Fischer also asked for directions to Bobbie Jo's home. An agreement was reached they would meet the following day, Thursday, December 16th.

The evidence will be the reason the defendant used the name of Darlene Fischer is because, as I mentioned earlier, Bobbie Jo had earlier rejected a a request by the defendant to come to Bobbie Jo's home in Skidmore and mate one of their dogs with one of Bobbie Jo's.

The evidence will also be the defendant didn't want anyone to know that she was having contact with the victim. So she created the false name of Darlene Fischer.

On the morning of Thursday, December 16th, Bobbie Jo awoke at about six A. M. She woke her husband Zeb up. Zeb left for his job at the Kawasaki plant in Maryville around six thirty in the morning. That was the last time he saw his wife alive. He put in a full day's work and clocked out of the Kawasaki plant at four P. M.

At the same time Zeb Stinnett was waking up that day about three hours away the defendant stopped at a Casey's general store in Kansas. Lyndon, Kansas is very

close to where the defendant lives, about a ten minute drive
from Melvern where she lived, over to Lyndon, Kansas. The
defendant worked part time at this Casey's store which is
about, as I mentioned, 15 minutes from Melvern. Cheryl
Fine, a coworker, will tell you the defendant purchased some
gas, some cigarettes and some oil for her car. She will
tell you the defendant appeared to be in some kind of pain
as she described it as labor pains. And she asked her
whether she thought she really ought to be going to Topeka
that day to go Christmas shopping which was the story the
defendant had given.

Miss Fine will tell you the defendant took
maternity leave from Casey's in November of 2004. However,
Miss Fine will tell you she never thought the defendant
looked pregnant even though she believed the defendant. She
said she didn't look pregnant to me.

Back in Skidmore, this is an aerial photograph of
Skidmore where Bobbie Jo and Zeb Stinnett lived. If you
will look, this house, second house at the end of the
street, this is Elm Street that goes east-west. West is in
that direction, north in that direction and south is this
direction. This is the home of Bobbie Jo and Zeb Stinnett
right here.

On December 16th, back in Skidmore Bobbie Jo went
about her business that day. We know about two thirty that

afternoon her mother, Becky Harper, who will testify, called
Bobbie Jo at her home. Bobbie Jo's mother worked at a
convenience store called Zumy Oil, a gas station and
convenience store about two blocks away, up the street on
Elm east from where Bobbie Jo and Zeb lived. During the
phone call at two thirty Mrs. Harper asked Bobbie Jo if she
could pick her up at work at the end of her shift at three
thirty P. M, an hour later, and take her to her home.
Bobbie Jo agreed to do that.

Mrs. Harper knew from a previous conversation with
her daughter that some lady was coming that day from Fairfax
to purchase a puppy from Bobby Jo. During the phone
conversation at two thirty Bobbie Jo terminated the
conversation by informing her mother they were here to look
at the dog. That was the last time that Becky Harper spoke
with her daughter.

At three thirty that afternoon, an hour later,
close to three thirty, three twenty five, somewhere in that
time period, when her work shift ended Mrs. Harper will tell
you there was no sign of Bobbie Jo at the store. She
thought this was odd because her daughter always picked her
up a little early where she would arrive early at her job to
take her home. She dialed Bobbie Jo's phone to see what was
up. And there was no answer except the answering machine.
she left a message on the answering machine. And since

1    Bobbie Jo hadn't come to pick her up she decided to walk
2    down the street a couple blocks.  It's a very short walk.
3    She knocked on the door, this is the home, the Stinnett
4    home.  She went up to the door, knocked on the door and
5    called out for her daughter.  There was no response.  Bobbie
6    Jo's mom entered her daughter's small home to find out what
7    was wrong.  As she entered the house she walked through the
8    front room which is kind of a living room connected to that.
9    Further back is a dining room and to the left there is a
10   room which is formally a bedroom.  And in that room she saw
11   a horrific sight, her daughter was lying on the floor, blood
12   was everywhere in that room.  She was bleeding profusely
13   from a large incision across the bottom of her abdomen.  She
14   was unconscious.

15        Mrs. Harper will tell you she was terrified.  She
16   thought her daughter's stomach had exploded and she
17   immediately called 911.  With the assistance of the 911
18   operator Mrs. Harper tried to perform C. P. R.  The 911 call
19   went to the Nodaway County Sheriff's department.  They were
20   giving her directions how to perform C. P. R. on her
21   daughter.  she was panicked.  You can imagine.

22        Sheriff Ben Espey, the Nodaway County Sherriff,
23   will tell you the 911 call from Becky Harper came in shortly
24   before three thirty P. M.  He drove as fast as he could to
25   Skidmore and got there in about 13, 14, 15 minutes.  Sheriff

Espey entered the home and tried to see if Mrs. Stinnett had a pulse. There was nothing. Nevertheless, he continued to administer C. P. R. as his training dictates until the ambulance crew arrived shortly thereafter and they took over.

Sheriff Espey will tell you he believed Bobbie Jo was dead the minute he walked in the door. He will tell you it was apparent Bobbie Jo's baby had been cut of out of her womb and he had never seen anything like it. Sheriff Espey will tell you based on the injury he observed on the victim, the fact there was blood spread out all over the room when he first arrived his belief there had been a violent struggle between Bobbie Jo and her assailant.

This is a photograph of that room, part of the room after the Bobbie Jo was removed. And you can see on the floor there is blood all over the floor. You will see additional photographs as the trial progresses.

Shortly thereafter Sheriff Espey made the decision to call in action the Northwest Missouri Major Case Squad. This is a task force made up of various law enforcement agencies. In this particular case the investigation was handled by the Nodaway County Sheriff's department, personnel from the Maryville Department of Public Safety, the Cameron police department, the St. Joseph police department, the Missouri state highway patrol and the

1   Federal Bureau of Investigation.  They were all called to
2   work and they quickly came together to try to work on this
3   case.
4           Their immediate investigation was to find the
5   baby.  The investigators quickly canvassed neighborhoods.
6   They started talking to neighbors to see if anybody had seen
7   anything.  Some of the neighbors had observed a small red
8   car that was dirty parked outside of the Stinnett home.
9   This was seen in the afternoon, about the time of the murder
10  of Bobbie Jo Stinnett.  However, nobody had seen anything
11  else of significance.  The investigators later learned the
12  defendant owned a small red Toyota.
13          The emergency room physician at the St. Mary's
14  Hospital in Maryville where Bobbie Jo had been taken after
15  she was removed from the scene declared her dead on
16  arrival.  They also confirmed an eight month old fetus had
17  been cut from her womb. The Jackson County Medical
18  Examiner's Office later determined, and this is a page from
19  the medical examiner's report, that the cause of death was
20  ligature strangulation.  She was strangled and the manner of
21  death was homicide.  The medical examiner found two sets of
22  ligature marks on Bobbie Jo Stinnett.  And you will see
23  pictures of those ligature marks.  The related injuries to
24  the body confirmed Bobbie Jo had been strangled.  She also
25  bled profusely.  She suffered a blow to the head as

1    indicated by a contusion on her right scalp.  She also
2    suffered a blow across the bridge of the nose with some kind
3    of object.  The medical examiner also noted a large incision
4    wound to the lower abdomen.  Also noted there were several
5    cuts on the fingers of Bobbie Jo Stinnett.  These were
6    consistent, consistent from cuts from a knife.  These types
7    of cuts are commonly known as defensive wounds in which
8    someone being attacked with a knife will try to thwart off
9    the attacker and they receive cut wounds on their hands and
10   arms.
11        Also noted was blood on the souls and feet of the
12   victim.  There is a photograph of Bobbie Jo Stinnett's
13   bloody foot.  You can see blood on the bottom of the foot.
14   There is another photograph indicating blood on the bottom
15   of the foot.  They also noted blood up between her toes.
16        You will hear testimony that this indicated to the
17   medical examiner at the time of her murder she was probably
18   still alife.  Because her feet were flat on the floor and
19   the blood was swished up between her toes.
20        Doctor Mary Case, long time medical examiner from
21   Saint Louis County, has been retained by our office and she
22   will tell you her opinion regarding the manner of Bobbie Jo
23   Stinnett's death.  Based on her review of the evidence
24   Doctor Case will testify Bobbie Jo was involved in a violent
25   struggle and most likely was still alife when her baby was

1    being cut from her abdomen.

2    Investigators quickly assembled to try to locate

3    the stolen child.  They learned from Becky Harper someone

4    had been there shortly before Miss Harper found her daughter

5    allegedly to purchase a puppy.  This unknown individual was

6    obviously a key suspect.  The investigators successfully

7    enacted an Amber alert to get the public alerted about the

8    disappearance of the child and the murder of Bobbie Jo

9    Stinnett.  They got this photo from her computer.  That's a

10   picture of Bobbie Jo Stinnett's computer she used to conduct

11   her business of breeding rat terrier dogs.  The

12   investigators started looking at that computer and trying to

13   trace her communications.  They learned that someone named

14   Darlene Fischer from the Fairfax area had arrived that day

15   to meet with Bobbie Jo.  Investigators immediately drove to

16   Fairfax to talk to authorities to see if there was anyone in

17   that area by the name of Darlene Fischer.  There wasn't

18   anyone by that name.  Then the investigators began to gather

19   the information necessary to trace the computer message

20   exchange and located the internet of the person identifying

21   herself as Darlene Fischer.

22   By Friday morning, December 17th, the

23   investigators obtained the necessary authority to conduct

24   computer searches.  Special Agent Kurt Lipanovich was able

25   to determine the computer message from Darlene Fischer to

Bobbie Jo had been sent from an internet computer registered
to the home of Kevin Montgomery in Melvern, Kansas.

About the same time investigators received an
anonymous tip from a caller who heard about the Amber
Alert. Made a phone call. This person who called in said
she knew Lisa Montgomery and informed law enforcement
authorities she believed the defendant could be involved in
the kidnapping and murder of Bobbie Jo Stinnett. She will
testify during this trial.

The evidence will be after this defendant murdered
Bobbie Jo Stinnett she put the baby in the car and drove
across the state line to Topeka, Kansas. She arrived at
Topeka. She went to the Long John Silver's restaurant in
Topeka and called her husband Kevin who by that time had
arrived home from work around six o'clock in the evening.
The Long John Silver's restaurant is located just across the
street from the Women's Birthing Center in Topeka. The
defendant falsely told her husband she had driven to Topeka
to do some Christmas shopping, had gone into labor and had
gone to the Women's Birthing Center and delivered her child
in Topeka. Authorities later checked and confirmed there
were no births at the Women's Birthing Center that day.

Amazingly Kevin Montgomery will tell you he
believed his wife's story. The defendant rode back to
Melvern. Her husband drove up with two of the kids from

Melvern to Topeka and they met the defendant at the Long
John Silver's restaurant. Lisa and the baby got in the
truck with Kevin and drove back. Two of Lisa's teenage
children drove her red Toyota back to their home in Melvern.

Upon arriving in Melvern Kevin and the defendant
began calling family, friends to announce the birth of the
child. Kevin's parents, Joy and Roger Montgomery, stopped
by to see the baby. Friends of the defendant stopped by to
see the baby. They took photos with their cameras which
were later seized by investigators. Here is a photo taken
that evening. On the left is the defendant. On the right
is Kevin Montgomery and Victoria Jo Stinnett is laying on
the couch in between them.

The defendant had made plans to name the baby
Abigail. In fact she began filling out birth announcements
which were later recovered by investigators. The next day,
Friday, December 17th, which was a cold day in December, the
defendant and Kevin awoke, dressed the baby, got in the car
and began to drive all over the Melvern and Lyndon area to
show off the baby. Went to the bank in Melvern, the Lyndon
State Bank in Melvern. They showed her to several employees
there. Went to the Whistle Stop Cafe, ate breakfast and
were the hit of the restaurant. They went to the Casey's
General Store where the defendant worked over in Lyndon,
about ten or fifteen minutes away, where she could show her

coworkers the new baby. They went to the Osage County
courthouse in Lyndon where they showed her off some more.

You will hear testimony from many witnesses
who saw and spoke with the defendant and her husband that
morning.  All of them will testify she was acting perfectly
rational.  She was able to carry on normal conversations and
there were no signs of bizarre behavior.  Some will testify
she appeared to be tired and acted as she was just sore from
childbirth.  Many will also testify they had become aware of
the Amber Alert on T. V.  In fact, several employees at the
Osage County courthouse will testify that they had heard
about the Amber Alert and they had never believed she was
pregnant in the first place and immediately began to be very
suspicious she was involved in the murder and theft of the
baby.  In fact, one of them went to the Osage County
sheriff's department to report her suspicions.

Meanwhile law enforcement authorities that were
involved in the investigation were closing in on the
defendant.  After receiving the anonymous tip and the fact
the computer had been traced back to the Montgomery home in
Melvern Detective Randy Strong and Detective Don Fritz
jumped in the car and began to drive down to see the baby.
Obviously everybody is trying to get the baby back.  By that
time the FBI was already on the scene and they were waiting,
three agents were waiting on the road outside the

defendant's home.  It was close to noon on the 17th of
December, the day after the murder.

Upon arrival Detectives Strong and Fritz met up
with the agents and they said, noticed outside of the home,
you can see the little driveway into the home.  They
observed a small dirty red Toyota that matched the
description of the car given by some of the neighbors up in
Skidmore.

Hoping to find the kidnapped child alive they
approached the Montgomery home and knocked on the door.  The
door was answered by the defendant's husband Kevin.  When
Kevin answered the door, are you here about the Amber
Alert.  Kevin allowed the investigators to enter.  And when
they stepped into the room the defendant was sitting on the
couch holding the baby.  Detective Strong informed the
defendant he was there to talk to her about the missing
baby.  The defendant first told Detective Strong she had the
baby at the Birthing Center in Topeka the day before.
Detective Strong then asked if one of the FBI agents,
Special Agent Tom Door could hold the baby.  The defendant
willingly gave up the child to Agent Door.  And once
Detective Strong felt satisfied the baby seemed to be okay
he asked the defendant if she would step outside to talk to
him.  The defendant stood up and walked, according to
Detective Strong, she walked through the door as if she was

1    in pain from having childbirth.  They went outside.

2    Detective Strong began to ask her questions.  Before he

3    started doing that, however, he advised her of her

4    constitutional rights.  You have all heard about Miranda

5    rights.  He read that form which is up on the screen telling

6    her her rights.  She signed it.  Sergeant Strong witnessed

7    it and Detective Fritz also witnessed it.  You can see it's

8    dated 12-17-04.  And the time of the interrogation was

9    eleven fifty six a.m.  I think it says P. M. but it would be

10   shortly before noon.  Detective Strong advised the defendant

11   of her rights.  When she agreed to waive those rights and be

12   questioned they began to ask questions of her.  Detective

13   Strong repeated the story, asked her questions about how had

14   she had this baby.  She repeated the story about the birth

15   in Topeka.

16        When Detective Strong began questioning her about

17   the story in detail she then changed it and said she lied to

18   her husband about the Women's Birthing Center and in fact

19   she actually delivered the baby in her home the day before

20   in order to save money.  She told the detective she had two

21   friends with her.  When Detective Strong asked for the name

22   of the friends, informed the defendant he would be checking

23   with the friends to corroborate her story, the defendant

24   then changed her story again and said her friends were not

25   with her, they were just on stand-by.

1    Detective Strong continued to question the

2  defendant about parts of the story until Kevin Montgomery's

3  parents pulled into the driveway.  When Kevin's parents, Joy

4  and Roger Montgomery, pulled into the driveway the

5  defendant's demeanor completely changed and she demanded

6  Detective Strong get out of there now.

7    The defendant agreed to be transported to a small

8  substation of the Osage County sheriff's department to

9  continue the interview.  Shortly after arriving at the

10  station the defendant told the detectives in the room you

11  have Bobbie Jo's baby.  The defendant then proceeded to

12  confess in detail about her crime.  She told the detectives

13  she had acted alone and that everything she had used in the

14  crime was still in her red Toyota back at the house.  She

15  stated she had taken a kitchen knife and white rope with her

16  in her coat pocket into the home when she went to meet with

17  Bobbie Jo.  She admitted she had purchased a home birthing

18  kit on the internet and she used materials from the kitchen

19  such as a suction ball and umbilical cord clamp to assist

20  her in taking the baby.

21    When the FBI later searched the defendant's red

22  Toyota they found all the evidence used in the commission of

23  murder and kidnapping.  This is a photograph of the rear of

24  the Toyota.  When they opened the trunk, when the

25  investigators opened the trunk in this bag, plastic trash

1    bag, they found a wealth of evidence.  They found the

2    defendant's coat, apparently blood stains all over the

3    front.  They found in the pocket of that coat a bloody

4    kitchen knife.  They also found in the bag a bloody rope

5    with hair entangled in it.  They also found a bloody towel

6    which was apparently used to clean up either herself or the

7    baby.  They found the umbilical cord of the Stinnett baby.

8    They found numerous items from the home birthing kit that

9    were apparently used to clean the baby.  They also found a

10   diaper bag, infant diaper bag, with baby formula and a

11   couple of diapers and other items used to care for a small

12   infant.  They also found a suction ball which those are used

13   to remove fluid from the baby's mouth, ears and nose when

14   they are first born.  And inside the car on a console they

15   found a sticky, I don't know what you call them, sticky

16   notepad with the address of Bobbie Jo Stinnett written out.

17         The defendant refused to provide the exact details

18   of exactly how she killed Bobbie Jo Stinnett but she

19   admitted she was in fact the killer and she had taken the

20   baby.  She then provided additional details about what she

21   had done when she left the Stinnett home.

22         You will hear all about the details of her

23   confession when Detective Strong testifies.  Later that same

24   day after initially denying she sent the e-mails claiming to

25   be Darlene Fischer she finally admitted to Special Agent

Scott Gentine from the Topeka office she was the one who
sent the false e-mails under the name of Darlene Fischer to
Bobbie Jo Stinnett.

You will also hear about other admissions she made
to Special Agent Gentine. The defendant, after confessing,
was transported from Lyndon up to the Kansas City FBI
headquarters up in town a few blocks away. Photographs were
taken of her at the time. These were taken right after the
arrest on December 17, 2004.

The defendant, the investigators had noticed
several injuries on her hands. You can see a close-up of
her hands here. She had covered up one of the injuries with
a band-aid. You can see there are many raw red marks on her
hands. You can see what one of our experts will testify is
consistent with a knife cut on her right finger. You can
see blood speckles on her finger, small finger.

They also scraped her fingernails for trace
evidence. The investigators scraped under her fingernails
and collected it and bagged it. They also noticed raw marks
across the palm of the defendant's hands, as you can see
there.

Later experts were able to determine that the
scrapings that came from underneath the defendant's
fingernails contained D. N. A. of the blood of Bobbie Jo
Stinnett. The hair that was found in the rope was later

1  examined by experts and determined to be the hair of Bobbie
2  Jo Stinnett.

3  Doctor Mary Case will testify that the injuries
4  to the defendant's hands were noteable and the cuts to the
5  fingers were consistent with the bloody knife that was found
6  in the defendant's coat pocket which was recovered from the
7  trunk of her car. Doctor Case will also testify the cuts on
8  Bobbie Jo Stinnett's fingers appeared to be consistent with
9  the knife found in the defendant's coat pocket. She will
10 also testify the raw red marks on the palms of defendant's
11 hands you just saw, you can see them across the palm of her
12 hands, were consistent with the bloody nylon rope found in
13 the trunk of her car.

14 The crime lab technicians also examined the
15 blood found on the knife and found that the blood on the
16 blade of the knife, the cutting portion, contained the
17 D. N. A. of Bobbie Jo Stinnett, the D. N. A. of the baby
18 from the placenta, that's Victoria Joe. On the handle of
19 the knife they found the D. N. A. of Bobbie Jo Stinnett,
20 trace D. N. A. which could possibly be from the baby and the
21 D. N. A. of the defendant most likely coming from the cuts
22 on her hands.

23 Later that day at FBI headquarters in Kansas City
24 Special Agent Mike Oyler approached the defendant and asked
25 her to sign a consent to search her computer which was

located in an upstairs bedroom of the defendant's home.  And
the FBI searched her home to gather evidence in the upstairs
portion.  Next to the baby nursery they found a computer the
defendant used.  It was the only computer in the home.  It
was also next to the defendant's bedroom.  When the
defendant was signing a waiver form she commented to Special
Agent Mike Oyler she realized the FBI would want to search
her computer so they could in her words understand what kind
of monster she was.

During the same interview the defendant
specifically mentioned she was upset because her ex-husband
had filed a motion for change of custody and she had been
served with the papers earlier that week.  She again
commented to Special Agent Oyler she had acted alone during
the commission of this crime.

The search of the defendant's computer provided an
incredible amount of evidence.  I have already described
some.  The computer evidence will demonstrate planning that
occurred in this case.  The defendant conducted website
searches of Bobbie Jo Stinnett's home in Skidmore.  She
exchanged several e-mails as early as a month before the
crime with her ex-husband Carl and his wife in which they
had threatened to expose her lies about being pregnant and
asked the court to change custody of the children from Lisa
to Carl, the effect of which would result the defendant

would lose her child support money and she was very
concerned about that.

The defendant searched for numerous sonogram
photographs on the internet.  I think you probably all know
this but in case some of you don't a sonogram is a
photograph of the baby in the mother's womb taken by doctors
to make sure the baby is okay before the birth.  The
defendant downloaded the photos, sonograms, and claimed to
others they were sonograms of her baby.  Here's one we found
on her computer and in her house.  She had one on her photo
bucket and sent the link of the sonogram over the internet
to her friends so they could look at her baby and share with
her and her good news.  She downloaded another sonogram from
the internet and changed the name from the real mother to
her own name.  In this photograph you can see a photograph
the defendant went to a web site, web site of a woman by the
name of Carrie Thornton.  She had put a sonogram of her baby
on the web site so people, friends could share with her in
the joy of her forthcoming pregnancy.  You can see in the
lower left-hand corner Carrie Thornton.  The defendant
apparently changed the name of that to her name as you can
see on the right, Lisa.  Downloaded it to show everybody
that she was pregnant.

The defendant made a multitude of false claims on
the internet about being pregnant.  She would post on web

site message boards and e-mails she would send to friends.
She studied in great detail how to perform a C. section of
the birth of a child by visiting a web site that teaches
someone how to perform a C. section procedure.

You will see all that. This is just one
photograph from one of those many websites she visited and
you can see the photograph on the left shows how to, where
the incision should be made.

In addition, investigators found on her computer
the messages she sent using the false name of Darlene
Fischer in order to trick Bobbie Jo Stinnett into meeting
with her. These were recovered and you can see, I will just
show real quickly here a few. I won't show you all. We
don't have time. This is the web site, the Rat Terrier
Breeder. You can see a message for Happy Haven Farms.
Happy Haven Farms was Bobbie Jo Stinnett's web site. She
would conduct her dog breeding business from Darlene Fischer
on December 15, 2004, 2:00 P. M. Bobbie Jo replied, and
you will see the text of those later, on December 15th, 2004
at seven forty four P. M. Shortly thereafter the defendant
sent an e-mail to Bobbie Jo. This is an e-mail from Darlene
Fischer to Bobbie Jo Stinnett and it reads as follows:
Bobbie, I just spoke online with Jason Dawson. He highly
recommended you. We are looking for a puppy to show for 4-H
in the summer for my daughter. I understand that rat

terriers are highly intelligent, willing to please. This

would be a for a pet and would be altered as 4-H does not

dintinguish as other shows do. Jason said you had several

puppies we might be able to choose from. I am highly in

favor from pictures, referring to pictures on Bobbie Jo's

web site, of your red female. However, I would like to at

least see them all in order to see which one's tempermanent

is more suitable for our family. I am located just outside

of Fairfax, Missouri and understand you are close by

somewhere near Maryville. Signed Darlene.

Bobbie Jo replied. Darlene, here's the driving

directions to West Elm Street from Fairfax. We live almost

clear at the west end of Elm Street in a little bitty house

on the south side of the road. The directions have you

coming DD highway, so you would take a right at the gas

station, a three-way stop onto West Elm. We are the second

to last house on left side of the road. There should be a

green Ford Expedition parked in front of our house. we are

the house in between the red privacy fence and the brick

front house. My mom works at the gas station should you

need some additional help finding us. And then she provided

on this, click on this and it gives you directions you can

follow to get to Bobbie Jo's home. By using trickery the

defendant was able to get the directions she had been

seeking to get to Bobbie Jo Stinnett's house.

Investigators also searched the computer and found the defendant had in fact ordered a home birthing kit which she used on the baby after she cut the Stinnett baby from Bobbie Jo's womb with the kitchen knife.

You also heard evidence the defendant tried to delete internet history and e-mails before the investigators arrived with computer experts who were able to obtain the deleted items from her hard drive.

Folks, you can hit delete on the computer but it doesn't really get deleted, it goes to the hard drive where it can be found later by trained investigators. That is what was done in this case. The defendant began deleting her internet history showing visits to all the C. section web sites and the Map Quest searches to Bobbie Jo Stinnett's. This began on December 13th, three days before the murder. It continued until December 16th.

After December 13th she selectively deleted e-mails deleting anything that was incriminating and leaving the rest.

