IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

FILED
2008
U.S.
WESTERN DISTRICT
OF MISSOURI
SM

UNITED STATES OF AMERICA,    )
                             )   No. 05-06002
                Plaintiff,   )
                             )
                             )
                             )
                             )   October 25, 2007
                             )    and Sentencing
                             )      Criminal
LISA MONTGOMERY,             )
                             )
                Defendant.   )


TRANSCRIPT ON APPEAL


VOLUME XV
(Pages 3056-3199)


BEFORE THE HONORABLE GARY A. FENNER

UNITED STATES DISTRICT JUDGE.


A P P E A R A N C E S:


For the Plaintiff:          Mr. Matt Whitworth
                            Ms. Roseann Ketchmark
                            Ms. Cynthia Cordes
                            Assistant U. S. Attorneys
                            400 East 9th Street
                            Kansas City, Mo. 64106

For the Defendant:          Mr. Fred Duchardt
                            Duchardt & Walker
                            110 East 6th Street
                            Kearney, Missouri 64060

                            Mr. John O'Connor
                            Wagstaff & Cartmell
                            4740 Grand Ave.
                            Kansas City, Mo. 64112

DOCUMENT

Mr. Dave Owen
Assistant Federal Public
Defender
818 Grand Ave.
Kansas City, Mo. 64106


ELIZABETH SHINN, BA, RPR
U. S. COURT REPORTER
400 EAST 9TH STREET,  ROOM 8435
KANSAS CITY, MO. 64106

## I N D E X
## VOLUME XV

|                                          |       | Page |
|------------------------------------------|-------|------|
| RUTH KUNCEL                              |       |      |
| Direct Examination                      | . . . | 3057 |
| Cross Examination                       | . . . | 3059 |
| Redirect Examination                    | . . . | 3116 |
| Recross Examination                     | . . . | 3141 |
| Further Direct Examination              | . . . | 3143 |
|                                          |       |      |
| Closing Argument on behalf of the Plaintiff | . . . | 3147 |
|                                          |       |      |
| Closing Argument on behalf of the Defendant |       | 3159 |
|                                          |       |      |
| Final Closing Argument on behalf of the Plaintiff | . . . | 3180 |
|                                          |       |      |
| Sentencing                              | . . . | 3195 |

## E X H I B I T S

| Defendant's | Received |
|-------------|----------|
| 518         | 3129     |

THE COURT:  Do you have any rebuttal or have you decided?

MR. WHITWORTH:   Fred has some more questions to ask and then we will make our decision.

THE COURT:  Okay, are you ready to go this morning.

MR. DUCHARDT:   Yes, sir.

THE COURT:  Okay.  All right, Tracy, bring the jury in.  Thank you.  Everyone can be seated.

Good morning, ladies and gentlemen.  We are going to proceed with some further questions of Doctor Kuncel. So, Doctor Kuncel, would you be sworn again today, please.

RUTH KUNCEL,

having been resworn, testified:

DIRECT EXAMINATION (Continued)

BY MR. DUCHARDT:

Q     Good morning again, Doctor Kuncel.

A     Good morning.

Q     When we left off yesterday afternoon we had finished, I believe, talking about the issue of malingering in the testing and your reasons for believing that Lisa was not malingering, is that right?

A     That's correct.

Q     Other than your determination Lisa had not malingered were there any other conclusions you were able to

1    reach from your testing that assisted you in reaching the

2    diagnosis that you had through your interview with Lisa and

3    your review of the information in the case?

4         A    Yes, there was.

5         Q.   Why don't you explain to the jury what those were?

6         A    Well, what you do with test data lay it all out

7    and then try to put the pieces together, again go back in

8    the medical analysis.  Here's what the X-ray shows.  Here's

9    what the blood tests look like.  And the conclusions I

10   reached were very consistent with what I tried to describe

11   yesterday in terms of someone who showed a lot of the

12   symptoms that are associated with being abused, who has a

13   post traumatic stress disorder associated with that and

14   subsequent events, who is highly anxious, in a great deal of

15   turmoil which account for some of the messiness associated

16   with the data because there is so much turmoil, who is

17   deeply depressed and shows a lot of symptoms that are a

18   little hard to characterize in terms of standard descriptors

19   which had to do with dissociation.  They have psychotic

20   components to them.  They're delusional.  They have

21   qualities that affect memory.  So there is in and out

22   overall effect that leaves her very splintered in terms of

23   how she puts together and how she thinks and that were

24   consistent with pseudocyesis although I did not want to go

25   there because medical components are not part of my area of

1 medical expertise.

2 And part of what I concluded in my report was that
3 the diagnostic process didn't really even then quite capture
4 her.  Diagnosis is a pigeon-holing process.  They're
5 standard methods, a person has this diagnosis, we seek
6 standards and she doesn't quite fit the pigeon hole.  It's a
7 unique set of circumstances that confront us with her.  And
8 she is a seriously mentally ill lady in my opinion with
9 qualities that are unique and don't easily pigeon hole that
10 explain some of the oddities and the dissociative components
11 that are not categorized.

12 MR. DUCHARDT:  I don't have any further questions,
13 ma'am.  Thank you.  These folks may have some questions for
14 you.

15 CROSS EXAMINATION

16 BY MS. CORDES:

17 Q.  Doctor Kuncel, you have never testified for the
18 government, have you?

19 A  No.

20 Q  Every single case you have testified in you have
21 testified for the defendant, the criminal case, right?

22 A  That's correct.

23 Q  And in fact it's not just the defendant in every
24 criminal case, it's ten different murder cases you have
25 testified for a defendant charged with murder, is that right?

1    A    Of the criminal murder cases, yes.

2    Q    I am just looking, I am going by the report you

3    prepared.

4    A    Yes.

5    Q    Of the cases you testified I see they're some

6    civil cases but of all the criminal cases it's for the

7    defendant?

8    A    Yes.

9    Q    It's ten different murder cases?

10   A.   Yes.

11   Q    Two of those are when the insanity defense is

12   used?

13   A    I don't have it in front of me.  I don't have it.

14   Q.   I counted ten by my count.

15        MR. DUCHARDT:   I'm sorry.  If counsel could at

16   least allow Doctor Kuncel to complete her answers before she

17   poses another question.

18        THE COURT:  Overruled.

19   A    Some of them have certainly been insanity.  It's

20   one commonly placed, mental health.

21   Q    Of those ten, six of those cases are death penalty

22   cases, are they not.

23   A    Roughly.

24   Q    Of the ones that are not murder cases they're

25   aggravated sexual abuse cases, is that right?

1      A      I testified in some to that effect.

2      Q      Aggravated criminal sexual assault?

3      A.     Yes.

4      Q.     Home invasion in an aggravated criminal assault.

5      A      Yes.

6      Q      That covers all of your criminal trials, right?

7      A      The ones where I had in fact appeared.  I have

8   been in many where the cases settled based on other

9   information including my reports where I have not in fact

10  appeared.

11     Q      I see, some depositions and things like that.  I

12  am including those as well.

13     A      Okay.

14     Q      Again they're all for the defendant?

15     A      Yes.

16     Q      Let's talk about your credentials just a little

17  bit.  You testified you were board certified?

18     A      Board certified by whom?

19     Q      I am looking at your C. V. and it says you are

20  board certified by the American Board of the Psychological

21  Specialities, a part of the American College of Forensic

22  Examiners.

23     A      To me board certified usually refers to a state

24  designation.  So it depends.  They use that designation, but

25  I don't take board certification seriously.

1    Q    You don't consider yourself board certified?

2    A    I belong to an organization that uses that

3    terminology.

4    Q    That particular organization is extremely easy to

5    get into, is it not?

6    A    Now it's probably not.  They have changed their --

7    when I joined it I joined in order to have access to

8    information that they published and had available to them.

9    Q    At the time you applied it was extremely easy to

10   get into, was it not?

11   A    Absolutely, yes.

12   Q.   Just consisted of filling out an application and

13   then they sent you a certificate, is that right?

14   A    That's correct.

15   Q    This is an organization based in Springfield,

16   Missouri.  Started in 1992.

17   A    I don't remember where it started.

18   Q    You are aware and have reviewed, you are aware

19   Doctor Martell testified for the government in this case?

20   A    Yes, I am.

21   Q    And you reviewed his report?

22   A    Yes, I did.

23   Q    And you are aware he's board certified?

24   A    I am aware he belongs to an organization that uses

25   that terminology.

1    Q    It's the premiere organization in the United

2 States, is that right?

3    A    I don't consider it that way particularly.  I

4 think a lot of people don't either.  It's one more

5 organization to join if one chooses to apply.

6    Q    Just to be specific, heing specifically board

7 certified as a forensic psychologist as a part of the

8 American Board of Professional Psychology?

9    A    I don't know I am in a position to repeat his

10 credentials with absolute certainty.

11    Q    Are you aware that for that particular

12 organization that to even apply for it you have to have a

13 hundred, not a hundred, a thousand hours of supervised

14 experience?

15    A    I never wanted to bother to apply.  I don't know

16 what credentials are required.

17    Q    You have to submit work samples and sit for an

18 oral exam?

19    A.    I am not an expert what the requirements are to

20 join that organization.

21    Q    During your direct testimony you relied on your

22 experience, I think it's the West Side Veterans

23 Administration Medical Center.  You talked a lot about your

24 P. T. S. D. experience while you worked there?

25    A.    I mentioned it, yes.

1    Q    You were there for a year or less, is that right?

2    A    That's correct.

3    Q    And for your testimony today and in order to

4  prepare your report you reviewed several items provided to

5  you by the defense, is that correct?

6    A    Innumerable items provided by the defense.

7    Q    You include a list of those in the first and

8  second page of your report?

9    A.    Yes.

10    Q.    This certainly isn't all of the evidence in this

11  case, is it?

12    A    I did my best to summarize what was available to

13  me then.  I have certainly reviewed a number of things since

14  then.  I don't know what else might have been in the case I

15  didn't see but I imagine there was.

16    Q    I see about 14 government FBI reports that you

17  listed here and the rest of the items interviews provided by

18  the defendant, is that right?

19    A    There were a number of interviews where it wasn't

20  quite clear to me who did the interviewing.

21    Q    Hard to tell if it's a government report or

22  defense report?

23    A    There were innumerable ones that were available.

24  A lot of them were interviews.

25    Q    I am looking at just the government's FBI

1  section.  There is just a small, about ten or so,

2  individuals that were listed here, does that sound about

3  right?

4      A    No, I think there were probably more than that.

5  The way I summarize, trying to summarize it in and do so in

6  a fairly expedient fashion, I went two or three pages of

7  listing and made an effort to summarize that.  I could

8  certainly provide you, if you wanted, a disc that the

9  defense provided me with, I have an innumerable listing.

10  This is an effort to summarize that.

11      Q    I guess my point, you have included a summary here

12  but either you are saying, are you saying it's just not all

13  encompassing of what you reviewed?

14      A    I am saying this was an effort to summarize

15  everything I saw.  It's a list that covers parts of three

16  pages.  And it's an effort to summarize all of that.

17      Q    So everything you looked at may not be included

18  here?

19      A    It is an effort to have covered everything I saw.

20  Whether I summarize it in the way you personally would find

21  appropriate, I don't know.

22      Q    My point, for example, for the FBI report there is

23  only one of the children listed it looks like so you didn't

24  review the reports from the other children, in this case, is

25  that right?

1       A     It has been awhile to go back and recall exactly

2  what I interviewed, reviewed.  I read reports by a number of

3  the children.

4       Q     Some of those could have been conducted by the

5  defense and not the government?

6       A     At this point exactly who conducted them, I don't

7  recall.

8       Q     Would you agree you are not familiar with all the

9  government's evidence in this case?

10      A     I have no idea how much evidence the government

11 has and what exactly was or wasn't given to me.

12      Q     When you say given to you, given to you by the

13 defense?

14      A     There is no way for me to be positive what you as

15 part of the government have and to be in a position to state

16 what I have is the summation of all of that.  I am not in

17 that position to know.

18      Q     You are just summarizing what you were given by

19 the defense, I understand, is that what you are saying?

20      A     I am summarizing what came to my attention that

21 was provided to me.

22      Q     By the defense.

23      A     Yes.

24      Q     And you didn't conduct any original interviews in

25 this case with any witness, is that right?

1    A    I spoke solely to Lisa Montgomery.

2    Q    The defendant?

3    A    The defendant.

4    Q    Let's talk about some of the testing you discussed

5    yesterday, the tests you actually administered.  Let's talk

6    about the trauma symptom inventory, that's P. T. S. D. post

7    traumatic stress test?

8    A    Tend to measure symptoms included in post

9    traumatic stress disorder.

10    Q    Just to be clear, go through a couple to show

11    actually what happens so that we have some organization to

12    it.  You made two different trips you said yesterday,

13    January 30, 2007 to talk to the defendant and you went to

14    Pennsylvania March 16th?

15    A    16th and 17th, 2007, yes.

16    Q    For the Trauma Symptoms Inventory test in January

17    you administered that test actually in full, is that correct?

18    A    I administered it in full under standard

19    directions.

20    Q.    Under standard directions meaning when you

21    administered the patient or the defendant was answering the

22    questions or participating in the exam and thinking about

23    the last six months, is that right?

24    A    Yes.

25    Q    So the last six months prior to January 30th of

1   2007?

2        A    That's correct.

3        Q    She completed that test at that time, right?

4        A    Yes, she did.

5        Q    Then in March of, March 16 of 2007, you went out

6   to Pennsylvania?

7        A    Yes.

8        Q    The test had already been completed, is that

9   right?

10       A    The test?

11       Q    You had already finished it once back in January?

12       A.   She had been given it once under standard

13  directions in January.

14       Q    Then you went back out to Pennsylvania and you

15  administered it a second time.

16       A    That's correct.

17       Q    The exact same test?

18       A.   Under different sets of instructions.

19       Q    This time instructed her to think about what was

20  in her mind or in her life, starting at the week before the

21  murder?

22       A    During the six months prior to the murder.

23       Q    So she needed to think back to the six months

24  prior to the murder?

25       A    That's correct.

1    Q    But you are giving her this test after she had

2    been charged while she was in custody March of 2007?

3    A    I am giving her the test, she was in jail in

4    Pennsylvania at the time, yes.

5    Q    After you had already given it to her once?

6    A    Under a different set of directions.

7    Q    Instructions, right?

8    A    Yes.

9    Q    And the result on this test that you gave her in

10   March of 2007 it actually indicated that the defendant had

11   less signs of post traumatic stress disorder than the first

12   time you gave it, is that right?

13   A.   It suggested she had been stressed and was

14   suffering from post traumatic stress disorder prior to the

15   incidents that are relevant here and was further traumatized

16   as a result of the incident here.

17   Q.   The second test you gave in March of 2007

18   indicators as far as the results came back showed she was

19   less stressed when she was answering about six months prior

20   to the murder than when you gave that second examination, is

21   that correct?

22   A    She had a post traumatic stress disorder prior to

23   the issues in question were apparent on that one and then

24   comparing to the one given in January she was further

25   traumatized, during the six month period, prior to January,

1    '07.

2        Q    The fact she had actually committed the offense,

3    killed Bobbie Jo Stinnett, could actually cause P. T. S. D.

4    could it not?

5        A.   And that could as far as I understand it, account

6    for the differential.  She had one to begin with and now it

7    was even stronger as a result of the situation.

8        Q    Let's talk about the symptom checklist, you did

9    that.

10       A    That's correct.

11       Q    You did the full test in January under standard

12   instructions?

13       A    Which was the week prior, rather than six months

14   prior, the week prior to the administration.

15       Q    Again at that time you are telling the defendant

16   to think back, this defendant to think back to the week

17   prior to the murder?

18       A    The original instructions which are again

19   according to the test designer, the week prior, so she was

20   thinking about the period of time, the week prior to January

21   30 of '07.

22       Q    Again she's thinking about that time after she has

23   been charged, after she's in custody?

24       A    Right, during the stretch, what symptoms is she

25   experiencing at that time.

1    Q    According to her as she remembers.

2    A    Sure, they're different kind of data, one is to

3    ask the person what their experience is.  That was her

4    report.

5    Q    And then in March of 2007 you do kind of a re-do

6    on this test, you do it a second time as well, don't you?

7    A    I gave it a second time with directions to tell me

8    what symptoms she in her mind is experiencing the week prior

9    to the incident in question.

10   Q    The second time as well, so you give the same

11   instruction on symptom checklist 90 both in January and

12   March?

13   A    No, the one in January was the week prior; in

14   other words, January 23 through 30th of '07.

15   Q    The current time?

16   A.   The current time frame.

17   Q    In March you tell her to go back to the week

18   before the murder?

19   A    That's correct.

20   Q    Asking the defendant to do it after you have given

21   the test one time with a different set of instructions?

22   A    Right, several months prior.

23   Q    Where in the test manual you had for either of

24   those trauma symptom checklist 90 does it say that's

25   appropriate to give it a second time and tell the patient to

1  think back to before the crime and answer, is there anywhere

2  in the test manual that says that's appropriate?

3      A    The test, re-test is a common process, that I

4  would presume.  As I described yesterday, I had good reason

5  to think that this woman clearly had P. T. S. D.  How do I

6  deal with the reality there is a high likelihood the

7  government will argue it's strictly P. T. S. D. as a result

8  of the incident in question.

9          My background is assessment, what I did is provide

10 a base line given her current state by giving it in January

11 and then use it within that context to try to get a handle

12 on who she was before.

13     Q    Doctor, my question is where in either of those

14 test manuals does it say that's an appropriate way to give

15 those exams, is it anywhere in the test manual?

16     A    In the test manual for the 16, not the one that

17 has to do with post traumatic stress disorder directly.  The

18 other one it talks about using other time frames that the

19 P. T. S. D. does not provide that, it doesn't, I agree.  I

20 said that yesterday.

21     Q    Doctor Martell has testified that administering

22 this exam a second time with the instructions you gave to

23 the defendant in March was inappropriate, you disagree with

24 that?

25     A    I wouldn't have done it if I thought it was

1    inappropriate.

2         Q    Are there any valid or reliable norms you are

3    relying on to say it's appropriate?

4         A    When you validate things they're a number of ways

5    of dealing with validity.  One of them is to refer to group

6    norms.  You go out and you give the test to two hundred

7    people and collect norms and you compare the individual to

8    those norms.

9              Another kind of validity is to look within the

10   context of what you are doing.  One can talk about in the

11   abstract what was going on in terms of testing but the

12   reality is my job is to do the very best I knew how within

13   ethical means of arriving at an opinion, her state of mind

14   at the time of the offense, therefore validating it by

15   looking at here's what she says now.

16             Okay, they're pros and cons of having to go to

17   Philadelphia but that's two months later.  There is a time

18   for a person to forget about exact details, she had been

19   tested a whole lot by a lot of people and I was able to use

20   the norms that are standard in terms of the group

21   administration and then prepare what she did and look at

22   those in light of the original norms.

23             I think that's a perfectly reasonable extension

24   and it provides a way of internally validating for the

25   purposes of this particular case.

1    Q    You are saying two months or so is enough time to

2  actually start the test over again?

3    A    I did not start the test over.

4    Q    You just administered it in full?

5    A    I administered it with a different set of

6  instructions and I think it is a process that is the best,

7  what are the alternatives in terms of deciding how, whether

8  she had P. T. S. D. prior.  This was a way of trying to get

9  a handle on it and I made very clear on the data that I

10  provided to Doctor Martell.  I did it and I have it in here

11  and you can see differences in them.  And I think they're

12  quite pertinent and I have explained them within the context

13  how they were collected.

14    Q.    Let's talk about the M. M. P. I.  That particular

15  exam you tested the defendant again in January of '07 but

16  you didn't finish that one?

17    A    Yes, for reasons I explained yesterday.

18    Q    You did explain those yesterday.  Then in March

19  you go to Pennsylvania and you don't start the exam again,

20  you just finish it?