You also heard the defendant's home was searched. A great deal of incriminating evidence was recovered during the search of the home. The agents found the remainder of the home birthing kit that was ordered. The items from the kit that were missing when they looked into it were found in the trunk in that trash bag. They also found a fully

equipped baby nursery in the upstairs portion of home.  And
most significantly they found the motion for the change of
custody which had been served on the defendant just on
December 10th.  That is a formal pleading filed in Osage
County District court by Carl Boman's attorney asking for
change of custody.  The hearing was set for the 25th day of
January, 2005.  The defendant was under a lot of pressure at
that time.  And what you are going to hear during the course
of this trial is the defendant was very concerned about
losing her child support money.  You will hear a great deal
of evidence about that.  All of the witnesses who are around
the defendant both in the days before and following this
brutal crime will testify she appeared to be acting normal
to them.  She could carry on conversations that made sense
and none observed any signs of what could be called bizarre
behavior.

The day after the murder she and Kevin drove to
four or five destinations to show off their baby as I
already told you about.  Witnesses who spoke with the
defendant that day will tell you she acted a bit tired but
was quite proud and acted as if that baby were her own.  If
the defendant's mental health experts testify she was insane
at the time of the crime the government will call experts
who examined the defendant and they will testify she was not
insane at the time of the crime.

1    The evidence in this case, members of the jury,

2 will be this defendant had falsely claimed to be pregnant.

3 She knew she wasn't pregnant.  And she was desperate to find

4 a baby in order to save face.

5    The evidence will be she targeted Bobbie Jo

6 Stinnett months in advance and she had planned to murder

7 Bobbie Jo and abduct her unborn child.  This defendant,

8 acting alone, strangled Bobbie Jo Stinnett with a braid rope

9 found in her trunk.

10    The evidence will be the bloody kitchen knife

11 found in the pocket of this defendant's coat in the trunk of

12 her car was the knife used to cut Bobbie Jo Stinnett's baby

13 out of her womb.

14    Members of the jury, there is a lot of evidence in

15 this case and you get to hear and see all of it.  You have

16 been very attentive this morning.  I thank you for that and

17 that concludes our opening statement.

18    THE COURT:  All right, ladies and gentlemen, we

19 are going to recess and we will go by the clock at the back

20 of the courtroom.  So it's eleven minutes after ten.  We

21 will be in recess until ten thirty.  You can go into the

22 jury room.  You can stay around there.  If you want to go

23 in the room and stretch your legs that's fine as well I just

24 ask you be back in the jury room at ten thirty and ask you

25 to keep in mind the instruction I have given you previously

1    throughout the course of the entire trial.

2          I will remind you you are not allowed to discuss

3    this case with anyone else, you are not to read, view or

4    listen to any media report of the case.  And you are not to

5    do any research on any issues in the case.   If anyone

6    should happen to attempt to approach you about this case you

7    are to let me know about that through Miss Diefenbach

8    immediately.  We will be in recess until ten thirty.  Please

9    be back in the jury room at that time.

10          (The jury leaves the courtroom.)

11          THE COURT:  I take it you are going to give an

12    opening statement.

13          MR. DUCHARDT:  Yes,  if we can kind of clear the

14    easel because I will be needing it.

15                        RECESS

16          THE COURT:  Thank you.  You can be seated.

17    Ready, Mr. Duchardt

18          MR. DUCHARDT:  Yes, sir.

19          THE COURT:  Thank you.  Everyone can be seated.

20    And, Mr. Duchardt, you may proceed with your opening

21    statement.

22          OPENING STATEMENT ON BEHALF OF THE DEFENDANT

23          MR. DUCHARDT:  Good morning.  It turns out we are

24    all such fragile beings.  When we are young we kind of think

25    we are strong, we can beat the world and stuff like that.

1   That the life we all live tells us differently, shows us how

2   fragile we are.

3         Bobbie Jo Stinnett was that kind of strong yet

4   fragile creature, fragile human being.  And you know what,

5   she never expected what was going to happen to her to happen

6   to her.  The government described to you in their opening

7   statement the tragic set of events and you already know from

8   my talking to each of you during the jury selection process

9   we are not denying Lisa's involvement.  You have already

10  heard about statements she made.  We will talk about that a

11  little bit now but you will hear from her, she admitted her

12  involvement.

13        So what you have heard and what you will hear from

14  the government is the what happened, the where happened, the

15  how it happened, the who was involved.  What you are not

16  going to hear from them is the why it happened, give a

17  little glimmer of attempted explanation.  But it's going to

18  be up to us to talk to you about the why.  And the why has

19  an awful lot to do with another fragile creature, fragile

20  human being, Lisa Montgomery.

21        In order to understand about how and why we got

22  here, let me talk to you for awhile about how and why Lisa

23  got to the place there on December the 16th, 2004.  Lisa was

24  born on February the 27th of 1968 in the State of

25  Washington.  Her mother Judy was married to a man John who

was in the military, stationed in Vietnam. At the time
John already had another daughter Diane, not by Judy. They
would later have another child Patty while living in
Washington. But as what happened with so many men in
Vietnam, John came back totally scared by the experience,
with post traumatic stress disorder to such an extent he was
afraid he was going to hurt his own children.

So he left the family. Basically then left Judy,
Lisa's mother, with three girls, one not her own. The one
who was not her own was given up to adoption and then began
what ended up being a really chaotic childhood that Lisa
then led with her mother.

From Washington the family goes to St. George,
Kansas, then to Colorado Springs, Colorado; to Topeka,
Kansas; to Rossville, Kansas; Ogden, Kansas; Tulsa,
Oklahoma; Modesto, California; San Antonio, Texas; Sperry,
Oklahoma and then Cleveland, Oklahoma. Along that path of
moving, moving, moving, Lisa's mother Judy took up with a
married name by the name of Jack Kleiner. Jack had three
children of his own by a previous marriage but left that
marriage, moved in with and married Judy. They then had
three children of their own, Jerry Jo, Teddy and Tom.

Jack Kleiner was a drunk. Jack Kleiner was
abusive. Jack Kleiner spent the early part of Lisa's
childhood with him from about age four terrorizing her and

terrorizing her sister Patty. He would come home, get
drunk, get angry if they hadn't done chores the way he
thought they were supposed to be done. He would send them
to the bathroom, make them strip down naked, bend over the
bathtub and inflict beatings on a regular basis. You will
hear about those beatings, how often they were, how harsh
they were, how degrading they were from Lisa's sister Patty
who shared in the brunt of all of that along with her.

You will hear from Jack Kleiner's daughters from
his previous marriage. They by this time were teenagers but
they would come into the house at times and they would hear
what was going on. They would see what was going on. They
would see these little girls shaking in terror. So you will
hear from Penny Craig, Jackie Moffett, and Becky Perky,
those daughters of Jack Kleiner, to confirm what we are
telling you about the kind of brutal things that were going
on to these children.

You will also hear what all too predictively next
happened, when you have got a grown man making young little
girls strip down to accept punishment. You will hear about
that man then starting to fondle Lisa at about age 12. Then
you will hear about years, literally years of this man
raping that girl from thirteen to fourteen to fifteen to
sixteen, all happening in a little town called Sperry,
Oklahoma. In Sperry, Oklahoma Kleiner had his family in a

1  trailer house which he then added an extra room on for Lisa
2  to be in so he could have his way with her just that much
3  more easily for himself.  And it went on day after day after
4  week after month after year, this girl being raped by this
5  man.

6  Just before Lisa's sixteenth birthday her mother
7  caught Jack in the act with Lisa and her mother made it
8  possible for Jack to leave.  But Jack came back, not that
9  long afterwards and stayed again for another several months
10 until about Memorial Day weekend when Jack struck Patty hard
11 and Judy packed up all five of the children and moved in
12 with another man who she would eventually marry, a man by
13 the name of Richard Boman.

14 Judy shortly after moving out from Jack filed for
15 divorce but never, never reported the years of raping of
16 Lisa to the proper authorities.  In fact, it never came out
17 on the record of any proceedings until the divorce
18 proceedings.  And Judy was confronted why, why didn't you
19 take this to the authorities.  Her answer was Jack had
20 begged her to keep him from being prosecuted and Judy didn't
21 want her children to suffer humiliation, not Lisa, she
22 didn't want the three children by Jack, the three young
23 children, to suffer the humiliation of having to be known as
24 someone who had a sister who had been raped.

25 What happened to Lisa went unprosecuted.  What

1  happened to Lisa got her three visits with a counselor just
2  before the divorce happened and nothing more.  Well, Jack in
3  the divorce proceedings, as many abusers like him, denied
4  having done any of this.  And you will actually hear
5  testimony from the same Jack Kleiner, now an old man.  This
6  is now twenty five years ago all this happened.  This old
7  man is still going to be denying under oath the abuse he
8  meted, physical and sexual.

9         The trouble is that at the time when he was moved
10 out from the household the first time he went looking for a
11 place to stay to a friend of his by the name of Lewis
12 Priest, and you will hear from Mr. Priest by way of a video
13 deposition in the case.  Mr. Priest died this summer.  We
14 took his deposition just before he passed away of cancer.
15 And he will tell you that Jack Kleiner right at the time
16 that Judy caught him with Lisa came to him looking for a
17 place to stay and said to him I did this.

18        You will also hear from Teddy Kleiner, Lisa's half
19 brother, Jack's son, about how Jack has bragged to him and
20 others in the years since then how he got away with raping
21 Lisa.  So you will be able to judge whether you believe Jack
22 Kleiner's continued denials of the abuse, of the rapes.

23        If it stopped right there in terms of the abuse it
24 would be horrific enough but what you are also going to hear
25 is that Lisa then suffered emotional abuse steeped on top of

that. And the emotional abuse came from her own mother,
Judy, who then took to telling people in the community Lisa
stole my man away from me. This fourteen, fifteen, sixteen
year old child telling Lisa had stolen Jack away from her,
broken up her marriage. Judy will testify, she will deny
saying that, but we will have a string of people to come in
and tell you just that, including the man who Lisa would
first marry, Carl Boman.

Now the interesting thing about all of is that
Carl Boman was Richard Boman's son. Remember I told you
when Judy moved the kids out from Jack Kleiner she moved in
with a guy by the name of Richard Boman. Well, Richard
Boman is Carl Boman's father. Carl had been in the Navy and
what Carl did was he came back home after leave and here's
this young girl living with his father and his stepmother.

Lisa through all of this was a wonderful student,
very bookish. She got herself lost from the abuse she was
suffering in her books. She would read. She would get away
by being able to read. She had planned to go into the Air
Force. The family was too poor to send her to college, that
way she had hoped to earn her way through working in the Air
Force to being able to go to college.

She was enlisted to go, but all of that changed
when she became pregnant by Carl. When she became pregnant
by Carl that then set her on her own odyssey. Before we go

on that odyssey what happened then is something that happens all too often and especially 20, 30 years ago when a person with true abuse does not get the kind of mental health treatment they truly need at the time.

Now after-the-fact we know and we will present the experts to you who find what you have got to be figuring already that at the time Lisa was suffering from her own post traumatic stress disorder that was going completely untreated at this time and she was building her life on this completely unstable foundation.

And not surprising from the background of chaos Lisa came from, her life after that patterns that same kind of chaos. Thus began what happened with Lisa mirrors what her mother had done. She moved in with Carl in Hominey, Oklahoma then to Cleveland, Oklahoma, then to Chula Vista, California; San Diego, California; El Cahone, California; Bartlesville, Oklahoma; Springdale, Arkansas, back to Bartlesville, to Deming, New Mexico, to Topeka, Kansas. Back to Bartlesville. Back to Kansas, Topeka and finally to Melvern, Kansas.

Early on in Lisa's Odyssey she had four stair-step children with Carl. The first was Desiree, born in 1987. She's now 19 When Lisa was 19; chelsea in 1988 when Lisa was 20. C. J. Carl, Junior, in 1989 when Lisa was 21 and Kayla in 1999, I am sorry in 1990, when Lisa was just 22,

stair steps, one after the other.  The pressure on her, four children so close together was the pressure that would have been on anyone.  It was tremendous.

The interesting thing as you are going to hear and see all of those four children, four really wonderful children, now respectfully 20, 19, 18 and 17.  You will see what fine people they have turned out to be, you will see that even though Lisa was battling her own problems.

You will hear from her husband, former husband Carl, that no matter what Lisa was and no matter what problems he had with her himself, she never did anything but show those children love.  And it's obvious by the way those children have turned out.  Carl will tell you the same.

On top of these pressures you are going to hear about two critical events.  The first happens right after Lisa gives birth to Kayla, her last child.  Kayla was two and a half months premature.  Lisa had great difficulty carrying the baby.  All of her children had been small.  She never really gained that much weight for any of the children.  She had had difficulties being able to carry the children to term.  She would even get to the point toward the end of the pregnancy she would try to help the pregnancy along by things like taking Caster Oil to try to help herself go into labor because it was difficult for her to carry the children.  She wanted the children very badly.

But she also wanted at the end of the pregnancies for them
to be overwith and to have those babies. But in this last
pregnancy it was particularly hard. And after having Kayla
premature, after going through the heartache of her being in
the hospital for so long but thriving and doing well, the
decision was made for Lisa to have what is commonly called a
hysterectomy, Mr. Whitworth accurately described it a tubal
fulguration, basically a procedure whereby the tubes are
cauterized to be able to keep the eggs from traveling down
the Fallopian tubes. She had that procedure just a few
months after Kayla was born. It's a decision that you are
going to find from the evidence she always regretted -- and
regretted in a strong sort of way that we will talk about.

Some years after that, particularly in 1994,
another critical event happened. Lisa and Carl were on the
rocks, their relationship had really hit a very difficult
place and Lisa was living apart from Carl. Carl's father
and Lisa's mother were still together at the time, were
living in California. Carl arranged for the kids to come to
California with him to spend the summer. Lisa had custody.
In cahoots with Judy, Lisa's mother, Carl decided to try to
keep the kids despite the court order. Lisa went to
retrieve the kids in California. And Judy in a very public
display took the kids away from Lisa, strong-armed her and
took the kids back to her place, enrolling them in her

school.

You are going to find that was an incredibly traumatic experience for Lisa believing she was going to lose those children.  It all came out.  She ended up getting the children back.  She and Carl reconciled and ended up moving to Arkansas.  But in the meantime something happened.  The first sign of Lisa's ability to cope was cracking.  Lisa, while she was away from Carl, had an affair with another man.  When they moved to Arkansas Lisa began telling people she was pregnant and then eventually told people she had lost the baby.  Carl knew this wasn't true. But Carl, despite knowing it wasn't true, did not confront Lisa about that.  He didn't look to get her mental health help.  She didn't look to get mental health help.  She thought she was telling what was happening to her, but Carl didn't and he will tell you why, said things were going well again.  He loved his children.  He wanted to be with them. He did not want to rock the boat. So he didn't.  And you have the first of what would then be an increasing number of incidents with Lisa where she believes she is pregnant but is not.

What the experts refer to this condition as is pseudocyesis.  It's called a somatic form disorder because it basically is a disease of the mind which impacts on the body.  It's a false belief of being pregnant that is

associated with objective signs of pregnancy. Basically
what happens is the mind deludes the body into believing
it's pregnant and literally the woman gains weight,
literally the woman's breasts enlarge, even start leaking at
times. All of the physical symptoms of pregnancy are going
but there is no baby. That's because the hormones that are
in the brain trigger other hormones in the body to produce
the very signs of pregnancy. This is exactly what happened
to Lisa there in 1994 and, as we will see, repeatedly then
after that.

But the important thing about pseudocyesis is to
understand it's a false belief. It's false. You could even
say I guess it's a lie if you are talking in those kinds of
terms but the person, the woman, does not believe it's a
lie. Believes it's true. And what happens is that this
delusion of the mind deludes the body which then deludes the
mind further. And it all comes down to a body that just has
a mind with a burning desire to have a child. So you are
starting to see the lie. Pseudocyesis is not something that
is new. We have what is called a Hippocratic oath all of
our doctors take, do no harm, a long list of things said.
Hippocrates was a Greek physician back around four B. C. He
came up with the Hippocratic oath. He is also the first
doctor to describe pseudocyesis. And pseudocyesis is, of
course, defined in the Diagnostic Statistical Manual, IVth

1    Edition.  It is a somatic form disorder.

2           What happens next.  Well, what happens next is

3    that Lisa, once she was away from Carl finally, which didn't

4    happen for another few years, began a relationship with a

5    man by the name of Kevin Montgomery.  And what Kevin brought

6    to Lisa's life was at least moving stability.  She didn't

7    move anymore.  They got to Kansas and it's one of the first

8    times she actually was in one place for an extended period

9    in her life.  But along with that came new stressors,

10   different stressors.  There came the stress of having to

11   deal with supporting not only her children who were with her

12   but also Kevin's children who were with their mother but

13   Kevin owed child support.  So there were problems with

14   finances.

15          What Lisa did to deal with that she would work

16   multiple jobs, three jobs at a time.  You will see Lisa's

17   social security statement about the regular work that she

18   did throughout her life, mostly at low-paying, minimum wage

19   jobs but consistently employed throughout her life.  Around

20   this time she's with Kevin, 2001, 2002, 2003 and ultimately

21   2004 she got to the point where she was working three jobs

22   at a time trying to help the family make ends meet.

23          The difficulty was that Carl Boman was not

24   regularly paying child support.  So he was behind regularly

25   on the child support and had quite an arrearage by the time

2004 happened. So finances were difficult. Raising four
children was difficult. Dealing with the stresses just of a
marriage was difficult and all on top of the mental illness
that Lisa had.

What then compounded was that Carl Boman also
remarried to a lady named Vanessa. She and Lisa were like
oil and water. Carl will tell you about that. It was very
difficult. He actually, when Vanessa wasn't around, didn't
have much problem getting along with Lisa. When Vanessa was
around it was a completely story. Vanessa hated Lisa.
Likewise Lorie Colwell, Kevin's ex-wife, hated Lisa. The
pressure on all of that was another part of the pressure.

Then we come into 2002, 2003. Lisa announced she
was pregnant. People saw her, believed she was pregnant.
Of course, she wasn't. But the signs of her pregnancy,
Kevin saw her abdomen getting bigger. He saw the things she
was doing and the way she was acting, consistent with a
woman being pregnant. He assumed the pregnancy was going
on. It wasn't. But Lisa kept telling him she was pregnant.
She kept appearing pregnant but eventually got to the point
where the pregnancy ended in her mind with a still birth.

You will find out there was no still birth. But
Lisa was creating in her mind the delusion of the pregnancy.
The delusion then carried forward to the ending of that
pregnancy with a false story of the baby being born dead and

1    then being donated to science.

2           Judy, Lisa's mother, she's never really been out

3    of the picture.  She has still been telling people all over

4    the place that Lisa stole her man away from her.  The story

5    is still going.  She will deny it, but the story is still

6    going.  She finds out about this 2003 pregnancy.  She was

7    there when the tubal fulguration happened.  She knows Lisa

8    can't be pregnant.  Does she take Lisa by the hand and say,

9    Lisa, you need help.  Let's go get you help.  You can't be

10   pregnant.  Let's do something.  Let's work together.  No,

11   she goes to Lisa's father-in-law and mother-in-law and says

12   Lisa is a liar, don't believe her.  She's lieing.  Then she

13   teams up with Carl who loves his children, he wants them

14   back, but he's also got a tremendous by this time back child

15   support debt he owes to those children and so wants those

16   children.  And so in cahoots with Judy rather than trying to

17   help Lisa he found a way and filed papers trying to get

18   those children, accusing her of making up pregnancies.

19   Because at that point Lisa was making up pregnancy and it

20   started in April of 2004.  What Lisa believed so strongly in

21   her mind and in her body was she was pregnant.  She took a

22   pregnancy test in April of 2004 and told Kevin, her husband,

23   that it was positive.  He did not see it.  But she took the

24   test, told him she was pregnant.  Told all kinds of people

25   about the pregnancy.

1    And as the months went by you will hear from all
2 of the people who saw Lisa's body and knew in their own
3 minds that Lisa was pregnant.  You will hear from Kevin, her
4 husband.  You will hear from Desiree and Chelsea, her
5 daughters, who both saw their mother with her shirt off and
6 were convinced because of the size of her body she was
7 pregnant.  You will hear from Lisa's friends, Lisa Green,
8 Jenny Hays, Rick Malone, Mona Marcotte, all of these people
9 working with and being around Lisa at this time.  They were
10 convinced she was pregnant because of the way she looked,
11 the way she acted.  Because pseudocyesis tricks the body
12 into looking to all the world as if you are pregnant.  She
13 bought maternity clothes.  She prepared a nursery.  She got
14 on websites and looked up things like Cesarean sections,
15 like home birthing.

16    At the same time Lisa was engrossed in another
17 kind of birth, little puppy dogs.  She got herself started
18 on breeding rat terrier dogs.  Getting those babies even
19 faster to deal with and to play with and to love by dealing
20 with the animals.  She actually was getting good at it in
21 terms of the breeding.  But now you have her working three
22 jobs, taking care of four children, trying to take care of a
23 household.  Having to deal with a mother who is incessantly
24 telling stories on her that would embarrass anyone that, of
25 course, aren't true.  Dealing with all of these people from

her ex-husband and his wife to her husband's ex-wife but also traveling the country going to dog shows, showing these dogs, preparing these dogs, birthing these dogs, taking care of these dogs, the dogs feeding a need she had and yet taking the time and the effort from her.

At this point we are now to the time when the perfect storm happens. We are in December of 2004. What you will hear from the evidence is that Lisa was on those web sites looking for things, talking to people about how she is pregnant, talking to people who are into home birthing, getting advice from them about home birthing, all the while believing she's pregnant.

Then through this whole dog situation Lisa's daughter Kayla gets involved in the showing of the dogs with Lisa, gets very interested in that, builds up her own relationship with some of these dog breeders and actually prevails upon her mom to let her live with one of these dog breeders down in Alabama so they can learn about these things. But before that happened Lisa and Kayla, that daughter, had a falling out, had a falling out over a dog that Lisa had given away, a little reddish-colored puppy, Kayla was mad about that, didn't want Lisa to do that but did and gave it to another breader by the name of Jason Dawson.

Lisa wanted to get another dog like that that,

looked like that dog to help Kayla. Enter Bobbie Jo
Stinnett, also pregnant but really pregnant. Breeding the
dogs. Lisa found out that Bobbie Jo had a little red puppy.
You will see in the evidence Lisa wanted that puppy for
Kayla. So she made arrangements through a fake name to meet
with Bobbie Jo to see that puppy.

What you are going to find out is that Lisa went
up there on the 15th of December and then again on the 16th
and she arrived at Bobbie Jo's house at about twelve
thirty. We know that because the neighbors actually were
home for lunch from work and saw the car in the driveway
about twelve thirty.

We also know from Bobbie Jo's mother talking to
Bobbie Jo at about two thirty that Lisa was still there and
they were still talking after that two hour period. It was
an hour later that Bobbie Jo's mother found Bobbie Jo.

What the evidence will show you that Lisa went for
the puppy and that something horrible went after that.
In order to understand all of this we are going to bring to
you two medical doctors well known in their field, Doctor
William Logan is a medical doctor in psychiatry and
practices here in Kansas City. We will also bring to you
Doctor Vilamer Ramachandran. Dr. Ramachandran is a medical
doctor who specializes in brain study and is one of the most
widely-published authors in the world on the subject of

1 pseudocyesis.

2 What these doctors will explain to you, help you
3 to try to understand, is the why, why these lies as the
4 government wants to refer to them, why these untruths about
5 everything that was happening. Lisa, as Mr. Whitworth put
6 it, was under pressure at the time that all this happened.
7 He is so right. But under the pressures we have talked
8 about he indicated, the evidence will show that Lisa was
9 worried about the money. The evidence will show that Lisa
10 was not getting money from Carl Boman. That was part of her
11 problem.

12 Losing the custody of the children to Carl Boman
13 was not an economic issue. It was a pseudocyesis issue.
14 Here are those children being taken away from her again,
15 just like in 1994. You will hear evidence she was trying to
16 cope with it. She talked to C. J. about the possibility of
17 him moving with his dad. She talked with each of the kids.
18 She loved them and she knew their dad loved them. Inside of
19 her the pseudocyesis was crying. That's what Doctor
20 Ramachandran will explain for you. Inside of her the need
21 for the babies was crying and everywhere it was being
22 stripped away from her. The pressure of losing her own
23 children again like she had in 1994. The pressure of a baby
24 that was supposed to be coming to term in her own body
25 wasn't there.

What Doctor Ramachandran and Doctor Logan will
tell you is that in this condition of pseudocyesis a person
may look on the outside as somewhat normal but for heavens
sake they are thinking they are pregnant when they are not.
And as they will explain to you the obvious there isn't
anything normal about that.  And so what happens is that the
person goes back and forth in this state and so they may do
some things that are consistent with one thing like dog
breeding.  They then do some things that are consistent with
taking care of their pregnancy like finding home birthing
kits.  Like looking at the issues of Cesarean section.  Like
looking at ways of giving birth in different areas.  And yet
what is going on is that the delusion is taking them further
and further and further away from reality.  And that's what
Doctors Logan and Ramachandran will tell you they believe,
to a reasonable degree of medical certainty, happened at the
time that all of this happened in Skidmore.

You will hear from a lot of experts as Mr.
Whitworth has previewd.  You will not only hear from doctors
on our side you will hear from doctors on their side.  What
you will have to do is listen to what those doctors are
saying, why they are basing their opinions on what they
are.  And think of the question why, why did these things
happen.  Why did Lisa react the way she did at the times she
did.