21    A    Yes.

22    Q    You don't think that's inappropriate.  You

23  shouldn't begin the entire exam over?

24    A    As I said yesterday, you can debate that.

25    Q    Just a moment ago --

1    MR. DUCHARDT:  May we approach.

2    (PROCEEDINGS OUTSIDE THE HEARING OF THE JURY)

3    MR. DUCHARDT:  She's not letting her --

4    MS. CORDES:  She's non responsive.

5    THE COURT:  That's exactly right.  She goes on

6    with a speech that isn't really responsive to the question.

7    The objection is overruled.

8    (PROCEEDINGS IN THE HEARING OF THE JURY).

9    Q    For the M. M. P. I. you begin, just to make sure

10   we are clear on this, you began administering it in January?

11   A    That's correct.

12   Q    You said that things came up and you couldn't

13   finish it, beyond your control, and then you continue

14   administering the examine in March in Pennsylvania?

15   A    That's correct.

16   Q    You chose not to start the exam over?

17   A    That's correct.

18   Q    This exam is supposed to be administered in one

19   setting?

20   A    And I had every intention when I set out to give

21   it in January to complete it.  As I pointed out yesterday,

22   A., I thought I could finish it that day and was not

23   permitted to stay.  And she was gone the second day.  My

24   goal, she already had been given this test by Doctor

25   Hutchinson back in I think '05, that was a re-test to begin

1    with.  So it wasn't the original and I wanted to capture,

2    she was clearly in better shape in January, I wanted the

3    data as best I could that was closest to the time of the

4    offense.  And again I made very clear, part of the reason

5    you are questioning me on that, I explained how I did it and

6    why I did it.

7         Q    Doctor Kuncel, Doctor Hutchinson's test was two

8    years ago.  This is over what, a hundred question test and

9    she administered --

10        A    56 questions administered close to the time of the

11   offense.

12        Q    Even more.  Two years prior, five hundred some

13   questions are administered but you don't start the test over

14   because you think the defendant will remember those

15   questions two years prior?

16        A    No, part of what I was looking for was trying to

17   understand, when you look at test data, it happens over a

18   period of time.  When Doctor Hutchinson gave it, my

19   understanding was, one, it was close to the time of the

20   offense.  Two, she was unmedicated.  One of the things that

21   needs to be clarified what impact has medication had, what

22   has the passage of time done.  So my goal in

23   re-administering the test was to track, that's a standard

24   technique to re-administer a test because the test captures

25   state of mental health at a time in both long term and in

1  short term factors.  Serves attempting to get some better

2  handle on her mental state at the time that I was testing

3  her so I could compare that to the original.

4        Of course Doctor Martell went back and gave it the

5  third time.  The turmoil, the critical scales are in the

6  first part of the test.  So that my use of them, I agree it

7  spans that time so during that stretch that's how she was

8  functioning.

9     Q    But you are aware that Doctor Martell again would

10  testify or actually he did testify that's an inappropriate

11  way to give the exam, just start it and then to pick it up

12  and finish it at a later date?

13     A    You have choices, for me to start over again makes

14  it, as I pointed out yesterday, half the second

15  administration, half the third.  Sometimes they're

16  practicalities in collecting data where there is no perfect

17  solution.  If I had said, gee, I started it and repeated it

18  I would suppose you might very well be saying but look,

19  Ruth, you did it, you started it, what did you do with that

20  half test.  Sometimes there is a no win situation.

21     Q    Instructions say it needs to be administered in

22  one setting and we can move on from that, let's talk about

23  the SIMS test.  This is specifically a test to detect

24  malingering, that's the purpose of the test, right?

25     A    Yes.

1     **Q**   When you administered that test it was suggested

2    the defendant was malingering or faking, lieing.

3     **A**   The part of standard test procedure is to consider

4    that possibility.  Always no matter when you are giving

5    tests whether they're in a psychiatric unit regardless of

6    the situation the possibility that a person has a reason to

7    exaggerate either pro or more or less is an inherent part of

8    testing and naturally I would give a test to check that out.

9     **Q**   I will ask the question again, your results for

10   the SIMS test showed the defendant, that the results were

11   suggested the defendant was malingering, right?

12    **A**   That they were in a test that has a high rate of

13   false positives.  In other words, in the test that

14   repeatedly identifies people quite frequently as malingering

15   when in fact more testing shows they aren't.  She was two

16   questions over the cut-off that the test designer --

17    **Q.**   Doctor Kuncel, is your answer, yes, the results

18   showed she was suggestive of malingering, the results?

19    **A**   I will do my best to answer.  It was marginally

20   above the cut-off suggesting the possibility of malingering.

21    **Q.**   So yes.

22    **A**   I think I have tried to answer your questions as

23   accurately as I could.

24    **Q**   I am reading this off your report.  Your report

25   you drafted, I am looking at page 37, she says the defendant

1  gives her statements to you and then you report that the

2  SIMS test indicates that the defendant is malingering, it is

3  suggestive of malingering.  You also note effective

4  disorder.  You note the authors of the test difficulty in a

5  assessing malinger of effective disorders, do you recall

6  that in your report?

7      A.   Let me be sure you are quoting me exactly here

8  please.  Where about are you reading.

9      Q    Page 36.

10     A.   Since it is specifically a screening measure the

11  assumption is any elevated scale warrants more careful

12  examination is what you are referring to?

13     Q    No, I am referring to the part that says, if you

14  could just read it, if you would like, go to page 36.

15  Structured inventory of malingering, SIMS, last paragraph

16  and first paragraph in the next page, read that.

17     A    Her score --

18     Q    Doctor Kuncel, could you read the last paragraph

19  on page 36 and the first paragraph on page 37?

20     A.   "The structured inventory malingering

21  symptomatology is an administered screen measure used to

22  detect malingering, psychotic and cognitive dysfunction,

23  since it is specifically a screening measure, the assumption

24  is any elevated scales warrant more careful examination.

25  They're five subscales and a total score scale on the SIMS,

1   cut off suggestive of malingering.  Ms. Montgomery scores

2   did not exceed the cut off of psychosis.  That is, she did

3   not claim exceptional number of symptoms of psychotic,

4   exceptional number of psychotic symptoms or exceptional

5   number of bizarre or unusual psychotic symptoms.  Her scores

6   do not exceed the cut off neurological impairment; that is,

7   she did not claim a lot of illogical or atypical

8   neurological scores.  Her scores did not exceed the cut off

9   of low intelligence.  Miss Montgomery did somewhat exceed

10  the cut-off on effective disorder.  The author noted

11  difficulty of detecting malingering effect.  Since she

12  claimed high number of anxiety, depressive symptoms the

13  further assessment of this dimension is pertinent.  Her

14  score on effective disorder also slightly exceeds the cut

15  off."

16      Q    Can you go to page 52 of your report.  Page 52,

17  you include a section on premeditation, is that right?

18      A    Yes.

19      Q    I see the section you included in your report or

20  pre-meditation not quite a full page you have some bullet

21  points.  First of all what facts are you relying on, what

22  facts do you think would support premeditation.

23      A    The totality of everything I am familiar with

24  including my test data, what I know about psychology in

25  general and what I have found out from interviewing her and

1   reviewing records.

2       Q.   Doctor Kuncel, what do you mean when you use the

3   word premeditation, can you just give your definition of

4   premedication when you are using it in this report?

5       A    What was her state of mind and what was her

6   thinking process, as best I could sort it out that was

7   related to the behavior in fact occurred.

8       Q    I am trying to get an idea what you mean when you

9   use the word premeditation in the report.

10      A    I am sorry, I thought I just answered that.

11      Q    I don't understand. What do you mean when you use

12  the word premeditation, could you tell me again?

13      A    What was her state of mind, what were her thoughts

14  and feelings that were going on in her mind that might be

15  pertinent prior to the incident in question.

16      Q    And you said you reviewed reports and facts of

17  this case?

18      A    I reviewed all the data I had, reviewed my notes,

19  reviewed Doctor Hutchinson's data.  I interviewed Lisa

20  Montgomery.  I looked at all my test data and did my best to

21  come up with my notion of her state of mind.

22      Q    What facts in this case do you think would support

23  premeditation.

24      A    It's a totality.

25      Q    I am just asking you specifically can you list a

1    few facts in this case you reviewed in the reports and the

2    items you looked at to prepare your report that you think

3    would support premeditation, do you have any examples of

4    fact you think would show premeditation?

5        A    I think the issue of having been sexually abused

6    and to the extent there seemed to be a lot of data relative

7    to that.  That's a state of mind that has, it's a

8    contributing factor that would affect her state of mind as

9    best I could track it during that period of time.

10       Q    I am sorry, Doctor Kuncel, I am trying to be clear

11   here.  You said you have reviewed the facts in the case and

12   the reports in this case.  I am asking of the reports and

13   the facts you have read about the murder of Bobbie Jo

14   Stinnett and the kidnapping of Victoria Jo, are there any

15   facts you reviewed that you think would be indicative of

16   premeditation?

17       A    I am talking about her state of mind, who she was

18   when she came to it, to the situation.

19       Q.   I am not talking about that.  I am talking --

20       A.   To me, maybe we are using the term differently.

21       Q    Are there any facts in this case?

22       A    What her state of mind was at that time not what

23   happened after.

24       Q    Doctor, are there any facts you looked at that

25   would indicate to you the defendant premeditated the crime?

1        A    Maybe we are using the term differently.  When I

2   use the term I am talking about what do I know about the

3   totality of this lady's psychological function effective

4   state, circumstances and way of thinking that would bring to

5   bear on the incident in question.  Because my role was to

6   talk about her state of mind, that was the charge I had

7   going to assess her to begin with, was to look at that.  So

8   what I am talking about premeditation I am talking about the

9   totality of who I can figure out she was at the time she

10  became involved in the incident in question, very seriously

11  mentally ill lady seemed to be, as best I could tell, who

12  arrived on the scene.

13       Q    Doctor, since you are not listing any facts that

14  you think would be indicative of premeditation I am just

15  going to ask you about a few.

16       Would you consider the fact that the defendant

17  researched C. sections on her internet prior to this crime

18  be indicative of premeditation?

19       A    That there was researching of C. sections.  She

20  talked about the difficulty of animals and delivering

21  animals, that was one possible reason for researching C

22  sections.  She talked about herself in terms of how that --

23  they're a wide variety of issues here.  To hook any one and

24  say, yes, she looked at C. sections, possibly it had

25  something to do with the situation at hand.  That's one of a

1  number of possibilities.

2       Q    So when the defendant told you she was looking at

3  C. Section for animals, you believed her, you didn't think

4  she was malingering?

5       A    I think when she, I don't know, did she

6  specifically tell me she was looking for C section and make

7  the tie between the computer searches and the animal, if she

8  did, that particular connection is escaping me.

9       Q    Your answer would be now you don't think

10  researching C section in this case is necessarily indicative

11  of premeditation, that is what your answer is because we are

12  going to take a long time to get through this.

13       A.   Well, maybe I could summarize and save everybody

14  some time.  They're a lot of hits on her computer and I

15  certainly agree that one possibility, especially after the

16  fact, is to go back and make ties as, to she did this in

17  order to prepare herself to do that.

18       Q    What about within the same minute --

19       A.   Please, you asked me a question and I would like

20  to finish.

21       Q.   I asked you a question, yes or no question so I am

22  going to keep going so we can get through some of this.

23       A.   With all due respect I have not had the --

24            MS. CORDES:  May we approach.

25            THE COURT:  Yes.

1  (PROCEEDINGS OUTSIDE THE PRESENCE OF THE JURY)

2  MS. CORDES:  I am trying to be as brief with my

3  cross and I can't get her to give a response.

4  THE COURT:  Do you want me to send the jury out

5  and tell her to answer the question.

6  MR. DUCHARDT:  Basically I went through the same

7  thing with their experts.

8  MS. CORDES:  No.

9  THE COURT:  I respectfully disagree with her

10  position.  She's horribly evasive and argumentative in terms

11  of simple questions and refusing to answer them.

12  MS. CORDES:  I think just to get through you might

13  want to give her instruction because I don't want to drag

14  out the court's time all morning long.

15  THE COURT:  Okay.

16  (PROCEEDINGS IN THE HEARING OF THE JURY).

17  THE COURT:  Ladies and gentlemen, we are going to

18  take a short break.  I would like to ask you to step into

19  the jury room for about five minutes please and Tracy will

20  be in to get you shortly.

21  (The jury leaves the courtroom.)

22  THE COURT:  If Mr. Duchardt believes that further

23  explanation needs to be provided he will have an opportunity

24  to question you about that again.  You do not have to give a

25  lengthy explanation to simple questions that are put to you.

1    And I am instructing you to answer concisely and directly

2    the questions that are provided to you and you need to

3    understand that if the defendant's attorneys feel further

4    explanation needs to be given they will have an opportunity

5    to inquire of you in that regard.  All right?

6              THE WITNESS:  I understand.  Thank you.

7              MR. DUCHARDT:   Judge, if I may, just for the

8    record, and I appreciate where the court is coming from and

9    I respect the court as we said earlier, I do respectfully

10   disagree.

11             I think Doctor Kuncel is answering in a very

12   similar fashion to the way the government's experts in my

13   opinion answered my questions.  And the way the questions

14   are being posed is such that Doctor Kuncel can't answer some

15   of them with a yes or no but needs to be able to explain,

16   but I am sure she understands your feelings in this regard.

17   I don't think that counsel is being fair with the way she is

18   questioning and the way that she is now starting to cut

19   Doctor Kuncel off, particularly in light of the fashion in

20   which she is framing questions.  But we both, both Doctor

21   Kuncel and I respect what you are saying and we will do our

22   best to keep within the confines of what you described.

23             THE COURT:  All right, thank you, Mr. Duchardt.

24   Bring the jury back in.

25                            RECESS

1          THE COURT:  Thank you.  Everyone can be seated.

2   And, Doctor Kuncel, I remind you you are still under oath.

3   And, Miss Cordes, you may continue.

4       **Q     Why don't we use this definition for**

5   **premeditation.  Premeditation means thinking or deliberating**

6   **about something and deciding whether to do it beforehand,**

7   **is that a fair definition?**

8       A     If it's one you want to use, by all means.

9       **Q     Do you think that's a fair one?**

10      A     It's fair for purposes of definition, fine, go

11  ahead.

12      **Q     So when I say premeditation that's what I mean,**

13  **thinking or deliberating about something and deciding**

14  **whether to do it beforehand?**

15      A     Okay.

16      **Q     Did you find any facts that you thought were**

17  **indicative that the defendant was premeditating this crime?**

18      A     I don't know I can give a yes or no answer to that

19  question.

20      **Q     You can't tell me yes or no if you found any**

21  **facts?**

22      A     I tried before with the issue of sexual abuse and

23  I don't think that was what you were looking for.

24      **Q     Do you think the fact the defendant researched C.**

25  **sections on the computer prior to the crime is indicative of**

1    premeditation?

2        A    It may or may not be.  It would require further

3    explanation.

4        Q    Do you think the fact the defendant extensively

5    researched Bobbie Jo Stinnett prior to commiting the crime

6    is indicative of premeditation?

7        A.   It may or may not be required for further

8    explanation on my part.

9        Q    Do you think the fact the defendant is researching

10   premature infants prior to committing the crime is

11   indicative of premeditation?

12       A    It may or may not.  It would require further

13   explanation.

14       Q    What about creating Darlene Fischer alias account.

15       A    May or may not.

16       Q    What is the explanation for that one?

17       A    One possible explanation is what she stated that

18   within the field of dog breeding one of the things that can

19   happen is people will sell a dog to one person for one price

20   and hold it out for a different price.  And if the goal is

21   to determine what the price of the dog would be to a total

22   stranger it's a way of checking out the possibility that the

23   price of the dog is elsewhere.

24       Q    And in your professional opinion you believe the

25   defendant was telling you the truth?

1    A    I think that's one possible explanation.

2    Q    In your professional opinion do you think the

3  defendant was telling you the truth, you don't believe she

4  is malingering.

5    A    They're a field of possibilities here.  They're a

6  number of possibilities and that's one of them.

7    Q    Your opinion though is that the defendant was not

8  malingering?

9    A    I can't answer that yes or no.

10    Q    Can't answer that either?

11    A    I would be glad to give you an explanation but you

12  are wording it in a way that neither yes nor no would

13  capture --

14    Q    What about before meeting for the crime the

15  defendant selectively deleted the creation of the Darlene

16  Fischer account, would that indicate it was created for a

17  more criminal purpose than the one you listed?

18    A    It may or may not.  If you care for me to expand I

19  would be glad to.

20    Q.    Okay, go ahead.

21    A    I don't have the full details of when and how she

22  deleted it nor am I an expert in computers.  People delete

23  things for a number of different reasons.  One possibility

24  is to hide it, I agree.  Another possibility you can end up

25  deleting things simply because you don't want to have things

1   on the machine.  I don't have the computer expertise to

2   follow through on the details what she deleted, exactly when

3   so I can offer an opinion.

4       Q   What about the fact the defendant took a knife and

5   rope and umbilical cord clamp, baby items, home birthing kit

6   to Bobbie Jo Stinnett, that is indicative of premeditation.

7       A   It may or may not be.

8       Q   Your section in your report on premeditation

9   doesn't include one fact about this case, does it, as far as

10  what, first of all, those that I just listed they are not

11  included in your section?

12      A   That's correct.

13      Q   Facts involving what the defendant did prior to

14  Bobbie Jo Stinnett's death are not included here either, are

15  they?

16      A   No, they aren't.

17      Q   Let's look at a couple things that are included.

18  You include the fact that the defendant has no criminal

19  record suggests that perhaps she wouldn't be able to

20  premeditate an act?

21      A   She has no criminal record suggests that to plot

22  something with a level of psychopathy seems unlikely.

23      Q.   Would you agree a criminal record doesn't impact a

24  person's ability to plan or to think ahead?

25      A   It suggests quite a bit about the kind of thinking

process that a person is likely to bring to a particular

situation.

    Q    You know there is no criminal record.  But are you

aware that the defendant told Doctor Dietz she had engaged

in under-age drinking?

    A    Yes, that she had engaged in under-age drinking.

    Q.   That would be considered charge conduct

potentially, right?

    A    I think the reality is that most of us have done

things that could be construed as criminal behavior

including under-age drinking.

    Q    What about using drugs, marijuana and crack

cocaine, acid?

    A    The same thing.

    Q    You would agree those items would constitute

criminal conduct that could be charged?

    A.   Sure, most of us have done things that could be

charged.

    Q    Finally, filing police report against her that

could be charged criminal conduct.

    A    That's assuming what she was alleging was false. I

don't have the information to indicate that one way or the

other.

    Q.   Drinking and driving, that would be criminal

conduct, too?

1     A     Same answer.

2     Q     What about neglecting her children, that would be

3 considered criminal conduct?

4     A     If in fact she did and reading the things I have

5 read about her suggests that on the whole she was a very

6 good mother.

7     Q     Her children testified that there was neglect and

8 abuse in the home, does that change your opinion?

9     A     I would want to see what they said and within what

10 context they said it, within the framework of, the entirety

11 of her parenting situation.

12    Q     Would you consider the fact she hired her brother

13 Tommie to slash her husband, Kevin's ex-wife Lori, criminal

14 conduct?

15    A     If in fact she did that I would construe that.

16    Q     What about lieing under oath, committing perjury?

17    A     If she is saying now does not necessarily mean

18 that at the time, given the kind of problems with thinking

19 she has, she could easily say now, yes, I know it's a lie

20 and not necessarily at the time she did it, know it's a lie.

21 That's very consistent with memory problems she has got.

22    Q     The defendant told Doctor Dietz because she was

23 backed into a corner that she had lied under oath.