What Doctors Ramachandran and Logan will explain
to you is the only thing that makes any sense in any of this
is pseudocyesis on top of the post traumatic stress disorder
that Lisa had putting her into a place where she could not
know and appreciate the nature, quality and wrongfulness of
her conduct, going from a two hour conversation with Bobbie
Jo about puppies to what happened.

What you will also hear in the evidence is about
deletions of e-mails like Mr. Whitworth was talking about.
But what you will find out is that e-mails, internet history
and all of that on Lisa's computer indicated what she was
doing, how she was feeding the pseudocyesis in her. But it
will also show you that when internet history and e-mails
are deleted, as Mr. Whitworth said, they are not gone off
the computer. But also the way things were deleted on
Lisa's computer were erratic. There were some things left
about Bobbie Jo Stinnett. There were some things erased.
But there is nothing consistent with Lisa having tried to
erase everything about Bobbie Jo Stinnett off her computer.

What we ask for you folks to do is listen to the
experts and ask that question why, if not pseudocyesis then
why would this woman who worked throughout her life, who
raised four good, strong, loving children, who never had a
criminal conviction, who was liked and loved by the vast
majority of people who came across her path, who felt she

1    was quirky but very, very nice.  How do you go from that

2    person who was hated by some like the ex-wife of her husband

3    but loved by so many, many more.  Hated by her mother for

4    the Jack Kleiner thing but loved by so many, many, many,

5    many.  How do you go from that person to what happened

6    here.

7            We ask you to listen to it and we will later ask

8    you to understand and believe it by clear and convincing

9    evidence the reason is pseudocyesis.  I thank you for your

10   time.  I thank you for what you are about to do in listening

11   to this evidence.  We will be back to talk to you later

12   about all of these things.

13           Thank you, Your Honor

14           THE COURT:  Mr. Whitworth, ready for your first

15   witness.

16           MR. WHITWORTH:   Yes, the United States calls Zeb

17   Stinnett.

18                    PLAINTIFF'S EVIDENCE

19                      ZEB STINNETT,

20   having been sworn, testified:

21                    DIRECT-EXAMINATION

22   BY MR. WHITWORTH:

23       Q    Sir, Would you state your name for the court and

24   jury, please.

25       A    Zebulon James Stinnett.

1       Q   Now, sir, where do you currently live.  I

2  currently live in Maitland, Missouri.

3       Q   How old are you?

4       A   I am 26.

5       Q   You are the husband, were the husband of Bobbie Jo

6  Stinnett, correct?

7       A   Yes.

8       Q   How old were you when you all got married?

9       A   I was 24.

10      Q   Where do you currently work?

11      A.   Kawasaki Motors.

12      Q   Is in that Maryville?

13      A   Yes.

14      Q   Did you work there back in December of 2004?

15      A   Yes.

16      Q   Had Bobbie Jo been working there?

17      A   Yes.

18      Q   Did she take maternity leave some time?

19      A.   Yes, closer into the end of her pregnancy she took

20  maternity leave.  Her back was starting to hurt.

21      Q   Where did you grow up?

22      A   I grew up in the Skidmore-Maitland area.

23      Q   When did you meet Bobbie Jo?

24      A.   I met her in high school, towards the end of my

25  senior year and her junior year.

1    Q    Did you know her before that as an acquaintance.

2    A    Yes, just, you know, like walking down -- you

3    know, going through the school and gatherings outside of

4    school and stuff like that we would see each other and say

5    hi.

6    Q    You were a year ahead of her in class.

7    A    Yes.

8    Q    When did you all start dating?

9    A    Started dating at the end of my senior year, that

10   summer, and then she got into high school, her senior year.

11   Q    When you graduated from high school did you start

12   working?

13   A    Yes.

14   Q    Did you and Bobbie Jo continue to date?

15   A    Yes.

16   Q    At some point in time did you start talking about

17   perhaps getting married?

18   A    Yes, she started to push a little bit on that and

19   you know women, but, yes, she started to hint about that and

20   it sounded interesting to me, too.  We were really

21   comfortable with each other and, you know, we could stand

22   each other, I guess.

23   Q    So you got married in April of 2003, correct?

24   A    Yes.

25   Q    Did you live in Skidmore?

1     A     I lived outside of Skidmore when we got engaged.

2   When we started to propose we were going to get married we

3   decided to get a house and move into Skidmore.

4     Q     Show you Government's Exhibit 1 A. is that a

5   photograph of the house you and Bobbie Jo lived in?

6     A     Yes.

7     Q     That's where you lived in when you first got

8   married?

9     A     Yes.

10          MR. WHITWORTH:   Your Honor, we offer Government's

11  Exhibit 1(a).

12          MR. DUCHARDT:   No objection.

13          THE COURT:  Received.

14     (PAINTIFF'S EXHIBIT 1(a) WAS RECEIVED IN EVIDENCE.)

15     Q     And did you get married in Skidmore?

16     A     Yes.

17     Q     What church did you get married at?

18     A     We got married at the Christian Church right

19  across the block.  I could see it right out the front door.

20     Q     Just across the street?

21     A     Yes, just right across the street from our house.

22     Q.    Showing you Government's Exhibit 1(b).

23          MR. WHITWORTH:  Your Honor, we offer 1(b).

24          MR. DUCHARDT:   No objection, Your Honor.

25          THE COURT:  Received.

1    (PLAINTIFF'S EXHIBIT 1(b) WAS RECEIVED IN EVIDENCE)

2    Q    Is that a photograph of you and Bobbie Jo at your

3    wedding in April of 2003?

4    A    Yes.

5    Q    And that was a happy day in your life?

6    A    Yes, of course.

7    Q    When did Bobbie Jo find out she was going to have

8    a baby?

9    A    We found out, it was around April.

10    Q.    Of 2004?

11    A    2004

12    Q.    Was she excited?

13    A.    Oh, yes.

14    Q    Were you?

15    A    Yes, I was excited, too.

16    Q    Showing you Government's Exhibit 1(c), is that a

17    photograph of Bobbie Jo taken of her when she was pregnant?

18    A    Yes

19    MR. WHITWORTH:    Your Honor, we offer in evidence

20    Government's Exhibit 1(c).

21    MR. DUCHARDT:    No objection.

22    THE COURT:  Received.

23    (PLAINTIFF'S EXHIBIT 1(c) WAS RECEIVED IN EVIDENCE.)

24    Q    When was the baby due?

25    A.    The baby was due in January.

1    Q    And did you have a name picked out?

2    A    We were still kind of tossing around names a

3    little bit but she was really interested in Victoria Jo.

4    Q    Now about that period of time after you got

5    married and about the time, let me just ask you, when did

6    Bobbie Jo get interested in breeding rat terrier dogs?

7    A    I really don't know when she really wanted to get

8    into it but she has always been interested in animals her

9    whole life and it was something she always wanted to do, I

10   think.  She really started breeding them, I believe, it was

11   about -- I don't remember.

12   Q    That's all right.  It's not important.  She did

13   get involved in the rat terrier breeding business, correct?

14   A    Yes.

15   Q    She even started her own website?

16   A    Yes.

17   Q    What was it called?

18   A.   Happy Haven Farms.

19   Q    Tell the jury a little bit about what she did in

20   that business?

21   A    Her Happy Haven Farms business she loved to give

22   them advice on how she thought breeding a mate so you have

23   more of a dog or you can have a breeding dog.  She liked

24   getting new advice from people from what they thought.  She

25   always posted pictures of how her puppies are coming along.

1    She kept informed of other breeders and, you know, just she
2    always wanted to know what other people had to say.  And she
3    always loved to give information is why she had the site
4    pretty much.

5         Q    Did you sell dogs for money?
6         A    Yes, just pretty much how much it cost to raise
7    them what she started out, what she sold them for.

8         Q    Did you also get involved with her a little bit on
9    that?

10        A    I was starting to get into it really good, yes.

11        Q    Would you attend dog shows?

12        A    Yes.

13        Q    Do you remember attending a dog show in April,
14   2004 in Abilene, Kansas?

15        A    Yes

16        Q.   Mr. Stinnett,  if you would look at the photograph
17   1(D), Exhibit 1(D), that is a photograph that was taken at
18   the dog show in Abilene, Kansas in April of 2004?

19        A    Yes

20             MR. WHITWORTH:   Your Honor, we offer in evidence
21   Government's Exhibit 1(d).

22             MR. DUCHARDT:  No objection.

23             THE COURT:  Received.

24        (PLAINTIFF'S EXHIBIT 1(d) WAS RECEIVED IN EVIDENCE.)

25        Q    Do you remember that dog show?

1          A     Yes, it was cold.

2          Q     Do you remember I guess Bobbie obviously won first

3    place in competition, is that correct?

4          A     Yes.

5          Q     Do you remember meeting Lisa Montgomery at that

6    dog show?

7          A     Yes.

8          Q     What can you remember about it?

9          A     Apparently she kept to herself a little bit.  She

10   seemed kind of self-absorbed, I guess.

11         Q     Now what do you mean when you say that?

12         A     She seemed like she had to be better than

13   everybody else.

14         Q     Now, was it shortly after this dog show in Abilene

15   you found out she was pregnant?

16         A     Yes.

17         Q     And she was excited, correct?

18         A     Yes.

19         Q     And when, I think I have already asked you but

20   when was the baby due again?

21         A     The baby was due in January.

22         Q     Of 2005?

23         A     2005, yes.

24         Q     Did Bobbie Jo keep calendars there at the house?

25         A     Yes.

Q     And show you Government's 1(e) and 1(f), are these the calendars she kept?

A     Yes.

MR. WHITWORTH:  Your Honor, we offer in evidence 1(e) and 1(f).

MR. DUCHARDT:   No objection, Your Honor.

THE COURT:  Received.

(PLAINTIFF'S EXHIBITS 1(e) AND 1(f) WERE RECEIVED IN EVIDENCE)

Q     I want to show you just a few entries in this. 2004.  You see the date, the year and the month.  Is the Abilene dog show on Saturday and Sunday, April 10th and 11th?

A     Yes.

Q     And did you all celebrate your first, was this your first anniversary on the 26th?

A     Yes.

Q     And I note throughout this calendar a number of entries her going to doctor visits?

A     Yes.

Q     Pre-natal care?

A.     Yes.

Q     Did you go to some of those with her?

A     Yes.

Q     Did she get regular care --

1    A    Yes.

2    Q    From her doctors.  I believe they're notations of

3  that throughout this calendar, is that right?

4    A    That is correct.

5    Q    On December 4th, did Bobbie Jo celebrate her 23rd

6  birthday.

7    A    We just went out to eat and she wanted to keep it

8  kind of subtle because she was pregnant, pretty big, didn't

9  really want to do a whole lot but yes.

10    Q    When Bobbie quit working at the Kawasaki plant

11  around November, 2004 what did she start doing during the

12  daytime?

13    A    Clean the house, taking care of puppies, visit

14  with her mom at the gas station there.  Go on breaks with

15  her.  Bring food home and just typical I guess you would

16  call housewife stuff.

17    Q    Do you recall Bobbie Jo ever talking about Lisa

18  Montgomery?

19    A    Yes, she did speak of her.

20    Q    What did she say?

21    A    She said that she was claiming she was pregnant

22  again and everybody was saying it's false and, you know.

23    Q    Talk about other dog breeders and that type of

24  thing?

25    A    Yes.

1    Q    Was there some kind of disagreement between Lisa

2    Montgomery and some of the other dog breeders you were aware

3    of?

4    A    They were always having spats about her --

5    MR. DUCHARDT:    Excuse me.    I am sorry to

6    interrupt.    May we approach.

7    THE COURT:    Yes.

8    (PROCEEDINGS OUTSIDE THE HEARING OF THE JURY)

9    MR. DUCHARDT:    I would be interested in his

10   theory.    This is not just hearsay, about three times

11   removed.

12   MR. WHITWORTH:    Well, there is a specific rule of

13   evidence that says if a defendant has procured the absence

14   of declarant it's not hearsay it's admissible.

15   MR. DUCHARDT:    That is not talking about things

16   of her knowledge.    This is hearsay on top of hearsay.    This

17   is her talking about what other people had supposedly said.

18   Her statements are admissible.    Hearsay upon hearsay is not

19   admissible even under that exception.

20   THE COURT:    I have kind of lost what your question

21   was, but I think you can ask him if Bobbie Jo expressed

22   concern about Lisa and what the concern was.

23   MR. DUCHARDT:    But he specifically then is going

24   to elicit what other people were supposedly saying to Bobbie

25   Jo about Lisa.

1    THE COURT:  I don't know what he's going to elicit
2    but he can ask what Bobbie Jo said and it's kind of hard.  I
3    don't track him with his questions but I will try to keep
4    him on track.

5    MR. WHITWORTH:   I will try, too.

6    THE COURT:  Thank you.  The objection is
7    overruled.

8    MR. DUCHARDT:   May I have a continuing objection.

9    THE COURT:  Yes.

10    (PROCEEDINGS IN THE HEARING OF THE JURY).

11    Q.   Was there some sort of disagreement between Lisa
12    Montgomery and some of the other dog breeders you were aware
13    of?

14    A    Yes, they were having disagreements about how to
15    breed their dogs and stuff like that.

16    Q    Do you remember December 15, 2004, the day before
17    your wife was murdered?

18    A    Yes.

19    Q    Tell us what happened that day?

20    A    That day I came home as usual.  And one of my
21    friends was wanting to go out for a little bit so we went
22    out.  And by the time I get home, which was probably around
23    eight o'clock or so, Bobbie was saying that she was chatting
24    on the message board and there was a lady interested in one
25    of our dogs and she was wanting to come over that next

morning to look at them. And she said that she was asking about what kind of dogs they were, if they were for breeding or if they were for show. And Bobbie said they are not for breeding. They are not for show. They are just, you know, pets, they are going to be home pets. And she said that the lady that was trying to contact Bobbie said she wasn't interested in showing the dog she just wanted the dog to give to her child to prance around the house and practice with before they got a show pet.

Q    Did she mention the lady's name?

A.   She said it was Darlene Fischer.

Q.   Did she say where Darlene Fischer claimed to live?

A.   Yes, she said she lived in Fairfax.

Q    She told you this the evening of December 15th?

A    Yes.

Q    Did you go to bed later that night?

A    Yes.

Q    What happened the next morning?

A    The next morning Bobbie was trying to push me out of bed because the alarm was going off and I didn't want to get out of bed. And that was about six twenty, six twenty five. Finally I get out of bed and I tell her I say, well, you are going to have to get up anyway, you have that lady coming over around eight o'clock to come look at that dog. And she said she knew. And I got my stuff ready for work

1    and I told her bye and got in my car and that's the last I

2    saw of her.

3         Q    You talked to her during the day at all than on

4    the phone?

5         A    No.

6         Q    That was the last time you ever saw her?

7         A    Yes.

8         Q    Did you put in a full day's work?

9         A    Yes, I had a little overtime, too.

10        Q    How long does it take to get from your home in

11   Melvern to Skidmore?

12        A    It's about a 20, 25 minute drive.

13        Q    When was the first time you learned something was

14   wrong?

15        A    It would have been when I was coming out of work

16   at four o'clock, my mom was parked by my car and she said

17   that something had happened and we had to go to the hospital.

18        Q    Did she tell you what had happened?

19        A    No, she wasn't sure what happened either.

20        Q    Were you concerned?

21        A    Yes.

22        Q    What did you do next?

23        A    I went ahead and got in my car and I headed up to

24   the hospital.

25        Q    What happened when you got there, what did you

learn?

A    When I got to the hospital they didn't tell me anything because they didn't really know what was going on either. But after awhile I got a call from Ben Espey, the sheriff.

Q    At the hospital are you all right, at the hospital did they let you see Bobbie?

A    Yes.

Q    What did you learn from Sheriff Espey. Are you okay. Did you find out from Sheriff Espey that the baby was gone?

A    Yes.

Q    And what was your reaction?

A    I was concerned.

Q    Did you learn how it happened?

A    Yes.

Q    After you got that bad news do you remember what you did the rest of the evening?

A    No, I -- I think I was just in shock. I don't remember.

Q    Well, now, shifting topics a little bit. In your home you had there on Elm Street did you all have an answering machine on your phone?

A    Yes.

Q    And when somebody would call your house to leave a

1    message if you were in the house and didn't answer the phone
2    did you hear what the person was saying?

3        A    Yes.

4        Q    After the message was left.  In other words, the
5    caller would call,  if you didn't want to pick it up and
6    answer they would leave a message and you could hear what
7    they were saying?

8        A    Yes.

9        Q    That way you didn't have to answer the phone if
10   you didn't want to.

11       A    Yes.

12       Q    When the message would be left what would happen
13   to the phone?

14       A    The number of callers who left a message would
15   show and it would also blink.

16       Q    A flashing light?

17       A    Yes.

18       Q    Did you go back to your home that night?

19       A    No.

20       Q    When is the next time you went back?

21       A    It wouldn't have been until around April of '05.

22       Q    Just couldn't bring yourself to go back?

23       A    Yes.

24       Q    I want to show you an entry of January, 2005
25   calendar.  Victoria due on January 19, 2005.

1    A    Yes.

2    Q.   The baby was taken about a month prematurely, is

3    that correct?

4    A    Yes.

5    Q    Do you remember what happened the next day, on

6    Friday the 17th?

7    A    I had a lot of family coming over to support me.

8    Pretty much just wondering where my baby was.

9    Q    Were you scared?

10   A    Very scared, yes.

11   Q    When did you find out they found your child?

12   A    As soon as they confirmed that, the FBI confirmed

13   they found the child and that she was okay, they let me know

14   they were going to the hospital with her.

15   Q    The hospital in Topeka?

16   A    Yes.

17   Q    Did you drive over there?

18   A    Yes.

19   Q.   Who was with you?

20   A.   My mother and mother-in-law.

21   Q    When you got there did you get to see your baby?

22   A    Yes.

23   Q    And was she okay?

24   A    Yes.

25   Q    How old is she now?

1    A.    She's almost three now.

2    Q    Have you tried to explain to her yet what happened

3 to her mother?

4    A    No.

5         MR. WHITWORTH:    That's all I have, Your Honor.

6         MR. DUCHARDT:    We have no questions.    Thank you,

7 sir.

8         THE COURT:    Thank you, Mr. Stinnett.

9         THE WITNESS:    Thank you, Your Honor

10        MR. WHITWORTH:    The United States calls Becky

11 Harper.

12                        BECKY HARPER,

13 Having been sworn, testified:

14                        DIRECT-EXAMINATION

15 BY MR. WHITWORTH:

16    Q    Miss Harper, if you would kind of lean forward and

17 speak into the microphone it would help everybody hear what

18 you have to say.

19         Would you state your name for the jury.

20    A    Becky Harper.

21    Q    Where are you employed?

22    A    Sumy Oil Company in Skidmore, Missouri.

23    Q    Do you also live in Skidmore?

24    A    Yes.

25    Q    Did you live there in 2004?

```
1        A    Yes.

2        Q    You are the mother of Bobbie Jo Stinnett, correct?

3        A    Yes.

4        Q    Where did Bobbie Jo grow up?

5        A    In Skidmore.

6        Q    Where did she attend high school?

7        A    In Skidmore, Maitland.

8        Q    How long have you known Zeb Stinnett?

9        A.   Probably all his life.

10       Q    Do you remember when Bobbie Jo and Zeb began

11   dating?

12       A    Probably in high school.

13       Q    What did Bobbie Jo start doing after high school?

14       A    She worked at Hy-Vee and then she worked at Earl

15   Mays and then she was at Kawasaki.

16       Q    They were married in April of 2003, is that

17   right?

18       A    Yes.

19       Q    That was a happy occasion, no doubt.

20       A    Yes.

21       Q    Do you remember when Bobbie Jo got pregnant.

22       A    Yes.

23       Q    When was it?

24       A    Somewhere around April of 2004.

25       Q    Was she excited?
```

```
 1        A    Yes.

 2        Q    Were you?

 3        A    Yes.

 4        Q    This going to be your first grandchild?

 5        A    Yes.

 6        Q    Do you remember when her due date was?

 7        A    January 19th, 2005.

 8        Q    Did she work at Kawasaki that fall?

 9        A.   Yes.

10        Q    Did she also have a dog breeding business?

11        A    Yes.

12        Q    Do you remember her taking maternity leave in

13   early December?

14        A    Yes.

15        Q    Did you all spend quite a bit of time together?

16        A    Yeah, about every day.

17        Q    Do you remember in, the day before Bobbie Jo, you

18   found Bobbie Jo, the 15th, Wednesday?

19        A    Yes.

20        Q    Do you remember when it happened that day?

21        A    I went to work and Bobbie Jo came, or she came to

22   our house and Tyler was in school, she followed me to

23   Maryville.

24        Q    Who is Tyler?

25        A    My son.
```

1      Q     Bobbie Jo's brother?

2      A.    She followed me to Maryville so I could get my

3   pickup fixed and brought me back home.

4      Q     What happened next?

5      A     We stayed at her house and ate super and cleaned

6   the house a little bit and she was on the internet.

7      Q     Do you know what she was doing on the internet?

8      A     Talking to someone about dogs.

9      Q     Do you know who it was, did she give you a name?

10     A     I don't remember a name.  I just remember being

11  from Fairfax.

12     Q     What was going to happen?

13     A     They were supposed to come the next day and look

14  at the puppies.

15     Q     Do you remember anything else that Bobbie Jo told

16  you about that meeting or that discussion, anything else you

17  can recall?

18     A     No.

19     Q     So did you go home that night?

20     A     Yes.

21     Q     By the way, how old is Tyler?

22     A      He's 13 now.

23     Q     About ten back then?

24     A     Yes.

25     Q     And do you remember seeing Zeb that night?

1     A     Yes.

2     Q     He came home when you were there?

3     A     He was there when we got back from Maryville.

4     Q     After you went home that night what happened the
5 next day?

6     A     I went to work and then --

7     Q     What time did you go to work?

8     A     About eight o'clock.

9     Q     The Sumy Oil Company, how far is that away from
10 Zeb and Bonnie Jo's home?

11     A     About two blocks.

12     Q.    How long does it take to walk from your work down
13 to Bobbie Jo's?

14     A     Probably less than five minutes.

15     Q     So what happened that day, can you tell the jury,
16 Thursday, December 16th?

17     A     I went to work in the morning.  And I went to the
18 bank at dinner time.  Come back from Maryville.  At about
19 two-thirty I called Bobbie Jo and she said they were there
20 looking at the puppies.  And then I asked her if she
21 remembered to come pick me up at three thirty and she said,
22 yes, she would be there.

23     Q     Was the phone conversation at two thirty?

24     A.   Right.

25     Q.    When three-thirty came close was Bobbie Jo there?

1      A    No.

2      Q    What did you do?

3      A    I called on the phone and I got the recorder.  And

4  then I tried again and I got the recorder.  And that time I

5  left a message saying that I thought maybe she had forgotten

6  me and I still didn't get no answer.

7      Q    So what did you do?

8      A    So then I walked to Bobbie Jo's house to see if

9  she was there.

10     Q    And what did you see when you walked there, was

11 Bobbie Jo's car still there?

12     A    Yes, her vehicle was parked out front.  The front

13 door was open.

14     Q    Did you see any other cars?

15     A    No.

16     Q    When you say the front door was open did it have a

17 screen door?

18     A    Yeah, it had a screen door and an inside door.

19     Q.   Was the inside door open?

20     A    Yes.

21     Q    And the screen door was closed?

22     A    Yes.

23     Q    Did you find that unusual?

24     A    Well, it was chilly weather, but not really.

25     Q    What did you do next?

1      A    I opened the door and hollered and nobody

2   answered.  So I went walking through to see if I could find

3   her.  And I walked through the living room and then I walked

4   into the dining room and then I could see her off in the

5   room off the dining room laying on the floor.

6      Q    And can you tell the jury what you saw?

7      A    There was blood everywhere and she was -- (crying)

8   she was laying on the floor.

9      Q    When you saw there was blood everywhere what do

10   you mean, was it just pooled around her body.  Describe for

11   the jury what you saw, if you can.

12      A.    It looked like it was spread everywhere on her and

13   all over the floor and everywhere.

14      Q    Was she conscious?

15      A    Yes, she was unconscious.

16      Q    She was unconscious?

17      A    She was unconscious or dead, I didn't know.

18      Q    What did you do?

19      A    I run to the other bedroom and got the phone and

20   called 911 and went back in there where she was at.

21      Q    What did you think had happened?

22      A    It looked like she exploded all over that room.

23      Q   So did you tell the operator what was going on?

24      A    I told her my daughter was eight months pregnant

25   and I didn't know what had happened.  It looked like she

1    exploded all over.

2         Q    I am going to ask you to try to recall exactly

3    what you saw when you walked in the room before you touched

4    her.

5              MR. WHITWORTH:  With the court's permission, may I

6    approach.

7              THE COURT:    Yes.

8              MR. WHITWORTH:  For record purposes, this is

9    Government's Exhibit 8(f).

10             MR. DUCHARDT:   Do you want to offer it.

11             MR. WHITWORTH:   Yes, we will offer it.

12             MR. DUCHARDT:   No objection.

13             THE COURT:  Received.

14        (PLAINTIFF'S EXHIBIT 8(f) WAS RECEIVED IN EVIDENCE.).

15             MR. WHITWORTH:  Judge, may the witness step down

16   for just a minute.

17             THE COURT:  She may.

18        Q.   Keep your voice up.  So Would you show the jury

19   where the front door is.

20        A    Right here.

21        Q    You are indicating at the bottom portion of the

22   diagram?