24    A     And that she is saying that at the time she talked

25 to Doctor Dietz is one thing, her memory, the nature of the

1  memory problems which I think contributed to the extent

2  psychological parts of it leave ideas coming and going,

3  therefore she would say it at the time to Doctor Dietz,

4  putting into context, gee, that wasn't true does not mean at

5  the time she actually did it she knew it was not true.

6  There is a very convoluted memory problem here that is

7  characteristic of severe psycho-pathology that could lead,

8  yes, I lied then when at the time she wasn't.

9      Q    Doctor, also in your premeditation paragraph in

10  your report you have the fact the defendant wouldn't be able

11  to premeditate the crime, that she is intelligent and has

12  organizational skills, what does that have to do with

13  premeditation on the crime?

14      A    If one, in the sense I think you are using the

15  term, plots something out with, I am going to do this, this,

16  and this in terms of the crime throwing out the computer,

17  for example, so there would not be information around,

18  hiding things that were apparently from the crime scene.

19  Intelligent people are capable of putting together much more

20  undetectable processes, seem to be the case.  Therefore it

21  doesn't feel it's very likely this was an organized A. B. C.

22  D. E. in the sense I think you are using the term.

23      Q    Doctor Kuncel, just to make sure I understand, you

24  are saying because the defendant is intelligent instead of

25  deleting items on the computer she should have thrown away

1   the computer and/or not used the computer at all?

2       A.    She knows enough about computers that if there was

3   a cold, calculated process at work here, as opposed to one

4   that was severely mentally ill, they're a lot of ways of

5   dealing with finding out information that are not

6   detectable.

7       Q    In your professional opinion, and I want to make

8   sure now I am following your conclusion, did you find the

9   defendant was malingering with you or not?

10      A    It's my opinion she was not malingering.

11      Q.   She was not malingering?

12      A.   That's correct.

13      Q    So the fact you testified she told you, you think

14  she was telling you the truth?

15      A    That's a different issue.  There is the issue of

16  purposefully telling an untruth.  There is the issue of an

17  untruth in a sense of outside reality, knows it's not true

18  but she doesn't realize it's not true and they're

19  confusional states that are in between.

20      Q.   You know the government experts found the

21  defendant was malingering, right?

22      A    I have read Doctor Martell's report, he concluded

23  she was.

24      Q    Doctor Dietz's report?

25      A    I read Doctor Dietz, that he thinks so, yes.

1    Q    Also the defense expert, Doctor Marilyn

2  Hutchinson, she also found malingering, are you aware of

3  that?

4    A.    I found Doctor Hutchinson's notes casual and not

5  quite so clear on that point.

6    Q    The defendant told you and you included several

7  pages in your report of detail about how Tommy, her brother,

8  was present with her on the day of the murder and it

9  includes quite a bit of detail what he did at the house and

10  what his role was, is that right?

11    A    That's correct.

12    Q    At the time the defendant was telling you this the

13  defendant was not aware that the government was going to

14  find a rock solid alibi for Tommy, is that right?

15    A    Yes.

16    Q    And when you were interviewing the defendant you

17  didn't know the government was going to find a rock solid

18  alibi for Tommy, did you?

19    A    That's correct.

20    Q    What the defendant did know at that time were

21  they're a few facts in the case that supported the idea a

22  second person could be there, is that right?

23    A    I don't know what she did or didn't know about

24  what the government had found out.  I don't recall offhand.

25    Q    For example, you included in your report that you

1    reviewed the report of Leona Hays?

2         A    I reviewed a number of reports.  As I recall, that

3    was one of them.

4         Q    I am going to show you a copy of that report from

5    the Missouri State Highway Patrol, you indicated you had

6    reviewed this and also reviewed a second report prepared by

7    the defense after they interviewed Miss Leona Hays, an

8    elderly woman, that lives in the area of Skidmore, is that

9    correct?

10        A    I believe so.

11        Q    And in this particular report, do you recall this?

12        A    Yes.

13        Q    Miss Hays makes a statement that she saw a red car

14   on the day, December 16, 2004 somewhere in the Skidmore area

15   that had two people in it, right?

16        A    Yes.

17        Q    You were aware of this when you talked to the

18   defendant?

19        A    Yes, I was.

20        Q    So was the defendant, wasn't she?

21        A    I do not know that for a fact.

22        Q    I am offering to you the defendant reviewed the

23   government's discovery in this case?

24        A    I don't have a direct recollection of whether she

25   knew explicitly this.

1    Q    She told you there were two people there, herself

2  and Tommy, right?

3    A    With a great deal of anguish about whether to tell

4  or not.

5    Q    But then provided what you included as pages of

6  detail about what he did that day?

7    A    Yes, she did.

8    Q    You also reviewed reports from the victim's

9  mother, Becky Harper?

10   A    Yes.

11   Q    And Becky Harper said when she was having the

12 conversation with Bobbie Jo Stinnett on December 16th she

13 called her on the telephone and Bobbie Jo was indicating to

14 her mother that someone was present in the house, she said

15 they're here, I've got to go, they're here?

16   A    Something to that effect.

17   Q    Which could be construed as maybe more than one

18 person potentially?

19   A    Correct.

20   Q    Or in the alternative saying they're here?

21   A.   Possibly.

22   Q    You are also aware of that fact when you

23 interviewed the defendant?

24   A.   Yes, I was.

25   Q    And again I am offering to you the defendant read

1    the discovery so she would have been aware of that fact,

2    too?

3         A    Again what the defendant did or didn't

4    specifically know, I'm not sure.

5         Q    Well, at any rate you are aware the government did

6    find a rock solid alibi that Tommy was not present on

7    December 16th and he was actually at his probation officer

8    hours away that afternoon?

9         A    I have heard that several times.

10        Q    You know that now?

11        A    Yes.

12        Q    Are you also aware that after you conducted your

13   interview with the defendant where she said her brother was

14   involved or committed the crime December 16th that she gave

15   a new statement to Doctor McCandless at C. C. A., her doctor

16   at C. C. A., were you aware of that?

17        A    That she spoke with her, Doctor McCandless, yes.

18        Q    And actually after this trial had started she

19   spoke to Doctor McCandless and gave a new version, didn't

20   mention Tommy?

21        A    Now my only knowledge of that is what I have seen

22   on the internet in terms of news reports so I don't have

23   direct knowledge of that otherwise.

24        Q    The fact that Tommy was not present and had

25   nothing to do with the murder of Bobbie Jo Stinnett, and the

1  fact the defendant outlined this in extensive detail to you

2  in her interview, does that indicate to you she's

3  malingering?

4  A    I think it's very characteristic of the kind of

5  delusional things that are similar to pseudocyesis.

6  Q    We will come back to that in a moment.  The

7  defendant during your interview of her also talked about her

8  carpal tunnel syndrome?

9  A.   Correct.

10  Q.   She indicated as though she actually wouldn't be

11  able to commit the crime because she had carpal tunnel

12  syndrome?

13  A    I am sorry, would you mind restating that.  I want

14  to make sure I answer exactly what.

15  Q    She represented to you she wouldn't be able to

16  commit the crime because she had carpal tunnel syndrome?

17  A    She was puzzled over how she could be accused of

18  doing it because she didn't see herself as having the

19  strength to do it.

20  Q.   I think specifically she said to you she can't

21  lift anything heavy like a bag of feed.  She decided against

22  surgery.  And even if she wanted, meaning to kill Bobbie Jo

23  and kidnap Victoria Jo, she isn't strong enough and wouldn't

24  have attempted it knowing she couldn't do it?

25  A    That was her, something to that effect.

1    Q    She's implying she doesn't have that physical

2  ability, correct.

3    A    As she described it to me, she didn't see herself

4  as having that ability.

5    Q    Are you aware, you said you reviewed some medical

6  records, are you aware of the medical records from Lawrence

7  Memorial Hospital for the defendant June 1st of 2000?

8    A    They're an awful lot of records.  Please refresh

9  my memory.

10    Q    In that particular record from Lawrence Memorial

11  Hospital the defendant went to the doctor because she was in

12  wrist pain and the doctor noted in his report the

13  relationship of carpal tunnel syndrome to her reported job

14  duty pushing a button is weak at best and goes on to note

15  that the defendant's statements to the doctor, the doctor is

16  writing is suggestive of symptom magnification, exaggerating

17  the symptoms, would that indicate to you the defendant's

18  claims about carpal tunnel syndrome were perhaps a little

19  over the top or malingering?

20    A    I don't remember that specific statement although

21  I do remember Doctor Martell seemed to have data that

22  suggested there were problems.

23    Q    But that doesn't change your opinion about whether

24  she was malingering or not?

25    A    I would need to go back and review the details of

1    that particular report.  That she seemed, had explained how

2    she went to a doctor in Coffeeville because she was having

3    wrist problems.  She seemed to have a history much before

4    any of the situation at hand of complaining about

5    difficulties with her wrists.

6        Q    In your report you also included a section about

7    the week, right prior to the murder, the weeks leading to

8    the murder of Bobbie Jo Stinnett, is that right?

9        A    Yes.

10       Q    And specifically you note how much the defendant

11   has told you she's working, she's working three jobs?

12       A    Correct.

13       Q    And she totals up and it ranges 68 to 76 hours a

14   week.

15       A    She saw herself working a lot and running back

16   and forth.  The commute time is significant.

17       Q    It's on page 15 of your report she talks about,

18   this is again under your section, the weeks, the specific

19   headline on here, the weeks prior to the murder, the death

20   of Bobbie Jo Stinnett and the defendant is telling how often

21   she is working?

22       A    Yes.

23       Q    Specifically she is saying four to nine hours a

24   day at Greyhound, 36 hours, that would be about 36 hours a

25   week, on the low end or high end, Wendy's 16 to 20 hours a

1  week and Casey's 16 to 20 hours a week.  So that by my

2  calculation, if I am doing my math correct, she is saying 68

3  on the low end to 76 hours a week, is that right?

4      A    Maybe your math is better than mine.  I didn't

5  count it that way.  For Greyhound, start at the bottom and

6  for it, okay four times nine is 36, plus 16, plus 16 she was

7  working a lot of hours she was saying one way or the other,

8  yes.

9      Q    Would it surprise you to know actually even in a

10 high period the defendant was working just approximately a

11 full work week, a full 40 hour or approximately 40 hour work

12 week?

13     A    Well, my understanding was she had, working

14 erratically, she was very, her employer considered her very

15 diligent and sometimes she would drive an hour to work so

16 she would be gone for three hours round trip to put in an

17 hour, those were kinds of things that the employer seemed to

18 be documenting.

19     Q    What I am talking about 40 hours, a full work

20 week, a regular, that's earlier in the year.  This specific

21 section you are discussing is talking about the weeks prior

22 to the murder.

23          Doctor Kuncel, we had a witness, employer at

24 Wendy's testify this is the murder down here (looking on a

25 calendar) December 16, that she quit Wendy's November 10 and

1   she quit Casey's November 17th.  The only job she actually

2   was working was Greyhound and Greyhound she quit the 11th,

3   December 11th?

4       A    I am sorry.  The question that elicited this data

5   was not starting December 16th and moving back exactly two

6   weeks what you were doing but more in the weeks prior so

7   that she was giving me a generic description of the stresses

8   she had, that she started with maternity leave dropping off,

9   that's true.

10      Q.   Your section is about the week prior to Miss

11  Stinnett's death, what it's entitled there, is only one job

12  here and by the defendant's statement, again going back to

13  Lawrence Memorial Hospital records, she states just

14  Greyhound she's working right before the murder she states

15  her job, talking about her Greyhound, her jobs consisting of

16  answering phones, selling tickets at the terminal but she

17  only works 15 hours per week and she just cannot tolerate

18  more hours.

19          MR. DUCHARDT:  I think counsel may be mistaken

20  about something.  May we approach.

21          THE COURT:  Yes.

22          (PROCEEDINGS OUTSIDE THE HEARING OF THE JURY)

23          MR. DUCHARDT:  Lawrence Memorial Hospital records

24  are from 2000, not from 2004.

25          MS. CORDES:  I can clarify that.

1          MR. DUCHARDT:   We are describing what she was

2     doing in 2000.

3          MS. CORDES:  I can clarify that.

4          THE COURT:  Thank you.

5          (PROCEEDINGS IN THE HEARING OF THE JURY)

6     **Q     These Lawrence Memorial Hospital records, they're**

7     **from 2000, she's talking in general about her work in**

8     **Greyhound?**

9     **A     Okay.**

10         MR. DUCHARDT:   In 2000.

11         THE COURT:  Yes.

12    **Q     This is what the defendant is reporting to the**

13    **doctor, her job consisted of answering phones, selling**

14    **tickets at the terminal but she only works 15 hours per week**

15    **and she just cannot tolerate more hours.  She states this**

16    **job is very easy and it takes very little data or computer**

17    **work and she essentially reads a book the majority of the**

18    **time as it is a very slow-paced job.**

19    **Actually my point, this is her describing her job**

20    **in general, the position she held at Greyhound is the same**

21    **in 2004, she came back to work for the same employer.**

22    **That's the only thing employment wise she has going on the**

23    **weeks prior to the murder, is that right?**

24    **A     Number one, the description here has to do with a**

25    **bigger time frame.  I did not specifically know Lisa's start**

1    and stop day.  She's describing the stresses in general,

2    worked very hard over a period of time, weeks prior, broader

3    base.

4          Also, it's important to keep in mind when people

5    are depressed getting out of bed can be a major issue.  So

6    that's an additional factor.

7    Q    But none of those change your opinion about her

8    being malingering when she's talking about her extensive

9    work hours?

10   A    Given the lack of specificity of the question I

11   asked her, I think that's a factor that needs to be kept in

12   mind.

13   Q    When you talk to the defendant about the birthing

14   kit her explanation to you was she bought a birthing kit for

15   the goat, is that correct?

16   A    Her explanation to me was that she was

17   anticipating a home delivery and having a birthing kit

18   around seemed like a good back-up.  Whether it was for

19   animals because the vet was not necessarily always available

20   or it might be needed for her, too.

21   Q    I was just referring to page 19 where she states

22   it's actually for her goat, but we can move on from that.

23         You talk about your experience with children of

24   sexual abuse and talked about your understanding of the

25   history of the defendant's sexual abuse.  And yesterday you

1    testified she was sexually abused from approximately 12 to

2    17, what is that based on.  That's a range we haven't heard

3    before.

4         A    My impression is there were a number of references

5    where exactly how long that period was up in the air.  Some

6    of them seemed earlier than others.  That she was not

7    putting a clear start day.  I have seen 13.  I have seen 14.

8    I have seen -- that there was a stretch through most of her

9    adolescence where she was being abused.

10        Q.   Are you aware the defendant under oath at a

11   divorce proceeding actually said the abuse was less than two

12   years?

13        A    That's one piece, I remember that one, yes, as one

14   of them.

15        Q    Doctor Kuncel, your experience with victims of

16   physical and sexual abuse you have experience in that area?

17        A    I have been a therapist to some, yes.

18        Q    Would you agree and we have just looked up a

19   number of statistics on sexual abuse that approximately nine

20   hundred thousand, if not more, children are abused every

21   year in the United States?

22        A    I don't have those statistics at hand but it's

23   very high.

24        Q    We are getting this from the National Center for

25   Victims of Crime, that would be a credible source.

1          MR. DUCHARDT:  May we approach.

2          THE COURT:  Yes.

3          (PROCEEDINGS OUTSIDE THE HEARING OF THE JURY)

4          MR. DUCHARDT:  Your Honor, if she wants to show

5     the item she has to Doctor Kuncel and ask her if she is

6     familiar with it that might be a way of doing it but she's

7     testifying.

8          THE COURT:  She said she wasn't familiar.

9          MS. CORDES:  Familiar with the statistic, that is

10    something they want to argue in closing.

11         THE COURT:  You can ask her about the source you

12    have, that she's familiar with that and she considers a

13    reliable source.

14         MS. CORDES:  I will redo it.

15         MR. DUCHARDT:  But counsel cannot testify.

16         (PROCEEDINGS IN THE HEARING OF THE JURY).

17    **Q.   Would you consider the National Center for Victims**

18    **of Crimes a reliable source?**

19    **A    It's one source.**

20    **Q    Is it reliable?**

21    **A.   I am not an expert how they collect their**

22    **statistics but I don't dispute it's a possible source.  I am**

23    **not going to argue with you about it.**

24    **Q.   I am not trying to make a big deal.  Do the**

25    **statistics I just mentioned do those sound approximately**

1  right to you in your professional opinion, a lot of kids are

2  abused.

3        A     I don't under estimate there are many abused,

4  physically and sexually.

5        Q     The nine hundred, ninety thousand sexually abused,

6  would that sound about right in your opinion?

7        A.    There are many sexually abused children, yes.

8        Q     Just a few final questions, Doctor Kuncel.  You

9  noted that your findings you thought were consistent with

10 pseudocyesis but you have respectfully explained you are not

11 specifically qualified to diagnose pseudocyesis, is that

12 right?

13       A     Correct.

14       Q     So your statement about that, you are specifically

15 relying on Doctor Ramachandran's diagnosis of pseudocyesis?

16       A     I drew a fine line between here are a lot of

17 psychological symptoms I do consider within my purview to

18 diagnose that those fit with pseudocyesis, but I am not

19 willing to make the diagnosis so there is a fine line here I

20 am trying to draw.

21       Q     But as far as the report you are relying on Doctor

22 Ramachandran's report when you are talking about the

23 pseudocyesis?

24       A     I am not relying on anyone's report.  That was

25 written for Doctor Ramachandran.

1    Q    You are just noting it's consistent but you are

2    not qualified in that area?

3    A    Correct.

4    Q    For the post traumatic stress disorder you did

5    diagnose in your report you are including that as an

6    explanation for the defendant's conduct, is that correct?

7    A    I am offering it as one diagnostic category, it

8    creates a kind of mental state where one can be dissociative

9    delusional and as a product of that behavior might come

10   about.  That could explain what happened to her.

11   Q    So that's what you have diagnosed the defendant

12   with.  And would you agree that the way Bobbie Jo Stinnett

13   was killed in this case was physically aggressive?

14   A    It certainly looked physically aggressive.

15   Q    Physically violent?

16   A    I am sorry.

17   Q    And physically violent?

18   A    Clearly she was, a violent thing happened to her

19   absolutely.

20   Q    On page 38 of your report you note in discussing

21   post traumatic stress disease the defendant has the tendency

22   to become physically aggressive or to slash out physically.

23   As a result the P. T. S. D. is at normal levels in Miss

24   Montgomery for both administrations, suggesting that Miss

25   Montgomery isn't likely prone to become physically violent

1   as a result of P. T. S. D.

2        A    Correct.

3             MS. CORDES:  Nothing further of the witness.

4             MR. DUCHARDT:   May I approach before I start.

5             (PROCEEDINGS OUTSIDE THE HEARING OF THE JURY)

6             MR. DUCHARDT:   Since counsel has opened up the

7   whole Tommy can of worms, it's my intention to go back and

8   talk to Doctor Kuncel considering she is aware of the

9   information we found out that about the situation that Tommy

10  admitted to us that he had gone directly to his probation

11  officer right after court, the date of December 9th and not

12  December the 16th and so the bottom line of this is I want

13  to approach because --

14            THE COURT:  Let's take a break.

15            MR. DUCHARDT:   Okay.

16            (PROCEEDINGS IN THE HEARING OF THE JURY)

17            THE COURT:  Ladies and gentlemen, we will take a

18  recess for 15 minutes.  Please be back in the jury room at

19  ten thirty five and keep the instructions I have given you

20  previously in mind.  Thank you.

21            THE COURT:   So do you have anything further you

22  want to say on that?

23            MR. DUCHARDT:   Judge, because of counsel's

24  questioning on the issue of Tommy and her asking Doctor

25  Kuncel about the details she's aware of, Doctor Kuncel is

1  also aware of the details we had done investigation about

2  Tommy's alleged rock solid alibi, that Tommy had admitted to

3  us that he went directly from his, from his sentencing to

4  his parole officer's office.  His sentencing was on the 9th

5  not the 16th and the paperwork in the file reflects his

6  sentencing on the 9th and the office of probation showing at

7  the office on the 9th rather than the 16th.