23        A    Yes, in here.

24        Q    Where it says wooden portion?

25        A    Yes.

Q      Show the jury, you walked --

A.      Through the living room and into the dining room and over here, this is the room I found her in.

Q.      Could you draw the position of Bobbie Jo's body when you walked in the room.

A      (witness draws ).

Q      Thank you.

Q      Now I want to ask you about her feet.  Did you notice how her feet were positioned?

A      They were straight up like this.

Q      Were the toes pointing to the ceiling.

A      Yes.

Q      Were the soles of her feet on the floor?

A      No.

Q      And showing you Government's Exhibit 2(a) were those Bobbie Jo's feet?

A      Yes.

Q      This is obviously taken after she was removed from the room but were her feet positioned upward like that with her toes pointing up?

A      Yes.

MR. WHITWORTH:    We would offer in evidence Government's Exhibit 2(a).

MR. DUCHARDT:    No objection.

THE COURT:    Received.

1    (PLAINTIFF'S EXHIBIT 2(a) WAS RECEIVED IN EVIDENCE.)

2    Q    Now, what did you do when you were talking to the

3    911 operator?

4    A    She asked me if I could do C. P. R. and I told her

5    I didn't know how.  She finally convinced me to try.  So I

6    tilted her head a little bit and tried to do C. P. R. and

7    then Ben Espey showed up.

8    Q    Did you get blood all over you?

9    A.    Yes.

10    Q    When Sheriff Espey arrived what happened?

11    A    He got on the phone and then he went to do

12    C. P. R.

13    Q    He took over?

14    A    Yes.

15    Q    What happened next?

16    A    The ambulance showed up and then I went outside on

17    the porch.

18    Q    I assume you were pretty shaken.  Do you know Lisa

19    Montgomery?

20    A    No.

21    Q    Had you ever met her before?

22    A    No.

23    Q    Do you ever remember Bobbie Jo ever talking about

24    her?

25    A    Not by name.

1    Q    What did you do after Bobbie Jo left in the
2  ambulance?

3    A    What did I do?

4    Q    What did you do after she left?

5    A    We got in the car and followed the ambulance to
6  Maryville.

7    Q    Did you go to the home?

8    A    We went to Kawasaki and then we went to the
9  hospital.

10   Q    Then what happened?

11   A    At the hospital we all just sat in there and
12 talked, they told us what had happened and then we went home.

13   Q    So you knew the baby was missing?

14   A    Yes.

15   Q    And where did you stay that night?

16   A.   At home.

17   Q    Did relatives stay with you?

18   A    Yes, I think my mom did.

19   Q    Do you remember what happened the next day?

20   A    I stayed home waiting for news about Victoria.

21   Q    And did you get a phone call from the sheriff or
22 someone?

23   A    Yes, from someone.

24   Q    What did you learn?

25   A    That they had found her.

1    Q    And so did you go to Topeka with Zeb?

2    A    Yes.

3    Q    Did you see Victoria Jo?

4    A    Yes.

5         MR. WHITWORTH:    No further questions, Your

6    Honor.

7         MR. DUCHARDT:    Ma'am, I just have a couple, if I

8    may.

9                        CROSS EXAMINATION

10   BY MR. DUCHARDT:

11   Q    As I understood your testimony, you talked to

12   Bobbie Jo on the phone at about two thirty, right?

13   A    Right.

14   Q    And it was about three thirty, was it, you headed

15   over there?

16   A    Yes.

17   Q    About the time you got off work?

18   A    Right.

19        MR. DUCHARDT:    That's all the questions I have.

20   Thank you.

21        THE COURT:    We will take a break for lunch now.

22   Thank you, Miss Harper, you can stand down.  Ladies and

23   gentlemen, we are going to take a recess for lunch now until

24   one-fifteen by the clock at the back of the courtroom.

25        And I want to remind you again that you are not to

1   discuss this case among yourselves or with anyone else, not
2   to read, view or listen to any media reports of the case.
3   You are not to do any research on any of the issues.   If
4   anyone should happen to attempt to approach you you are to
5   let me know about that.

6           So please be back in the jury room at one fifteen
7   and we will resume at that time.  Thank you.

8                           RECESS
9           THE COURT:   Thank you.  You can be seated.
10  Ready, Mr. Whitworth.

11          MR. WHITWORTH:   Yes, sir.

12          THE COURT:  Mr. O'Connor.

13          MR. O'CONNOR:   Yes, sir.

14          THE COURT:   Thank you.  Everyone can be seated.
15  Mr. Whitworth, ready for your next witness.

16          MR. WHITWORTH:   Yes, the United States calls
17  sheriff Ben Espey.

18                        BEN ESPEY,
19  having been sworn, testified:

20                     DIRECT-EXAMINATION
21  BY MR. WHITWORTH:

22      Q    Sir, Would you state your name for the jury.

23      A    My name is Ben Espey.

24      Q    Sheriff Espey, there is a microphone.  If you
25  could direct your voice into that it would help everybody.

1    What is your occupation?

2          A.   I am the Sheriff of Nodaway County.

3          Q    How long have you been sheriff of Nodaway County?

4          A    15 years.

5          Q    You are the elected sheriff, is that correct?

6          A    That's correct.

7          Q    Where is your office located, sir?

8          A.   In Maryville, Missouri.

9          Q    Is Skidmore, Missouri a town located in Nodaway

10   County?

11         A    Yes, it is.

12         Q    And is it a part of your duties as the sheriff of

13   Nodaway county to provide law enforcement protection to the

14   citizens of Skidmore?

15         A    That's correct.

16         Q    Do they have a city police department there?

17         A    No, they don't.

18         Q    On December 16, 2004 did your department receive a

19   911 phone call from Skidmore?

20         A    Yes, we did.

21         Q    Who called?

22         A    Becky Harper called our 911 dispatch.

23         Q    Do you know what time it was?

24         A    Our clock showed it was three twenty eight P. M.,

25   the middle of the afternoon.

Q     Did you receive that call or did someone else?

A     My jail dispatcher who was doing my dispatching received the call.  I was standing in the office when the call come in.

Q     What did you hear?

A     I could hear a lady's voice.  She was very frantic, very upset, hysterical.  And the comment that I got was that her daughter was on the floor and her stomach had exploded.

Q     When you got that information what did you do?

A     I immediately looked up a couple deputies in the area.  I had them go to Skidmore.  and I immediately jumped in the patrol unit and headed for Skidmore.

Q.    Were you by yourself?

A     Yes.

Q.    How long did it take you to get there?

A.    Approximately 14 minutes.

Q..   Where did you go?

A.    410 West Elm, the location we were given on dispatch to go to.

Q     Were you familiar with that street?

A     Yes.

Q     Did you know where to go?

A     Yes, I had a general idea.

Q     And whose home was it?

1   A It was a Zeb and Bobbie Jo Stinnett's residence.

2   Q What did you do when you arrived.

3   A. I immediately run from the front door, the front

4 door was open.  I knew we had a problem so I wasn't going to

5 wait and knock.  And I opened the door and hollered where

6 are you at, Becky.  Becky hollered I am in the back, come on

7 back.

8   Q Did you go inside the house?

9   A Yes, I did.

10   Q Showing you Government's Exhibit 3(b), is this a

11 diagram of the crime scene?

12   A Yes, it is.

13   Q That's the Stinnett home at 410 West Elm.

14   A It appears to be.

15   MR. WHITWORTH:  We offer in evidence Government's

16 Exhibit 3(b).

17   MR. O'CONNOR:  No objection.

18   THE COURT;  Received.

19 (PLAINTIFF'S EXHIBIT 3(b) WAS RECEIVED IN EVIDENCE.)

20   Q Sheriff Espey, when you got into the house and

21 went inside I want you to describe the inside of that house.

22 And in front of you you will see Government's Exhibit 1(a).

23   A Yes.

24   Q Already admitted into evidence, is that the

25 Stinnett home?

1      A    Yes, it is.

2      Q    You said you went in the front door.  Was the door

3 open?

4      A    I don't believe it was.  I believe I opened the

5 door.

6      Q    When you walked inside, showing you Government's

7 Exhibit 3(c), what is that a photograph of?

8      A    When you enter the front door that is the living

9 room area that you walk into.

10      MR. WHITWORTH:   Your Honor, we offer 3(c).

11      MR. O'CONNOR:  No objection.

12      THE COURT:  Received.

13   (PLAINTIFF'S EXHIBIT 3(c) WAS RECEIVED IN EVIDENCE.)

14      Q    Now, after you entered the house as you go through

15 that doorway, that arch doorway.

16      A    Yes.

17      Q    What room is there?

18      A    You are standing in the living room looking into

19 the dining room.

20      Q.   Showing you Government's Exhibit 3(d), is that a

21 photo of the dining room?

22      A    Yes.

23      MR. WHITWORTH:   We offer Government's Exhibit

24 3(d).

25      MR. O'CONNOR:  No objection.

1    THE COURT:  Received.

2    (PLAINTIFF'S EXHIBIT 3(d) WAS RECEIVED IN EVIDENCE.)

3    Q    This photograph, is this the dining room you just

4    spoke about?

5    A    Yes, it is.

6    Q    And off to the right is that the computer?

7    A    Yes, it is.

8    Q    Of Bobbie Jo Stinnett?

9    A    Yes.

10    Q    If you look straight ahead there is another

11    doorway, what room does that lead to?

12    A    You are looking into a small kitchen area.

13    Q    Next showing you Government's Exhibit 3(e), is

14    that a photograph of the same dining room looking to the

15    left side of the room?

16    A    Yes, just walk through the living room standing in

17    the north part of the dining room.

18    MR. WHITWORTH:    Your Honor, we offer Government's

19    Exhibit 3(e).

20    MR. O'CONNOR:  No objection.

21    THE COURT:  Received.

22    (PLAINTIFF'S EXHIBIT 3(e) WAS RECEIVED IN EVIDENCE.)

23    Q    The room to the left is that the room where Bobbie

24    Jo and Becky were found?

25    A.    That's correct.

```
 1        Q      Looking back into the kitchen, showing you
 2    Government's Exhibit 3(f).
 3        Q      That is a photograph from the dining room looking
 4    into the kitchen.
 5             MR. O'CONNOR:  Just to save time, we have seen
 6    these photographs.  We don't have any objection.  Just put
 7    them on the screen and save us going back and forth.
 8             THE COURT:  Thank you, Mr. O'Connor.
 9        Q      3(f), is that the photograph looking into the
10    kitchen?
11        A      Yes, it is.
12        Q      Photograph 3(g), which we also offer 3(f) and (g).
13    G.             MR. O'CONNOR:  We have no objection to these
14    exhibits.
15             THE COURT:  Thank you, they are received.
16    (PLAINTIFF'S EXHIBITS 3(f) AND (g) WERE RECEIVED IN
17    EVIDENCE.)
18        Q      Is that a photograph of the kitchen?
19        A      Yes, that's the kitchen.
20        Q      Now tell us when you went into the room where
21    Becky and Bobbie Jo were at, what did you see?
22        A      The first thing I saw was Bobbie Jo on the floor
23    and blood over pretty much the entire hardwood floor.
24        Q      Showing you 3(h), does that depict the dark
25    colored smear that is blood you are talking about?
```

1    A    Yes.

2    Q    Can you describe the location of the blood in the

3    room?

4    A    There was blood, as you can see the blood is

5    smeared all over the wood floor and they're clots, what I

6    noticed in particular there were clots of blood, fairly

7    large clots of blood in different areas around the room.

8    Q    Can you describe to the jury where Becky Harper

9    was at and Bobbie Jo?

10    Go over and point out to the jury where you found

11    them?

12    A    When I walked in the room her feet were in this

13    area, Bobbie Jo Stinnett was at this angle.  She was lying

14    flat on her back.  Becky was to her right side kneeling down

15    over her daughter trying to administer C. P. R.

16    Q    Is it fair to say that Becky Harper was upset?

17    A    Yes, she was very upset.

18    Q    What did you do when you saw this?

19    A    Becky, my dispatcher instructed Becky Harper to

20    start administering C. P. R. on Bobbie Jo because we didn't

21    know from the other end of the telephone line if there was

22    any life.  When I walked into the room Becky asked me if I

23    could do C. P. R.

24    Q    What did you tell her to do?

25    A    I told her I would.  And I asked her due to the

1   amount of blood of the victim, Becky get me a wet towel so I

2   could wipe her off.

3       Q    What happened to that towel?

4       A    I used that towel to wipe Bobbie Jo's mouth and

5   face off so I could start C. P. R.

6       Q    What did you do with the towel afterwards?

7       A    I don't remember.

8       Q    Now showing you Government's Exhibits 3(h) and

9   3(i), I want to ask you some more questions about the room.

10  This is another photograph of the room, is that correct?

11      A    Yes, this is correct.

12      Q    What can you tell the jury is significant in this

13  picture?.

14      A    This appeared to have been a bedroom at one time

15  and there were I believe a couple dog cages in there.  I

16  felt like it turned into a dog grooming area and there is a

17  dresser there maybe they used to groom the dogs on.  As far

18  as the room, the question asked, there was, adjacent you are

19  looking into a bathroom and there was no blood in that

20  bathroom.  The blood was on the wood floor on this

21  particular room.

22      Q    Was it on both sides of the floor?

23      A    It was all over the floor, yes

24      Q.   Showing You government's 3(j), is that another

25  photograph of some of the blood?

1    A    Yes, this would be the south side of the room.

2    Q    And 3(k), is that another photograph of some

3    coagulated or pooled blood?

4    A    That blood would be pretty close, about the mid

5    section where Bobbie Jo would have been laying on the floor.

6    Q    Can you describe Bobbie Jo's physical condition?

7    A    One of the first things I noticed her stomach had

8    been jaggedly cut open and her intestines were protruding

9    from the body.

10    At that point in time when I first entered the

11    room I didn't know Bobbie Jo had been pregnant.  I just

12    noticed the cuts and I noticed the blood over her entire

13    body.  Didn't know from that point on.

14    Q    Did you know Bobbie Jo in the past?

15    A    Not really.

16    Q    Now showing you Government's, let me ask you

17    before we get to the next picture, when you walked into that

18    room what was the position of her body.  You have described

19    it on the diagram.  Was she on her back or on her stomach?

20    A    She was lying flat on her back with her legs down.

21    Her toes would have been pointing toward the ceiling.

22    Q    Were the soles of her feet on the floor at any

23    point in time when you were in that room?

24    A    No, they were not.

25    Q    Showing you Government's Exhibit 3(l), is this a

1   photograph of Bobbie Jo Stinnett that was taken after she
2   was placed on the ambulance gurney but before she was
3   removed from the home?

4        A    That is correct.  That is Bobbie Jo.

5        Q    Was there a reason why pictures weren't taken
6   before she was placed on the gurney?

7        A    The paramedics arrived shortly after I did and
8   once they knew we were doing C. P. R. that had to be
9   continued so she had to be transported immediately to the
10  St. Francis Hospital in Maryville.  And we were in a hurry
11  getting back to our vehicles to get the camera and try to
12  get the pictures taken before they removed her to go ahead
13  and transport her.

14       Q    After seeing her lying there did you believe she
15  had been pregnant?

16       A    No, I didn't.  I didn't until Becky made the
17  comment my daughter was eight months pregnant.

18       Q    Did you notice anything about her stomach, her
19  abdomen concerning whether there was a baby there?

20       A    She didn't give the appearance of being eight
21  months pregnant at all then.  So I immediately went out to
22  the ambulance and told the paramedics I believe the mother
23  had stated her daughter was eight months pregnant.

24       Q    Showing you Government's Exhibit 3(m), is this a
25  photograph of Bobbie Jo Stinnett's lower portion of her body

1    that was taken on the gurney as she was being taken out of

2    the house?

3        A     Yes.

4        Q     And what did you notice about her feet?

5        A     She had blood all over her feet, entire body,

6    hands, in her toes.

7        Q     Government's Exhibit 3(n), just another photograph

8    of blood in the room, is that pretty much the way it looked

9    when you came in there that day?

10       A     Yes, it is.

11       Q     Finally 3(o), is that one more photograph looking

12    to the entrance of the room?

13       A     That is correct.

14       Q     Does that depict blood again, pooled and spread

15    across the floor?

16       A     That's correct.

17       Q     Now, did you notice anything about Bobbie Jo

18    Stinnett's neck at the time you were in the house?

19       A     No, I didn't. There was blood on her neck. I

20    didn't notice then.

21       Q     After she was taken from the home what did you do?

22       A     Well, we had some other leads we were following.

23    I contacted Randy Strong, had him go to the hospital and

24    meet the ambuance so he could help process the body until I

25    could get there to talk to the doctors and see what we

1    really had.

2         Q    Did you make a decision to call into action the

3    northwest Missouri Major Case Squad?

4         A    Yes.

5         Q    Why did you make that decision?

6         A    It was obvious to me law enforcement officers and

7    the head of that investigation, I was going to need help

8    with this.  We had a baby missing.  Didn't have any leads.

9    Virtually no leads to go on and I could use a lot of extra

10   help.

11        Q    How long have you been in law enforcement?

12        A    22 years.

13        Q    Have you been to many crime scenes where blood has

14   been shed?

15        A    Yes, I have.

16        Q    When you looked around that room when you went in

17   there that day did you have an opinion what might have

18   happened?

19        A    Immediately I could tell that gave all the

20   appearances of being a crime scene.

21        Q    Would the fact there was blood spread all over the

22   room mean anything to you?

23        A    Yes.

24        Q    What?

25        A    It meant to me there was a struggle.  You could

see, the pictures didn't show very well but you could see swirls, there had been a struggle on the floor. The fact there was clots of blood indicated and Bobbie Jo had jagged marks in her lower abdomen and it was very obvious the body wasn't laying in one place. The body was all over that room for the clots of blood to be around.

Q    Did investigators begin arriving at the scene?

A    Yes.

Q    Did the major case squad take over the processing of the scene?

A    Yes.

Q    What did you do next?

A    We started following leads. Unfortunately, when things come in people start calling, need to look at this or that or check this car. And we had twenty some officers running in all different directions following each and every lead to see if we could nail down what we had.

Q    Did you eventually go to the hospital?

A    Yes.

Q    What happened when you got to the hospital?

A    I went in to observe the body and see if there was anything else I didn't know I needed to know. And the doctor did tell me after she was cleaned up the blood was cleaned off her neck, I could see there were two ligature marks which appeared from a rope which would have given me

1    the impression she had been strangled at least twice.

2        Q    Showing you Government's Exhibit 3(p), is that a

3    photograph of Miss Stinnett at the hospital?

4        A    Yes.

5        Q    And you have indicated that you observed

6    strangulation marks?

7        A    And the doctors pointed that out to me when I got

8    there.

9        Q    Showing you Government's Exhibit 3(q), tell the

10   jury what you see in that picture?

11       A    Two different ligature marks.  You can look at

12   that.

13       Q    You want to step, with the court's permission,

14   could he step up and point out.

15            THE COURT:  You may.

16       A    This is the way it's made.  You can see it appears

17   to be a rope, a type of a rope and then the pressure put on

18   which created that type of bruising.

19       Q    Thank you.  Did you talk to Becky Harper about

20   what had happened that day?

21       A    No, the only conversation I had with Becky when we

22   were both in the room at the same time and I had Becky get

23   me a towel.

24       Q    Did you learn at some point somebody was supposed

25   to have come to visit with Bobbie Jo about buying a dog?

1    A   Yes, one of my officers got that information I
2   think from Becky Harper.

3    Q   And at some point was a decision made to start
4   looking at Bobbie Jo Stinnett's computer?

5    A   Because we really didn't have any leads other than
6   looking for a red car, somebody by the name of Dorothy
7   Fischer.

8    Q   Darlene Fischer?

9    A   Darlene Fischer supposedly going to come look at a
10  dog and we know she was doing dog trading.  So the computer
11  we were going to have to, my concern get specialists to look
12  at so we didn't lose anything off that computer we might
13  need later.

14   Q   Was that one of the reasons you called in the
15  Northwest missouri Major Case Squad?

16   A.   Yes.

17   Q   You didn't search the computer.

18   A   No, I didn't touch the computer.

19   Q   After you learned about the computer and the fact
20  Bobbie Jo had been on the internet in the dog breeding
21  business, had people working on those leads, did you try to
22  get an Amber alert issued?

23   A   Yes, immediately we tried to get the Amber alert.

24   Q   Tell the jury, I think they all know, what is an
25  Amber alert?

A.    When you have a missing child we can put it out nationwide, television, radio, all law enforcement is teletyped so it can have everybody looking for this child.

Q    Is it also given to the media outlets such as T. V. stations, radio?

A    All the media puts it out.

Q    And were you successful in getting an Amber alert.

A    Eventually.  Not right off.

Q    Did you have a little trouble?

A    I had ten hours of trouble.  It took about ten hours to get the Amber alert.

Q    What was the problem?

A    We didn't know, to do an Amber alert you are supposed to have eye color, hair color, height, weight and sex of the child.  The only thing we knew was the sex of the child that it was female.

Q    In the mother's wound, didn't have any information, is that correct?

A.    We didn't meet the criteria to do the Amber alert.

Q    But you were eventually successful in getting that issued, were you not?

A.    I called the United States senator and very aggravated and said I need this done right now.  I felt like a newborn stood alone.  Isn't much of an identifier as anything else, the new born baby the first day or so is

1    going to stand out, anybody can recognize it.

2         Q    Did you develop a suspect in Darlene Fischer?

3         A    The suspect never did pan out.

4         Q    Because there was no Darlene Fischer?

5         A    We had several officers go to Fairfax, where

6    Darlene, I was one of the officers that went two hours

7    trying to locate Darlene Fischer.

8         Q    Was an arrest made in Melvern, Kansas?

9         A    Yes.

10        Q    Do you remember what time it was?

11        A    No, I'm not sure the exact time.  Early afternoon

12   is my best recollection.

13        Q    Within 24 hours?

14        A    Like 20 hours.

15             MR. WHITWORTH:    No further questions.

16                               CROSS EXAMINATION

17   BY MR. O'CONNOR:

18        Q    Sheriff Espey, the photographs we have looked at

19   most of them inside the crime scene those were done

20   obviously after Miss Stinnett's body had been removed, is

21   that correct?

22        A    Similar.

23        Q    For example, this photograph, which I believe is

24   Defendant's 352, would that have been taken before or after

25   she had been removed?

1        A    That was just after.

2        Q    Now I assume when you were there you were working

3   on trying to do C. P. R, is that correct?

4        A    Yes.

5        Q    It's my understanding several E. M. S. folks

6   showed up, is that right?

7        A    Two, as far as I know, two.

8        Q    So there were two other E. M. S. besides you in

9   the room working on Bobbie Jo?

10       A    Yes.

11       Q    And did they bring this big board in they try to

12  put people on to transport them out to the ambulance?

13       A    Yes.

14       Q    Do you know how that board works, give us an idea

15  how it works?

16       A    Some houses are not equipped you can put on a

17  stretcher, because stretchers are too big so use a hard

18  board, put a person on a board, strap them, lay that hard

19  board on a stretcher and then put them in the ambulance.

20       Q    Is that what was done here?

21       A    Yes.

22       Q    To get a person out the door like the one there,

23  is that the door she would have been taken out?

24       A    No, this door you are looking at here goes into a

25  bathroom.

1       Q     The door would have been the other direction?

2       A     We are pretty much standing in that doorway taking

3  that photograph.

4       Q     And so when you see that scene there with all the

5  blood, at least three of you and including Miss Harper

6  unfortunately were in that room working on Bobbie Jo with

7  your feet in that blood?

8       A     Yes, we were in the room.

9       Q     That's a necessary part of what you were doing?

10      A     Yes.

11      Q     I assume when you are trying to save someone's

12  life you are not thinking about whether or not you are

13  disturbing someone, you are trying to help the person?

14      A. · Actually on this instance I had a mind set when I

15  left the office it was a crime scene and I told my officers

16  we are going to be working a crime scene.  When the

17  paramedics come into the room I said this is a crime scene,

18  be real careful how you walk.  So they knew that before they

19  come in.

20      Q     But the emergency people coming in their job is to

21  get the person, get them out by whatever means and they are

22  not really paying a lot of attention nor -- I am not being

23  critical.

24      A     Their focus is on the body and the person.

25      Q  . I see you wrote a report, do you remember writing

1    a report about your being at the scene?

2         A    Yes, I do.

3         Q    I am assuming when you do write a report you try

4    to put as much information in the report you can use to

5    describe what happened?

6         A    A person should, yes.

7         Q    And I see it's typewritten so I assume you had

8    time to think about what you wrote and before you wrote it?

9         A    Yes, probably.

10        Q.    And in your report, I am going to read it to you

11   and if you disagree I am happy to show it to you if there is

12   a disagreement.  I will try to read it word for word.

13   Entered the residence.  Went to the southeast room of the

14   house.  There I could see a white female lying on the floor

15   in a pool of blood.  Do you remember saying that?

16        A    That's in my report, yes.

17        Q    Would you agree there was nothing in your report

18   about there being blood everywhere on the floor, you never

19   made that assertion in your report, would you agree?

20        A    Not in the initial report, no, I didn't.

21        Q    And blood that is pooled if people start stepping

22   in it that's when stuff can start getting scattered and

23   appear to be like maybe when a struggle, where actually the

24   struggle was, the emergency efforts to try to get Bobbie Jo

25   out to the hospital to see if she could be saved?