8          I know what the testimony has been but we have

9  said all along this was information that called into

10  question just how solid this alibi was.  And now that

11  counsel has opened it up, opened the door as to what Doctor

12  Kuncel knows about that I believe we are entitled go ahead

13  and inquire of her further about Tommy's admissions he had

14  gone to the parole officer the day that he was in court

15  which was the 9th not the 16th as reflected in the

16  paperwork.

17          THE COURT:  Unless you maintain that Tommy wasn't

18  at his probation officer's on the 16th.

19          MR. DUCHARDT:  That certainly is part of the

20  argument.

21          THE COURT:  There isn't any evidence to support

22  that.

23          MR. DUCHARDT:  Judge, but in this phase, they're

24  two things.  Number one, this is a time when other

25  information can be presented, number one, but, number two,

1 what counsel asked what Doctor Kuncel was aware about the

2 facts of the situation about Tommy and what information she

3 was provided about that and that included exactly what we

4 are talking about in terms of information that calls into

5 question Tommy's rock solid alibi is the point they are

6 trying to make.

7         MR. WHITWORTH:  First of all, the information

8 about December 9th came from interview that the defense did.

9         MR. DUCHARDT:  With Tommy.

10         MR. WHITWORTH:  Sometime this summer but before

11 Doctor Kuncel interviewed the defendant.

12         MR. DUCHARDT:  No.

13         MR. WHITWORTH:  Yes.

14         MR. DUCHARDT:  We did?

15         MR. WHITWORTH:  Yes, the probation officer

16 testified under oath here in court he was there on the 16th,

17 she's certain of that.  And all the documents support he was

18 there on the 16th and multiple documents that were signed

19 and dated by Tommy Kleiner on December 16th.  So we don't

20 believe this is something is misleading.  It's going to

21 confuse the jury and the court should exclude it because

22 under Rule 403 analysis --

23         MR. DUCHARDT:  They opened the door to this.

24 They are the ones who are trying to take it only so far and

25 the way they opened it up is they asked Doctor Kuncel about

1  her awareness of particular facts.  I should be allowed to

2  now go back to expound upon those particular facts about

3  which Doctor Kuncel is also aware including the information

4  from the records she has reviewed and also the information

5  that we provided to her about Tommy Kleiner's indication

6  that he went to the probation officer right after the

7  sentencing procedure.

8         THE COURT:  Your request to inquire about that

9  information from Tommy Kleiner is denied.  There is no

10  evidence to support that in the record.  The evidence is

11  totally to the contrary.  Any such discussion would tend to

12  mislead and confuse the jury and it has more potential to be

13  confusing than probative, particularly in relation to the

14  manner in which it's offered as to the opinion of this

15  witness.  But your statement as to what you would be able to

16  present if you were allowed to inquire is accepted as an

17  offer of proof.

18         Any objection?

19         MR. WHITWORTH:   No, Your Honor.

20         THE COURT:  And that offer is denied.

21         MR. DUCHARDT:  If I may also supplement the offer

22  of proof to say we would also offer the testimony of Ron

23  Ninemire, investigator, because he's the one who talked to

24  Tommy Kleiner and received from Tommy Kleiner the admissions

25  that he was at his probation officer on the day he was

1   sentenced.  And then I would also present the records which

2   are already in evidence from the government indicating on

3   the order of probation that the date on which he was placed

4   on probation was December the 9th and then also the journal

5   entry from the court indicating that the sentencing occurred

6   on December 9th, not December 16th.

7           THE COURT:  Offer of proof is denied.  Be back at

8   ten thirty five.

9           MR. DUCHARDT:   One other thing we better talk

10  about too, the situation with Leona Hays she was also asked,

11  Doctor Kuncel was also asked what she knew about information

12  related to Leona Hays.  She was shown a police report about

13  Leona Hays' account to police and then she was also, Doctor

14  Kuncel was also asked about Leona Hays' discussions with us

15  about the situation.  And particularly included in our

16  discussions with her was her identifying the person driving

17  the car as being a smallish blond person.  She also

18  indicated that a picture of Tommy Kleiner looked very much

19  like the person who she saw driving at the time.  And since

20  again they have opened up this issue it's my intention to

21  elicit those specific facts from Doctor Kuncel regarding

22  that information from Leona Hays.

23          THE COURT:  You want to speak to that.

24          MS. CORDES:  I think that would be fine if they

25  want to get into Leona Hays.  Ron Ninemire might be in a

1  better position to testify his discussion with Tommy

2  Kleiner.

3       Those reports she had relied on is a separate

4  issue, but the whole Tommy, December 9th is not something

5  she is relying on and they want to use the report she relied

6  on to prepare her report for her testimony today.

7       MR. DUCHARDT:  I disagree.  In terms of what

8  she's relying on for her testimony I would disagree with

9  counsel's last characterization about Doctor Kuncel's

10 information about the records of Tommy Kleiner.  We have had

11 those records for some time and she has had those.

12      THE COURT:  They don't have any objection to your

13 inquiring about the Leona Hays statement so you may inquire

14 on that.

15      MS. CORDES:  The December 9th interview with

16 Tommy, we actually don't have any objection to that.

17      THE COURT:  You will withdraw any objection to

18 that.

19      MS. CORDES:  Yes, just for the record and

20 appellate purposes and that type of thing, if they would

21 like to do it they can.

22      THE COURT:  Okay.  They don't have any objection.

23 You want to inquire about it.

24      MR. DUCHARDT:  Okay.

25      (The jury returns to the courtroom.)

1        THE COURT:   Thank you.  Everyone can be seated.

2   And, Doctor Kuncel, as you come back to the witness stand I

3   will remind you you are still under oath.

4                        REDIRECT EXAMINATION

5   BY MR. DUCHARDT:

6        Q    Doctor Kuncel, I have a few more for you, if I

7   may.  The issue was raised with you regarding a thing that

8   is called board certification, can you kind of explain to

9   the jury what that concept entails.

10            First of all, I guess I should ask since it was

11   already brought out, you are board certified, is that

12   correct?

13        A    By a particular organization I chose to join.

14        Q    In any event, would you explain to the jury what

15   this whole notion of board certification is about?

16        A    To some extent I suppose it varies state to state

17   and I am from Illinois.  Within Illinois there is such a

18   thing as board certification for M.D. position, board

19   certified in neurology or some kind of specialty.  There is

20   no such designation in Illinois.  So board certified doesn't

21   have any legal standing, at least in Illinois for those

22   purposes of a psychologist.

23        Q    Does licenser have something to do in Illinois?

24        A.   Yes, licenser, I am a licensed clinical

25   psychologist in the State of Illinois.  The government has

1  set credentials you need and tests and so on.  And then if

2  you meet certain standards they issue you a license.  So,

3  yes, I was licensed with the state as a clinical

4  psychologist.

5         Now the term board certified, they're various

6  free-standing organizations that choose to use that

7  designation because it sounds, I suppose, prestigious, I

8  guess.

9         Frankly, I went back to school three years that I

10 didn't need to because I already had a license as a clinical

11 psychologist and I got tired of joining organizations.  Now

12 some people hold this up as a high credential for particular

13 organizations.  I joined enough organizations to keep me, I

14 thought, educated where you get the information coming from

15 them.

16     Q    Continuing education?

17     A.   Continuing education.  I never applied for the

18 particular organization.  I had no reason to think I don't

19 have the credentials.  I just didn't bother.

20     Q    Now you were also asked about cases in which you

21 have testified and it was pointed out that in cases in which

22 you have testified the government or the state has not

23 called you, it has been the defense --

24     A    That's correct.

25     Q    Who has called you.  Is there a peculiar, let me

1   put it this way, have there been cases in which you have

2   made findings for, which would be in favor of the positions

3   abdicated by the government and would be against the

4   positions abdicated by the defense.

5       A    Yes, I evaluated people where I have been retained

6   by the defense and called the attorney back and said,

7   frankly, your client is a psychopath.  I could probably

8   explain how he got to be one, but that's all I can do at

9   which point, bye, Ruth.  That certainly has happened to me.

10      Q.   Have there been such situations in which the

11  government has learned of that but still does not call you

12  because of financial concerns over having multiple experts

13  on the same issue?

14      A    Well, sometimes they don't know.  It's not that

15  unusual for me to evaluate somebody under seal.  In other

16  words, even the jailers supposedly at least don't know who I

17  am because the defense has a right to evaluate things.  I am

18  not in the nuance of the legal system but my understanding

19  they're a lot of evaluations I have done the government

20  doesn't necessarily know I have ever been part of it.

21          They're also cases where I have been the court's

22  witness, appointed by the court to do evaluations.  Also it

23  depends on the county and a lot of counties have their

24  in-house staff that do evaluations.  Dupage County, where my

25  office is, has a group of people who do most of the

1    evaluations for the government.

2            And then it's not unusual for them to go back to

3    the same source over and over.  So the government has its

4    regulars you might say it retains.

5            So if I am going to do it at all it sounds like I

6    prefer working for the defense.  I find it meaningful to try

7    to find out what happened and why in a particular case,

8    present that honestly because at the end of the day I need

9    to live with myself about my integrity and present a healthy

10   defense and if they want to use it, then I end up involved

11   in the case.

12           They're a lot of them that never go to trial.  Not

13   long ago I called up an attorney and said your client is

14   really, really dangerous.  I think he's a real threat if he

15   gets back out because a lot of these evaluations, including

16   future dangerousness if this person is released what is

17   going to happen and he said thank you.  Okay.  So what he's

18   going to do with it, is a matter of question.

19       Q    Now you were again asked particular questions

20   about your particular tests, many of the things we went

21   through and you explained.  And I don't want to go back and

22   belabor that a lot.  But particularly you were questioned

23   again about your testing regarding post traumatic stress

24   disorder and your using that test to try to test how Lisa

25   would have reacted at the time of the offense.  In other

1  words, trying to date back the testing to that time?

2      A    Right.

3      Q    Using the questions think of how you were feeling

4  a week before, basically, December the 16, 2004?

5      A    Correct.

6      Q    And you have already indicated that your belief

7  was that that was an appropriate way of using the test to

8  try to find some additional information?

9      A    It's kind of like if you read the package, let's

10  say you try to make macaroni and cheese and you read the

11  back of the package, sure they're standard instructions to

12  do but sometimes you have a practical matter at hand and I

13  don't know of any test that is out there that measures post

14  traumatic stress disorder in terms of setting up the time

15  frame that I needed.  And I am very up front, this is a 56

16  page report detailing what I did and why which of course

17  leaves me open to more scrutiny than if I had written a

18  really short report that hides all kinds of things.  I lay

19  it out.

20      Q    It's also been shared with you though when Doctor

21  Dietz was questioned about this earlier in the trial,

22  earlier in the trial I played for him an video of his

23  interview with Lisa Montgomery where she specifically was

24  talking about hearing her mother's voice of criticism and

25  also her being uncomfortable sitting in a room with two men.

1    And Doctor Dietz' testimony those were independent signs

2    apart from the test that Lisa still suffers from P. T. S. D,

3    post traumatic stress disorder, from the abuse.

4              Would you tend to agree with that conclusion?

5        A    I have reviewed those tapes.  Yes, that was my

6    impression of what he had concluded.  So that she had post

7    traumatic stress disorder prior to the incident in question,

8    seemed to me they were concluding the same thing I

9    concluded.

10       Q    You were then asked by counsel about the SIMS test

11   and about the malingering issue on that.  And you again said

12   she was two questions over the threshold in answering, but

13   you were also asked to review a portion of your report and

14   only read a couple of paragraphs of that.  Did you feel that

15   the jury was not getting the entire context of what you had

16   said about the SIMS by only singling out those two

17   paragraphs?

18       A    I was asked to stop at a point where the rest of

19   what I had to say pointed out the weaknesses of the SIMS.

20       Q    Why don't you go ahead and read the rest of that

21   now you were stopped from reading earlier.

22            THE COURT:   Mr. Duchardt, how much is she going

23   to read?

24            MR. DUCHARDT:   Just a paragraph.

25       A    "Miss Montgomery's scores did somewhat exceed the

1  cut off of an effective disorder.  Author notes the high

2  degree of difficulty in assessing malingering of effective

3  disorder.  Since Lisa claimed a somewhat high number of

4  anxiety, depressive symptoms, findings suggested that

5  further assessment of this dimension is pertinent which I

6  went on and did and turned out her score on amnesia disorder

7  also slightly exceeded the cut off.  One possible

8  explanation is that in contrast to most individuals taking

9  the SIMS Lisa is experiencing amnesia for multiple reasons,

10  had trauma, P. S. T. D. and thus reporting more and greater

11  variety of symptoms than a typical individual would report.

12  Because of the slight elevation on these two scales Miss

13  Montgomery's total score not surprisingly slightly exceeded

14  the prescribed cut off score for the SIMS.  Note, she

15  exceeded the cut off by a few items, two items on a 75 item

16  test.  Since the SIMS is screening the cut off score is set

17  to tolerate false positives that is better to correctly

18  identify individuals as in need of further assessment from

19  malingering than incorrectly eliminates those that may be

20  malingering, hence more detailed assessment of malingering

21  is undertaken which I did and turned out fine, just as

22  Doctor Hutchinson gave the same test, found her fine back in

23  '05."

24      Q    One other, going away from the testing then

25  because we have already talked an awful lot about testing,

1  counsel asked you about you are noting that Lisa had no

2  prior criminal history and that is certainly what is clearly

3  in the records that were presented to you, right?

4      A    Yes, this happened in the context of no prior

5  criminal history in contrast to a lot of the people I

6  evaluate who have a rap sheet this long.

7      Q    Counsel then asked you about things I guess what,

8  the point is being made that there were things that Lisa

9  could have been arrested for had they been detected like

10 underage drinking and drug use and certainly those things

11 are true, but you kind of took an issue with trying to

12 undercut the notion of prior criminal history with those

13 kinds of things, is it because people with criminal

14 histories also have those kinds of things?

15     A    The people, Doctor Martell's data shows she's not

16 a psychopath.  They're a lot of people whose criminal

17 history goes on and on and on, to try to turn her into

18 somebody with this terrible criminal background because of

19 things she might have gotten arrested for seemed to me to be

20 trying to magnify how bad her background is which is not to

21 minimize they're real things out there like underage

22 drinking that are problematic.

23     Q    Sure.  Now do you find things like underage

24 drinking and drug abuse in people who have been sexually,

25 emotionally and physically abused?

1    A    That can happen because often drinking and drug

2  usage has to do with, in a sense, self-medication.  They're

3  a lot of different motives but one can have to do with I am

4  anxious, I am depressed, I am trying to alter my mood.  And

5  people use alcohol and drugs for those reasons.

6    Q    Now counsel also asked you about Lisa supposedly

7  making a false police report against her brother Tommy and

8  asked if that created any problems for you.  Are you

9  actually aware that as a result of that police report which

10  Lisa made against Tommy actually pled guilty to the charges?

11    A    Yes, I remember there was a police report he went

12  on to plead guilty.  I thought perhaps they were pointing at

13  some other police report I didn't know about.

14    Q    Now you had been asked about Lisa's abuse and

15  neglect of her children and you had indicated, at least

16  insofar as your experience and also looking at the situation

17  as a whole, you found that was probably an unfair

18  characterization of the individual instances that they are

19  raising.  Was I tracking right on that.

20    A    I think you are.  To me my opinion the

21  allegations that I gathered about her being a negligent and

22  inappropriate parent seem to be similar to the allegations

23  about her being a criminal because of underage drinking

24  which is not to say that never, four kids in four and a half

25  years she never did anything out of line.  I am not saying

1   this woman was a saint as a parent, but I start looking at

2   the kinds of things that are in the records that are

3   reported by other people about what she did and how hard she

4   worked, everything from home schooling her kids, taking them

5   on trips, even within the context of discussing with me, she

6   talked about all the things she was trying to do to counter

7   her own background.  She said nobody ever taught me how to

8   handle money.  I wasn't very good at it because nobody ever

9   taught me.  I set up a checking account for my child to try

10  to show her how to balance a checkbook, how to handle and

11  use money correctly, on and on and on.

12          There were efforts on the part of the very damaged

13  woman to try to do a better job than what had been done for

14  her.  Did she do it perfectly.  No.  Was she also taxed.

15  Having four children in three and a half years, anybody who

16  has ever done a lot of parenting it's hard, have been a

17  parent, at every particular moment.

18          And I also got to watch her, one of the positives

19  of going to Philadelphia was that the area I was assigned to

20  had a glass window and there was an open area where they

21  have contact visits; in other words, family are allowed to

22  come visit inmates in this institution.  And there were

23  little kids periodically that would come up and press their

24  mouths against the wall, the little children to see what is

25  going on, watching her respond to these children.

1    So a perfect mother, I don't pretend to suggest

2  she was.  Given a very, very damaged woman she cares

3  enormously about her children and worked very hard at

4  parenting I think she did.

5    Q    You were also asked whether you were aware of the

6  allegations by Tommy Kleiner Lisa had supposedly tried to

7  hire him to slash Lori Colwell's tires and you became aware

8  of Tommy's allegation to that effect, is that right?

9    A    I am aware of that allegation.

10    Q    And did you, well, were you also aware that the

11  incident of course never happened?

12    A    I couldn't be sure but I had no other confirmation

13  about that.

14    Q    And that Tommy was the only source for this piece

15  of information?

16    A    I don't remember reading anything else suggesting

17  otherwise.

18    Q    Particularly also on the abuse or the neglect, one

19  of the sources or the major source for this was Judy

20  Shaughnessy, is that correct?

21    A    In the record she made that allegation is my

22  understanding.

23    Q    Did you also see in the record investigations were

24  made of Lisa because of allegations by Judy Shaughnessy and

25  never once was there any action taken to take the children

1  out of the home?

2     A    Yes.  In fact, I remember one statement I don't

3  know how she managed to learn some parenting given the

4  circumstances in the past she seemed like a caring mother.

5     Q    You were then also asked about Lisa's saying under

6  oath in proceedings regarding Justin Kleiner's placement

7  that she had had a tubal ligation reversal operation.  She

8  basically swore to that under oath?

9     A    Yes.

10    Q    And of course you know that's not true?

11    A    Correct.

12    Q    Does that factor, certainly, certainly it's untrue

13 and it's a statement under oath untrue, is that right,

14 ma'am?

15    A    That's my understanding.

16    Q    And is there anything about that factor though

17 that is somewhat important in terms of the other findings

18 that you made?

19    A    Yes, and one of the difficulties in this case has

20 been trying to capture and explain the type of psychological

21 problems she has.  They're some kinds of mental illness that

22 are very clear.  Paranoid schizophrenia who sees monsters

23 coming through the door, this is a kind of mental health

24 issue that I think most of us grasp very quickly.  This is

25 clean.  But we have a lady who from very early on what is

1 true and what is real when you are lied to over and over,

2 when you are treated and punished for things that you didn't

3 do, there is a problem with reality testing that is created,

4 that is very difficult to capture and explain such that

5 memories or events that take place one time may not be

6 understandable the other.

7 For example, the a doctor says to her maybe your

8 tubes are not thoroughly tied off because sometimes the

9 operation is not effective. That can get translated into,

10 well, then maybe she can get pregnant in the same way. Or

11 if your brother doesn't have any toys because you were taken

12 away maybe it's my fault. It's the same kind of process and

13 very hard to explain, I tried hard to capture because I need

14 to convey that to you. The issue of whether at the time she

15 was on the stand and said it was reversed or changed,

16 whether at that moment she was lieing about it.

17 Q   Or just wanted to believe it?

18 A   Or just wanted to believe it, I don't know, but

19 after-the-fact she could look back at it and kind of a

20 fluctuating process. And then she said, yeah, I realize now

21 it wasn't similar.