1    A    I disagree with that.  I think it was a pool of
2    blood you would see footprint tracks where they stepped in
3    not where it was smeared.  This is really not a good
4    picture.
5    Q    Is there a better one we can put up there,
6    Government's Exhibit 3(c).
7    A    Maybe I am sitting at a bad angle.
8    Q    That may be a bad one.  3(i), is that a better
9    one.  If you need to step down I think the judge would allow
10   it.
11   A    If they're looking at what I am looking right
12   here.
13   Q    Yes.
14   A    It depicts what was in the room.
15   Q    You agree in the report you wrote you didn't
16   mention anything about blood clots on the floor or blood
17   smear or the appearance of a struggle.  You never used the
18   word appearance of a struggle in the report you wrote?
19   A    That's correct.
20   Q    And let's go back to our Exhibit 452.  This is the
21   room that Bobbie Jo was in, correct?
22   A    That is correct.
23   Q    And would you agree with me against the wall there
24   is a cabinet that appears to have a lot of knickknacks on
25   it, little things that can fall over, be knocked over if

1    there is a struggle going on in the room.  Those all appear
2    to be intact, do they not?

3        A    They appear to be, yes.

4        Q    Is there anything inside the room, dog cage,
5    furniture, plants, all these little knckknacks, in this rack
6    any of that appear to be disturbed, knocked over as if a big
7    fight had gone on in that room?

8        A    No, it appears the fight was in the middle of the
9    room not on the side of the room because there is no blood
10   on the wall.  There is no blood on the cabinets I could see,
11   mainly on the floor where they slid around on the floor.

12       Q    Did you in fact trail blood out on your shoes?

13       A    I was in the room.  I am sure I did.

14       Q    And again please, I am not being critical, I am
15   just trying to state what happened here.  I am not being
16   critical.  And so is it a fair statement anybody would have
17   been in ths room would have tracked blood at some point?

18       A    That's a fair statement.

19       Q    And so we know at least you, two E. M. S. officers
20   and Miss Harper were in that room?

21       A    That's correct.

22       Q    Did you see any furniture or anything in the house
23   knocked over that appeared a struggle started maybe
24   somewhere else and ended there?

25       A    No, I did not.

1      Q    Did you notice before you left the crime scene

2  that, whether or not a time, I know we have a photograph of

3  Miss Stinnett's feet, did you notice at the time whether or

4  not she had anything on her feet, socks, shoes?

5      A    She was barefoot at the time.

6      Q    Did you make any notes in your emergency efforts

7  of seeing blood on the bottom of her feet or did you see

8  those later in the photographs?

9      A    No, I saw them when I walked in the room, blood on

10  her feet.

11      Q    When they carried, did you see them actually carry

12  her out?

13      A    Yes.

14      Q    Would she have been carried out in the normal

15  fashion she would have been carried like someone with a

16  stretcher or did they have to hoist her to get to the

17  doorway?

18      A    No, the hard board was laid horizontal.

19      Q    There was a picture of that board up a minute ago,

20  but I believe the board would have been laying in that blood

21  as she was put on?

22      A    Set it down just as we look at the pictures to the

23  left where the body was laying

24      Q.   Does that board work in two pieces?

25      A    One piece.

1    Q    One piece and --

2    A    One solid piece board.

3    Q    Do you notice whether or not there was any blood

4    on the bottom of that board after it was moved?

5    A    No, I didn't.

6    Q    Would you assume there would have been?

7    A    There sure could have been, yes.

8    Q    And you pretty much had determined from your

9    experience and just what you saw there you believed Bobbie

10   Jo was deceased but since C. P. R. efforts had been started

11   it's a policy to keep going with that effort?

12   A    That is correct.

13   Q.   This house is a very small house, is it not?

14   A    Not very big.

15   Q    In fact, when you look at the pictures would you

16   agree the pictures make the house look bigger than what it

17   really is, the picture of the outside?

18   A    Yes.

19   Q    When you go to see that house it's really small?

20   A    It's a small house.

21   Q    These rooms are very small that are in it?

22   A    Yes.

23   Q    This room is very small, would you agree?

24   A    Without looking I am guessing about a twelve by

25   twelve.

1    Q    And it's pretty full with either the dog cages,

2    knickknacks, looks like a computer on the desk and you have

3    that one area where it looks like, could more than two

4    people fit on that floor body-wise?

5    A    Probably get about five.

6    Q    On the floor?

7    A    Yes.

8    Q    In between?

9    A    Yes, in fact there is a first photo of Bobbie Jo

10   on the cot, show the size better, show the size of the room.

11   Q    And you didn't make any notice of anything on her

12   neck at the scene but you said you later saw it after it was

13   pointed out to you by the doctors?

14   A    No, not at the scene because there was so much

15   blood.

16   Q    Had you ever previously had experience with

17   ligature marks?

18   A    Oh, yes, a lot.

19   Q    And so when you saw the marks they appeared they

20   were ligature.

21   A    Yes.

22   Q    This is a photograph, Sheriff, of the same room

23   except it shows on the top the horses and the little

24   knickknacks sitting up there and a better photograph of the

25   computer on the desk.  And you agree none of those items

1   appear to be disturbed or knocked over?

2       A   They're not knocked over in that picture, no.

3   They were not on the floor knocked over when I entered that

4   room.

5           MR. O'CONNOR:   Thank you, that's all I have,

6   sir.

7           Offer 452 and 453.

8           MR. WHITWORTH:   No objection.

9           THE COURT:  Received.

10      (DEFENDANT'S EXHIBITS 452 AND 453 WERE RECEIVED IN

11  EVIDENCE)

12                      REDIRECT EXAMINATION

13  BY MR. WHITWORTH:

14      Q   Sheriff, I am going to show you a clearer picture

15  of that same picture Mr. O'Connor showed you.  Appear to be

16  some items on the floor in the corner?

17      A   I can't see good enough on this picture.

18      Q   Look up there on the screen.

19      A   Well, there appears to be.

20      Q   By the bathroom door?

21      A   There appears to be something there but I can't

22  tell you what it is.

23      Q   Mr. O'Connor asked you some questions about the

24  pooling, he showed you your report.

25      A.  I remember that report.

1      Q    Did you also testify in front of the grand jury on

2   January 12, 2005, less than a month after that crime

3   occurred?

4      A.   Yes.

5      Q    Do you recall being asked this question by me,

6      MR. O'CONNOR.  Can I have objection before we go

7   to that.

8      (PROCEEDINGS OUTSIDE THE HEARING OF THE JURY)

9      MR. O'CONNOR:  I object to his grand jury

10  testimony.

11     THE COURT:  Let him read it and ask if that helps

12  refresh his recollection.  Then ask him about it.  Thank

13  you.

14     (PROCEEDINGS IN THE HEARING OF THE JURY).

15     Q    If you could read pages five and six of this.

16     A    Where you have underlined it?

17     Q    Yes.

18     A    "And can you tell the jury."

19     THE COURT:  Don't read it out loud.  Just read it

20  to yourself.

21     Q    Read it and see if that refreshes your

22  recollection.

23     A    Okay.

24     Q    Does that refresh your recollection what you saw

25  in the room that day?

1    A    Yes.

2    Q    When you first came into the house and looked into

3    the room with Becky Harper?

4    A    Yes.

5    Q    What was the condition of the room?

6    A    Blood was smudged over the entire floor and blood

7    over the entire body with blood clots lying over the entire

8    floor.

9    MR. WHITWORTH:    Thank you.  No further

10   questions.

11   MR. O'CONNOR:    Just a couple.

12                    RECROSS EXAMINATION

13   BY MR. O'CONNOR:

14   Q    That testimony was given January of 2005, is that

15   correct?

16   A    I am not sure the exact date.

17   Q    That's what this says.

18   MR. O'CONNOR:  Do you disagree, Mr. Whitworth.

19   MR. WHITWORTH:  I agree.

20   Q    The report you wrote when it was fresh in your

21   mind was December 16th, the day this happened?

22   A    That was a brief report to get everything started,

23   did not include any investigation.

24   Q    But you do agree none of that was mentioned in

25   that report, the struggle or there was blood smudge.  That

1   report said she was lying in a pool of blood?

2       A.   The initial report you are inquiring about is

3   pretty much a one-page report and that's all I had in there

4   at that time.

5           MR. O'CONNOR:   That's all I have.

6           THE COURT:  Thank you, Sheriff.  You are excused.

7           MR. WHITWORTH:   Did you move those pictures into

8   evidence.   If so would you please identify the exhibit

9   numbers, the ones I showed to the sheriff.

10          THE CLERK:   The number 3 series, (g) and (f) and

11  after that through (q).

12          MR. O'CONNOR:   No objection.

13          THE COURT:  Received.

14  (PLAINTIFF'S EXHIBIT 3 SERIES WAS RECEIVED IN EVIDENCE)

15          MR. O'CONNOR:   We have a large amount of

16  exhibits like the next exhibit.  Offer them at the beginning

17  and move to admit them.  We don't have to go through all

18  this.   That was my problem.

19                      STEVE WHITTINGTON,

20  having been sworn, testified:

21                      DIRECT-EXAMINATION

22  BY MISS KETCHMARK:

23      Q    Please state your name for the record.

24      A.   Steve Whittington

25      Q.   Would you spell your name?

1    Q    W-h-i-t-t-i-n-g-t-o-n.

2    Q.   What is your postion there?

3    A    I am a sergeant investigator.

4    Q    How long have you been in law enforcement?

5    A.   I have been in law enforcement 30 plus years.

6    Q    On December 16, 2004 were you involved in the

7    investigation of the murder of Bobbie Jo Stinnett?

8    A    Yes, I was.

9    Q    What was your first involvement?

10   A    I received a call to respond to the town of

11   Skidmore and to a possible situation there that a lady on

12   the floor was bleeding profusely.

13   Q    When you got there what did you see?

14   A    When I arrived I walked in the door and proceeded

15   back to where the sheriff was at in a room off the dining

16   room, I believe it was, and observed a female subject laying

17   on her back on the floor and with her insides protruding out

18   of her intestines and what-have-you were on the outside.

19   Q    Did the ambulance arrive before or after?

20   A    The ambulance got there just shortly after I got

21   there.

22   Q    Was she, Bobbie Jo Stinnett, taken from the home

23   on the ambulance fairly quickly?

24   A    They were in the process of doing C. P. R. and

25   when E. M. S. personnel arrived, they continued to do

1   C. P. R. and, yes, they were getting her out of there.

2       Q    Were you quickly thinking this was a crime scene?

3       A    Most definitely, yes, my past experience I knew

4   this was going to be a crime scene.

5       Q    What did you do in order to capture Bobbie Jo

6   Stinnett there in the room before she was taken onto the

7   ambulance?

8       A    The deputy that rode with me to Skidmore, I

9   advised him to quickly get my camera, which he did so, and I

10  immediately shot a few pictures of her on the back board

11  before they took her out of the residence.

12      Q    Did you also take pictures of the floor?

13      A.   Yes, I took pictures of the floor and the area of

14  the room.

15      Q    That was right as the ambulance is taking her away

16  and before the crime scene is called in?

17      A    Yes, they had her in the ambulance, working on her

18  in the ambulance.

19      Q    I am going to show what has already been admitted

20  as Government's 3 (m)(n)(l) and (o), and ask if these are

21  the photographs you took very quickly when you arrived.

22      A    Yes, they appear to be the photographs I took.

23           MS. KETCHMARK:  With the court's permission I

24  would ask if I could pass these to the jury.

25           THE COURT:  You may.

1     Q    Can you tell the jury what happened after Bobbie

2 Jo Stinnett was taken out to the ambulance, what were some

3 of your immediate duties?

4     A.    Some of my immediate duties, my main concern

5 protecting the crime scene or the scene, trying to keep

6 everybody out as much as possible, the least amount of

7 people we had in there running around the better off we were

8 going to be until I found out what was going on.

9     Q    Did you take part in assembling the Northwest

10 Missouri Investigation Unit, the specialized unit?

11     A.    Yes.

12     Q    What did you do?

13     A    I made a phone call to Sergeant Dave Merrill of

14 the Missouri State Patrol who is in charge of NOMIS and I

15 advised of the situation and he in turn activated NOMIS.

16     Q    Did you quickly learn that a baby was missing?

17     A    Yes, I was advised that there had been a baby

18 inside the female subject and the baby was no longer there.

19     Q    So what did you do?

20     A    At that time we concentrated a search for a baby.

21 We searched the interior of the home for a baby.  We went to

22 the outside, checked trash cans, any place we might think

23 there could be a baby.

24     Q    Where else did you search, what else did you do.

25 Did you canvass the neighborhood?

1    A    Yes, we canvassed the whole neighborhood looking

2    at the same time for the baby and talking to any neighbors

3    and this type of thing, several officers were in the process

4    of doing that.

5    Q    Were you involved in a lead involving a Darlene

6    Fischer from Fairfax, Missouri?

7    A    Yes, I was.

8    Q    What did you do regarding that lead?

9    A    Information came to me there was a Darlene Fischer

10   from Fairfax and I am from Fairfax myself.  I had never

11   heard of the name.  So myself and another officer proceeded

12   to Fairfax.  I visited with some people lived there all

13   their lives and they had never heard the name either and

14   this type of thing.

15   Q    Did you also look at dog breeders?

16   A    Yes, it came to our attention that the possibility

17   of people that breed dogs might have something to do with

18   this and they're people that live east of Fairfax and breed

19   dogs by the name of Sellers.  And I stopped and communicated

20   with them and they advised they had heard of Bobbie Jo but

21   did not know her and they had never heard of this Darlene

22   Fischer.

23   Q    So you were coming up with nothing in Fairfax and

24   nothing with dog breeders at that point?

25   A    That's correct.

1    Q    I am going to show you a photograph, 7(h).  You

2 mentioned when you came into the home there was a woman to

3 the right of front door.

4    A    Yes, I believe it was Becky that was sitting there

5 in one of the chairs.

6    Q    I am going to show you, I think it's on your

7 monitor now, 7(h), can you tell where the photograph is?

8    A    It appears to be inside, I assume it would be the

9 front door.

10    MS. KETCHMARK:    I offer Government's Exhibit

11 7(h).

12    MR. O'CONNOR:    No objection.

13    THE COURT:  Received.

14    (PLAINTIFF'S EXHIBIT 7(h) WAS RECEIVED IN EVIDENCE.)

15    Q    This is what appears to be a red tinged rag at the

16 front doorway of the home.

17    A    Yes, that's what it appears to be.

18    Q    Are you saying Becky Harper was in the chair?

19    A    Yes, she was sitting in a chair to the right of

20 the doorway.

21    ms. KETCHMARK:  That's all the questions I have at

22 this time.

23                    CROSS EXAMINATION

24 BY MR. O'CONNOR:

25    Q    Sheriff Whittington, you said when you got there

1    someone else was with you, who was that?

2        A    Deputy Don Sanders.

3        Q    You got there before the ambulance, as I

4    understood it?

5        A    I was probably about 30 seconds to 45 seconds

6    ahead of the ambulance.

7        Q    Did you, you actually went inside the house?

8        A.    Yes.

9        Q    Where did your partner that was with you go?

10       A.    He followed me into the house also.

11       Q    And did you, did both of you then go back where

12   the sheriff was appearing to be working on Bobbie Jo

13   Stinnett?

14       A    I went clear on back where the sheriff was working

15   on Bobbie Jo.

16       Q    We have been told that is the area where Miss

17   Stinnett was found on the floor, is that what your memory

18   is?

19       A    It appears to be the room she was found in, yes.

20       Q    Can you tell us where you went into the room and

21   what you did in that room to either assist the sheriff or

22   assist whatever was going on in that room?

23       A    At that time before I went into the room I was

24   taking pictures of Bobbie Jo on the back board as they were

25   carrying her out the door.

1    Q    And so would you have gotten blood on your shoes

2    in that room?

3    A    No, I did not enter the room at that time.

4    Q    Did you enter it at any time?

5    A    I don't recall entering it.  I think I stood in

6    the doorway and took most of the pictures.

7    Q    How many emergency personnel were there with the

8    sheriff assisting him with her?

9    A    I couldn't really tell you at that time.  It

10   probably was two or three.

11   Q    And were they all around on the floor of that room

12   trying to get Bobbie Jo in a position to get her --

13   A    They were in the room because they put her on the

14   back board, yes.

15   Q    Was the back board laid down in the room where

16   that blood appeared to be?

17   A    Yes.

18   Q    Did the men in the room appear to be standing in

19   that blood or stir that blood so to speak while they were

20   trying to do their life-saving efforts?

21   A    I didn't pay any attention at the time.

22   Q    Bobbie Jo was taken out, is that correct?

23   A    That's correct.

24   Q    How did the name Darlene Fischer come to your

25   attention?

1    A.   I don't recall how it came to me but it did come

2  to me from somebody, another officer or could have been the

3  sheriff himself.

4    Q    It would have been that night?

5    A    That night, yes, later on that night.

6    Q    Not while you there at the scene?

7    A    No.

8    Q    Did you have anything else to do at the scene,

9  collection of evidence or anything like that?

10    A    No.

11    MR. O'CONNOR:   No further questions.  Thank you,

12  sir.

13                    REDIRECT EXAMINATION

14  BY MS. KETCHMARK.

15    Q.   Before you entered the room and before any back

16  board was brought into the room, before any ambulance

17  drivers came into the room, do these photographs fairly and

18  accurately depict the blood spread throughout the perimeter

19  of the room?

20    A    Yes, most definitely.

21    MS. KETCHMARK:   That's all I have.

22    MR. O'CONNOR:   No further questions.  Thank you.

23    THE COURT:  Thank you, Deputy.  You are excused.

24                    MELISSA COFFELT,

25  having been sworn, testified:

1
DIRECT-EXAMINATION

2
BY MISS KETCHMARK:

3
    Q    Please state your name for the record.

4
    A.    Melissa Coffelt.

5
    Q    How do you spell Coffelt?

6
    A    C-o-f-f-e-l-t.

7
    Q    In December of 2004, almost three years ago, where

8
were you working?

9
    A    Nodaway County Sheriff's Department.

10
    Q    What was your position?

11
    A    I was the 911 coordinator and dispatch trainer.

12
    Q    Do you remember that day pretty distinctly?

13
    A    Yes.

14
    Q    On that date, December the 15th, what were your

15
hours of work?

16
    A    Seven A.M. To three P. M.

17
    Q    Three P. M. you got off duty.  Did you come back

18
to the station, the dispatch center?

19
    A    I did for some personal reason.

20
    Q    When you came back about what time was that?

21
    A    About four, four-fifteen.

22
    Q    Anything happen that kept you there that evening

23
on the 16th?

24
    A    I came upstairs and I was confronted by two of my

25
dispatchers that wanted me to come in and listen to a call

1    they had just received.

2         Q    Did you stay from four P. M. there at the
3    sheriff's department?

4         A    Yes, I went in to dispatch and listened to a 911
5    call we had received and the 911 call was about the Stinnett
6    case.

7         Q    How long did you work then from four P. M, I guess
8    it would be overtime?

9         A    I stayed until approximately one, one thirty that
10   evening, into the morning.

11        Q    What was going on that evening there at the
12   dispatch center and what were your duties?

13        A    Mainly the reason I stayed was because I was the
14   supervisor and we had an abundance of phone calls that were
15   coming in, not just from our county and from around the area
16   but nationwide and I was trying to help set up for multiple
17   calls that were coming in and trying to get help.
18   People wanted to give advice what they thought was
19   happening.

20        Q    You left after midnight that night.  When did you
21   come back to the sheriff's department again?

22        A    I came back in at about five A.M. the next
23   morning, between five and six.

24        Q    Why did you come back so early, were you scheduled
25   to come in that early?

1      A.    I had come in to help set up the sheriff's

2  office.   There were several FBI agents and other officers

3  that were in working on the case and I was trying to get

4  things set up for the next day.   And just I knew phone calls

5  would be coming in from the press and we had been making

6  phone calls to different area hospitals throughout the

7  evening.

8      Q    Why were you trying to call area hospitals that

9  evening.

10     A    We were looking for anything as far as a baby was

11 concerned.

12     Q    Did you have information that there was a four

13 week premature baby that had been kidnapped?

14     A    Yes.

15     Q    And your thoughts were they may take the baby to

16 the hospital for care?

17     A    Yes, whether it was an emergency room or a 24 hour

18 doctor's office.

19     Q    And now on the 17th when you come back at five

20 A.M. and you are setting things up, do you also work the

21 phones.

22     A    I did several things that morning.   I set up a

23 conference room downstairs where all officers could meet and

24 then I went back upstairs to help alleviate some of the

25 other dispatchers that had stayed most of the night to take

1    phone calls.  And that is what I was going to be doing the

2    rest of the day, helping. Helping with phone calls and just

3    wherever was needed.

4         Q.   Is it fair to say phone calls continued to come

5    through this whole period, the 15th and into the 17th?

6         A    Absolutely, yes.

7         Q    Did you pass on any information from these calls

8    to the investigators, any leads?

9         A    I took phone calls from approximately seven A.M.

10   on and at about nine fifteen I received a phone call from an

11   informant that struck my interest from the information I had

12   received.

13        Q    What in particular heightened your interest with

14   this phone call?

15        A    The lady I spoke to informed me that she knew of a

16   woman.

17             MR. O'CONNOR:    Could we approach.

18             THE COURT:  Yes.

19             (PROCEEDINGS OUTSIDE THE HEARING OF THE JURY)

20             MR. O'CONNOR:    I object to this testimony as

21   hearsay, just someone calling on the phone.  Can't cross

22   examine the other person.  I think it's hearsay.

23             THE COURT:  Thank you, the objection is

24   overruled.

25             (PROCEEDINGS IN THE HEARING OF THE JURY).

1    Q    What about the phone call heightened your
2  interest?

3    A    My informant told me that she was keeping a
4  woman's daughter that lived in Melvern and during that
5  time --  there were several things that kept my interest
6  actually.

7    Q    We will just go through them.

8    A    She had told me she knew a woman, she was a dog
9  breeder and this lady in Melvern, Kansas had, I am sorry, I
10  am very nervous.

11    Q    Did she say if she, this caller initially she
12  wouldn't give you her name?

13    A    No, she wanted to remain anonymous.

14    Q    Did she tell you if she had a child in her care
15  that might be associated with the suspect?

16    A    Yes, she stated she had this lady's daughter in
17  her care because she was a dog breeder along with the woman,
18  Lisa Montgomery, and Lisa had asked her if she could stay
19  with her because she was having trouble in school and at
20  that time she had been living with her in Alabama.

21    Q    Did she give you additional information why the
22  daughter was living with her, why this made her suspicious
23  of anyone, can you tell us how it unraveled.

24    A    She stated that the daughter --

25         MR. O'CONNOR:   Can we approach again.

1           THE COURT: Yes.

2           (PROCEEDINGS OUTSIDE THE HEARING OF THE JURY)

3           MR. O'CONNOR: This becomes hearsay on hearsay.

4 What she told her is one thing but what someone else told

5 her --

6           THE COURT: Obviously you are not offering it for

7 the truth of it.

8           MS. KETCHMARK: No.

9           THE COURT: Why follow up on this lead.

10           MS. KETCHMARK: Why was this for?

11           MR. O'CONNOR: Could we ask the court to tell the

12 jury it's not to show the truth but subsequent conduct.

13           THE COURT: I can do that. I mean I guess that's

14 a strategic call on your part.

15           The objection is overruled.

16           (PROCEEDINGS IN THE HEARING OF THE JURY).

17     Q    Did this caller say she had the power of attorney

18 over this child and there was discussion of her having

19 custody of this child?

20     A    Yes.

21     Q    Did she discuss with you why she thought the

22 mother of this child, did she eventually give you the name

23 of the mother of the child she had power of attorney and

24 possible custody of?

25     A    She told me that the lady's name was Lisa

1   Montgomery and Lisa had given her power of attorney because
2   her daughter Kayla wasn't doing well in school.
3       Q   Did you eventually learn the identity of this
4   caller?
5       A   Yes.
6       Q   How many phone calls were there, just the one with
7   this caller or were there multiple phone calls with this
8   caller?
9       A   I had conversations with the informant five or six
10  times throughout the day.
11      Q   What is the informant's name?
12      A   Patricia Hughes.
13      Q   Patricia Hughes.  Now, what did Patricia, or
14  Patsy, Hughes tell you Lisa Montgomery had told her about
15  her pregnancy?
16      A   Patricia had told me that Lisa was pregnant with
17  twins and she was due approximately December 12th.
18      Q   Did she tell you if she knew if Lisa Montgomery
19  had given birth to twins on the 12th?
20      A   No, through letters that her daughter Kayla had
21  received it stated in letters that her mother didn't look
22  pregnant with twins and was just curious if her mom wasn't
23  lieing about the whole situation.
24      Q   Did Patsy Hughes at that point on December 17th
25  say she learned that Lisa Montgomery was claiming she had

1  given birth to a baby?

2      A.   Yes, she said they had spoken to the husband and

3  she had gone shopping for the afternoon.  And it was odd to

4  her that evening she had come home and now they had a baby

5  girl and it wasn't twins, it was just one baby.

6      Q    What did you do with this information?

7      A    I immediately gave it to the FBI officer that was

8  upstairs and the highway patrolman that was in the office.

9      Q    During your phone calls were you able to ascertain

10  where Lisa Montgomery lived?

11      A    Yes, she had told me she lived in Melvern, Kansas.

12      Q    You passed that Melvern, Kansas, Lisa Montgomery

13  information on to the investigators?

14      A    Yes.

15      Q    You said that Patsy Hughes learned that Lisa

16  Montgomery had gone shopping and came back with giving birth

17  to a baby girl?