22 Q   The question I think that was attempting to be

23 posed from you or to you, I want to try to put it in a way I

24 think captures what the question is and you kind of alluded

25 to it a little bit here, are there an awful lot of facts in

1   this case that can be interpreted that Lisa in the legal

2   sense of the word thought about or premeditated this crime?

3       A    Yes, clearly.

4       Q    Do you interpret those facts in the same fashion

5   in light of your evaluation of Lisa?

6       A    No.

7       Q    Now there is one issue that did come up --

8            Your Honor, I am going to offer Exhibit 518 which

9   is the record from Lawrence Memorial Hospital about Lisa's

10  treatment for carpal tunnel syndrome.

11           MS. CORDES:  No objection, Your Honor.

12           THE COURT:  Received.

13  (PLAINTIFF'S EXHIBIT 518 WAS RECEIVED IN EVIDENCE.)

14      Q    Doctor Kuncel, let's go to the other report, this

15  is the June first report.  Let's go to the earlier report

16  which I think is page 10.  And, Doctor Kuncel, you did

17  receive these reports about Lisa's carpal tunnel syndrome

18  treatment, is that correct?

19      A    Yes.

20      Q    And I don't want to go through, all the way

21  through every bit of this but if you could block out the

22  second and third paragraphs real quick.

23           Miss Boman is a 32 year old, right-handed female.

24  she worked for Spears Manufacturing and she started having

25  symptoms consisting dorsal right wrist pain, numbness and

1    tingling.  Her job duties was cutting pipe fittings from an

2    injection mold machine.  She did that by pushing on a button

3    utilizing a hydraulic cutter.  She did this for four months

4    and began having significant wrist and hand complaints

5    prompting her to miss work.  She was seen by a company

6    doctor and told she had tendonitis.  The pain became so

7    severe she could not drive.  She called her supervisor", et

8    cetera.  Is this consistent with the report by the doctors

9    there, you recall that.

10        A    Yes.

11        Q    And then let's go to the second page,  if we can,

12   let's go to physical examination and let's block that.

13   "Healthy-appearing female, no tenderness, negative

14   impingement tests in both shoulders.  Very similar findings

15   with percussion over the median nerve.  She also has similar

16   findings on the right side with carpal tunnel compression

17   test.  Second, test 30 seconds.  Right-sided Jamar

18   dynamometer", And here we have, this is an non bell shaped

19   curve not consistent one would expect and is seen with an

20   inconsistent effort and is suggestive of symptom

21   magnification.  That's I think the part counsel pulled out

22   of the report.

23            We then go to the next is the bell shaped curve

24   which is consistent with normal effort and does not suggest

25   stymptom magnification measuring left-sided grip strength,

1    testing.

2              "Assessment.  Dorsal wrist pain, source unclear.

3    X-rays of the wrists have been performed to rule out

4    possible dissociation of carpal instability although I think

5    it's unlikely.  The patient has abnormal physical

6    examination features to suggest early or mild carpal tunnel

7    syndrome.

8              Patient demonstrates inconsistent effort and non

9    physiological findings on Jamar dynamometer testing, right

10   wrist as compared to left."

11             And then we go down to the treatment plan that

12   basically X-rays were done, objective findings and then we

13   come down, patience is fit for work as long as avoids

14   repetitive forceful gripping and twisting.  She's presently

15   performing 15 hours of work a week and that was pointed

16   out.  So she is then at a new job at Greyhound not doing the

17   repetitive motion that actually caused the problems she was

18   having, is that your understanding, ma'am?

19        A    Realizing I am not a medical doctor but that's my

20   understanding.

21        Q    Can we go to the discharge report.  And let's go

22   to the top, the subjective and physical examination.  "The

23   patient has undergone the nerve conduction velocities

24   performed by Doctor Moret on May 24, 2000."

25             So on the physical examination in June the grip

1    strengths were equal, is that correct, ma'am?

2        A    That's what it seems to say.

3        Q    Now go to assessment.  "Nonspecific

4    undifferentiated bilateral upper extremity pain.  Patient

5    reached maximum medical improvement.  Basically

6    over-the-counter Tylenol.  No further follow-up visits."  So

7    is it a fair statement she was diagnosed with mild carpal

8    tunnel syndrome at the time and she was treated for it?

9        A    As a non physician that's my read.

10       Q    You were also asked about statistics regarding the

11   number of unfortunate children that have various levels of

12   abuse in this country including sexual abuse, is that

13   correct, ma'am?

14       A    Correct.

15       Q    And I am assuming you agree they're an awful lot

16   of kids who have been abused in some fashion or another and

17   even 90 thousand maybe that have been sexually abused.

18       A    Abuse is unfortunately common, yes, it is.

19       Q    Is the kind and degree and length of abuse like we

20   have in this case common?

21       A    No, not in my opinion.

22       Q    In your review of the literature do you see this

23   kind in length and duration of use common?

24       A    No.  And it's within the context of what kind of

25   personality she had to begin with.  You take a really quiet,

1  shy, unassertive child there is plenty of secondary

2  information suggesting and then have her abused by a

3  parenting figure, apparently repeatedly in a number of ways

4  with no place to go for support.  Not only did it seem like

5  the other parent in the household was abusive but the family

6  was constantly on the move.  There wasn't a little girl down

7  the street to play with on a regular basis.  Abuse of this

8  variety in this context with this kind of personality I

9  think it would be very difficult.

10      Q    You were also asked about Lisa's testimony about

11  in the divorce proceedings about when the abuse began but

12  wasn't she asked at that point at what time the actual

13  intercourse and rapes began?

14      A    I don't exactly remember how those were worded.

15  I do remember there were contexts and that my understanding

16  was there had been a lot of sexual overtures prior to overt

17  intercourse.

18      Q    And particularly were you familiar with Nancy

19  Wallentini's records and she's actually already testified

20  before the jury and in her statement that Lisa had indicated

21  to her that this had began about eighth grade?

22      A.   Something to that effect.

23      Q    Is that where you were getting the twelve to

24  thirteen range?

25      A    I think probably, yes.

1    Q    And, ma'am, in terms of you, you testified already

2  that the abuse entailed not only touching, not only

3  intercourse but oral and anal intercourse, where did you get

4  that information from?

5    A    That was my understanding from watching Doctor

6  Martell and Doctor Dietz' tape.

7    Q    And particularly did Doctor Martell specifically

8  ask Lisa to go into detail as to what the abuse entailed?

9    A    I believe it was Doctor Martell as opposed to

10  Doctor Dietz where Lisa was pressed to elaborate exactly

11  what happened and that's where I derived my information.

12    Q.   Specifically did he ask her did it include oral

13  sodomy and anal sodomy and did she say yes it did, very

14  reluctantly?

15    A    That was certainly my understanding.

16        MR. DUCHARDT:  May we approach.

17        THE COURT:  Yes.

18        (PROCEEDINGS OUTSIDE THE PRESENCE OF THE JURY)

19        MR. DUCHARDT:  It's my intention if we have got

20  any question about this to play the portion of the tape

21  where Doctor Martell goes into this.  If we do I would be

22  happy to.

23        MS. CORDES:  We have Nancy Wallentini's testimony

24  transcript she says it's two years, there is nothing about

25  oral or anal.  Approximately two years.

1      MR. DUCHARDT:  Basically what she got, what she
2 was described sexual abuse began where she was in the eighth
3 or ninth grade and it continued for approximately two years.
4 Basically we know when it ended which was when she was 16.
5 Started the eighth or ninth grade which is exactly the point
6 I made.

7      MS. CORDES:  That's not 12 or 13, 14, eighth or
8 ninth grade.  I am just looking at this.  It doesn't seem
9 to be quite what you are saying.

10      MR. DUCHARDT:   We have Judy Shaughnessy
11 specifically indicating she came in just before, like just
12 days before Lisa's 16th birthday.  So we have got that if
13 you want to clarify with her.

14      THE COURT:   She has got it back to twelve.

15      MS. CORDES:  She said 12 to 17.

16      MR. DUCHARDT:   I asked her where she got the 12
17 and she said from the eighth grade basically.

18      MS. CORDES:  Eighth grade.  She was twelve when it
19 was six if not seven.  She's fudging.

20      THE COURT:  I am not sure that's what we are up
21 here on anyway.

22      MR. DUCHARDT:   It would be my intention next to
23 play the tape.

24      THE COURT:  And that relates to the sodomy issue.

25      MR. DUCHARDT:   Yes.

1          THE COURT:  Is that something you are going to

2     cross her on.

3          MS. CORDES:  Going to play a clip from Dr.

4     Martell's interview showing what she said to Martell?

5          MR. DUCHARDT:   Exactly what Martell pressed her

6     to say.

7          MS. CORDES:  Didn't ask any questions.

8          THE COURT:  Do you have a transcript of what was

9     said in that tape?

10          MR. DUCHARDT:   Yes, basically the essentials of

11     it she was asked specifically you wanted to go into details

12     and wanted to be able to understand and did the abuse

13     include vaginal intercourse.  Yes, it did.  Did it include

14     oral sex, and anal sex.  And, yes, it did.  And how often

15     did it happen.  He did it as often as he wanted.  Those are

16     the highlights of it.

17          MS. CORDES:  Is he still talking about the oral.

18     That's outside the scope of my cross. I didn't ask anything

19     about oral or anal sex.

20          THE COURT:  There was a lot of questions asked and

21     covered.

22          MS. CORDES:  What I asked, you testified it was 12

23     to 17, asked her what that was based on and I brought up the

24     fact the defendant said it was less than two years and that

25     was it.  I talked about the defendant was sexually abused.

1          THE COURT:  I am going to let him inquire unless

2    you have got some objection to it.  And I think what Mr.

3    Duchardt is saying is that if it's an issue as to whether

4    she said this then he wants to play it, if it's not an issue.

5          MR. DUCHARDT:   That's why I approached.  I have

6    got the fact out, but if there is some question she's

7    misaccounting the facts I am agreeable to play it.

8          MS. CORDES:  Just go ahead and play it.

9          THE COURT:  Then play it.

10          (PROCEEDINGS IN THE HEARING OF THE JURY).

11    **Q.   Doctor Kuncel, so we can share with the jury**

12    **directly the questions and answers by Lisa to Doctor Martell**

13    **we have this clip of the interview.**

14          **(The tape was played).**

15    **"Q.  We have been talking about patterns over time, was**

16    **there, you know, we really haven't talked much about the**

17    **specifics what he would do to you.**

18    **A     Okay.**

19    **Q    I don't want to go into that too far the nature of**

20    **what he did change or was it pretty much the same?**

21    **A.   It got worse.  No, it got worse.**

22    **Q    How did it get worse?**

23    **A    Sometimes he drank too much at night and I think**

24    **it was my fault.   He would try and --**

25    **Q    So --**

1    A     Try to and couldn't and I got blamed for it.

2    Q     Try to?

3    A.    Try to and could not.

4    Q     Did he abandon that, pursue over time?

5    A     Continued.

6    Q     Was there a time he was able to do that?

7    A     Yeah.  He would do whatever he wanted.

8    Q     How old were you when this abuse changed, became a

9    regular part?

10   A     About 14, 13 or 14.

11   Q     Did it change?  That's what he would always do

12   instead of other things?

13   A     That's where it progressed from this touching and

14   stuff to the -- other things, and it stayed that way.

15   Q     Were you comfortable to explore this a little

16   further so I can understand?

17   A.    I thought I knew where we were but I think I may

18   not.

19   Q.    If I understand just touching and fondling, did it

20   progress to vaginal entry?

21   A.    Yes, we lived on a farm and mom took everybody

22   shopping one day and left me there.

23   Q     Was that something initially that --

24   A     He was able to.

25   Q     And?

1        A     Sometimes.

2        Q     Once it progressed there did that become a

3   regular thing or just an occasional thing.

4        A.    Yeah.

5        Q     How about oral, is that something he would expect

6   you to do frequently?

7        A     Yeah.

8        Q     Did that continue or did that quit?

9        A     Don't know.

10       Q     Did there come a time when he stopped asking you

11  to do any of those things?

12       A     He quit?

13       Q.    He just wouldn't ask you.

14       A     He would just do whatever he wanted.

15       Q     He never --

16       A     Right.  I used to take Tommy but Tom, put Tommy in

17  bed with me but he would take Tommy and put him in his own

18  bed.

19       Q     So that didn't work?

20       A     I wasn't allowed to stay in anybody's house over

21  night.  I couldn't have friends over.

22       Q     He would always have access to you?

23       A     Probably or so nobody else would find out.  My

24  sister knew, Patty knew.

25       Q     She has seen him, is she the one that caught him?

1    A    Yes.  She knew for a long time.

2    Q    How would she know?

3    A    She was going to spend the night in my room.

4    Q    I am sorry, where were you?

5    A.   I think she was going to spend the night in my

6    room.  And at a trailer my room had been built and then like

7    wholly another room.  My closet wasn't finished.  So the

8    bathroom of the trailer a window you could see into my

9    room."

10   Q.   Is that the way you recall having seen that

11   video, ma'am?

12   A    Yes.

13   Q    And particularly were there, and Lisa mentions it,

14   were there independent people who actually whose reports you

15   had seen confirming that the sexual abuse was going on?

16   A    That was my understanding from the reports.

17   Q    And basically it was Patty who had seen it going

18   on?

19   A    Yes.

20   Q    And I share with you she has already testified to

21   the jury she saw that.

22        Ma'am, just kind of reaching the ultimate, Doctor

23   Logan actually shared with the jury his notion that possibly

24   what Lisa was doing with the whole Tommy situation was she

25   can't face the horror of what she did, is that certainly one

1    explanation for the whole Tommy question?

2         A    I think that it is -- it is certainly possible.

3    The Lisa I saw when I interviewed her in January was

4    distraught through a good chunk of time for that day, trying

5    to piece together what happened, did I do this, what is that

6    about.  What is real, what is not.  How does Tommy fit into

7    this.  And describing chunks of what she remembered and what

8    she didn't and trying, could I possibly have done this, was

9    something that was overwhelming thought to her.

10             MR. DUCHARDT:   Judge, play we approach.

11             THE COURT:  Yes.

12             (PROCEEDINGS OUTSIDE THE HEARING OF THE JURY)

13             MR. DUCHARDT:   It would be my intent to

14   specifically go into the results of the polygraph

15   examination with her but obviously I am approaching, letting

16   you know about that in light of your previous ruling.

17             THE COURT:   I think we have already covered that.

18   My ruling remains the same.

19             MR. DUCHARDT:   Very good.  Thank you.

20             (PROCEEDINGS IN THE HEARING OF THE JURY)

21             MR. DUCHARDT:   Ma'am that's all the further

22   questions.  These folks might have some additional questions

23   for you.

24                      RECROSS EXAMINATION

25   BY MS. CORDES.

1    Q.   Doctor Kuncel, just a few quick questions, to be

2    clear, that video clip that was just shown, the interview I

3    believe Mr. Duchardt said was the interview with Doctor

4    Martell, the government's expert, is that right?

5    A    Yes, that was my understanding that Doctor

6    Martell, was it was Doctor Martell, my understanding who was

7    talking with Doctor Dietz.

8    Q.   That interview was in the spring of 2007 after the

9    defendant was charged with the murder of Bobbie Jo Stinnett?

10   A    I don't remember the exact dates but they

11   interviewed her after I did in March, I think the summer.  I

12   am not sure.

13   Q.   My point she made those statements after she was

14   charged?

15   A    That she was incarcerated and charged from the

16   beginning is my understanding.  I am no legal expert and I

17   saw her after she had been charged and they did, too.  Maybe

18   I am misunderstanding.

19   Q    You also talked about Nancy Wallentini but Mr.

20   Duchardt brought that up there is nothing in her report that

21   mentions oral or anal sex, does it?

22   A    Not that I recall.

23   Q    And actually we have the testimony from when she

24   testified in this trial and she said as far as the range of,

25   eighth or ninth grade and continued for approximately two

1    years?

2        A    You have the document in front of you.

3        Q    But you testified today it was 12 to 17.

4        A    From other documents that she reported it

5    continued and quit when she was about 16, 17.  My

6    recollection is they're various reports how long it lasted

7    and it lasted until he permanently left the house which was

8    much later, I think.

9        Q    We are not aware of any reports that support 12 to

10   17 years of age, do you know what those are?

11       A    The 12 year old it seems to have come out of the

12   eighth grade, Mr. Duchardt said, that allegation.  That she

13   continued to be abused, as best I understood it, 13, 14, and

14   as long as he was in the house, when he permanently left.

15   He came and went is my understanding.

16            MS. CORDES:  Nothing further.

17                      FURTHER DIRECT EXAMINATION

18   BY MR. DUCHARDT:

19       Q    Ma'am, how long of a sexual abuse does it take

20   for a person to be damaged in the fashion that you have

21   described?

22       A    It can happen if it's done once.

23       Q    And particularly is this the kind of, were you

24   also taking into account all of the stripping naked of these

25   children to administer beatings to them from the time they

1  were four?

2      A    I'm talking about physical and sexual abuse as

3  best I can put together from the records what was happening

4  from the time she was a very little girl all the way through

5  her adolescence in one form or another.

6              MR. DUCHARDT:  Thank you.  That's all.

7              MS. CORDES:  Nothing further.

8              THE COURT:  That's all, Doctor Kuncel.  You are

9  excused.

10             MR. DUCHARDT:   May we approach.

11             THE COURT:  Yes.

12             (PROCEEDINGS OUTSIDE THE HEARING OF THE JURY)

13             THE COURT:   Did you get my pleading about Doctor

14  Gur's offer of proof on that.

15             THE COURT:   All right.  It's received and

16  denied.

17             MR. DUCHARDT:   Thank you and I am ready to rest.

18             THE COURT:   All right.

19             MR. WHITWORTH:  We have no rebuttal.

20             THE COURT:   I am going to send the jury to lunch

21  then until one o'clock, and we will do the argument then.

22             (PROCEEDINGS IN THE HEARING OF THE JURY)

23             MR. DUCHARDT:   Judge, the defense is resting in

24  the penalty phase of the trial.

25             THE COURT:  And, Mr. Whitworth, you don't have

1  anything further either.

2      MR. WHITWORTH:   No, Your Honor.

3      THE COURT:  Thank you.  Ladies and gentlemen, that

4  concludes the evidence in this case and I am going to go

5  ahead and send you to lunch at this time and ask you to be

6  back in the jury room at one o'clock.  And at one o'clock I

7  will read my final instructions in this phase of the trial

8  to you and after that the attorneys will again have an

9  opportunity to argue the case at this stage and then it will

10 be submitted to you for your deliberations.

11     So please keep the instructions I have given you

12 previously in mind and be back in the jury room at one

13 o'clock.  Thank you.

14     (The jury leaves the courtroom.)

15     THE COURT:  I don't think we have anything further

16 to talk about, do we, Mr. Whitworth.

17     MR. WHITWORTH:   No.

18     THE COURT:  Mr. Duchardt.

19     MR. DUCHARDT:   No.

20     THE COURT:  See you at one o'clock.

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11          (Instructions were read to the jury. Closing

12   arguments were given on behalf of the plaintiff and the

13   defendant.  The jury retired to deliberate and returned on

14   October 26, 2007 with a verdict for the death penalty.)

15

16

17

18

19

20

21

22

23

24

25

CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

1

2     MS. KETCHMARK:  Bobbie Jo was in the sanctity of

3 her own home.  Victoria Jo was the in the sanctity of her

4 mother's womb.  Mother and daughter.  This mother and

5 daughter were the most innocent and vulnerable.

6     On December 16, 2004 this defendant violated

7 Bobbie Jo and Victoria Jo in the most wicked and evil way

8 imaginble and then left Bobbie Jo's lifeless and multilated

9 body on a blood-soaked floor for Bobbie Jo's mother to

10 find.

11     The death penalty is reserved for the worse

12 crime.  This crime is the worse.  It is horrific.  I want to

13 go over and walk through the verdict form Judge Fenner has

14 outlined as the process you will take in reaching your

15 penalty verdict.