18      A.   Yes.

19      Q    Did Patsy Hughes tell you if her reputation for

20  being truthful, Lisa Montgomery's reputation for being

21  truthful --

22          MR. O'CONNOR:   Objection.

23          THE COURT:  I will sustain that objection.

24          MS. KETCHMARK:   That's all the questions I have.

25          MR. O'CONNOR:   I have no questions.  Thank you,

1    Judge.

2              THE COURT:    Thank you, Miss Coffelt.

3                          RICHARD SCOTT HOLMAN,

4    having been sworn, testified:

5                          DIRECT-EXAMINATION

6    BY MISS KETCHMARK:

7         Q    Please state and spell your name for the record.

8         A.   Richard Scott Holman, H-o-l-m-a-n.

9         Q    How are you employed?

10        A    I am employed by the St. Francis Hospital in

11   Maryville, Missouri.

12        Q    What is your profession?

13        A.   I am an obstetrician-gynecologist.

14        Q    Can you give the jury a quick overview of your

15   professional work experience?

16        A    I graduated from medical school in 1985.  Did an

17   internship for one year.  Did a residency for four years in

18   obstetrics gynecology and have been in practice in the

19   military and private practice for the last 17 years as a

20   board certified obstetrician and gynecologist.

21        Q.   Are you licensed to practice medicine in Michigan,

22   Missouri and Kansas?

23        A.   Yes.

24        Q    Have you been board certified in obstetrics and

25   gynecology since 1993?

1       A       Correct.

2       Q       Can you give us an idea of how many C. sections

3  you have performed?

4       A       I have been involved with, performed approximately

5  a thousand C. sections over the course of my career.

6       Q       Did you guesstimate how many deliveries you have

7  assisted?

8       A       Probably in the neighborhood of about four

9  thousand total.

10       Q       On December 16, '04 were you involved with the

11  treatment, care or assessment of Bobbie Jo Stinnett?

12       A       Yes, I was.

13       Q       What was your involvement initially?

14       A       I was called from my office to come to the

15  emergency room as there was a call that had gone out for a

16  pregnant woman who was eviscerated.

17       Q       What does eviscerate mean.

18       A       Evisceration means the bowels, the intestines

19  normally inside the abdomen are now on the outside of the

20  abdomen through a wound or incision or something of that

21  nature.

22       Q       And you normally don't work the emergency room but

23  you were called in?

24       A       Correct, because of the pregnancy issue.

25       Q       What did you do, when was the first time you saw

1   Bobbie Jo Stinnett?

2      A    I went to the emergency room to try to find out

3   anything I could find out, how far along the pregnancy was,

4   if we were dealing with a live baby, anything I could find

5   out.  That was all the information I was given.  I called

6   surgery and had them bring up instruments in case I needed

7   to perform surgery right there.

8           As soon as the ambulance came to the hospital I

9   ran outside, jumped in the ambulance, pulled down the sheet

10  to look and see what we were dealing with.

11     Q    I am going to show you what has been admitted as

12  Exhibit 3(l), does this photograph depict what you call

13  eviscerated.

14     A    Yes, it does.

15     Q    Is this how Bobbie Jo Stinnett was presented to

16  Saint Francis Hospital?

17     A    That is correct.

18     Q    Did you recognize Bobbie Jo Stinnett when you

19  looked at her?

20     A    In the course of taking care of her I came to

21  realize this was somebody I did know in fact and had cared

22  for previously.

23     Q    I am going to show you photograph 12(n), do you

24  recognize that photograph.  I think it's on your monitor.

25     A.   Yes, that appears to be Bobbie Jo Stinnett.

1      Q.   How many times had you seen or treated Bobbie Jo

2    Stinnett during her pregnancy, do you recall?

3      A    I had seen her about three times in the month of

4    November from about the 18th to the 29th, something like

5    that.

6           MS. KETCHMARK:    We offer exhibit 12(n).

7           MR. O'CONNOR:    No objection.

8           THE COURT:  Received.

9    (PLAINTIFF'S EXHIBIT 12(n) WAS RECEIVED IN EVIDENCE.)

10     Q    You jumped in the back of the ambulance and you

11   thought you recognized Bobbie Jo Stinnett as a patient you

12   had cared for?

13     A.   Correct.

14     Q    What did you then do?

15     A.   My first thing, back in the other slide, to assess

16   the wound she had there to try and see what the situation

17   was regarding the pregnancy.  It suddenly became very clear

18   to me there was no baby present; that in fact someone knew

19   what they were doing, had performed a Cesarean section on

20   this patient, this woman, and taken the baby.  There was no

21   baby left.  The placenta was still attached to the uterus

22   and in the process of the natural course of things that

23   happened the uterus had diverted on itself exposing the

24   placenta completely along with the bowels you saw there in

25   that photograph.

1      Q     What did you do at that point?

2      A     At that point I instructed let's move her into the

3   emergency room so we can take care of her.  And we moved her

4   into emergency room.  I peeled the placenta outside of the

5   uterus, turned the uterus right side, the way it belongs,

6   put it back in the abdomen and made preparation to close the

7   incision that had been made in her uterus so we could

8   proceed with resuscitation of the patient.

9      Q     I am going to show you Exhibits 13(a) and 13(b).

10  First, 13(a), what is that.

11     A     That is a placenta.

12     Q     And 13(b).

13     A     This is the abdomen, natural wound in the patient.

14           MS. KETCHMARK:    Government would offer 13(a) and

15  13(b).

16           MR. O'CONNOR:    No objection to 13(a).  Can we

17  approach on 13(b).

18           (PROCEEDINGS IN THE HEARING OF THE JURY)

19           MR. O'CONNOR:    I object to 13(b) as a photograph,

20  that the very nature of this photograph would tend to

21  inflame the jury and I believe the evidence and the

22  testimony can be better supported with other photographs

23  other than this photograph.  And not to be graphic, but her

24  private area is showing in this photograph which I think has

25  a different feel in terms of the inflammatory nature so I

1  would object for those reasons.

2         THE COURT:  The objection is overruled.

3         MS. KETCHMARK:   For the record, they're very many

4  gruesome photos and we have tried very hard to select

5  limited photographs and be as tasteful in this type of

6  situation as we possibly can.

7         MR. O'CONNOR:   I suggest, it's none of my

8  business but I wouldn't put that on that screen with all

9  those people, I would pass them to the jury.  To the victim,

10 I wouldn't do that to her, but that's not my call.

11        MS. KETCHMARK:   That's probably not a bad idea.

12 Is that okay with you.

13        THE COURT:  The objection is overruled.

14        (PROCEEDINGS IN THE HEARING OF THE JURY).

15 (PLAINTIFF'S EXHIBITS 13(a) AND 13(b) WERE RECEIVED IN

16 EVIDENCE.)

17    Q    13(a), you had said this is a placenta, is that

18 the umbilical cord, the white tube?

19    A    Yes, that is.

20    Q    That's what you peeled back and preserved?

21    A    No, actually -- can I approach.

22        THE COURT:  Yes.

23    A    This is the maternal side of the placenta or the

24 side against the woman with the umbilical cord that connects

25 to the baby.  This side is connected to the mother.  And

1    that is what you have to go in and peel off to separate from
2    the uterus.

3       Q    Did you preserve that placenta with the assistance
4    of nurse Kathy Brand?

5       A    Yes, we did.

6            MS. KETCHMARK:    Then I am going to pass, with the
7    court's permission, Exhibit 13(b) to the jury.

8            THE COURT:    Pursuant to the previous record,
9    granted.

10      Q    Does 13(b) fairly and accurately depict the
11   abdominal wound of Bobbie Jo Stinnett after you peeled back
12   the placenta and re-inverted her uterus.

13      A    Yes, and put the uterus and bowel back into the
14   abdomen, that's correct.

15      Q    It appears as if a portion of tissue had been cut
16   out, is that accurate?

17      A    Yes.  What happens is you make that incision
18   there, the tissue kind of just gapes open automatically so
19   there is nothing actually missing.  When we close that wound
20   we would put that back together so those edges would be
21   together and approximated.

22      Q    I have asked you to look at some web sites with
23   me, is that right?

24      A    Yes.

25      Q    I am going to show you 42(o), do you recall

1    looking at this web site?

2        A    Yes, I do.

3        Q    I am going to show you a 42(v), do you recall

4    looking through that web site?

5        A    Yes, I do.

6        Q    I am going to show you 42(n) and ask if you recall

7    viewing this web site?

8        A    Yes.

9        Q    I am also going to show you 42(p) and ask if the

10   photograph from one of these web sites, did I ask you to

11   look at these?

12       A    Yes, I did.

13       Q    Are all of these web sites and photographs

14   consistent with how Bobbie Jo Stinnett was presented in the

15   emergency room?

16       A    The type of incision that was made, correct.

17            MS. KETCHMARK:    I would offer Government's

18   Exhibits 42(o), 42(v) 42(n) and 42(p).

19            MR. O'CONNOR:    No objection.

20            THE COURT:   Received.

21   (PLAINTIFF'S EXHIBITS 42(o),(v),(n) AND (p) WERE RECEIVED IN

22   EVIDENCE.)

23       Q    On 42(o), I am going to draw your attention to a

24   paragraph, actually the anesthesia takes effect, the doctors

25   make incision through your abdomen.  Most cases a bikini cut

1    is used.  This is a horizontal incision above the pubic

2    area.  Is that consistent with how Bobbie Jo Stinnett was

3    presented?

4         A    Yes.

5         Q    I am going to show you 42(p), the first animated

6    diagram, does that reflect how Bobbie Jo Stinnett was

7    presented in the emergency room with a bikini cut incision?

8         A    Correct.

9         Q    Show you 42(v) and direct your attention to page

10   two, again this is very, almost identical to the first web

11   site about the bikini cut, an incision through the abdomen

12   and most cases the bikini cut, this is a horizontal incision

13   above the pubic area.  Is That consistent with how Bobbie

14   Jo was presented?

15        A    Yes.

16        Q    On the next page there is a paragraph, Next the

17   doctor makes an incision in the uterus, again either a

18   horizontal or vertical cut.  Sucks out the ambiotic fluid

19   and gently pulls the baby out.  Was there an incision, how

20   did Bobbie Jo present with her uterus.

21        A    Her incision was horizontal like the previous

22   side, showed both on the abdomen and uterus.

23        Q    42(n), this web site, if I could go to page two

24   toward the bottom, Once the anesthesia takes effect the

25   doctor usually makes a small horizontal incision in your

1  skin above your pubic bone called the bikini cut and then

2  makes a second cut in the lower section of your uterus.  Is

3  that consistent again with how Bobbie Jo Stinnett was

4  presented in the emergency room on the 16th?

5      A    Yes, it is.

6      Q    Who declared Bobbie Jo Stinnett dead that day?

7      A.   The emergency room physician, Doctor Sporliter.

8      Q    Once she was declared dead did you focus on other

9  things such as hair and her hands?

10     A    Working down, there were the abdominal incision

11 was right here, her hands, at that point we recognized there

12 were some hair intertwined in her fingers, on her hand and

13 that was made known to the doctor.  At that point we bagged

14 the hands for evidence.

15     Q.   Was there any discussion since there was no baby

16 found about an Amber alert?

17     A    Right, once we I realized there was no baby

18 present and there had been a C. section performed and

19 realizing the patient was not quite term, as I had seen her

20 in the past, I told the law enforcement deputy sheriff that

21 was there, I said, you know, you probably need to think

22 about an Amber alert because there could be a baby out that

23 was in some difficulty after the trauma that had just been

24 administered and perhaps the baby would get in some trouble

25 and somebody would show up to an emergency room or hospital

1    with a baby having difficulty.

2           And one of the key first tests you are aware of

3    that would be a birth outside the hospital, they couldn't

4    tell where the baby was born and confirm that exact

5    situation.

6       Q    I think this may be obvious but would you comment

7    on the physical condition of an eight month old woman, is

8    she at her physically strongest?

9       A    Obviously not.  Being pregnant tends to throw off

10   your balance.  You are not as quick.  You are not as agile

11   and you can't move as fast, those sorts of things certainly.

12      Q.   Finally I want to ask you one thing about a drug,

13   Pitocin and Oxytocin are those similar drugs?

14      A    Yes, that's a generic brand name.

15      Q    You can search those type of drugs on the internet

16   and web site?

17      A    Oh, yes.

18      Q    What is Pitocin used for during child birth?

19      A    Used in two situations.  One is to make uterine

20   contractions to occur to effect delivery.  That's one way to

21   use it.  And the second way to use after delivery to make

22   the uterine contract down so there is less bleeding

23   associated with it.  Both things have to do with making the

24   uterus contract.

25      Q    With Pitocin if it were given to someone would it

1  speed up their labor?

2      A    It would speed up or perhaps cause them to go into

3  labor.

4      Q    May even cause someone not in labor to go into

5  labor?

6      A    Correct.

7      Q    Can you tell the jury one more time why is this

8  incision, this bikini cut incision, not a line, why does it

9  look like it's gaping open and skin missing?

10      A    Well, because I guess the way the body is

11  designed, if you make an incision in the abdomen the

12  abdominal wall, the tissues tend to fall open.  If you cut

13  your finger or cut other places it naturally tends to gape

14  open.  Certainly having an enlarged abdomen from being

15  pregnant and then having an incision made across that makes

16  it gape open and perhaps look like, to the untrained eye,

17  there is something missing, but there is actually not; it's

18  just that gaping effect that makes it look like there is a

19  hole there.

20      Q    On Bobbie Jo Stinnett's abdomen did you notice a

21  jagged cut?

22      A.   Correct, was not a clean smooth like I would make

23  perhaps but it was very jagged.

24          MS. KETCHMARK:   That's all the questions I have.

25                    CROSS-EXAMINATION

1  BY MR. O'CONNOR:

2      Q    I just have one question.  When you were called to

3  do the life saving efforts you performed was Bobbie Jo

4  Stinnett ever conscious during your efforts?

5      A    No.

6           MR. O'CONNOR:    Thank you.

7           THE COURT:  Miss Ketchmark, anything further

8           MS. KETCHMARK:    No, sir.

9           THE COURT:    Thank you, Doctor, you are excused.

10          MS. KETCHMARK:    The United States would call

11 Kathy Brand.

12                        KATHY BRAND,

13 having been sworn, testified:

14                        DIRECT EXAMINATION

15 BY MS. KETCHMARK:

16     Q.    Please state your name for the record.

17     A.    My name is Kathy Brand.

18     Q    Will you spell brand?

19     A    B-r-a-n-d.

20     Q    Where do you work?

21     A    I work at Saint Francis Hospital.

22     Q    What is your position?

23     A    I am the obstetrics nurse manager so I am a

24 registered nurse.

25     Q    On December 16th of 2004 were you working at St.

1    Francis?

2         A    Yes, I was.

3         Q    Were you called in to assist in the care and

4    assessment of Bobbie Jo Stinnett?

5         A    Yes.

6         Q    Why were you called in if you are not an emergency

7    room nurse?

8         A    The house supervisor called for extra hands.  They

9    had told us a pregnant woman was coming in hemorrhaging and

10   so with my O. B. experience I was asked to go to the

11   emergency room.

12        Q    I am going to show you Exhibits 14(e), 14(f) and

13   14(g).  First, I will show you 14(e) and 14(f) and 14(g), do

14   these fairly and accurately reflect the nature of Bobbie Jo

15   Stinnett's clothes when she entered the emergency room?

16        A.   Yes, they were saturated with blood.

17             MS. KETCHMARK:   The government would offer 14(e),

18   14(f) and 14(g).

19             MR. O'CONNOR:   No objection.

20             THE COURT:  Received.

21   (PLAINTIFF'S EXHIBITS 14(e) (f) AND (g) WERE RECEIVED IN

22   EVIDENCE.)

23        Q    And 14(e), does that reflect, now that the jury

24   can see the exhibit, how the blood is seeping onto the sheet

25   in the emergency room?

A    Yes, cut them away from her.

Q    On 14(f), we focus just on the pants, does that give some idea of the blood soaked?

A    Yes, the blood has soaked clear through the back board into the sheets we had laid her on.

Q    14(g), a close-up, on that photograph can you see hair on that back board, on that orange back board. I don't know if you can really see that. Do you see hair on that back board?

A    Yes, I do.

Q    I want to also show you 14(h) and 14(i), what do those pictures show?

A    Her hands.

Q    Anything in particular in her hands of note on that day?

A    Well, we noticed hair in her hands, in between her fingers.

Q    Do these photographs accurately reflect the type of hair you noticed in her hands?

A.    Yes.

MS. KETCHMARK:    The Government would offer 14(h) and 14(i).

MR. O'CONNOR:    No objection.

THE COURT:    Received.

(PLAINTIFF'S EXHIBITS 14(h) AND 14(i) WERE RECEIVED IN

EVIDENCE.)

Q    14(i) depicts the hair, looks like three or four hairs you can see.  And then if we could show the jury 14(h) and it shows blood in between her fingers and hair, a few hairs on her hand, is that correct?

A    Yes.

Q    In the emergency room when personnel noticed the hairs in her hand what was done, did you bag her hands, did you assist in bagging her hands?

A    Yes, we didn't do that until she was pronounced dead.

Q    I am going to show you United States Exhibit 14(a) and 14(b)  14(a), does this reflect her hands bagged.

A    Yes.

Q    Left hand.  And on 14(b), does that reflect her right-hand bagged?

A    Yes, it does.

MS. KETCHMARK:    United States would offer 14(a) and (b).

MR. O'CONNOR:    Can we approach.

THE COURT:  Yes.

(PROCEEDINGS OUTSIDE THE HEARING OF THE JURY)

MR. O'CONNOR:    are you seeing this on your monitor.  14(a) and (b) are photographs very gruesome in nature.  They're kind of repeats of some of the other

1  photographs.  I don't think showing them bagged helps the

2  jury in understanding the case.  The evidence they have been

3  bagged, the defense is not going to argue the hairs.  Later

4  we will be arguing they belong to Bobbie Jo or my client and

5  they're prejudicial showing them bagged.

6          MS. KETCHMARK:  If they are willing to stipulate

7  the hairs collected are from the hands of Bobbie Jo I

8  wouldn't put the pictures on the slide, they were collected

9  and bagged properly.

10          MR. O'CONNOR:   There is no objection to that.

11          THE COURT:  You are not asking to do that right

12  now, just when you present that evidence.

13          MS. KETCHMARK:   Yes.

14          THE COURT:  They agree it was collected from the

15  victim's hands.  Thank you.

16          (PROCEEDINGS IN THE HEARING OF THE JURY).

17          MS. KETCHMARK:   Would offer 14(a) and (b) into

18  evidence, but we are refraining from publishing them at this

19  point.

20          MR. O'CONNOR:   No objection.

21          THE COURT:   Received.

22  (PLAINTIFF'S EXHIBITS 14(a) AND (b) WERE RECEIVED IN

23  EVIDENCE.)

24      Q    I am going to show you 14(c).  What does that

25  photograph depict?

1     A    That is a picture of the placenta.

2         MS. KETCHMARK:  The United States offers 14(c).

3         (PROCEEDINGS OUTSIDE THE HEARING OF THE JURY)

4         MR. O'CONNOR:  Same objection.  The doctor has

5 already identified the placenta from the photograph.  This

6 is more blood and guts.  I think its prejudicial effect --

7         THE COURT:  What do you want to accomplish?

8         MS. KETCHMARK:  The baby's blood taken from this

9 placenta and matched to the baby, Victoria Jo.

10         MR. O'CONNOR:  No objection.

11         THE COURT:  Okay, thank you.

12         (PROCEEDINGS IN THE HEARING OF THE JURY)

13         MS. KETCHMARK:  United States would offer 14(c)

14 but refrain from publishing it at this time

15         MR. O'CONNOR:  No objection.

16         THE COURT:  Received.

17   (PLAINTIFF'S EXHIBIT 14(c) WAS RECEIVED IN EVIDENCE.)

18         MS. KETCHMARK:  That's all the questions I

19 have.

20         MR. O'CONNOR:  I don't have any questions.  Thank

21 you, ma'am.

22                 PAUL GATEWOOD,

23 having been sworn, testified.

24                 DIRECT-EXAMINATION

25 BY Ms KETCHMARK:

1    Q    Please state your name.

2    A    Paul Gatewood.

3    Q    Where are you employed?

4    A    With the City of St. Joseph.

5    Q    What is your position?

6    A    I am a detective.

7    Q    How long have you been in law enforcement?

8    A.   For 17 years.

9    Q    What are your basic duties as a detective?

10   A    To investigate any type of crime that happens

11   within a specific area of my city.  We are broken into

12   different areas of the city.

13   Q    What IS NOMIS

14   A    NOMIS is a group of investigators from northwest

15   Missouri that come together on major crime scenes to kind of

16   allocate all our resources together into one pool.

17   Q    What does NOMIS stand for?

18   A    I don't know.

19   Q    Were you called in on December 16th, 2004 to

20   assist in the investigation of the murder of Bobbie Jo

21   Stinnett?

22   A    Yes, I was.

23   Q    What were your duties.

24   A    My duties was with our crime scene team and this

25   NOMIS, the state highway patrol calls our crime scene team

1    and work just the crime scene.  And that was the position
2    they called us for that day.
3         Q    Who all went up from the St. Joe crime scene
4    detectives, who went up to process the crime scene?
5         A.   Sergeant Mike Wilson, our leader, and then
6    Detective Hart and I drove the van and have a big trailer
7    with a lot of equipment on it.  Detective Garland, Detective
8    Shelton, Detective Weed and Detective Walker.
9         Q    So a team went up?
10        A    A full team, yes.
11        Q    In this case, and it may be similar in most of
12   your processing of crime scenes, what specialized tools,
13   what is the basic procedure for processing a crime scene?
14        A    We use many tools.  Our basic tool, start with
15   videotape photographs.  Of course, other eyes and ears.  We
16   have specialized equipment such as your crime site alternate
17   light source.  So if you apply this alternate light source
18   it will see different things you may not see with the naked
19   eye.  We use link lifts, fingerprint pattern, various sorts
20   of specialized equipment.
21        Q    What is Lumminol?
22        A    Lumminol is a chemical we use like if something is
23   cleaned up or blood in particular is soaked into a carpet or
24   somebody is trying to clean it up or washed down a sink you
25   can apply Lumminol and it will show apparent blood wherever

1    it was prior to us getting there.

2        Q    In this case were photographs and videotape taken

3    of the crime scene?

4        A    Yes, they were.

5        Q    Were fingerprints searched for at the crime scene?

6        A    Yes.

7        Q    Did you use the powdered dust technique?

8        A    Yes.

9        Q.   Did you also use the specialized vision for

10   possible things that aren't apparent?

11       A    Crime site, yes.

12       Q    Did you also use Lumminol to detect any blood you

13   might not be able to see with the naked eye?

14       A    Yes.

15       Q    I am going to show you Exhibit 3(b) and 6(a).

16   Here is 3(b) and I am going to show you 6(a), do you

17   recognize those two exhibits?

18       A    Yes, I do.

19       Q    And is that the diagram 3(b) and on 6(a) is the

20   diagram with the evidence collected and marked?

21       A    Yes.

22       Q    Have I asked you to review Exhibit 7(a), the

23   videotape that was taken on the 16th at the crime scene.

24       A    Yes.

25       Q    Approximately how long is Exhibit 7(a), if we

1      were to play it straight through?

2           A    27 minutes and -- almost 28 minutes.

3           Q.   Did you assist me in splicing this 25 plus, 27

4      minute video into about four minutes of snaps from each of

5      the major rooms?

6           A    Yes.

7           Q    And of the eight splices what does splice or clip

8      one depict?

9           A    Splice one is the front area of the house and the

10     porch area.

11          Q    Clip two.

12          A    Clip two is as we enter into the living room.

13          Q    Clip three.

14          A    I am not going to be able to remember all of them.

15          Q    Clip three of the living room were focused on the

16     base of the telephone on the wall flashing one?

17          A    Yes.

18          Q    And then the door with a smear on it?

19          A    Yes.

20          Q    And is clip four the dining room?

21          A    I believe so.  I don't have that list in front of

22     me.

23          Q    Do all of the eight clips depict the crime scene

24     as it was viewed by you on the 16th, the evening of the 16th?

25          A    Yes, they do.

1          MS. KETCHMARK:   The Government would offer 7(a)-1

2     through 7(a)-8.

3          MR. O'CONNOR:   No objection.

4          THE COURT:   Received.

5     (PLAINTIFF'S EXHIBITS 7(a)-1 THROUGH 7(a)-8 WERE RECEIVED IN

6     EVIDENCE.)

7          Q    If we could play 7(a)-1, is that the clip of the

8     front porch?

9          A    Yes.

10         Q    And 7(a)-2, is that a clip of the living room?

11         A    Yes, it is.

12         Q    7(a)-3, is this the clip of the base on the wall

13    and the telephone in the chair?

14         A    Yes.

15         Q    And also a clip of something of interest on the

16    front doorknob?

17         A    Yes, it is.

18         Q    Clip 4, is this a clip of the dining room?

19         A    Yes, this is the dining room.

20         Q    Is there a computer off to the right not shown in

21    this clip?

22         A    Yes, there is, desk top.

23         Q    7(a)-5, is this a clip of the corner of that

24    dining room where the computer station is located?

25         A    Yes.

1    A.    Yes, they were.

2    Q    Looks like five independent swabbing samples were

3  taken?