16     The first thing we have to prove beyond a

17 reasonable doubt is that this defendant was 18 years at the

18 time of time offense.  And the parties have stipulated this

19 is not an issue.  So you must complete the verdict form as

20 to section one.

21     Section two, intent.  This defendant intended to

22 kill Bobbie Jo Stinnett or intended to injure which resulted

23 in the death by strangulation.  We presented, you listened

24 to, I don't remember, I think in three or four weeks, fifty

25 witnesses.  You have heard so much testimony barraged at

1  you.  Doctor Laboy testified that the cause of death was
2  ligature strangulation.  Dr. Mary Case confirmed it.  This
3  is not a question.  Cause of death, ligature strangulation.
4  Manner of death, homicide.  Section two.

5  You then move into the statutory aggravators,
6  kidnapping resulting in death, grave risk of death to
7  Victoria Jo.  And this is very abbreviated, we will go into
8  in a little detail in just a minute, especially heinous or
9  depraved killing, substantial planning and premeditation.
10  And, fifth, that Bobbie Jo was vulnerable.

11  After you look at the five statutory aggravators
12  we must prove at least one, all five are clear.  You move to
13  the non statutory aggravators.  And in this case it's the
14  victim impact.

15  So let's go to the first statutory aggravator,
16  kidnapping resulting in death.

17  Instruction number 7 sets forth the kidnapping
18  resulting in death.  When you look at this, this is
19  virtually identical to your instruction in the guilt phase,
20  the first element, second, third and four, there is a minor
21  change in words.  I think mother is added or not added.
22  You have already returned, you know this was proven beyond a
23  reasonable doubt.  We have established statutory aggravator
24  number one.

25  Instruction number 3, I point this out, applies

1   to all the aggravators, all the evidence.  You may consider

2   any evidence that was presented during the guilt phase of

3   the trial as well as the evidence that was presented at the

4   sentencing phase of trial.  Just keep that in mind.  It is

5   the whole three plus weeks.

6       Move to statutory aggravator number two, grave

7   risk of death to Victoria Jo.  This was a crude C. section

8   with a kitchen knife.  Her training, she researched this on

9   the internet.  Minimal training to perform this surgery.

10  Obviously there were no nurses, doctors, medical equipment.

11  After the murder and kidnapping she seeks no medical

12  assistance for this four week premature baby.  No assessment

13  of the lungs, the heart.  No, she just goes and parades this

14  baby in the cold.  Thank God Victoria Jo lived.

15      Aggravating statutory number 3, especially heinous

16  or depraved killing.  It is the United States' burden to

17  prove to you beyond a reasonable doubt that the heinous and

18  the depraveed nature of this crime.  You guys had to view

19  some gruesome photographs in the guilt phase.  Remember it's

20  the defendant that brought the gruesomeness into this

21  courtroom.  It's our burden to prove the heinous and

22  depraved nature now.  So we have to look at the evidence.

23  And it's your duty to look at the evidence and evaluate the

24  evidence, the multiple blows to her head.

25      I am going to have to show these pictures again.

1  I want to cover once again the heinous, the depraved, the

2  blow to the right side of the head, temporal area, blunt

3  force trauma to the right side of the head, the trauma, the

4  impact to the front of her face, right at the bridge of the

5  nose, fresh contusion, injuries to both elbows. Both on the

6  right elbow and consistent on the other side on the left

7  elbow as she's struggling to protect herself and her little

8  girl as is she is being inflicted with trauma about her

9  head, strangulation. She's struggling with her elbows. You

10 know the defendant cut her hand as this defendant is using

11 the knife to mutilate her body and that's all Bobbie Jo has

12 is her hands.

13       The multiple ligature marks on the neck. You have

14 seen these before, multiple marks on the left side of Bobbie

15 Jo's neck. It goes around to the right side of her neck and

16 then all the injury about her head and her face, the

17 strangulation injury. Her face is covered with petechiae,

18 burst blood vessels all on her forehead and on the side, all

19 on her face. When you look close to her eyes you can see

20 blue where there is bruising, so much pressure and

21 strangulation. And then when you look at her eyes she has

22 pooling under her left eye, below and above and her right

23 eye. She's just keeping blood from pouring out of her

24 eyes. And look at the ragged abdomen cavity. This is

25 vicious. As this defendant cut and cut deeper and deeper

1    into Bobbie Jo's delicate womb when you get the autopsy and
2    you clean off the horror it doesn't get any better, it's
3    just more clear how this defendant multilated her.

4          Doctor Laboy testified that were at least five
5    independent marks, start and stop marks on the top and two
6    on the bottom,

7          The multilation and injury to Bobbie Jo.  Mr.
8    O'Connor said it is unthinkable, it is unimagineable, it is
9    unspeakable, it is off the chart.  Death is warranted in
10   this case,.

11          Statutory aggravator number four.  We didn't have
12   to prove premeditation during the guilt phase but we did.
13   But the substantial planning, premeditation is an
14   aggravating factor, the planning and the premeditation, the
15   targeting of Bobbie Jo.

16          This defendant is a cold-blooded predator and
17   Bobbie Jo was her prey.  This defendant looked at Bobbie
18   Jo's image event account over and over and over looking at
19   her and her pictures.  Over a month before the murder,
20   November 8th, she sent a message to Bobbie, "When are you
21   due, Bobbie."  Hindsight is 20-20.  We know what it's all
22   about now.  On November 16th, part the her message was "I
23   don't know how far you are from me."  You know what she's
24   thinking.  "I couldn't remember where you lived in
25   Missouri." but was thinking it was within a day drive to and

froe, went over this in the guilt phase. It's sickening.
The C. section research over and over. She's a smart, she's
a smart defendant. Didn't take her too much training. The
defense wants to candy coat this C. section research, a
goat, a dog. Hindsight is 20, 20. We know why she was
researching C. section. And we know what this defendant did
with her research. She's a quick learner and she performed
a C. section just as the internet showed.

What do we know about the day before the murder.
Her practice round, the morning of December 15th. Agent
Lapanovich was able to track her movements to the Skidmore
area. And then in the afternoon when she gets back home
within one minute of getting on her computer what does she
do. She creates a deceptive way to get inside the home of
Bobbie Jo Stinnett. That afternoon, on December 15th, part
of her e-mail "I would like to at least see them all."
She's so calculating and so manipulating. You know what
that means, we can't meet in a public place and you bring
one dog, I need to go to your home. "I would like to at
least see them all." It's horrific.

The day of the murder, the first thing in the
morning, destroys computer evidence. There is no doubt she
knows the wrongfulness of what she is thinking, what she is
planning, what she is going to do, what she did, what she
tried to cover up. She's equipped to kill and kidnap. Like

a horror movie. She gets a baby carrier, a diaper bag,
packed bottles, diapers. She gets the umbilical cord
clamp. She gets a suction ball. She takes the rope. She
takes the knife and she hides them in her pocket when she
knocks on that door. The planning and the premeditation and
the execution is horrifying, horrifying.

The death penalty is warranted in this case.
Ladies and gentlemen, if not now then when? If not this
defendant, then who.

Let's look at statutory aggravator
number five. Bobbie Jo was vulnerable. You remember
Doctor Holman's testimony He's a O. B. G. Y. N. that went
to the emergency room. You are not at your physical best at
eight months pregnant, at your 36 week pregnancy. You can
tip your unstable balance, unstable gait. You are not as
strong, not as quick. Bottom line is you are less able to
avoid, resist or withstand an attack.

Five aggravator factors, we have all five. This
is not a numbers game, -- this is weighing. We have five
statutory aggravators, one non-statutory, not sure, they
have 19 mitigating factors they are claiming. It's not a
numbers game. Judge Fenner has mentioned this repeatedly
and please remember this.

When we move to the non statutory
aggravator, victim impact. And you now know Bobbie Jo was

1   a beautiful woman inside and out.  And she was loved by so

2   many.  Becky will never be able to give her only daughter

3   the new mother advice and counseling and Zeb will never be

4   able to give his daughter her mother back.  Victoria Jo will

5   never be able to give her mother a hug.  And Bobbie Jo will

6   never be able to give her daughter the love she dreamed

7   about.  But, ladies and gentlemen, you can give this family

8   the justice they so desperately need, the justice they

9   deserve.

10          This case is death worthy.  The defense has asked

11  you to focus now on their mitigating factors about the who.

12  They presented you with evidence about the defendant's

13  childhood, the defendant's long lost relatives, the

14  defendant's self portrait, the defendant's tatting and

15  crafting.  They have presented you with all evidence about

16  Lisa.

17          And then the defense continues to try to explain,

18  why we already know, why isn't pseudocyesis or post

19  traumatic stress disorder.  Now they are saying the why is

20  because of child abuse.  That's what the defense has to

21  offer you.   What happened twenty years ago.  Nine hundred

22  thousand children victims every year, ninety thousand

23  victims of sexual abuse a year.

24          Let's take a look at their mitigators.  Severe

25  mental or emotional disturbance.  She may have some post

1    traumatic stress disorder.  It didn't have anything to do

2    with her thinking or her conduct what she did.  And it may

3    have been caused by what she did to Bobbie Jo Stinnett.  Her

4    disturbance, she has a behavioral problem.  She shouldn't

5    get points for having a behavioral problem.

6            The wrongfulness of her conduct, we have been over

7    this.  There is no doubt she's very clear on the

8    wrongfulness of what she did, the history of criminal

9    conduct, now this.

10           If you find the defendant has never been caught,

11   convicted or arrested, let's look at her criminal conduct.

12   Admitted drug use, under age drinking, drinking and driving,

13   false police report against brother, perjury and then the

14   abuse and neglect of her children.  And she's supposed to

15   get points for this mitigator.

16           Mitigating factor, physical, sexual and emotional

17   abuse that occurred twenty years ago.  And then I think

18   there was one that said in the continued abuse as an adult

19   by her mother, Judy Shaughnessy, the abusive excuse.  There

20   is no room for excuses in this courtroom.

21           We understand she was physically and sexually

22   abused when she was a child.  We understand that at age 36

23   she had some time to seek treatment herself.  It's never her

24   responsibility.  When you read the mitigating factors it's

25   not her responsibility, it's not her fault, everybody else

1   should have been getting this adult woman counseling.

2         The defense argues because she was a good inmate,

3   a good worker, a good relative, a good wife, a good mother

4   that that is a pass. Well, we know she wasn't a good

5   mother. She was a lazy worker. Tried to trick you into

6   thinking she's got three jobs at 60, 70, whatever hours a

7   week. You can ask for the evidence when you go back if you

8   want to pull out some of her work records. Don't be

9   tricked. Look at the records. She wasn't even employed

10  several weeks before the murder except for at Greyhound

11  where she could bring her kids, she could bring books, she

12  could get on computer. And they were trying to say she was

13  so stressed because she worked three jobs, sixty plus hours

14  a week. She was the mother of four, she was stressed, she

15  could not help but do this. There is no room for that in

16  this courtroom. A good mother, no, she was not a good

17  mother. She should not get points for abusing and

18  neglecting her children. She hardly went to their events.

19  She called them stupid. She would beat them on the arm with

20  a flashlight. She didn't cook. She didn't clean. The kids

21  waited on her. The kids nurtured her, provided money to

22  her. She lied to her children, to her husband. It's a way

23  of life. Deception, manipulation is a way of life and they

24  want you to give her credit and say she's a good wife, a

25  good mother.

1          She never apologized for her actions.  Like I

2    said, it's not her fault, her extended family set her up for

3    this.

4          Then the mitigating factor that the defense brings

5    to you.  The defendant, she helps and teaches other inmates

6    crafts and tatting and other things.

7          Let's talk about the handiwork of this defendant

8    in this case.  Let's talk about her handiwork as she got on

9    the computer and researched C. section, emergency C.

10   section, premature enfant, her handiwork when she

11   deceptively created Darlene FischerFischer4kids to get

12   inside Bobbie Jo's home.  Let's look at her handiwork when

13   she got that rope wrapped around Bobbie Jo's throat and

14   pulled it tighter and tighter.  Look at her handiwork and

15   look at her handiwork when she got the knife and she

16   mutilated Bobbie Jo Stinnett.  That's her handiwork.  And

17   look at the defendant's handiwork when she reached inside

18   Bobbie Jo Stinnett's body and pulled Victoria Jo with her

19   own hands to take her and claim her as her own.  And look at

20   this defendant's handiwork afterward when she gloated and

21   paraded this premature enfant in mid December around town

22   with the blood of the real mother under her fingernails.

23   The tatting of this defendant, the tatting of this defendant

24   is irrelevant.

25         THE COURT:  All right, ladies and gentlemen, we

1    are going to take a recess now for about 15 minutes.  Please

2    be back in the jury room at two twenty five and keep the

3    instruction I have given you previously in mind.

4              (PROCEEDINGS OUTSIDE THE PRESENCE OF THE JURY)

5              MR. DUCHARDT:   Two things, Judge, in the argument

6    of Miss Ketchmark I believe raised the specter again of the

7    lack of an apology, lack of remorse.  And I raised this

8    question once before and I raise it again.  I object to that

9    comment.  I would ask the court consider a mistrial since

10   the matter was not pled or proven.

11             THE COURT:  In what fashion do you claim Miss

12   Ketchmark addressed that?

13             MR. DUCHARDT:   She specifically said it here.

14             MR. OWEN:  No apology

15             MR. DUCHARDT:   She never apologized for her

16   actions and that was basically the same point I had made

17   earlier.

18             THE COURT:   Objection is noted for the record.

19   Overruled.

20             MR. DUCHARDT:   Also we had not specifically made

21   a record about the objections I made again renewed over

22   night, the particular aggravating factors.  And I am sure

23   the court saw my pleading about that and I just wanted to

24   make sure for the report it's clear.

25             THE COURT:  I did and I considered that as having

1   been timely filed and overruled.

2          MR. DUCHARDT:  Thank you, sir.

3          (PROCEEDINGS IN THE HEARING OF THE JURY)

4                      RECESS

5          THE COURT:  Thank you.  You can be seated.  Tracy,

6   bring the jury in.  Thank you.  Everyone can be seated. Mr.

7   Duchardt.

8          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

9          MR. DUCHARDT:   May the court please.  Good

10  afternoon.  From the first time I talked to each of you back

11  in voir dire you knew that if we got to this point I would

12  be here asking for one thing, and that's for not death but

13  life.

14         What I have got to figure out is how to touch your

15  hearts and your minds to make you feel that is the right

16  decision.  What I knew from the beginning, what we knew from

17  the beginning, is that we were not going to do that by in

18  any way trying to minimize what happened to Bobbie Jo, what

19  has happened to Becky Harper, what has happened to Zeb

20  Stinnett, what has happened to Bobbie Jo's family.  We don't

21  do it.  We haven't done it from the beginning and we won't

22  do it now.

23         Miss Ketchmark talked to you about how bad what

24  happened is, but that's only half of what you consider in

25  deciding whether the death penalty is the appropriate

sentence because it's not just the crime you have to look at just like the judge told you in your instructions. It is the person. It is the who of Lisa that you look at as well because you are to look at not just aggravating factors but you are to look at mitigating factors and weigh. And that's the reason not only was it good for us to do it and right, it was fair, it was just and we have brought you the things we ask you to consider in deciding that life is the right thing to do.

And that starts out in what you are thinking about. And what you have to think about with what I said in my opening statement which is the why that this happened. And you have heard experts, Doctor Ramachandran and Doctor Logan talk to you about pseudocyesis. You have had all of the experts talk to you about borderline personality disorder. You have had all experts talk to you about post traumatic stress disorder. You even had the lawyers on both sides say that mental illness is in this case. What you all have made of that, none of us can know for sure except you found that mental illness, we didn't prove it rose to the level of by clear and convincing evidence that Lisa did not know and appreciate the nature, quality and wrongfulness of her conduct.

But there is something that everybody has to agree, whether you think that Lisa was obsessed about babies

because of pseudocyesis or because of some other mental
illness, my gosh, look at this obsession. What causes a
woman to make the end-all and be-all of her existence,
everything she does on the internet, everything she does in
her existence comes down to needing and wanting this baby.

What is that all about. What it's all about you
know. It comes down to this horrific childhood she had.
Does any one of you think that we would be here at all if it
wasn't for that horrific childhood. Do you think for a
minute that Lisa would have done any of this if none of that
would have happened, if she would have had the kind of
wonderful upbringing I am sure everybody at this table had
had. Do you think for a minute we would be here right now
if it wasn't for that.

This is layer upon layer upon layer upon layer.
This is not a one-time abuse. This starts with abandonment.
It starts when she was very, very young with her father
leaving. And he explained it to you. He was so sad that he
had to admit he abandoned Lisa and Diane at a very young
age. But he explained to you what was going on with Judy
and what she was doing. But Lisa doesn't know all this.
Daddy is here, he loves me, he's gone.

Then take on top of that the situation with
Diane. And Judy, Judy comes in here and says, oh, I tried
to keep Diane, but Diane tells you differently. Diane tells

you she was mother to Lisa and Patty.  That she's the one
because of a few years older she was taking care of them and
when she's dragged out of that home she doesn't know what is
going on other than the Judy telling her it's her fault.

What happens here is Lisa learns something, a
lesson, nothing is safe, nothing is for sure.  If I do
something wrong and I am the one who is next to get yanked
out the door and taken, who knows where.  It's serious in
itself.

But then take the next layer. Judy has been
cavalier with her relationships already.  You heard it from
both John and Diane about the men fighting over her in the
front yard, about Diane trying to protect those kids, Lisa
and Patty, from the skirt of Judy trying to force his way
in.  And what does Judy then do.  She, of course, hop
scotches the country through Lisa's young life.  And I
showed you that diagram of the move after move after move
after move after move.  There is no stability for the
child.

But then some stability comes but what does it
come in the form of.  A man by the name of Jack Kleiner.
Jack Kleiner is a brutal, sadistic, perverted alcoholic.
Jack Kleiner took pleasure in whipping these little girls.
It doesn't go on for just a little while.  It goes on from
the time they're age 4, Patty put it I don't remember a time

that he wasn't doing that to us. What a degrading way of
doing it, stripping them naked and beats them. And so when
you have got that kind of perverted stuff it takes its
unfortunate course to exactly where it went, which is then
starts abusing Lisa, fondling her and raping her and
sodomizing her and doing it whenever he pleases from the
time she's in about eighth grade all the way up until her
mother catches them on the floor just before her 16th
birthday. She boots the guy out but then comes right back.

What does a little girl learn from all that. What
she learns is that she's a sex tool or toy, that's her only
value. And she learns it day after day, year after year.
What do you expect when she grows up but that she becomes
promiscuous. She doesn't have any better sense of herself
than that. She doesn't think any more of herself than
that.

The question comes up how long was this going
on. Was it going on for years. How many times. Well,
Doctor Kuncel tells you it only takes once. And I have
heard a poem that basically goes something like that about
rape of a woman just once. Rape is a nightmare of
unexpressable terror and yet I recount the story to others
in search for an understanding I never see. Where are the
people that can comprehend the intensity and magnitude of
emotions I feel. People need to understand what violation

of one's total being means because rape is the composite of
all the worse crimes. It is the murder of cultural
innocence, the theft of one's private self, the kidnapping
of a mind, the assault of a personality. Rape is mental as
well as physical, a point society fails to understand and
the feelings of vulnerability afterward scare the victim
into a lifetime of paranoid suspicion of all men beyond
one's intimate friends. The worse injuries never heal. Do
you understand it. I don't think so, I don't think they're
people who can understand, but Lisa it wasn't just once.
It's repeated over and over and over again. It's not five
times, it's not fifty times, it's whenever Jack Kleiner
wanted it. It was so blatant the other kids saw it. And
they told you about it. The only thing she thought she was
functional as is a sex object.

somebody might say why didn't she cry for help.
Well, who was she going to cry to. Who is she going to cry
to. Patty told her mother it was going on and her mother
wouldn't believe it until she saw it with her own eyes and
then only takes Lisa to get counseling about ten months
after she learns about the abuse, and then only to try to
keep custody of the other kids.