4    A    Yes.

5    Q    I am now going to show you again 3(b) which is the

6  diagram inside and out.  On this diagram do you list one

7  item that was collected on the outside of the home?

8    A    Yes, we do, item number one.

9    Q    What is item number one?

10   A    Is a piece of plastic tubing about two foot long,

11 probably a quarter inch in diameter, clear plastic tubing.

12   Q    And on 6(a), the diagram of the home with items

13 marked that were collected or lifted, could you quickly go

14 through those 27 items, items 2 through 28, and read those

15 to the jury of what was collected and where.  And with the

16 court's permission if you need to get up, if it's okay with

17 the Judge.

18          THE COURT:  Yes, is it easier to go to the screen?

19          THE WITNESS:  Yes, I have a hard time seeing it.

20   A    Item No. two located right here is blood from the

21 screen door, actually on the knob that you open and close

22 the door with.

23          Number three is a photograph of fingerprints on

24 the wooden door jam that goes up on the door.  There is four

25 fingerprints you can see like this and as it turns you can

see the thumb, four fingerprints and the thumb print.

Number four is blood from outside the front door, the door that comes in, the main door, blood on the outside of it.

Number five is a rag. Just as you enter into this living room area, as you walk in the door on the floor right next to the wall is like a wash cloth and it had apparent blood on it.

Number 6 on the inside of front door on the knob was apparent blood.

Number seven is a mobil phone lying right here in this blue recliner.

Number eight is a knife sheet, actually in this, this is a recliner and on this right where it indicates the knife was stuck between the cushion on the arm and wood. So it was very obvious.

Number nine which is behind the recliner laying on the ground is the lap-top computer.

Number ten will go into the dining room.

Ten is the desk-top computer hard drive, everything.

Eleven, between the computer and the table here on the floor is a checkbook of the Stinnetts laying on the ground or on the floor.

Number twelve is over here. This is like a china

1  hutch.  On top of it is a Kodak camera.

2  Number thirteen is blood from the kitchen drawer,
3  one of the drawers.  They're three drawers here.  One of
4  them is some blood, apparent blood.

5  Sixteen is from the stove over here on the front
6  of the stove, also apparent blood.

7  Seventeen is hair from a drawer, on another drawer
8  here.  One of the three there was a blond hair half in and
9  half out of the drawer.

10  Number eighteen is a print from one of the right
11  knobs.  There is a print that we located and collected.

12  Twenty, blood from the kitchen sink.  As you look
13  down in the sink you could see the, you know, when you do
14  your dishes you still look down and see a little bit of
15  water.  When I look in there there was apparent blood in
16  there.  So we took a swab and drew that.

17  Number twenty one, twenty two, twenty three,
18  twenty four and twenty five is what we refer to as the dog
19  room where there was apparent blood clots all over the floor
20  in here so we wanted to take samples of different areas,
21  just did it at the entry way, then here, here and here and
22  over here.  Those are all swabs of blood.

23  Number twenty six is a water standard.  What a
24  water standard is at that time we took cotton swabs and we
25  used distilled water and you have to take a standard in case

1    there is some contamination in that water.  That way we can

2    test it and make sure no standard because each one we took

3    dropped distilled water on it to help pick up some of the

4    blood.  So that number 26 is just one cotton swab with that

5    distilled water on it.

6           Number twenty seven was a bungi cord located out

7    on the back steps as you walked out the back door.

8           And number twenty eight was A. K. registration

9    which came out of the file cabinet you see in the video

10   earlier that was right there.

11        Q    Thank you.   Now when you get to the home and you

12   are processing this is like eight o'clock in the evening,

13   later on in the evening?

14        A    Yes.

15        Q    No arrest has been made.

16        A    No.

17        Q    Do you know basic information, a strangulation, a

18   knife injury, and a computer relation, someone that may have

19   come to the house and they communicated over the computer,

20   that is some of the information you had?

21        A    That's correct.

22        Q    Is that why you were picking up like the tubing

23   and the bungi cord for possible strangulation.

24        A    Definitely.

25        Q    You don't know if that was used or not?

1          A     No, we do not.

2          Q     A knife that was in the chair was that because it

3    possibly could be the murder weapon?

4          A     Yes.

5          Q     And prints, you don't have a suspect at that point

6    so you are just generally looking for prints?

7          A     Yes, everywhere.

8          Q     I am going to show you United States Exhibit 7(b)

9    and 7(c), 7(d) 7(e) 7(f) and 7(g), I have showed these to

10   you before.

11         A     Yes.

12         Q     7(h), 7(i), 7(j) 7(k), I am sorry, I said 7(k) but

13   it didn't come up, I am sorry.  L, M, N, O, P, Q, R, S, and

14   T. are these all photographs that were taken at the crime

15   scene?

16         A.    Yes.

17         Q.    Do these all depict items collected from you on

18   that evening?

19         A     Yes.

20               MS. KETCHMARK:  The United States would offer

21   Exhibits 7(b) excluding 7(k) through 7(t).

22               MR. O'CONNOR:   No objection.

23               THE COURT:  Received.

24   (PLAINTIFF'S EXHIBITS 7(b) THROUGH 7(t) WERE RECEIVED IN

25   EVIDENCE EXCLUDING 7(k).

1        MS. KETCHMARK:    I would like to publish these to
2   the jury.

3        Q    Do these items focus on the print, blood swab and
4   computer?

5        A    Yes.

6        Q    And the tubing?

7        A    Yes.

8        Q    7(b), is that the tubing you collected marked item
9   one?

10       A    Yes.

11       Q    7(c), is that, what is that on that exhibit?

12       A    This is the a -- this is the one I told you about,
13   the storm door, apparent blood here and here.

14       Q    Did you take a fingerprint lift from this?

15       A    No, when we went there and we looked at it and
16   even with digital photography you can see we are looking for
17   ridge patterns, for anything of prints, those are the
18   different ridges on your finger.  You don't know that will
19   give us a good print.  Then we want to collect for D. N. A.
20   that's when we take the distilled water for swabbing and we
21   swab the whole area for D. N. A.

22       Q    7(d), what does that depict?

23       A    This is what I mentioned earlier, you can see just
24   like that, one, two, three, four and then there is a thumb
25   print right around this corner.

1      Q     Was this in blood or not?

2      A     No, this appeared to be something working on the

3    car or they had greasy hands, come home, no red, dark,

4    almost a black color.

5      Q     Did you lift prints or try to collect that any

6    way?

7      A     Yes, we attempted to lift it.  First we

8    photographed it, videotaped it.  Then we dusted it and even

9    looked through the crime site with the piece of equipment I

10   was talking about that allows you to see things in contrast,

11   a lot better than the naked eye would be able.

12     Q     After you dusted does 7(e) reflect how the prints

13   are enhanced?

14     A     Yes, this is after applying powder.  Now we start

15   to see the ridges being formed.

16     Q     Is this similar with the print around the side of

17   the door jam in 7(s) as a single print?

18     A     Yes.

19     Q     That's after it has been dusted?

20     A.    This is after it has been dusted and really start

21   to see here patterns and ridges after we dusted it.

22     Q     Did you lift prints from these, I think you said

23   grease prints.

24     A     We tried.

25     Q     You couldn't do it?

1    A.    No.

2    Q    7(g), what does that depict?

3    A    This is on the door, these two little spots of

4    apparent blood.  Again they don't dust any good for

5    fingerprints but we are going to swab them for D. N. A.

6    Q    7(h).

7    A    This is as you walk into the living room when you

8    first enter the door and down at your feet to the right-hand

9    side just inside the doorway, here's your doorway, right

10   here is this rag with apparent blood soaked in it.

11   Q    7(i).

12   A    This is the interior, the same door we were just

13   looking at as if apparent blood.  Again you can see in this

14   close-up there is no pattern at all so we are looking for a

15   swab.

16   Q    Did you even attempt to lift a print from that?

17   A    No, no, we were looking at it and there were no

18   ridges detailed at all.

19   Q    17(j).

20   A    This is the faucet.  And on this knob here is

21   where we did lift a print, able to lift a print.

22   Q    I am going to show you what has been marked as

23   Exhibit 7(k), do you recognize this exhibit?

24   A    Yes

25   Q.    What is 7(k).

1    A    This is a fingerprint card.  This is what we use

2   after we dust it.  We will put the powder and swirl the

3   brush around and make sure it's nice and even.  And we will

4   take a piece of tape and put it over the fingerprint.  Once

5   we put it over the fingerprint we lay it on this white

6   background.  is this actually a lift.  On the other side it

7   gives places for all your information, where it was taken,

8   who took it and then my drawing which is not as good as the

9   picture and all the information you need on it

10            MS. KETCHMARK:    United States would offer 7(k).

11            MR. O'CONNOR:    No objection.

12            THE COURT:  Received.

13       (PLAINTIFF'S EXHIBIT 7(k) WAS RECEIVED IN EVIDENCE.)

14            MS. KETCHMARK:    If we could pass to the jury.

15    Q    Is it hard to get the lift?

16    A    Very hard.  What you want, you want a smooth, flat

17   surface like the bench.  And you can see this fingerprint on

18   here.  So you try to tape up and over and it's crooked, it's

19   tough to get a good fingerprint off something like that.

20    Q    7(l).

21    A    This is the desk-top computer hard drive down

22   here.

23    Q    7(m).

24    A    That is showing the hard drive itself.

25    Q    7(n).

1    A    That is what was on the front of the computer
2  signed in to Happyhavenfarms@HotMail whatever and the dark
3  spot something about the screen saver that is supposed to be
4  covered.   It wasn't working but that's what you see on the
5  front of the computer sitting in the corner.
6    Q    And 7(o), the swabbings on the floor?
7    A    This is what we consider the dog room and this is
8  apparent blood all over, just all over the place.  And we
9  actually looked at first for any foot wear impressions, hand
10  impressions.   Again with visual photography you can look and
11  see there is no distinctive patterns.
12      Then what we focus, the swabbing, you have a
13  pretty good size room.   It's not a big room but a lot of
14  blood.   What we did was we took a swab.   That's what 21 is.
15    Q    And 7(p) a close-up of 21?
16    A    Yes.
17    Q    7(q).
18    A    Yes, the same thing, another swab in the left.
19    Q    7(r).
20    A    A swabbing right in the middle.
21    Q    7(s).
22    A    A swab right to the right.
23    Q    And 7(t).
24    A    And then a swab at the other side of the room.
25    Q    Why did you collect a check book?

1    A    It was out of place.

2         MS. KETCHMARK:    That's all the questions I have.

3         THE COURT:    I think we will take a break.

4         MR. O'CONNOR:    I have a few questions.    Thank

5    you.

6         THE COURT:    Ladies and gentlemen, we are going to

7    take a recess now for twenty minutes.    Again going by the

8    clock at the back of the courtroom we will be in recess

9    until twenty minutes to four.

10        And I want to ask you to keep in mind the

11   instructions I have given you previously during this recess

12   and please be back in the jury room at twenty minutes to

13   four.

14                          RECESS

15        THE COURT:    Thank you.    You can be seated.    All

16   right, Tracy, bring the jury in.

17        Thank you.    Everyone can be seated.    Detective

18   Gatewood, I will remind you you are under oath.

19        Mr. O'Connor, you may cross examine.

20                     CROSS EXAMINATION

21   BY MR. O'CONNOR:

22   Q.   The videotape we Just watched a minute ago, that

23   was of course taken after Miss Stinnett had been removed, is

24   that correct?

25        A    Yes.

1    Q    When you are called to the scene like this, as I
2    understood it, looking at your report that there was a
3    debriefing session first by the sheriff of what had happened
4    before you guys did your work to collect evidence at the
5    crime scene, is that a fair statement?
6    A    Yes.
7    Q.   What Was the purpose of this briefing session?
8    A    The briefing is to give us an idea or scenario
9    what had taken place before we entered the crime scene,
10   personnel entered the crime scene, different information
11   they had gathered.
12   Q    I am looking at a narrative report you wrote.
13   Have you had a chance to look at your report before today?
14   A    Yes, I have.
15   Q.   I am going to ask you about this report but at
16   some point in time if I either misstate something or you
17   want to look at it, this isn't hide and seek, I am happy to
18   show you what I have here, okay?
19   A    Okay.
20   Q    When you were briefed by the sheriff where did
21   that briefing take place?
22   A    Mobil command center.
23   Q.   Where was that?
24   A.   Parked on the street in front of the residence.
25   Q    Was the information, part of the information given

1    to you the victim's mother had found her daughter lying in a

2    pool of blood?

3        A    Yes.

4        Q    Any other information about any other whereabouts

5    of blood at the scene other than that statement?

6        A    Yes, the kitchen sink.

7        Q.   What about the kitchen sink?

8        A    The sheriff said something about picking up a

9    knife in the sink looking for any trace evidence, somebody

10   had mentioned something there might be apparent blood in the

11   sink.

12       Q    Was there any information given at that debriefing

13   even the sheriff himself may have tracked blood in and out

14   of the crime scene?

15       A.   Yes.

16       Q    Why was that important to note?

17       A    Well, the tracks coming in and out, if we found a

18   good foot impression on the carpet coming out of the room

19   then we would have to take comparisons from the mom's shoes

20   and the sheriff's shoes to see whose actual footwear

21   impression it would have been.

22       Q    Was there anything in that debriefing the sheriff

23   told you there was blood smeared everywhere and appeared to

24   be a struggle or some kind of a fight in that room?

25       A    No.

Q    When you were, before you went to start your crime scene work I assume you want to know information about how many people had been there in that particular room?

A.    Yes.

Q    And why would that be for?

A    Again it's process of elimination. Anybody that goes in that room or comes out can leave D. N. A. fingerprints, footwear impression. So we are going to have to know who we make comparisons with and we want to know up front how many people went in and how many people stepped in the blood, just a whole scenario of things that could happen.

Q    I assume you were aware that life-saving efforts had taken place in that room before Bobbie Jo Stinnett was removed?

A    Yes.

Q    Were you of the understanding how many personnel, persons I guess I am looking for, numbers of persons that would have been in the room where all that blood was on the floor and basically walking in that blood or working within that blood to help save Bobbie Jo's life?

A    I understood the sheriff and the mother. Those are the only two people I understood were in the room.

Q    If I told you now that there has been testimony there were at least two E. M. Ts. in that room, let me start

1  over.  As I understood, the mother was there first, is that

2  your understanding?

3      A    Yes.

4      Q    Then Sheriff Espey showed up which would be two

5  people in the room, trying to do C. P. R.

6      A    Yes.

7      Q     If I told you there has been evidence at least

8  two emergency E. M. Ts had been used in the room with that

9  board they use to take people to the hospital?

10     A    Yes.

11     Q    Knowing that now, having that information would

12 that help you in knowing or deciding in that room all the

13 blood appears to be smeared, whether that was part of an

14 actual crime scene other was it now part of what has been

15 done to the actual crime scene that now has somewhat been

16 compromised not purposely, just by the life saving efforts?

17     A    It's hard for me to say whether it was life saving

18 or crime scene.  More importantly to us, if we had found the

19 footwear impression, we would make comparison with those

20 people.  That's what we are trying to get to find the people

21 that had went into the crime scene.

22     Q    Did you make any determination whether or not you

23 believed a struggle had occurred?

24     A.   It did appear there was a struggle with just the

25 swiping of the blood just going back and forth, in different

1  directions, no definite footwear impressions or anything

2  like that that we located.

3      Q    Was that also with the result of the life-saving

4  efforts taking place, people walking, maneuvering, picking

5  up the body and moving it on a board.

6      A    It could be.

7      Q    Did you notice anything in the room where you

8  believe Bobbie Jo was found, where the blood was, that had

9  been knocked over as if there had been a fight in that room?

10      A    No, I don't remember anything being knocked over.

11      Q    This is 7(a), a video clip we just did, I want to

12  do one more time and then I am going to ask you a couple

13  more questions.

14      Kind of focusing on this, the cabinet?

15      A    Yes.

16      Q    In that cabinet appeared from the photograph to

17  have a lot of items on it including items at the very top

18  that looked like items if that cabinet was hit they could

19  have, may have fallen down, would that be a fair statement

20  what you saw?

21      A    Yes.

22      Q    And nothing was disturbed in that cabinet or

23  nothing knocked on the ground in that room, is that correct?

24      A    No.

25      Q    Nowhere else in that room was anything knocked on

1    the ground, is that correct?

2        A    No.

3        Q    Did you ever measure that room for the size of

4    that room?

5        A    Yes, there were measurements taken. I did not.

6        Q    You did not take measurements, okay.

7            MR. O'CONNOR:    I don't have any further questions.

8                            REDIRECT EXAMINATION

9    BY MS. KETCHMARK.

10       Q.    Were there multipe swipings multiple directions on

11   the north wall where the cabinet was?

12       A.    Yes.

13       Q    How about the east wall, were there swipings

14   multiple directions?

15       A    Yes.

16       Q    How about the south wall, multiple directions.

17       A    Yes.

18       Q    And we have the entry way?

19       A    Yes.

20           MS. KETCHMARK:    That's all the questions I have.

21           MR. O'CONNOR:    No other questions.  Thank you,

22   Your Honor.

23           THE COURT:  Thank you, Detective.  You are

24   excused.

25                        KATHLEEN HENTGES,

1    having been sworn, testified:

2                    DIRECT-EXAMINATION

3    BY MISS KETCHMARK:

4         Q    Please state your name for the record.

5         A    Kathleen Hentges.

6         Q    Would you spell Hentges?

7         A    H-e-n-t-g-e-s.

8         Q    Where do you work?

9         A    For the Kansas City, Missouri Crime Laboratory

10        Q.   What do you do there?

11        A    I am a forensic specialist IV which means I am a

12   certified latent fingerprint examiner.

13        Q    How long have you been employed in that capacity?

14        A    I have been on the department for over 31 years

15   and I have been a latent print examiner for 26 years.

16        Q    You said you are a certified latent examiner, how

17   many are there in the State of Missouri approximately?

18        A    In the state of Missouri they're approximately 13

19   certified examiners.

20        Q    Do you belong to any associations.

21        A    Yes, I do.

22        Q    What are they?

23        A    I am a member of the International Association for

24   Identification which is a world-wide parent body

25   organization.  I am also a member of the Missouri Division

1   of the International Association for Identification, also

2   the Kansas Division and the New England Division.  I serve

3   on the committee for the certification for the State of

4   Missouri and also currently a board member.

5          MR. O'CONNOR:   We would stipulate for purposes

6   of brevity to her qualifications she's qualified to the

7   field she has been asked to testify.

8          THE COURT:  Do you accept that?

9          MS. KETCHMARK:   Yes.

10     Q    Can you explain what a latent fingerprint is?

11     A    A latent print on your fingers or on your palm

12  area produces a moisture that exudes perspiration, sometimes

13  you have oil or different substances on the fingers or the

14  palm area at the time an item is touched.  Sometimes you can

15  see an outline of some ridge detail there such as an example

16  would be on a piece of glass or sometimes has to be

17  chemically enhanced like a piece of paper, you can actually

18  touch a piece of paper and by using chemical enhancement you

19  would produce a latent print.  But the latent print, they're

20  breakages that occur within the fingers and palm area and

21  each individual is individually unique.  So when an item is

22  touched it's processed with whatever type of chemical needs

23  to, depending on the item, that's what produces a latent

24  print.

25     Q    What is a known print?

A       A known print is a set of inked prints taken in a controlled environment by placing a thin film on the fingers or the palm area and rolling them out on a recipient surface such as a white piece of paper to recording of the pattern type and ridge characteristics within the finger and palm is recorded on that piece of paper.  Again that is taken in a controlled environment where a latent print is not taken in a controlled environment.

Q       Is it possible for a person to touch a surface and not leave a print?

A       Yes.

Q       Why is that?

A       Like I stated earlier, there has to be some type of moisture or oils on your fingers at the time you touch an item.  You can have someone that maybe is not perspiring or doesn't have any of those substances, they can actually touch an item and not leave that detail.  Or you can touch an item and maybe it's not of sufficient value to make a comparison.

Q       And how do you basically make a comparison just in real short terms?

A       A comparison is done by taking a set of known inked prints to the latent print that has been determined to be of value and comparing the regular characteristics within the latent print to the known inked print.  Again each

1    person is individually unique so no two persons in the world
2    will have the same print.  So that comparison is conducted
3    using both of those to see if the same type time ridge
4    characteristics are there in both the known impression and
5    the latent impression.

6        Q    Are all prints lifted good for comparison
7    purposes?

8        A    No.

9        Q    Can you explain the difference between prints of
10   value and prints of no value?

11       A    A print of value, there is no set number of ridge
12   characteristics needed to make a comparison.  Generally I am
13   looking for eight to twelve ridge characteristics.  How we
14   make an examination is through three levels of detail, level
15   one being the pattern type.  You may have heard of loops and
16   whirls.  That is level one.  Level two is the breakages of
17   the ridge detail within the finger of the palm area.  And
18   level three would be the pores that occur on the ridge, as
19   level three.

20            So that's how we make a comparison.  So really
21   there isn't a set number of ridges needed to make a
22   comparison but it's up to each examiner to determine where
23   they feel comfortable making an identification or a non
24   identification.

25       Q    Did you do print examination work in the case, the

1    murder of Bobbie Jo Stinnett?

2         A    Yes, I did.

3         Q    Were prints collected or photographed at the home

4    of Bobbie Jo Stinnett?

5         A    Yes.

6         Q    After looking at latent lift cards or photographs

7    were there any prints of value found in the home of Bobbie

8    Jo Stinnett?

9         A    Yes.

10        Q    Where were they found?

11        A    There was one print that was off of the faucet and

12   then there was one print that was on a door jam.

13        Q    Were you able to identify who left the print on

14   the faucet.

15        A    Yes.

16        Q    Who was that?

17        A    That belonged to the victim, Bobbie Jo Stinnett.

18        Q    Did you receive, I am going to show you what has

19   already been admitted into evidence as 7(k), do you

20   recognize 7(k).

21        A    Yes, I do.

22        Q    And I am going to show you what has been marked as

23   10(c) and its contents, do you recognize the contents?

24        A    Yes, I do.

25        Q    In homicide cases during the autopsy are homicide

1    victims fingerprinted after they are deceased?

2        A    Yes.

3        Q    Are these photographs taken from Bobbie Jo

4    Stinnett's known fingerprints taken from Bobbie Jo Stinnett?

5        A.    Yes.

6        Q.    Is that how you were able to determine Bobbie Jo

7    Stinnett had left the print on the faucet in the kitchen?

8        A    The inked impressions that were taken of the

9    victim were a little bit dark and smudged.  And so I took

10   these prints to the photography section who was able to

11   lighten the image up where I could make a positive

12   identification of Bobbie Jo Stinnett.

13       Q    Then you mentioned another print, the door jam.

14   Were known prints of multiple individuals submitted for you

15   to compare with the print on the door jam?

16       A    Yes.

17       Q    Were you able to determine who left that print?

18       A    No, I was not.

19       Q    None of the folks' prints submitted to you matched

20   that print?

21       A    That's correct.

22            MS. KETCHMARK:    That's all the questions I

23   have.

24            MR. O'CONNOR:    No questions.

25            THE COURT:   Thank you very much.  You are

1    excused.

2            MR. WHITWORTH:    The United States calls Mr. Terry

3    white.

4                        TERRY WHITE

5    having been sworn, testified:

6                    DIRECT EXAMINATION

7    BY MR. WHITWORTH:

8        Q    Sir, Would you state your name, please?

9        A.   Terry White.

10       Q    Where do you live currently, what city?

11       A    In Skidmore, Missouri.

12       Q.   How old are you?

13       A    22.

14       Q    Where do you work?

15       A    United Services.

16       Q    What do you do there?

17       A.   I am a T. V. technician.

18       Q    Are you married to Amanda White?

19       A    I am.

20       Q    In December of 2004 where did you and Amanda live?

21       A    In Skidmore, 412 West Elm.

22       Q    Were you married at the time?

23       A    Yes.

24       Q    Did you know the Stinnetts?

25       A    I briefly talked to them but I didn't know them

1    that well.

2         Q    Where did you live?

3         A    Right next door.

4         Q    Showing you Government's Exhibit 4(a), is that a

5    aerial photograph?

6         A.   Yes.  MR. WHITWORTH:   I offer into evidence

7    Government's Exhibits 4(a), 4(c), 8(a), 8(b), 8(e).

8              MR. O'CONNOR:   No objection.

9              THE COURT:  Those exhibits are received.

10   (PLAINTIFF'S EXHIBIT NOS. 4(a), 4(c), 8(a), 8(b), and 8(e)

11   WERE RECEIVED IN EVIDENCE.).

12        Q.   4(b), is that an aerial photograph of your home

13   in Skidmore?

14        A    Yes, it is.

15             MR. WHITWORTH:  May the witness step down to the

16   screen, Your Honor.

17             THE COURT:  He may.

18        Q    Show the jury, if you would, please where your

19   house is.

20        A    Right here.

21        Q    Where is the Stinnett home?

22        A    This one right here.

23        Q    Is that West Elm Street in front?

24        A    Yes.

25        Q    If you could go next to 4(c).  Is that another

1  aerial from the front looking at the front of the house?

2       A    Yeah.

3       Q    And where is your living room?

4       A    Our living room is, there is a window you can't

5  see but that's where the living room is, in that corner of

6  the house.