What is she telling Lisa through all of that about
Lisa's worth. Then not only all of that she tells Lisa it's
her fault, she's the one responsible for this. And Judy

1     came up here and swore to you all she has never said that to

2     anybody, she has never blamed Lisa for her abuse, she never

3     said Lisa stole my man. And then we paraded the litany of

4     witnesses including members of her own family, all the way

5     up through Wendy Treibs, telling you that just this last

6     week she talks to Judy and Judy was still saying this.

7          What does a kid think when her mother is the one

8     who keeps blaming her for something that can't possibly be

9     her fault. And we know what Judy did about all of this.

10    She did nothing. She didn't tell the police. She didn't

11    get Jack prosecuted. Mr. Whitworth told you in his closing

12    argument he would have liked to have prosecuted Jack

13    Kleiner.

14          But now we hear about the quote, unquote abuse

15    excuse. Folks, this isn't an excuse. It is explaining to

16    you how Lisa got to this point. It's telling you who the

17    person was on December 16, 2004, the person parading around

18    that baby on December the 17th, 2004, the person who is here

19    before you right now. And that's a person who basically

20    suffered years of abuse from a man who threatened to hurt

21    her further, threatened to hurt her sister, to rape her

22    sister if she didn't comply. Who was she going to tell --

23    who was she going to tell. Why didn't she go get help. She

24    didn't think she was worthy of it. Why didn't she think she

25    was worthy of it. Because everybody has told her that,

everybody who is supposed to think she's worth something, that she is worthless, told her that she is worthless.

They say tens of thousands of children are abused, that many of them recover. And yet their own experts explain when that occurs, it happens when you have got loving, supportive parents who help you through the situation. And, no, that isn't the case with Lisa. Her mother never supported her. Her mother always found things wrong with her. Her mother always blamed her for losing Jack. Wendy Treibs came in and told you, yes, that's exactly what happened.

The prosecutors want you to think that Lisa is making herself out to be a victim. Folks, she was a victim. She was a victim of the worse kind of sexual, degrading abuse you can witness. If you were thinking it up how can you think of much worse than this. All of this shapes the thought process, all of this gets that person to the point that they figure out what are the things in life that are important, what are the things that make sense to me. And everything that Lisa put together here is of abandonment, of abuse, of torment, to the point the only thing that gives her any joy, any pleasure, are those little babies. Is there anybody here who would think for one minute without that abuse that any of us would be here right now.

1    It is a place people grew up with the privilege

2 of having good parents to take care of them and try to stand

3 up here and tell you that Lisa should have bucked up and

4 done better. Shame on them. shame on them. This is a

5 woman who is at this point, who came to this point because

6 of people named Jack Kleiner and Judy Shaughnessy.

7    Now they want to say, oh, gosh Jack Kleiner and

8 Judy Shaughnessy didn't kill Bobbie Jo. And you know what,

9 they're right, they're right. They killed Lisa's soul.

10 They killed Lisa's soul.

11    Folks, you have all of the information about how

12 all of this happened. Whether you say that Lisa was on the

13 internet looking at all of those things planning to take a

14 baby or you believe that it was pseudocyesis, whether you

15 think that Lisa put together all of these steps she took

16 because of another mental illness or because of

17 pseudocyesis, which every one of those conclusions you reach

18 isn't that mental illness -- I ask you to say yes, it is. So

19 when you are looking at all those things they're issues you

20 look at after you have looked at the issues of the crime.

21 You look at the issues of the person. You look at the

22 aggravating factors and then you look at the mitigating

23 factors.

24    Judge Fenner gave you all the instructions. He

25 read them so well. He went through even every step of the

verdict form.  I just wanted to go back to this first
instruction related to the consideration of mitigating
factors.  It's before you consider the appropriate
punishment you must consider whether the defendant has
established the existence of any mitigating factors.  A
mitigating factor is a fact about the defendant's life and
character.  Again you are to consider life and character or
act, the circumstances surrounding the offense that would
suggest in fairness a sentence of death is not the most
appropriate punishment or that a lesser sentence is the more
appropriate punishment.  Unlike aggravating factors which
you must unanimously find proved beyond a reasonable doubt
in order to consider them in your deliberations the law does
not require unanimous agreement with regard to mitigating
factors.  Any juror persuaded of the existence of mitigating
factor must consider it in this case.  Further any juror
may consider a mitigating factor found by another juror even
if he or she did not find that to be mitigating.

I want to stop here for a second and ask you, tell
you, let you know these are decisions which each one of you
makes individually.  This whole issue about the existence of
mitigating factors and this whole notion of weighing is an
individual thought process and decision.  So I am asking not
only all of you but each of you to consider these factors.
It is the defendant's burden to establish any mitigating

factors but only by a preponderance of the evidence.  This
is a lesser standard of proof under the law than proof
beyond a reasonable doubt.  A factor is established by a
preponderance of the evidence if its existence is shown to
be more likely so than not so.  In other words, a
preponderance of the evidence means such evidence as when
considered and compared with that opposed to it produce in
your mind the belief that what is sought to be established
is more likely than not true.

         And then it goes on to talk to you about that form
that you are going to go through.  Judge Fenner did such a
wonderful job I am not going to try to go back and show you
all.  I may go back in a little bit and just remind you you
literally go through and consider each one of the mitigating
factors that I am going to talk about and decide if one of
you, two of you, three of you, all of you, believe that
those factors exist.

         Let's go to number 10.  Let's block out 4 through
7 for the jury.  These are the issues about Lisa's physical
and sexual abuse and psychological abuse.  Is there any
question but they exist.  I don't think so.  Lisa was a
victim of childhood physical and sexual abuse at the hands
of her stepfather Jack Kleiner and was psychologically and
emotionally damaged as a result of that abuse.  Even their
experts agree.  Do you need an expert to find that.  Lisa

Montgomery was a victim of childhood emotional abuse at the
hands of her mother, Judy Kleiner, now Judy Shaughnessy and
psychologically and emotionally damaged as a result of that
abuse.

You heard it, how early it started when Diane
Mattingly talked to you yesterday. You heard it already
from Patty and other witnesses's testimony. You could see
it just by seeing Judy Shaughnessy and how she is still not
telling the truth about what happened to Lisa and what she
has done to make this situation just that much worse.

number six, Lisa Montgomery continued to receive
emotional abuse from her mother, Judy Kleiner, now Judy
Shaughnessy into adult mode and has been psychologically and
emotionally damaged as a result of that abuse. Again Wendy
Treibs told you it's still going on.

Finally Lisa Montgomery never received adequate
treatment for the abuse which she received. Is there any
question about that. I don't think so.

Let's go to numbers 1 and 2. So then the
question, as I told you in opening statement, is a different
one than what you were asked in the first phase of the
case. You were asked two questions, whether Lisa
Montgomery's capacity to appreciate the wrongfulness of her
conduct or to conform her conduct to the requirements of the
law was significantly impaired. Essentially even though you

might not have found this was a defense to the charge in the first phase of the case, I ask you to find that to be true, to be proven. That these mental illnesses, whether you accept what the government's witnesses say or ours, that this is significant impairment this woman suffers because of the mental illness she has. You heard this through direct testimony from two experts in this phase of the case. Doctor Logan and Doctor Kuncel, both of whom indicated their belief that certainly Lisa meets this criteria. Then you also have, let's stay with that for just a second, also that Lisa committed the offense under severe emotional or mental disturbance. Again it seems to be here for the opinions of all of the experts but basically two experts, Doctor Logan and Doctor Kuncel said so particularly, and that's what the evidence tells you. No matter whether she has pseudocyesis or it was just the burning yin to have that baby and parade it around, what in the world caused all of this, it goes back to the abuse.

But these are all not only the things about this woman. As I told you in opening statement there is more to this woman, there is not this caricature they want to paint. And so we ask you to look at the other mitigating factors that are here.

Let's look at number 3. Lisa Montgomery does not have a significant prior history of other criminal conduct.

1  Miss Ketchmark did her little bullet points for you during

2  her argument which she didn't mention is that Lisa has no

3  prior criminal convictions.  None.

4       What they want to do is caricaturize the

5  particular things they want to pull out, things like

6  promiscuity, things like drug use, things like under age

7  alcohol abuse.  I think, world, do you think those kinds of

8  things happen to a girl who has been physically, sexually

9  and emotionally abused.  Is this any surprise.  But is that

10  an indication of a prior history that is in any way

11  significant by way of criminal conduct.

12       The answer, folks, is no.  She does not have a

13  significant prior history of other criminal conduct.

14       Let's go to number 8.  Despite having been the

15  victim of significant sexual, physical and emotional abuse

16  Lisa raised four good children and worked many jobs to

17  support her children.

18       Well, we go in Miss Ketchmark's argument to

19  tangents maybe all around this but let's go to the bottom

20  line of it.  You got to see some of those kids.  You got to

21  see what sweet kids they are.  You got to hear from their

22  dad, what great kids all four of them are.  And he, himself,

23  Carl Boman, the man who wrote those terrible e-mails to

24  Lisa, who admitted he was angry with her said she showed

25  those kids love, she always showed those kids love.  Was she

1   perfect at it, no.   Are you surprised with the upbringing

2   she had that she wasn't perfect at it.

3        My gosh, what is surprising she did as good as she

4   did, that she tried at it as hard as she did.  And yet these

5   folks, just like Judy Shaughnessy, can't give her credit

6   even for that.  Come on, come on, can't she have a break

7   even at this.  She has got the good kids and the works.  Oh,

8   well, when she was just about to have this baby she thought

9   she was going to have in 2004 she took time off from work,

10   we don't look at the body of all of the work she did over

11   the years.  I showed you that Social Security form in which

12   it shows the money even at these low-paying jobs she was

13   working she was making through 2000, 2001, 2002, 2003, 2004.

14   She was working three jobs at a time sometimes, folks.  They

15   can't deny that.  As much as they want to try, she's working

16   hours upon hours.  And as Kevin himself told you much of

17   that time, especially in 2001, 2002 up to when Kevin got his

18   job in 2003, Lisa was the bread winner of the house.  She

19   was supporting.

20        You know at times Carl couldn't pay his child

21   support, he was reluctant to admit it, but we even showed

22   him how far he was in arrears at least at one time. Lisa is

23   carrying the load for those children and she did it.

24        If you want to cherry pick one time or another

25   time or a particular time and say she's not working enough

1   hours to satisfy these folks, okay.  If you want to look at

2   proof in the pudding then you look at how those children

3   turned out.  And even though she made some mistakes what you

4   know by-in-large those kids turned out very well and it

5   turned out that way because right over there, that lady over

6   there made that happen.

7           let's go to number 9.  Lisa Montgomery's mental

8   health has substantially improved since her incarceration

9   because she is now receiving psychiatric treatment including

10  medication to address her condition.  You heard this from

11  Doctor McCandless.  Basically what you heard is that Doctor

12  McCandless has looked at the situation, has described the

13  situation she feels Lisa is in with her mental illnesses and

14  is giving her medication that seems to be helping her.

15  Seems to be no question about that.

16          Go to the next page.  Tatting is irrelevant, I

17  wrote it down so that I would not forget it.  Well, if I had

18  on there and the court had instructed you on tatting, then I

19  guess maybe we would have an issue about that but we brought

20  you the tatting because what we wanted you to understand is

21  not only that Lisa is using her time productively to keep

22  herself doing good things while incarcerated and not making

23  trouble.

24          We also wanted to explain to you how she is using

25  her skills to help others.  And that you heard completely

from Miss Collins, Miss Taylor and Miss Tinsley, the three
ladies who came in and testified from C. C. A. What they
told you is exactly what you have there. In the time she
has been incarcerated Lisa Montgomery has assisted other
inmates, particularly those who were younger than her and
those with disabilities, teaching other inmates crafts and
other things. And Lisa Montgomery would continue to do so
if sentenced to life imprisonment without the possibility of
release. Why is that important? Because you all have a
right to know what is likely to happen if you choose to
sentence to life imprisonment. And you know that because
you have got the history of what she is doing to this point.

Lisa Montgomery peaceably served her time awaiting
sentencing. We know that for sure. That's what the ladies
told you.

If Lisa Montgomery is sentenced to life
imprisonment without release she will serve her time
peaceably. Basically you know that because that's what she
has done to this point and every indication is of that. And
you know what. Go back to the lack of prior significant
criminal history. Trust me, folks, they're people who go to
jail, men and women who commit crimes inside there. Lisa is
not that kind of person. Lisa has shown you if you were to
entrust to a life sentence that she will be productive. She
will do things. She will make something of herself given

1    that time and that opportunity.

2        Now some might want to twist that around to say

3    Lisa wins.  I have heard the line before.  Or how is that

4    punishment because she's in a situation where she can still

5    do tatting, where she can still do other things.  Folks,

6    it's still punishment but the fact is is is a life thrown

7    away better than a life that is productive.  I submit to you

8    the life that is productive, the person who is going to use

9    that opportunity, the person who is going to take what is

10   given to them, that's important.  And I think it's important

11   probably to you all to know that if you were to do this,  if

12   you were to sentence to life that there is going to be

13   productivity in that life.

14       can we go to the next.  Lisa Montgomery continues

15   to attempt to offer advice, nurturance and and emotional

16   support to her children even while she has been

17   incarcerated.  You heard about that from the girls.  Desiree

18   and Chelsea, again how sweet are they.  What are they asked

19   about, Desiree is asked did you give your mother money, put

20   money on her books.  Of course she did.  Why did she do

21   that?  Because she loves her mother, a thousand dollars,

22   divide that up, folks, over the thousand plus days Lisa has

23   been in jail.  It isn't much in that context but it was

24   fortunate in what her daughter told to Lisa about her love

25   for her mother.  And you know from that just how much

Desiree loves her mother. Desiree loves her mother. They talked to you about how Lisa has helped them in years gone by, taking them different places, teaching them things and how they look forward to being able to continue to do that in the future.

Let's go to 14, if Miss Montgomery is sentenced to life imprisonment without the possibility of release she will continue to reach out to the children, to offer advice, nurturance and emotional support to the children even while incarcerated. Is there any doubt? No doubt in this world.

Kevin told you about his and Lisa's relationship. In a way how it's gotten stronger since they have been in this situation. In a way Lisa has protected, isn't that interesting, isn't it interesting how some things happen. How a woman who has always been, always felt like a sex object is now finally safe from sexual advances because she's in jail. And in some ways her relationship with her husband is better because of that, because now it's on a level that has nothing to do with sex, it has to do with friendship and support and love. It's a strong thing.

And then you heard an amazing story. Some things happen in cases that none of us necessarily figure on when we start. And the re-uniting of this family is something that happened. Comes out of tragedy. But these are people who care about each other, they have always cared about each

each other in their mind and heart. Now they know they will keep what they have found.

What about John Patterson's story about talking to Lisa and her telling him she forgives him. Nobody could have given that back.

Let's go to the last page. We may not have thought of everything that you might think is important as a mitigating factor, but you are allowed to consider anything as a mitigating factor. You are allowed to take the lead on that and come up with anything that you believe is important in that regard.

Once you have talked about and gone through the steps of deciding if they're aggravating factors and if they're mitigating factors you then weigh those aggravating and mitigating factors. There is a process you do that with but there is something I ask you to consider as you are making that weighing process and that's something that is called mercy.

Now they're some people who say that those who don't do mercy shouldn't get mercy, that a person who commits a crime doesn't deserve mercy. And I submit to you they don't get what that word means. If mercy was something that we deserved or, better put, if we are looking for something that people deserve we wouldn't call it mercy, we would call it something else. Mercy comes not as a

result of what the person does who receives it, it comes as a result of people who give it. And, better put, the best measure of mercy is not through the person who receives it, the measure of mercy is those people who give it.

I am not ashamed to ask you all for mercy. I ask you for mercy on behalf of Lisa and on behalf of all the people who care about her and you know them. You have heard from them and you know who they are. You have heard from them all, from family members, from friends, from people who care very much about her.

So how do you make the decision for life. Let's go to the beginning of your special verdict form and you start with the other issues but you get eventually to the mitigating factors and the judge has already told you each of them. We have been through each of them. So let's page through, let's page through past the mitigating factors to the next step. Then there is a determination you all make in weighing aggravating and mitigating factors. I ask you, each of you, in considering the aggravating and mitigating factors to do not find the aggravating factors outweigh the mitigating factors . I ask you to employ mercy in that decision-making process. I ask you to understand that if any one of you believes that the aggravating factors do not outweigh the mitigating factors that life imprisonment is the right sentence.

1    Is life imprisonment mercy?  Yes.  It is a measure

2  of the mercy that you all would have.  But is it also a

3  sentence that is incredibly severe?  The answer is yes.    If

4  it wasn't for the death penalty it would be the most severe

5  sentence in the law.  Because it means Lisa never goes home.

6  Lisa never goes to any events involving her children.  Lisa

7  never goes to a wedding.  Lisa never gets out to do

8  anything.  She stays in prison and she dies in prison.

9  That, folks, is punishment.  But I admit to you it is also

10  mercy.  What we ask for desperately is that you take the

11  opportunity you have here to give mercy but give a strong

12  punishment and find that life is the right sentence.

13    I could stand here for longer and talk to you some

14  more, try to find ways to touch you but I think these are

15  the things, they're things I want to leave each of you with,

16  that really life imprisonment will be justice in this case.

17  And I please ask you to do that.

18    Thanks all of you for all of the time, all of the

19  effort, all of the intense work you have done.   Thank you,

20  Your Honor.

21    THE COURT:  Mr. Whitworth.

22    FINAL CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

23    MR. WHITWORTH:   May it please the court, members

24  of the jury.  We went through the jury selection process

25  four weeks ago almost now.  We asked each of you to keep an

1    open mind, listen to all the evidence.  And you all said you

2    could do that.  We asked you if you would listen to all the

3    aggravated evidence and all the mitigation evidence and then

4    engage in the weighing process.  And when I asked each of

5    you the question of you if we proved to you the aggravated

6    evidence outweighed the mitigation evidence, whether you

7    could impose a sentence of death each one of you told us you

8    could do that.

9         Members of the jury, the evidence of the

10    defendant's guilt in this case is overwhelming.  And this

11    kind of brutal and senseless murder is the type of case that

12    warrants the maximum punishment under the law.  And this

13    case is one of those rare senseless murders that deserves

14    the ultimate punishment, a death sentence.  That's what we

15    are going to ask you to impose here today.  And when you go

16    back and deliberate we want you to carefully consider

17    everything you have heard during the course of this trial.

18    And if you do that, use your reason and common sense we are

19    hopeful you will arrive at the conclusion this case warrants

20    the death penalty.

21         .  Mr. Duchardt talked about a life sentence and they

22    want you to impose a life sentence.  It's understandable.  I

23    don't mean to make it a light sentence.  It's a very serious

24    penalty.  There is no question about it.  But in this

25    particular case if you give a life sentence you have to ask

yourself this question is that fair to the Stinnett family.
And make no mistake about it, and I will say it again, if
you give a life sentence in this case this defendant wins.
Is that justice.  Ask yourself that question inside of your
heart.

First, here are some questions I would like you to
ask yourself.

First, is that justice for the Stinnett family.

Second, are you really punishing Lisa Montgomery
severely if you give her a life sentence.  What we learned
yesterday she can read books all day in prison, something
that she loves to do.  She can make friends in prison and
she has.  She can tat, quilt and teach other inmates to do
the same things.  She gets to watch T. V.  She gets to use
the phone when she wants.  She gets to watch movies.  She
can call Kevin to get money from him.  And then she takes
that money she can buy things at the prison store.