7       Q    Were you home on Thursday, December 16th?

8       A    I was.

9       Q    What were you doing that day?

10      A    I was playing video games and doing laundry.

11      Q    Did you work during that period of time?

12      A    I worked at Joe's Pizza.

13      Q    Where is that located?

14      A.   It's located in Barnard, Missouri.

15      Q    Do you remember what time you woke up that day?

16      A    Around seven.

17      Q.   Was your wife at home during the day?

18      A.   She was home in the morning and went to work that

19  morning.

20      Q    Where did she work at?

21      A    She worked at a place called Max Stout Studios.

22      Q    You indicated you did laundry and also played

23  video games, do your washing machine and your video or

24  T. V. make noise when you have those on?

25      A    The washing machine is located downstairs so you

1   can't hear it at all.

2       Q.   What about your video games?

3       A    Just normal T. V. viewing level, no surround sound

4   or anything like that.

5       Q    Do you remember seeing either Bobbie Jo or Zeb

6   Stinnett that day?

7       A    No.

8       Q    What time did your wife go to work?

9       A    She left around, probably seven-forty-five.

10      Q    And did she come home for lunch that day?

11      A.   She did around one-fifteen.

12      Q    Did you hear a noise outside the home sometime

13  around noon?

14      A.   Around twelve thirty I heard a car door and looked

15  out to see if my wife arrived home.  It wasn't her car so I

16  didn't pay any more attention.

17      Q.   Did you see a car?

18      A.   I saw a red car sitting on West Elm.

19      Q    When you heard the car door slam was it one car

20  door or two car doors?

21      A    One car door.

22      Q    Did you see anyone?

23      A    No.

24      Q    Did you look when you first heard the sound?

25      A.   I just like looked out the window to see if my

1    wife was home and it wasn't her car so I didn't pay any more

2    attention to it.

3         Q    When you looked outside what did you see?

4         A    The rear of the car.

5         Q    I am going to show you what has been marked as

6    Government's Exhibit 8(e), does that look familiar?

7         A    It looks like the car I seen out the window.

8         Q    And did you also see part of the side of the car?

9         A.    Yes, the rear quarter panel.

10        Q    Showing you Government's Exhibit 8(b), did that

11   look familiar?

12        A    Yeah, I wouldn't have seen the whole side but just

13   the rear side, back area of it.

14        Q    Did you see Bobbie Jo Stinnett's vehicle, that

15   green Expedition?

16        A.    Yes, it was sitting where it always sat.

17        Q    Showing you Government's Exhibit 8(a), is that

18   where the car was parked that day?

19        A    Yes.

20        Q    Could you explain to the jury where the red car

21   was at?

22        A    The red car would have been pulled up.

23        Q    If you could go back to 4(c) briefly.

24        A    The red car would have been pulled up in front of

25   the Stinnett house facing east.

1          MR. WHITWORTH:  With the court's permission, if he
2   could step down one more time.
3          THE COURT:  Yes.
4     Q.   Just show the direction the car was pointing.
5     A    The car was sitting here facing east with the
6   headlights going that direction.
7     Q    Where was Bobbie Jo's car?
8     A.   Bobbie Jo's car was parked up in there kind of
9   behind the fence.
10    Q.   Did you ever see anybody going in and out of the
11  house that day?
12    A    No.
13    Q    What time did your wife, you said your wife came
14  home from work at one thirty?
15    A.   Yes, she came home for lunch.
16    Q    And how long did she stay?
17    A.   She went back to work probably one-forty.
18    Q    Did you leave the house that day?
19    A    I left to go to work at three o'clock.
20    Q    Did you notice anything when you left?
21    A    I didn't notice it because I went west on West
22  Elm.
23    Q    And, in other words, you would have --
24    A.   I would have circled around the curb there.
25    Q    The bottom of the photograph?

1    A    The bottom of the photograph, yes.

2    Q    Gone what, north?

3    A    I would have circled around and there is a black

4    top that cuts back and I would have went around the block

5    that way.

6    Q    Is that Highway DD.

7    A    Yes.

8    Q.   So the record is clear, if you could step up and

9    show which way Highway DD is?

10    A    Behind this house here and it runs parallel to

11    West Elm.  I would have pulled out around and back that

12    direction.

13    Q    Is that DD running east-west?

14    A    Yes, it does but it curves back around and heads

15    out of town.

16    Q    So you don't know if the red car was still there

17    or not because you didn't look?

18    A    I didn't look, no.

19    Q    Did you hear anything unusual that day, any noises

20    coming from the Stinnett home, anything of that nature?

21    A    No.

22    Q    When did you find out your next door neighbor had

23    been murdered?

24    A    Whenever I got a call at work from the sheriff and

25    he told me what had happened and asked me to come home.

1    Q.    Did you give him a statement?

2    A    Yes, I did.

3         MR. WHITWORTH:    No further questions.

4                    CROSS EXAMINATION

5    BY MR. O'CONNOR:

6    Q    Just real quick, sir, when you looked out when you

7    heard this car door you approximate that time to be twelve

8    thirty?

9    A    Yes.

10   Q    You told the officers basically the same day when

11   they interviewed you about what you saw?

12   A    Right.

13   Q    And then you approximate the time you went to work

14   around three o'clock?

15   A    Yes.

16   Q    But when you left to go to work you didn't notice

17   whether there was any vehicle?

18   A    No, I didn't notice.

19        MR. O'CONNOR:    Thank you, sir.

20        MR. WHITWORTH:    May he be excused, Your Honor.

21        THE COURT:    Thank you, Mr. White, you are

22   excused.

23                    AMANDA WHITE

24   having been sworn, testified.

25                    DIRECT-EXAMINATION

BY MR. WHITWORTH:

Q . Ma'am, Would you state your name for the jury, please.

A    Amanda White.

Q    And how old are you?

A    21

Q.    Are you married to Terry who was just in here?

A.    Yes, I am.

Q     If you could speak into the microphone.  You can pull it towards you.  Do you live in Skidmore?

A    Yes, I do.

Q    And what is your address there?

A    412 West Elm Street.

Q    You lived right next door to the Stinnetts?

A    Yes.

Q    Back in December of 2004?

A    Yes, we do.

Q    What time did you get up for work on Thursday, December 16th?

A    Around seven.

Q    And did you leave for work?

A    Yes, around eight I went to work.

Q    Where did you work at?

A    Mac's Recording Studios in Skidmore.

Q    That's right there in town?

1    A    Yes.

2    Q    Did you see either Bobbie Jo or Zeb Stinnett that

3    day?

4    A    No.

5    Q    Did you know either one of them?

6    A    As acquaintances, yes, we introduced ourselves.

7    Q    Did you know Bobbie Jo was pregnant?

8    A    Yes, I did.

9    Q    Do you remember what time you came home from lunch

10   that day?

11   A.    It was about one-fifteen.

12   Q    And did you notice anybody, any vehicles at the

13   Stinnett home?

14   A    Yes, there was a red vehicle parked in front of

15   their house, a dirty red car.

16   Q    Again what time was it?

17   A    About one-fifteen.

18   Q    Showing you Government's Exhibit 4(c), that's a

19   aerial of your neighborhood.

20   A    Yes.

21   Q    Your husband has already shown us where your house

22   is and where the Stinnett home is.

23        MR. WHITWORTH:  If the court would permit, can she

24   step up to the photograph?

25        THE COURT:  She may.

627

Q    Can you explain to the jury the direction you came
home for lunch that day?

A    From there I drove toward, to here, parked in the
driveway.

Q    When you drove past the Stinnett home what did you
see?

A    The dirty red car was parked right in front of
their house facing east.

Q    You can go ahead and sit down.  Did you recognize
that car?

A    No, I hadn't seen it before.

Q    Did you see anyone outside of the home?

A    No.

Q    The Stinnett home?

A    No.

Q    Did you go inside to eat lunch?

A    Yes.

Q.   How long did you stay?

A.   Until about one-forty.

Q    Did you get a pretty good look at the car?

A    As I was driving past, yes.

Q    Showing you exhibit 8(b), does that look familiar?

A    Yes.

Q.   Does that appear to be the car you saw parked in
front of the driveway?

1          A.    Yes.

2          Q     Did you also get a side view of the car, a

3     driver's side-view when you drove past it?

4          A     Yes.

5          Q     Showing you Government's Exhibit 8(c), does that

6     look familiar?

7          A     Yes, it was very dirty just like that.

8          Q     Now, what time did you go back to work?

9          A     One-forty.

10          Q     And you drove past, did you get in your car in the

11     driveway?

12          A     Yes.

13          Q     Did you back out?

14          A     Yes.

15          Q     Which direction did you go?

16          A.    I went east.

17          Q     Back up Elm Street?

18          A.    Yes.

19          Q     Did you go in front of the Stinnett home?

20          A     Yes.

21          Q     When you passed the home did you see anyone inside

22     or outside the home?

23          A     No.

24          Q     Was the car still there or was it gone?

25          A     It was still there when I left.

1    Q    When you were at home eating lunch did you hear
2 any loud noises, screaming, anything of that nature from the
3 Stinnett home?

4    A    No.

5    Q    When did you learn that Bobbie Jo had been
6 murdered?

7    A    That evening when I got home.

8    Q    Were you interviewed by the police?

9    A    Yes.

10    Q    And were the Stinnetts good neighbors?

11    A    Yes.

12    MR. WHITWORTH:    No further questions.

13    MR. O'CONNOR:    No questions, Your Honor.

14    THE COURT:    Thank you, Miss White.    You are
15 excused.

16    MR. WHITWORTH:    Your Honor, the United States
17 calls Sergeant Dave Merrill.

18                    DAVID MERRILL,
19 having been sworn, testified:

20                    DIRECT-EXAMINATION
21 BY MR. WHITWORTH:

22    Q    Sir, Would you state your name for the jury.

23    A    David Merrill.

24    Q    And where are you employed?

25    A    The Missouri State Highway Patrol.

1    Q.    How long have you been in law enforcement?

2    A     Twenty four years.

3    Q     How long with the patrol?

4    A     21 years.

5    Q.    Now, what is your current rank?

6    A     I am a sergeant in the division of drug and crime

7    control.

8    Q     Where is your office?

9    A     In St. Joseph, Missouri at True Paycheck Quarters.

10   Q     What was your assignment in December of 2004?

11   A     I was the supervisor of the criminal investigation

12   unit assigned out of the division of drug and crime control

13   of the Missouri State Highway Patrol.

14   Q     How did you become involved in the Bobbie Jo

15   Stinnett homicide?

16   A     On December 16th of '04 I was contacted at

17   approximately 4:00 P. M. by Deputy Steve Whittington of the

18   Nodaway County Sheriff's Office.

19   Q     What did you learn from Deputy Whittington?

20   A.    He advised me he was at a residence in Skidmore,

21   Missouri; that his department had responded to a 911 call

22   from that residence.  That there was an unresponsive female

23   at the residence who was later identified as Bobbie Jo

24   Stinnett that had her stomach, abdomen area cut open as well

25   as she was covered in blood at the scene.

1    Q    And what did you do when you got that information?

2    A    Based on the information that Deputy Whittington

3    had provided me I suggested to Deputy Whittington that we

4    should consider activating the Northwest Missouri Major

5    Investigation Squad Initial Response Team to get more

6    investigators up to the area from local law enforcement

7    agencies in northwest Missouri to investigate the crime

8    that had occurred.

9    Q    Is that also called NOMIS.

10    A    Yes.

11    Q    N-O-M-I-S.

12    A    Yes.

13    Q    Would you tell the jury what the initial response

14    team is?

15    A.    The initial response team of the Northwest

16    Missouri Major Investigation Squad is a group of

17    investigators that that is their basic job function within

18    the different agencies they work for, as far as the

19    interviews and investigating criminal activity.  They have

20    all been assigned to be a part of this squad to investigate

21    major criminal activity in northwest Missouri.

22         It also includes the St. Joseph police department

23    crime scene investigation unit that we use to basically

24    process the crime scene at a major investigation usually of

25    a homicide.

1    Q    And does it include federal law enforcement
2    agencies.

3    A    Yes, we can.

4    Q    What time did you arrive at the crime scene?

5    A    I arrived at the crime scene at approximately
6    Six P. M. When I received the phone call from Deputy
7    Whittington I was in Davis County at least an hour away and
8    I needed to respond to the Troop H. headquarters to get our
9    crime scene investigation unit van and then proceed to
10   Skidmore.

11   Q    When you first arrived what did you do?

12   A    Upon arrival at Skidmore on Elm Street I contacted
13   Deputy Whittington. He briefed me and advised me of any
14   additional information that had taken place at the scene
15   prior to my arrival. Between the time I was contacted and I
16   had gotten there he advised me he had, that his department
17   had officers on the scene, had done a neighborhood canvass
18   and had knockd on doors in the neighborhood trying to look
19   for information as to who was there. He briefed me on the
20   fact that the victim's mother, Bobbie Jo Stinnett, not
21   Bobbie Jo Stinnett

22   Q.    Becky Harper.

23   A    Yes, Becky Harper, had contact with Bobbie
24   previously in the afternoon, I believe around two thirty and
25   had said something about somebody being there to look at a

1   dog and that she had later went to the residence around
2   three thirty and found her daughter in the condition that I
3   previously described in the residence.

4           In addition, they had learned that at least one
5   neighbor had seen a red car parked in front of the residence
6   earlier in the afternoon.

7      Q   Did you learn at some point that Miss Stinnett had
8   been pregnant?

9      A   Yes, I was further advised that the ambulance
10  personnel on the scene that had responded discovered that
11  the umbilical cord had been cut and the baby from the wound
12  was in fact missing and they had conducted a search in the
13  area immediately around there to look for the baby.

14          And additionally we did some additional searching
15  after my arrival, too but no baby was found.

16     Q   Were you asked by Sheriff Espey to be the lead
17  investigator there at the crime scene?

18     A   Yes.

19     Q   That was one of your assignments with NOMIS, you
20  were the primary contact point at the time, correct?

21     A   Yes.

22     Q   So what did you do next?

23     A   Becky Harper and Bobbie Jo Stinnett had went into
24  the hospital and they had been interviewed by Deputy Ralph
25  Meyer of the Nodaway County Sheriff's Department and some

information, obviously we were looking for who would have

possibly been there at the residence looking for a dog and

also who would have been driving the red car.  And it was

revealed from the interview of Becky Harper some lady from

the internet was there to look at a dog from Fairfax.

Q     So did that give you a lead?

A     Yes, it did.

Q.    And did you also assign a member of your task

force to the hospital to collect evidence?

A     Yes, that was Detective Sergeant Randy Strong of

the Maryville Public Safety Department.

Q     What time did the crime scene investigation in St.

Joe arrive?

A     A little after 7:00 P. M. I think it was, yes, a

little after 7:00 P. M.

Q     Did you assist with any of the interviews of the

neighbors?

A     I did one interview of a neighbor directly to the

east of the Harper's residence.  He had arrived home from

work and did see Becky come out of the house covered in

blood at one point, was the only thing he saw there.

Q     Once you obtained that lead did you take steps to

try to examine the victim's computer?

A     . Yes, upon arrival of the St. Joseph police

department crime scene investigation unit I advised Sergeant

1    Mike Wilson we were going to need a computer forensics
2    examination on the scene as quickly as possible.  And he
3    contacted Detective Curtis Howard who acquired the equipment
4    in Saint Joe to perform that task to come immediately to the
5    scene.  We knew there was a computer within the residence
6    based on the information from Becky Harper and we wanted to
7    take a look at what was available to us at that time.

8         Q    Were you all able to get the name of the person
9    who was supposed to be meeting with Bobbie Jo that day?

10        A    Well, we got some additional information from
11   Becky that because she had been with Bobbie Jo the night of
12   the 15th and that there was.  And obviously we came up with
13   a name from that forensics review of Darlene.

14        Q    Did you learn where this person was from
15   allegedly.

16        A    Fairfax, Missouri.

17        Q    When you learned that information what did you do?

18        A.   There was a user screen name attached with that
19   information of Fischer4kids@hotmail.com that was associated
20   with the conversation about her coming to Bobbie Jo
21   Stinnett's house on the 16th to look at a dog.  We put the
22   two names together Darlene and then Fischer and assumed that
23   would possibly be who we were looking for in Fairfax,
24   Missouri.

25             That information was shared with other law

enforcement officers who made contact with the Atchison
County Sheriff's Department where Fairfax, Missouri is which
is about 15 to 20 miles from Skidmore. An extensive search
for a red car within the town of Fairfax, Missouri as well
as checking with a few of the local residents and the
sheriff's department if they had ever heard of anybody by
the name of Darlene Fischer.

Q    Did you have any luck?

A    No.

Q    Did you, at the same time this was going on were
you receiving a fairly large number of what turned out to be
false leads?

A    Yes.

Q    Is that unusual in a case like this?

A    No, it's not.

Q    And did you take steps to try to run down those
leads to see if there were anything to them?

A    Yes, we did.

Q    And what did you find?

A    We found nothing that was related to the
investigation we were working on.

Q    Did you also take steps to get an Amber alert
issued?

A    Yes, the Nodaway County Sheriff had initiated
contact through his department with Jefferson City, the

1   Missouri State Highway Patrol, who was the agency that is

2   responsible for the issuance of that alert.  Initially

3   because of the amount of information we had at that point

4   when this was originally requested simply did not meet the

5   criteria.  We did not know specifically a full description

6   of the child that had been abducted or was missing.  And

7   additionally we did not have, other than just a red car, we

8   had not much to go on as far as a description of who might

9   have committed the abduction.

10       Q    But eventually it was issued, correct?

11       A    Yes, I believe around 23 hundred hours.

12       Q    And I think we have already had some testimony

13  about this, but are Amber alerts also distributed to the

14  media?

15       A    Yes.

16       Q    The idea you want the word to get out to the

17  public, correct?

18       A    Yes.

19       Q    Was that done in this case?

20       A    Yes, it was.

21       Q    Now, did you go home that night?

22       A    Yes, I did.

23       Q    What time?

24       A    It was fairly late in the morning, around, I think

25  I got home around six thirty finally that night.

1      Q    Do you remember what time you came back up to

2  Skidmore.

3      A    I went directly from there to the Nodaway County

4  Sheriff's office the following morning.

5      Q.   In Maryville?

6      A.   Yes.

7      Q    Do you remember what time it was?

8      A    That was around 9:00 A.M.

9      Q    When you got there did something happen that

10  turned out to be a significant lead?

11      A    Yes.

12      Q    Where was that?

13      A    I was in the sheriff's department at the Nodaway

14  County sheriff's department at Maryville in the office area

15  and Melissa Wallace, a 911 dispatcher, came to me with some

16  lead information she had just received from a phone call,

17  that a woman who wished to remain anonymous had stated she

18  knew of a woman by the name of Lisa Montgomery who had told

19  people she was pregnant with twins but, her knowledge of

20  her, she didn't think she was in fact pregnant, that she

21  wasn't big enough to be pregnant, with twins especially.

22  And that she now had gotten some information that morning

23  that she was claiming she had a new baby at her residence in

24  Melvern, Kansas.

25      Q    You had that tip, did you get some additional

1  information concerning the Fischer4kids@hotmail.com.

2     A    Yes.

3     Q    Internet address?

4     A    We were searching and in the process after

5  obtaining the screen name from the internet chat that took

6  place on the 15th about a woman coming to or that Darlene

7  Fischer who was using, who we thought was Darlene Fischer,

8  using the screen name Fischer4kids@hotmail.com, we were

9  seeking the identification of who that person was through

10  their I. P. address that would record information where that

11  data and conversation was coming from as a source who was

12  participating in that conversation.

13     Q    And what is an I. P. address, is that an internet

14  provider address?

15     A    Yes.

16     Q    Were you working closely with the FBI to try to

17  come up with the information you needed to trace that

18  internet provider address of Fischer4kids@hotmail.com?

19     A    Yes, I was.  Special Agent Mickey Roberts was

20  there at the sheriff's office.  I had contact with Jeff Owen

21  that morning also in trying to facilitate that information

22  to us.  And Mickey advised me that Special Agent Kirk

23  Lipanovich of the FBI was also working in that direction and

24  at that point.  At about the same time I was receiving the

25  information from Melissa Wallace we were finding out that

1   the I. P. address or at least some information to help us

2   identify who the screen name

3   Fischer4kids@hotmail.com or where that came from was in fact

4   from the area of Topeka Kansas, at least we had that

5   identified at that point.  In checking Melvern, Kansas was

6   in fact fairly close to Topeka.  We did a quick intell scan

7   to tell us who Lisa Montgomery was and it came up that we

8   had her associated with Kevin Montgomery at a specific

9   address in Melvern, Kansas.

10      Q   What was the primary goal of the investigation at

11   this point in time?

12      A   To find the child that was missing.

13      Q   So did you, after learning that information, did

14   you consider that to be a very strong lead?

15      A   Yes.

16      Q   What did you do next?

17      A   I conferred with Sheriff Espey at the office also

18   and it was determined we needed to get somebody headed for

19   Melvern, Kansas as quick as possible to follow up on that

20   lead to identify and see if this person, Darlene Fischer,

21   was in fact or appeared to be Lisa Montgomery at the time,

22   and that was our only connection to who possibly could have

23   been at the residence when Bobbie Jo was murdered and the

24   baby was abducted.

25      Q   Who did you assign to go to Melvern.

1    A    Assigned Detective Sergeant Randy Strong of the
2 Maryville Public Safety Department and also Lieutenant Don
3 Fritz of the Cameron Police Department, they were both
4 assigned to the initial response team.
5    Q    This information kind of came together in the
6 morning, is that correct?
7    A    Yes.
8    Q    And so did Detective Strong and Detective Fritz
9 take off to Melvern?
10    A.    Yes, they did.
11    Q    If you are going the speed limit that's about a
12 three hour drive, right?
13    A    Yes.
14    Q    They arrived down there sometime, a couple hours,
15 did you learn subsequently the baby had been recovered?
16    A    Yes, I did.
17    Q    And was everybody greatly relieved at that time?
18    A    Yes, they were.
19    Q    Is that pretty much the end of your involvement in
20 the investigation?
21    A    Yes, at that point the FBI who was assisting in
22 the investigation took over the additional investigation
23 that was completed, yes.
24    Q    Over in Kansas --
25    A    Yes.

1    Q    The crime scene, is that because it was an
2    interstate crime, in other words, a state line was crossed?
3    A    Yes
4         MR. WHITWORTH:    That's all I have, Your Honor.
5         MR. O'CONNOR:    No questions, Judge, thank you.
6         THE COURT:  Thank you, Sergeant, you are excused.
7         MR. WHITWORTH:    May we approach.
8         THE COURT:    Yes.
9         (PROCEEDINGS OUTSIDE THE HEARING OF THE JURY)
10        THE COURT:  Are you through.
11        MR. WHITWORTH:  We are going fast.  We zipped
12   through this.
13        THE COURT:    Okay.  You would just as soon adjourn
14   for the day.
15        MR. WHITWORTH:    If that's okay with you.
16        (PROCEEDINGS IN THE HEARING OF THE JURY.
17        THE COURT:  Ladies and gentlemen, we are going to
18   adjourn for the day now.  I would like for you to be back in
19   the jury room tomorrow morning again at eight forty five, a
20   quarter to nine.
21        And I want to remind you as you go home tonight
22   the instructions I have given you previously.  You can leave
23   your notes in the jury room.  Tracy will collect them.  They
24   won't be read and they will be returned to you in the
25   morning.

I want to remind you you are not allowed to
discuss this case among yourselves or with anyone else. You
can tell people obviously you are on the jury here and that
I project it might take through October the 26th and there
is a possibility it could take a little longer than that.
And I will try and keep you apprised of where we are as our
schedule proceeds. But beyond that you can't talk about the
case among yourselves or with anyone else. You can't do any
research on the case. So don't try and look anything up in
a book, don't try to get on the internet and do any research
on anything or try to find out anything about any issue or
matter that is mentioned in the case. You are not to read,
view or listen to any media reports of the case. You can
have a friend or your spouse cut out any news articles about
the case if you would like them to hold for you and you can
read after your being excused as jurors in the case.

And I take it you understand that the reason for
all that is that it's your obligation to decide this case
based on the evidence you hear here in this courtroom about
something you hear about the case outside the courtroom.

And, ladies and gentlemen, you are to keep an open
mind until you have heard all the evidence and had an
opportunity to discuss the case with your fellow jurors.
And if per chance anybody should happen to attempt to
approach you about the case you are to let me know about

1    that through Tracy.

2            And I want to remind you we are not going to be in

3    court Monday of next week.  It's a federal holiday and we

4    have to pay security and everybody overtime to come in on

5    Monday so we are going all have that day off.

6            And I want to thank you for your attention and

7    cooperation today.  You have been very timely and punctual

8    about things and I appreciate that.  It makes things go a

9    lot faster.  It certainly makes my job easier as well.

10           Have a good evening and we will see you all again

11   tomorrow morning eight forty five or a quarter to nine,

12   please be in the jury room.

13           I would like for you all to be back at eight

14   thirty in the morning and we will see if we have anything to

15   talk about.  And we will begin as soon as the jury gets

16   anything.

17           (The jury leaves the courtroom.)

18           THE COURT:  Do you have anything we need to talk

19   about?

20           MR. WHITWORTH:   No.

21           THE COURT:  Do you, Mr. Duchardt.

22           MR. DUCHARDT:  No.

23           THE COURT:  Thank you.

24

25

<u>CERTIFICATION</u>

I certify that the transcript fees charged and the page format used conform with the requirements of this court and the judicial conference of the United States, but is not the exact format of the judicial conference only in order to enhance clarity and readability.

Official Court Reporter