When she gets sent off to federal prison she gets
even more opportunities for activities to engage in and she
doesn't have to cook three square meals a day.  Is she
really being punished severely in light of what she did in
this case if you give her a life sentence.  And in your good
conscience isn't a crime this vile, this personal, this
shocking, deserving of a death sentence.  Ask yourself that
question.

1    You know I want to talk about the defendant's
2  defense and as I sat through this trial and I listend to the
3  defense in this case all the mitigation evidence attempting
4  to put everybody else on trial, her attempt to put the blame
5  or how she turned out to be on her parents, her family,
6  things that happened to her over twenty years ago, her
7  failure to take responsibility for her actions, her attempt
8  to get you to feel sorry for her and to divert your
9  attention away from the fact she carefully planned out this
10  crime, it brought to mind an analogy I sometimes share with
11  juries.  And that is this, many years ago, I have an older
12  brother who lived in Japan with his wife and daughter and
13  moved, he was a missionary and was over there for many
14  years.  And when they moved away his little girl wrote, my
15  niece wrote me a letter and my wife, she was about eight or
16  nine years old.  At the time we got it back here in Missouri
17  I remember opening up and reading it that day.  And as I
18  read through the letter the letter, the things I read
19  through, a two page letter, it was full of grammatical
20  errors and misspelled words, bad punctuation.  And after I
21  read the two page letter I realized I didn't know what she
22  had said because I was focused on the grammatical errors.
23  So I went back through and read through it again.  And what
24  it was was a beautiful letter from a young girl telling us
25  how much she missed and how much she loved us.

1    And you know, members of the jury, that's what the
2  defense wants you to do.  They want you to focus on the
3  grammatical errors, things that don't have anything to do
4  with crime, all these things that happened twenty years
5  ago.  They want you to focus on that to divert your
6  attention away from what is the real issue in this case and
7  that is what this defendant did to Bobbie Jo Stinnett and
8  Victoria Jo Stinnett.  And please don't fall into that trap
9  of being distracted by all of these things, all of these
10  excuses this defendant wants you to fall into.

11    Now why should you impose a sentence of death in
12  this case.

13    First, there is no doubt she committed this
14  crime.  Recall the overwhelming evidence of guilt.  This
15  defendant by the time we started trial no longer even
16  contested she did it.  That's how overwhelming the evidence
17  was.  The substantial planning and premeditation we showed
18  you from the computer evidence.  The motive, you know what
19  the motive was.  The gruesome crime scene.  She was caught
20  with Victoria Jo in her lap in her home in Melvern a day
21  after the murder.  She confessed three times.  And we
22  removed any lingering doubt anyone might have by producing
23  the D. N. A. evidence which linked her to that knife and to
24  that bloody rope and to the blood under her fingernails.

25    You will never have to go to sleep at night for

the rest of your lives worried you somehow sentenced an innocent person. That's not an issue in this case. You could always have that feeling inside of you you didn't make a mistake, so she might be innocent. So you don't have to worry about that.

Now I am going to come back to some more reasons why you should impose a death sentence in a few minutes but I want to talk about the defendant's mitigation evidence in this case. Now before I go on to more reasons why the maximum punishment under the law is warranted here, I want to respond to some of Mr. Duchardt's arguments.

Let me say initially and I mean this, these lawyers, these fine lawyers on this side, they have done the best they could with a difficult case. This case is not about Fred Duchardt, John O'Connor, Dave Owen, me, Miss Ketchmark and Miss Cordes. We are irrelevant. This case is about the facts of what happened here and about this brutal senseless murder this defendant committed on Miss Stinnett in her home on December 16, 2004. That's what this case is about.

He asked you for mercy and, folks, I just want to tell you I don't want you to get caught up in some kind of guilt trip what we are asking you to do here. The only person that killed anybody is in the courtroom and she's sitting right over there. You are not going to be killing

anybody. What you are going to be doing if you impose a
sentence of death even for the the maximum punishment under
the law, you are not killing anybody. So don't get caught
up in any kind of guilt trip over what we are asking you to
do here today.

Now, the defendant called C. C. A. employees to
testify she was a well-behaved inmate, adapted well to
prison. Of course, I submit to you she's going to be on her
best behavior awaiting trial. She's smart. Keep that in
mind. And she wants to get bonus points for doing what
she's required to do and that is follow the rules at
C. C. A.

Finally I submit to you that what we learned from
those C. C. A. employees and what you learned is a little
bit about prison life and about all the things they can do
as prisoners. That's one thing that's good about the United
States, we take care our prisoners in custody, medical
needs. They get to see a psychaitrist if they are
depressed. They get medications. They get to eat decent
food, three meals a day. They have a lot of the same things
I have at home.

And I am not going to make light of being locked
up. There is nothing fun about that. But for what she did
she doesn't deserve to have all of that. Bobbie Jo will
never have that for the rest of her life. She will never

1    have it. She's gone.

2         Now you also saw the video clips, they put on a

3    string of video clips about the defendant taking her kids,

4    filming her kids at basketball, soccer games, football

5    games, music programs, vacations and that's great. You know

6    Bobbie Jo Stinnett will never get to do any of those things

7    with her daughter, with her husband. Because she took it

8    away. She will never get to experience. She wants credit

9    for that, for being a good mom -- after what she did.

10        And that's this good mom thing I have to tell you,

11   folks, I am not saying she's has no redeeming qualities but

12   I am going to tell you this. They tried to portray her as a

13   good, nurturing mother. Are you kiding me. What kind of

14   mother would do what she has done to her children with this

15   crime. What kind of mother would put their kids through

16   this. She's a good mom? You have got to be kidding me.

17        And then what, they apparently still live in a

18   filthy home. They had to do the cleaning and cooking and

19   she goes out and deceives the entire family by claiming to

20   be pregnant. She told them she had a miscarriage. Don't

21   you think that hurt back in '02, '03 she donated the baby to

22   science which is a big fat lie, don't you think that hurt

23   those kids. They lost a sibling. Don't you think that hurt

24   Kevin when he learned that. You learned your spouse, you

25   think had a miscarriage and the hurt that creates inside and

1    she does, she's a good mom.

2         And then after all of that she drags those kids

3    into court here to testify in this high profile case in

4    front of all these people and puts them through this again

5    and victimizes them again in front of the whole world.

6         MR. DUCHARDT:  Objection.  May we approach.

7         (PROCEEDINGS OUTSIDE THE HEARING OF THE JURY.)

8         MR. DUCHARDT:  It's an unfair argument, Your

9    Honor, it's imposing on the defendant's right to present

10   evidence.  And besides that it mischaracterizes what these

11   children did.  They volunteered and wanted to come and

12   counsel I think knows that because his people interviewed

13   those girls.

14        MR. WHITWORTH:   They subpoenaed the girls.

15        MR. DUCHARDT:   We subpoenaed them so they would

16   have the resources to get here.  They all wanted to come.

17        THE COURT:  Objection overruled.

18        MR. DUCHARDT:   May it be continuing.

19        THE COURT:  Yes.

20        (PROCEEDINGS IN THE HEARING OF THE JURY.

21        MR. WHITWORTH:  She drug these kids in here to

22   testify on her behalf.  Don't you think that's painful for

23   them.  She's a good mom?

24        Most of us, if we had children that we were

25   involved in a situation we would want them a thousand miles

away from this. We wouldn't make them come to court and testify.

We heard the evidence about the mental or emotional disturbance. Again it's the same thing, the same thing we heard for a week last week.

Now we had Doctor Logan back, Doctor Kuncel and we heard the same old excuses for what she has done, try to make up some kind of mental defense to excuse her conduct. And you know, you guys heard Doctor Kuncel testify this morning. That was very questionable. She ignored all the evidence on premeditation. She finally after Miss Cordes cross-examined her for about ten minutes that she found malingering on some of the tests. She always testifies for the defense. I think you should question her objectivity. You should question her reliability as a witness.

And you know I think we all kind of know what the mental defense here is. Folks, it's that she is selfish, manipulative, deceitful, narcissist and mean. She fits the profile of women who kidnaps infants, just like Doctor Dietz told us. And you heard from Doctor Martell. You heard about Doctor Hutchinson. You heard Doctor Kuncel, she tested high on the malingering or faking scales. Those tests speak for themselves. They can try to explain away all they want but they speak for themselves. She flunked the test, she's faking mental illness.

We also heard about abuse and neglect again. we put Judy Shaughnessy on trial. She's far from being a candidate for Mother of the Year, we all know that. But she didn't kill anyone. Jack Kleiner didn't kill anyone. This defendant did. And she is still trying to blame others for her actions. She calls in her long lost sister she hasn't seen in over 30 years, calls in her father who abandoned her over 35 years ago. Calls in Wendy Treibs, her cousin, who lives way down in Texas. Do these people really know her. Do they really know what she's like. They're not with her on a day-to-day basis.

Ask yourself this question, when is Lisa Montgomery going to take responsibility for her actions. When is that going to happen. She wants sympathy because she had bad parents. The sympathy in this case belongs with the Stinnett family. You heard the mitigation factor about raising four kids, she wants credit for raising four good kids. And they do seem to be pretty good kids, I will give them that, but I would submit to you that most of the credit probably belongs to the father, Carl Boman. He was the stable person in that family. When she was running around having affairs, running around on him, he stayed in the marriage to try, because he said for the kids, he stayed in the marriage for the children.

And then you know that she sent her 14 year old daughter to

1   live in Alabama with someone she barely knew in August of

2   2004, she sent her off. What kind of mother would do that.

3         We also know that two of the kids, Carl and

4   Chelsea, Carl, Junior and Chelsea, they were wanting to move

5   out in December of 2004. That's what that motion for change

6   of custody is. You all looked at it when you were

7   deliberating. They want to move to Oklahoma with their dad.

8   They didn't want to stay here with their good mom. Think

9   about that.

10        One of the mitigation factors is the loving

11   relationship with Kevin. Now you recall the testimony that

12   she told several people, you heard this, she was going to

13   leave Kevin before the murder occurred, she was thinking of

14   leaving. And then when she lies to him about the pregnancy

15   and victimizing him. And his parents, Roger and Joy

16   Montgomery, are nice people. She puts them through this.

17   she puts them through this, all those kids through this.

18   And then when she gets caught, she gets in jail, we find out

19   what kind of a manipulator she is. Kevin is her source for

20   money. And he gives her money. I feel sorry for him

21   because he's so naive he doesn't realize he's being taken

22   advantage of. It's so sad that he's doing that even though

23   he's not paying child support for his own sons. Isn't that

24   pathetic. Does that tell you something about her

25   character.

1    The sex abuse, it happened, it happened, sad.  But
2   it was a long, long time ago.  And can we use, let that
3   unfortunate situation that happened so long ago be used as
4   an excuse for a savage crime like this.

5    Members of the jury, as a society, we cannot let
6   this happen.  This case is not entirely United States versus
7   Jack Kleiner although at times I thought the defense was
8   trying to make it that way.  He was a bad guy.  He should
9   have been prosecuted sounds like.  But, folks, that's not
10  what we are here for, it's not United States versus Jack
11  Kleiner, United States versus Judy Shaughnessy, it's United
12  States versus Lisa Montgomery.

13   Get focused back on why we are here.  Mr. Duchardt
14  said that Jack and Judy killed Lisa's soul.  The only person
15  that killed anyone in this courtroom is sitting at defense
16  counsel table.  When is she going to take responsibility for
17  her actions.  When is she going to become personally
18  responsible for what she has done.  Looks like you are going
19  to have to do it.  She's never going to.  She's always going
20  to be in the blame game blaming others for her actions.

21   The 911 recording, I thought about playing it but
22  no-one should have to listen to that twice.  You heard the
23  sobbing of the mother.  Think about how you felt when you
24  heard it.  I am not going to subject you to that again.
25  That rips your heart out when you hear it.  And she is

1   responsible for that. She wants mercy. What kind of mercy
2   did she show Bobbie Jo Stinnett, no mercy. We know there
3   was a violent struggle in that house, blood all over that
4   room. What kind of mercy did she show Bobbie Jo stinnett
5   when she was grabbing the knife trying to stop the defendant
6   from cutting out her baby, she showed her no mercy. And I
7   submit you should show her no mercy with your verdict. The
8   scales of justice, we talked about that during jury
9   selection, and I said you weigh the aggravating evidence
10  against the mitigating evidence. Folks, the aggravating
11  factors, the heinousness of this offense, and look what she
12  did to this victim, doesn't that make the scales of justice
13  slam down, mitigating factors fly up.

14      Think about that. You to have weigh it. We
15  understand asking you to return a death verdict is asking a
16  great deal, extremely important decision, shouldn't be taken
17  lightly. We don't take it lightly and you shouldn't
18  either. But I ask you isn't this one of those rare cases
19  that is truly deserving of the maximum possible punishment,
20  it's warranted here. Some crimes are so shocking, so
21  violent, so evil, so over the top they warrant a death
22  sentence. This case, members of the jury, is one of those
23  crimes.

24      You know, members of the jury, Victoria Jo
25  Stinnett will never get to give her mom a Christmas card

like this. She's in kindergarten, reads "Here is my hand so
tiny, so small for you to hang upon the wall, for you to
watch as years go by how we grow, my hand and I." She will
never get to give one of those to her mom. And Bobbie Jo
will never get to have that wonderful warm feeling that
mothers get when their daughters give them a card like that
when they're five years old and so special you save it all
these years. She will never get to experience that feeling
because of Lisa Montgomery.

Now I going to sum up. On the morning of
December 16, 2004 Bobbie Jo Stinnett was a small town girl,
married to her high school sweetheart Zeb. She was
expecting her first child. She was happy. You heard about
her life. And she was robbed of her dreams by the
defendant.

I ask you today to please give the Stinnett family
justice. Please give Bobbie Jo justice. We are
recommending to you without any reservation whatsoever that
you impose a sentence of death.

I thank you for your attention. You have been a
great jury and I wish you the best in your deliberations.
Thank you.

(The jury retired to deliberate and on Friday,
October 26, 2007, as reflected by the court record, the jury
returned a verdict of death.)

1

2                     SENTENCING PROCEEDINGS

3          THE COURT:   Thank you.  You can be seated.  Are

4     you ready, Mr. Duchardt.

5          MR. DUCHARDT:  We are.

6          THE COURT:  Mr. Whitworth.

7          MR. WHITWORTH:  Yes, Your Honor.

8          THE COURT:  And, Mr. Duchardt, I am sure you have

9     had an opportunity to review and discuss the presentence

10    report with Miss Montgomery, is that correct.

11         MR. DUCHARDT:  Yes, sir, we have.

12         THE COURT:  You have noted several matters in

13    response to the presentence report.  And by way of the

14    information you sought to have included, some of that

15    information in relation to abuse suffered by the defendant

16    and treatment being provided to the defendant by Doctor

17    McCandless at C. C. A. has been included by way of the

18    information you have offered, would you agree with that?

19         MR. DUCHARDT:   Judge, I think Mr. Fowler handled

20    the debate about that very well and he has included all of

21    the information in there we wanted included in one way or

22    another.  And we could also take some additional steps if we

23    think the Bureau of Prisons needs additional information.  I

24    think he handled it very well.

25         THE COURT:  Thank you.  You also requested that

1  the presentence report be supplemented with additional

2  information from the psychiatric and other experts that you

3  offered at trial, specifically Doctor Gur, Doctor

4  Ramachandran and Doctor Logan's information.  And Mr. Fowler

5  has addressed those matters as well.  And I concur with Mr.

6  Fowler that given the rulings of the court and findings of

7  the jury that further supplementation of the presentence

8  report is not necessary in relation to those matters.

9          Do you want to discuss any of that any further?

10         MR. DUCHARDT:    No, Judge, again I think what he

11 has done, he has made mention of all of that in the report,

12 our positions on that.

13         I can take additional steps to get that

14 information directly to the Bureau of Prisons ourselves so I

15 am satisfied with the way the report has approached the

16 matter.

17         THE COURT:  As we all understand, given the jury's

18 finding in this case, the option of sentence is limited to

19 being consistent with the jury's finding, do you have

20 anything you would like to say or anything you would like to

21 offer before I pronounce sentence on Miss Montgomery.

22         MR. DUCHARDT:    Just briefly.  You were very kind

23 to give us ample opportunity to ask you to reconsider what

24 we felt were the critical rulings in the case.

25         You have done so.  You have ruled those matters

1   consistently as you did at trial and we respect those but as

2   I'm sure you understand, we have an honest disagreement with

3   you over those matters. And the appropriate thing for us to

4   do now is take those up on appeal as we have already

5   indicated in a previous pleading we intend to do so. But I

6   think you are exactly right in light of your rulings on the

7   motion for new trial and motion for judgment of acquittal,

8   The court is under the statute bound by what the jury's

9   recommendation was.

10         THE COURT: All right, thank you. Mr.

11   Duchardt, have you discussed with Miss Montgomery the fact

12   she has a right to speak today at the time of her

13   sentencing. I have, Judge, and she has indicated to me she

14   does not wish to exercise that right.

15         THE COURT: All right, thank you. Miss

16   Montgomery, is there anything you would like to say this

17   morning before I pronounce sentence on you, ma'am?

18         THE DEFENDANT: No.

19         THE COURT: Mr. Whitworth, do you have anything

20   further you would like to say or anything you would like to

21   offer?

22         MR. WHITWORTH: No, Your Honor.

23         THE COURT: Thank you. Given the jury's finding

24   in this case it is the judgment of the court that the

25   defendant, Lisa M. Montgomery is sentenced to death based

1   upon her conviction and the penalty imposed by the jury

2   herein.

3          The time, place and manner of execution are to be

4   determined by the Attorney General of the United States,

5   provided that the time shall not be sooner than 61 days or

6   later than 90 days after the date of this judgment.

7   However, if an appeal is taken from the conviction or

8   sentence execution of the judgment shall be stayed pending

9   further order of this court upon receipt of the mandate of

10  the Court of appeals upon review and final judgment herein.

11         It is further ordered that the defendant shall pay

12  to the United States a special assessment in the amount of

13  one hundred dollars which is due immediately.

14         The defendant, Miss Montgomery, is further

15  committed and to be retained in the custody of the Bureau of

16  Prisons to be confined until the sentence of death is

17  carried out.

18         Mr. Duchardt, is there anything further you are

19  aware of that needs to be addressed in this matter this

20  morning.

21         MR. DUCHARDT:  One thing.  May I approach.

22         THE COURT:   Yes.

23         MR. DUCHARDT:   On the issue of in forma pauperis,

24  is that something you think I need to take up with the court

25  of appeals or did I do it wrong?

1          THE COURT:  Generally, it's just my position I let

2     the court of appeals do that.  But I don't mind making that

3     determination in this case because it's pretty clear what

4     the circumstance is.

5          MR. DUCHARDT:  You want me renewal of the motion.

6          THE COURT:  Yes.

7          (CONFERENCE AT THE BENCH)

8          MR. DUCHARDT:  Now that sentence has happened,

9     that's what I will do on that.  The only other thing I

10    wanted to do also on the record, there were attachments to

11    our suggestions for the motion for new trial that because of

12    the size of them I couldn't get the electronic case filing

13    system to take those.  So I later, even though I provided

14    discs of those to the court directly and to Mr. Whitworth

15    directly, they did not actually show up on the docket sheets

16    until later when the clerk's office got a chance to do them.

17    I just wanted to make sure it was clear in the record so why

18    there was that appearance on the docket.  And those were the

19    only two other things I had.

20          THE COURT:  The record will reflect that.

21          (PROCEEDINGS IN OPEN COURT.)

22          THE COURT:  Mr. Fowler, is there anything further

23    you are aware of that needs to be addressed.

24          MR. FOWLER:  No, Your Honor.

25          THE COURT:  All right, thank you all.

<u>CERTIFICATION</u>

I certify that the transcript fees charged and the page format used conform with the requirements of this court and the judicial conference of the United States, but is not the exact format of the judicial conference only in order to enhance clarity and readability.

*Libby Shinn*

Official Court Reporter